Justin G. Reden, Bar No. 230068
Michael J. Riddell, Bar No. 252918
REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320
San Diego, CA 92127
Telephone: (619) 758-3869
Facsimile: (800) 746-5015
Email: *jreden@redenandreden.com*
Email: *mriddell@redenandreden.com*

Attorneys for Plaintiff MICHAEL GOERGEN

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| MICHAEL GOERGEN, as an individual<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN ARBITRATION ASSOCIATION, a not-for-profit New York corporation; BLACK ROCK COFFEE BAR, LLC, an Oregon limited liability company; GEORGE A. FINKLE, as an individual; and DOES 1 to 25<br><br>Defendants. | Case No.: 30-2022-01246861-CU-PA-CJC<br><br>**COMPLAINT FOR DECLARATORY AND RELATED INJUNCTIVE RELIEF** |

## SUMMARY OF ALLEGATIONS AND RELIEF

1.     Plaintiff MICHAEL GOERGEN ("Plaintiff") seeks declaratory and injunctive relief against Defendants regarding the non-existence and/or unenforceability of any contractual agreement to arbitrate certain disputes with Black Rock Coffee Bar ("BRCB") and the corresponding lack of jurisdiction or authority by the American Arbitration Association and/or Arbitrator George A. Finkle ("AAA") over Plaintiff in a pending private contractual arbitration currently pending with AAA.

**PARTIES**

2.      Plaintiff is an Oregon resident.

3.      Defendant BLACK ROCK COFFEE BAR, LLC ("BRCB") is an Oregon limited liability company, engaged in the business of marketing and selling franchises for coffee shops in multiple states including California. At all relevant times, BRCB was registered with the State of California's Department of Business Oversight as a California licensed franchisor, and it consented to jurisdiction here pursuant to California laws and regulations related to the marketing, sale, and operation of franchise business in California.

4.      Defendant AMERICAN ARBITRATION ASSOCIATION ("AAA") is a New York non-profit organization that conducts private contractual arbitrations within all 50 states including California. AAA has offices and/or provides arbitration services in Orange County, California. Despite numerous written objections, AAA and/or Arbitrator George A. Finkle is attempting to unilaterally impose arbitral jurisdiction and authority over Plaintiff in an arbitration proceeding designated as AAA Case No. 01-20-0005-4335. Which is being conducted pursuant to written agreements to which Plaintiff is not a party, did not sign, and did not otherwise consent or agree to.

5.      Defendant GEORGE A. FINKLE is an individual who works for, or on behalf of, AAA. AAA assigned George A. Finkle to the Arbitration at issue in this Complaint. The exact nature of the employment or contractual relationship between AAA and George A. Finkle relative to the Arbitration is presently unknown to Plaintiff, but Plaintiff is informed and believes that AAA and George A. Finkle are acting on behalf of one another, as agents for one another, in concert with one another, or at the direction or control of one another. AAA and George A. Finkle shall be referred to collectively and individually as "AAA."

6.      Plaintiff is ignorant of the true names and capacities of the Defendants sued in this Complaint as "DOES 1 through 25, inclusive," and therefore sue those Defendants by their fictitious names. Plaintiff shall seek leave to amend this Complaint to allege their true names and capacities when ascertained. On information and belief, each of the fictitiously named Defendants DOES 1 to 25 is subject to the jurisdiction of this Court and is responsible in some manner for the occurrences alleged in this Complaint, and Plaintiffs' damages, as alleged herein, were caused by

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

1  such Defendants' conduct.

2  **JURISDICTION AND VENUE**

3  7.     This Court has jurisdiction over this matter based on, *inter alia*, Code of Civil

4  Procedure ("CCP") §§ 395 and 410.10 in that, among other things, Plaintiff consents to jurisdiction

5  here.

6  8.     The underlying loan transaction(s) that Defendant BRCB complains of in the

7  Arbitration all took place in Orange County, California ("Loans"). The Loans are memorialized by

8  written agreements prepared, signed, and entered in Orange County, California. In conjunction with

9  the Loans, the lender filed a UCC 1 Financing Statement with the California Secretary of State. The

10  money loaned as well as other assets, security, and consideration are *res* within the state of

11  California.

12  9.     Defendants BRCB and AAA additionally conduct their business within the State of

13  California, County of Orange and are attempting to exercise jurisdiction or authority over

14  individuals, businesses, a Plaintiff, property, security, and assets within the state of California.

15  10.    BRCB markets and sells franchises within the State of California and is registered

16  with the California Department of Business Oversight.

17  11.    This Court has jurisdiction over this Action pursuant to the California Constitution

18  Section 1 (property rights), Section 3 (right to petition the government), Section 7 (right to due

19  process/equal protection) and Section 16 (right to civil cause trial by jury).  This Action primarily

20  seeks to preserve, protect and exercise those rights both for the sake of Plaintiff, and for the public

21  interest of similarly situated persons and entities.

22  12.    This Court has jurisdiction over the entire action because this is a civil action

23  seeking declaratory relief and equitable action.

24  13.    Venue is proper in Orange County, California for the foregoing reasons and because

25  Plaintiff has not consented to any alternate venue.

26  **GENERAL ALLEGATIONS**

27  14.    From 2007 through the present BRCB was a franchisor offering drive-through, sit-

28  down and combination retail franchise businesses specializing in espresso, coffee, and related

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

1  items, with the franchises operating under the name Black Rock Coffee Bar. BRCB was founded

2  by Jeffrey Hernandez and Daniel Brand; they, along with Jake Spellmeyer, and Bryan Pereboom

3  own and operate BRCB.

4      15.    From 2017-2019, BRCB entered into agreements and maintained

5  franchisor/franchisee relationships with a number of different coffee shop entities. For purposes

6  here the relevant franchisee entities are BR COFFEE, LLC, a Nevada limited liability company;

7  BR RAINBOW OP, LLC, a Nevada limited liability company; BR BLUE DIAMOND OP, LLC, a

8  Nevada limited liability company; BR SILVERADO RANCH OP, LLC, a Nevada limited liability

9  company; BR FT APACHE OP, LLC, a Nevada limited liability company and BR RAINBOW

10  NORTH OP LLC, a Nevada limited liability company (these entities are individually and

11  collectively referred to as the "Franchisees").

12      16.    Plaintiff entered into agreement titled Limited Guarantee of Franchise Agreement

13  ("Limited Guarantee") relating to BRCB's right to purchase the assets of the following Franchises:

14  BR Blue Diamond OP, LLC, BR Rainbow OP, LLC, and; BR Silverado Ranch OP, LLC.  Copies

15  of the Limited Guarantee agreements are attached as Exhibit 1.  The Limited Guarantee agreements

16  do not contain an arbitration provision. Additionally, they are narrowly limited to Plaintiff

17  guaranteeing the "timely payment and performance" relating to BRCB's right to purchase, if it

18  elected to do so, from franchisee any and all assets or property used in the operation of the

19  franchise.  Overall, the Limited Guarantee is someone irrelevant in that it is BRCB who incurs a

20  payment obligation in an asset purchase scenario, not franchisee. BRCB is not electing to trigger

21  the right to purchase assets and therefore the Limited Guarantee is moot.

22      17.    Beginning in 2018, The Robert Lattanzio Trust Dated 6/23/2006 ("Trust") agreed to

23  make a loan to BR Coffee, LLC to be used for the construction and operations of the anticipated

24  coffee shops. The Loans exceed 2.3mm and are secured, documented, and recorded. Attached as

25  Exhibit 2 is a true and correct copy of the Revolving Credit Note associated with the loans and

26  UCC 1 Financing Statement filed in California. Plaintiff is not a party to the loans or loan

27  agreements and is not a guarantor of them.

28      18.    A dispute developed between BRCB and Franchisees regarding the terms,

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

Michael Goergen v. American Arbitration Association, et al
Complaint for Declaratory and Related Injunctive Relief

1    conditions, operations, and obligations set forth in the written agreements between one another

2    ("Franchise Agreements"). The underlying dispute does not involve Plaintiff or the Loans. After

3    failed attempts to informally resolve their dispute, on May 26, 2020, the Franchisees filed suit

4    against BRCB, Jeffrey Hernandez, Daniel Brand, Jake Spellmeyer, and Bryan Pereboom, in

5    Orange County Superior Court (Case No. 30-2020-01145693).

6         19.    On May 29, 2020, BRCB submitted a demand for private contractual arbitration

7    with AAA. A true and correct copy of this demand is attached hereto as Exhibit 3. The named

8    Respondents are BR Coffee, LLC, BR Rainbow OP, LLC, BR Blue Diamond OP, LLC, BR Ft

9    Apache OP, LLC, and BR Rainbow North OP, LLC. Plaintiff is <u>not</u> named or referenced in this

10   Arbitration Demand. BRCB and Plaintiff do not have a contract between one another and therefore

11   are not required to submit any disputes amongst themselves to private contractual arbitration.

12        20.    On June 16, 2020, Franchisees objected to the arbitration.

13        21.    In light of the June 16, 2020, objection to arbitration, on June 17, 2020, BRCB filed

14   a Petition to Compel Franchisees to arbitration.  The Petition was filed in Federal District Court in

15   Portland, Oregon. Plaintiff was <u>not</u> named or referenced in BRCB's Petition, request, or the

16   resulting Order compelling Franchisees' compliance with the contractual agreement to arbitrate.

17        22.    On July 21, 2020, Franchisees filed an opposition to BRCB's Petition to Compel

18   Arbitration. Since Plaintiff was not named in the Arbitration demand or the Petition to Compel

19   Arbitration, it was not included in the opposition to the Petition.

20        23.    On August 14, 2020, the Federal District Court issued its Order compelling

21   arbitration between BRCB and Franchisees. A true and correct copy of that order is attached hereto

22   as Exhibit 4. The Order <u>does not</u> compel Plaintiff to participate in the Arbitration.

23        24.    After the Order issued compelling certain parties to comply with contractual

24   arbitration requirements, on September 4, 2020, BRCB filed its First Amended Arbitration Demand

25   with AAA relative to those parties Ordered to the Arbitration. A true and correct copy of this

26   demand, without exhibits, is attached hereto as Exhibit 5. Plaintiff is <u>not</u> named or referenced in

27   this First Amended Arbitration Demand.

28        25.    On September 25, 2020, Franchisees answered the First Amended Arbitration

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

Demand and presented counterclaims. A true and correct copy of the Answer and Counterclaims are attached hereto as Exhibit 6. Plaintiff is <u>not</u> a party to, named, or referenced therein.

26.     After approximately seventeen (17) months passed, on October 20, 2021, BRCB belatedly tried to include Plaintiff in the Arbitration proceedings by way of filing its Second Amended Arbitration Demand ("SAAD"). A true and correct copy of the SAAD, without exhibits, is attached hereto as Exhibit 7. As set forth in the SAAD – Fifth Claim for Relief, BRCB specifically claims Plaintiff breached the Limited Guarantee agreement.  Of course, that agreement does not contain an arbitration provision and is limited to the inapplicable event of BRCB purchasing the assets of the franchise, had it elected to do so, which it is not seeking to do in the arbitration. Additionally, at the Seventh Claim for Relief, the other specific claim against Plaintiff involves an alleged "fraudulent transfer" associated with the business Loan made by the Trust - not breach of a purported contract between BRCB and Plaintiff.  Neither direct cause of action against Plaintiff involves a contractual arbitration provision. The SAAD does not otherwise expressly address the legal or factual basis under which the Plaintiff would or should be subject to the arbitrator's jurisdiction despite the fact that the Plaintiff never entered into any agreement to arbitrate any dispute with BRCB.

27.     Prior to filing the SAAD, and over Plaintiff's repeated objections, on September 24, 2021, BRCB brought a motion to amend its Arbitration Claims to add Plaintiff as a party to the Arbitration alleging breach of personal guarantee of BRCB's asset purchase right and fraudulent transfer in conjunction with its business Loan.  A true and correct copy of Plaintiff's December 29, 2021, objection to AAA's jurisdiction or authority is attached hereto as Exhibit 8.

28.     Disregarding Plaintiff's Objection, Arbitrator George A. Finkle granted BRCB's request to amend on October 19, 2021. A true and correct copy of this the Order is attached hereto as Exhibit 9. In doing so, George A. Finkle violated California and Federal law. The first fatal mistake is that he incorrectly concluded AAA's own internal rules somehow granted him legal authority to determine his own jurisdiction over third parties.  <u>Benaroya v. Bruce</u> Willis (2018) 23 Cal.App.5[th] 462. The second mistake is that he incorrectly concluded he had the legal authority or ability to determine the threshold issue of whether Plaintiff is party to an agreement to arbitrate.

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

Benaroya v. Bruce Willis (2018) 23 Cal.App.5th 462. The third mistake is that he incorrectly concluded he had legal authority to engage in what is known as "substantive arbitrability" analysis, which he required of himself to reach a determination that Plaintiff, who did not sign the underlying arbitration agreement, is somehow still subject to the terms of that agreement. Am. Builder's Ass'n v. Au-Yang (1990) 226 Cal.App.3d 170; Unimart v. Super. Ct. of Los Angeles Cty. (1969) 1 Cal.App.3d 1039.

29.    On December 17, 2021, the Franchisees filed a First Amended Complaint in the Orange County Superior Court Action.

30.    Plaintiff did not enter into any agreement on his own behalf which states that claims against him would be subject to arbitration. His above-referenced Limited Guarantee cannot be construed to compel Plaintiff to arbitrate claims made against him individually. He has never stated such intent.

31.    Plaintiff's objections to jurisdiction and authority notwithstanding, AAA continues to treat Plaintiff as a party to the arbitration proceedings.  On several different occasions, AAA and George A. Finkle told Plaintiff it would not cease attempts to exercise jurisdiction or authority over Plaintiff without a Court order directing it to stop.

**First Cause of Action**

**Declaratory Relief (Civil Code §1060)**

**[Against AAA, BRCB, George A. Finkle, and DOES 1 to 25]**

32.    Plaintiff refers to and incorporates by this reference all the preceding paragraphs as if fully set forth herein.

33.    An actual and present controversy exists between Plaintiff and Defendants as to the validity, enforceability and/or scope of the Arbitration agreements which Defendants attach to their Claims for Arbitration.

34.    Plaintiff contends it is not a party to the Arbitration agreements, and did not sign, agree, consent, or otherwise agree to be bound by the agreements. Accordingly, the agreements, and arbitration clause contained therein, does not apply to, or extend to Plaintiff or the acts alleged by BRCB in its Second Amended Arbitration Demand.  Plaintiff is not bound by any agreement to

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

1  arbitrate with BRCB. Plaintiff is informed and believes Defendants contend otherwise.

2      35.    Estoppel is inapplicable here because Plaintiff is not seeking to assert claims against

3  BRCB related to the franchises.

4      36.    The issue of whether Plaintiff is obligated to arbitrate any claims with BRCB, or any

5  claims for fraudulent transfer or otherwise, is to be determined by the courts and not by AAA.

6  Plaintiff is informed and believes Defendants contend otherwise.

7      37.    Plaintiff accordingly seeks declaratory and injunctive relief as set forth in the Prayer

8  for Relief below.

9                              **Second Cause of Action**

10                                **Injunctive Relief**

11              **[Against AAA, BRCB, George A. Finkle, and DOES 1 to 25]**

12      38.    Plaintiff refers to and incorporates by this reference all the preceding paragraphs as

13  if fully set forth herein.

14      39.    Defendants intend to unilaterally arbitrate claims against Plaintiff without regard to

15  its Objections. The AAA Arbitrator, George A. Finkle is proceeding with setting hearings, issuing

16  orders, imposing deadlines, and other actions against Plaintiff, and unless restrained will cause

17  great and irreparable injury to Plaintiff, potentially causing it to lose rights and benefits, otherwise

18  afforded to it by the Courts.

19      40.    The Arbitration against Plaintiff is in violation of applicable law, wrongful, and is in

20  part, believed to be driven by the financial or other interests of Defendant AAA and/or George A.

21  Finkle.

22      41.    The Arbitration should be restrained and enjoined since there is no valid contractual

23  agreement by Plaintiff to arbitrate.

24      42.    Plaintiff has no other plain, speedy, legal, or adequate remedy, and the injunctive

25  relief requested is necessary and appropriate at this time to prevent irreparable loss to Plaintiff's

26  interest.

27                              **PRAYER FOR RELIEF**

28      43.    Plaintiff prays for judgment by this Court in their favor and against the Defendants,

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

and each of them, as follows:

     a)  For a declaration that AAA, Arbitrator George A. Finkle, and any of their agents, representatives, attorneys, arbitrators, employees, and all persons acting in concert or participating with them, does not have jurisdiction or authority to arbitrate any claim against Plaintiff under any of the agreements for which such a right has been claimed by BRCB, or limiting that jurisdiction as this Court finds just and lawful;

     b)  For the issuance of such temporary, preliminary, and/or permanent injunctions necessary and appropriate to enjoin the attempts by AAA, Arbitrator George A. Finkle, and any of their agents, representatives, attorneys, arbitrators, employees, and all persons acting in concert or participating with them, to exercise and assert jurisdiction or authority over BRCB's claims against Plaintiff and to protect Plaintiff's rights of due process, equal protection and petition/recourse to the courts, state or federal, on both the trial and appellate court levels;

     c)  For the issuance of an Order that AAA, Arbitrator George A. Finkle, and any of their agents, representatives, attorneys, arbitrators, employees, and all persons acting in concert or participating with them, cease and desist from taking any other action, except through this Court, which further asserts or allegedly adjudicates the claims of BRCB against Plaintiff, or against any party relating to the claims against Plaintiff.  This shall include any and all prior actions taken in this regard being null and void.

     d)  For costs of litigation;

     e)  For attorney's fees, and;

     f)  For such other relief as the Court deems necessary and proper.

Dated: February 23, 2022               REDEN & REDEN, APC

By: _____
                  Justin G. Reden, Esq.
                  Michael J. Riddell, Esq.
                  Attorneys for Plaintiff

REDEN & REDEN, APC
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

Exhibit 1

## LIMITED GUARANTY OF FRANCHISE AGREEMENT
## BLACK ROCK COFFEE BAR

The "*Guaranteed Agreement*" means that Franchise Agreement, dated August 23, 2019, between **Black Rock Coffee Bar, LLC, an Oregon limited liability company ("*BRCB*")** and BR Blue Diamond OP, LLC, a Nevada limited liability company (the "*Obligated Party*"), together with the Addendum to Franchise Agreement, dated August 23, 2019, between BRCB and the Obligated Party.

This Guaranty (this "*Guaranty*") is given this 23rd day of August, 2019 by Mike Goergen (referred to in this Guaranty as "you" and like terms), with respect to the Guaranteed Agreement described above.

For good and valuable consideration, you unconditionally guarantee to BRCB, and to its successors and assigns, the full, complete, and timely payment and performance of each and all of the terms, covenants, and conditions of the Guaranteed Agreement (and any modification or amendment to the Guaranteed Agreement) arising under or relating to Section 15.7 (Right to Purchase Assets) to be kept and performed by the Obligated Party during the term of the Guaranteed Agreement, including any related representations, warranties or covenants in the Guaranteed Agreement.

You further agree as follows:

1.      This Guaranty will continue unchanged by the occurrence of any Insolvency Event as defined at Section 14.1 of the Guaranteed Agreement, with respect to the Obligated Party or any assignee or successor of the Obligated Party or by any disaffirmance or abandonment of the Guaranteed Agreement by a trustee in bankruptcy of the Obligated Party. Neither your obligation to make payment or render performance in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty will be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of the Obligated Party or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

2.      Your liability under this Guaranty is primary and independent of the liability of the Obligated Party. You waive any right to require BRCB to proceed against any other person or to proceed against or exhaust any security held by BRCB at any time or to pursue any right of action accruing to BRCB under the Guaranteed Agreement. BRCB may proceed against you and the Obligated Party jointly and severally or may, at its option, proceed against you without having commenced any action, or having obtained any judgment, against the Obligated Party. You waive the defense of the statute of limitations in any action under this Guaranty or for the collection of any indebtedness or the performance of any obligation guaranteed pursuant to this Guaranty.

3.      You agree to pay all attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the obligations guaranteed or in enforcing this Guaranty against you.

1

BRCB0038940
Ex. 14 to Asai Decl.
Page 3 of 11

4.      You waive notice of any demand by BRCB, any notice of default in the payment of rents or any other amounts contained or reserved in the Guaranteed Agreement, or any other notice of default under the Guaranteed Agreement. You expressly agree that the validity of this Guaranty and your obligations will in no way be terminated, affected, or impaired by reason of any waiver by BRCB; by its successors or assigns; by the failure of BRCB to enforce any of the terms, covenants, or conditions of the Guaranteed Agreement or this Guaranty; or by the granting of any indulgence or extension of time to the Obligated Party, all of which may be given or done without notice to you.

5.      This Guaranty will extend, in full force and effect, to any assignee or successor of BRCB and will be binding upon you and your successors and assigns.

6.      Until all obligations of the Obligated Party to BRCB have been paid or satisfied in full, you have no remedy or right of subrogation and you waive any right to enforce any remedy that BRCB has or may in the future have against the Obligated Party and any benefit of, and any right to participate in, and security now or in the future held by BRCB.

7.      All existing and future indebtedness of the Obligated Party to you is hereby subordinated to all indebtedness and other obligations guaranteed in this Guaranty and, without the prior written consent of BRCB, will not be paid in whole or in part, nor will you accept any payment of or on account of any such indebtedness while this Guaranty is in effect.

8.      This Guaranty will be construed in accordance with the laws of the state of Oregon, without giving effect to its conflict-of-laws principles.

"GUARANTOR"

Signature: _____
Name:    Mike Goergen

STATE OF NEVADA              )
                             ) ss.
COUNTY OF _CLARK_            )

The foregoing instrument was acknowledged before me on this 4 day of September, 2019 by Mike Goergen.

_____
(Signature of notarial officer)
My Commission Expires: March 06, 2023

OFFICIAL STAMP
**CURTIS DAWSON JOYNER**
NOTARY PUBLIC - OREGON
COMMISSION NO. 984251
MY COMMISSION EXPIRES MARCH 06, 2023

2

CONFIDENTIAL

## LIMITED GUARANTY OF FRANCHISE AGREEMENT
## BLACK ROCK COFFEE BAR

The "*Guaranteed Agreement*" means that Franchise Agreement, dated October 11, 2019, between **Black Rock Coffee Bar, LLC, an Oregon limited liability company ("*BRCB*")** and BR Silverado Ranch OP, LLC, a Nevada limited liability company (the "*Obligated Party*"), together with the Addendum to Franchise Agreement, dated October 11, 2019, between BRCB and the Obligated Party.

This Guaranty (this "*Guaranty*") is given this 11th day of October, 2019 by Mike Goergen (referred to in this Guaranty as "you" and like terms), with respect to the Guaranteed Agreement described above.

For good and valuable consideration, you unconditionally guarantee to BRCB, and to its successors and assigns, the full, complete, and timely payment and performance of each and all of the terms, covenants, and conditions of the Guaranteed Agreement (and any modification or amendment to the Guaranteed Agreement) arising under or relating to Section 15.7 (Right to Purchase Assets) to be kept and performed by the Obligated Party during the term of the Guaranteed Agreement, including any related representations, warranties or covenants in the Guaranteed Agreement.

You further agree as follows:

1.      This Guaranty will continue unchanged by the occurrence of any Insolvency Event as defined at Section 14.1 of the Guaranteed Agreement, with respect to the Obligated Party or any assignee or successor of the Obligated Party or by any disaffirmance or abandonment of the Guaranteed Agreement by a trustee in bankruptcy of the Obligated Party. Neither your obligation to make payment or render performance in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty will be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of the Obligated Party or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

2.      Your liability under this Guaranty is primary and independent of the liability of the Obligated Party. You waive any right to require BRCB to proceed against any other person or to proceed against or exhaust any security held by BRCB at any time or to pursue any right of action accruing to BRCB under the Guaranteed Agreement. BRCB may proceed against you and the Obligated Party jointly and severally or may, at its option, proceed against you without having commenced any action, or having obtained any judgment, against the Obligated Party. You waive the defense of the statute of limitations in any action under this Guaranty or for the collection of any indebtedness or the performance of any obligation guaranteed pursuant to this Guaranty.

3.      You agree to pay all attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the obligations guaranteed or in enforcing this Guaranty against you.

4825-1067-1017. v. 1

1

CONFIDENTIAL

4.      You waive notice of any demand by BRCB, any notice of default in the payment of rents or any other amounts contained or reserved in the Guaranteed Agreement, or any other notice of default under the Guaranteed Agreement. You expressly agree that the validity of this Guaranty and your obligations will in no way be terminated, affected, or impaired by reason of any waiver by BRCB; by its successors or assigns; by the failure of BRCB to enforce any of the terms, covenants, or conditions of the Guaranteed Agreement or this Guaranty; or by the granting of any indulgence or extension of time to the Obligated Party, all of which may be given or done without notice to you.

5.      This Guaranty will extend, in full force and effect, to any assignee or successor of BRCB and will be binding upon you and your successors and assigns.

6.      Until all obligations of the Obligated Party to BRCB have been paid or satisfied in full, you have no remedy or right of subrogation and you waive any right to enforce any remedy that BRCB has or may in the future have against the Obligated Party and any benefit of, and any right to participate in, and security now or in the future held by BRCB.

7.      All existing and future indebtedness of the Obligated Party to you is hereby subordinated to all indebtedness and other obligations guaranteed in this Guaranty and, without the prior written consent of BRCB, will not be paid in whole or in part, nor will you accept any payment of or on account of any such indebtedness while this Guaranty is in effect.

8.      This Guaranty will be construed in accordance with the laws of the state of Oregon, without giving effect to its conflict-of-laws principles.

"GUARANTOR"

Signature: _____

Name:    Mike Goergen

STATE OF NEVADA          )
                         ) ss.
COUNTY OF Clark          )

The foregoing instrument was acknowledged before me on this 11th day of October, 2019 by Mike Goergen.

TANYA A. VASKNETZ
Notary Public, State of Nevada
Appointment No. 04-86401-1
My Appt. Expires Apr 13, 2020

(Signature of notarial officer)
My Commission Expires: 04-13-19

4825-1067-1017, v. 1

2

## LIMITED GUARANTY OF FRANCHISE AGREEMENT
## BLACK ROCK COFFEE BAR

The "*Guaranteed Agreement*" means that Franchise Agreement, dated August 23, 2019, between **Black Rock Coffee Bar, LLC, an Oregon limited liability company ("*BRCB*")** and BR Rainbow OP, LLC, a Nevada limited liability company (the "*Obligated Party*"), together with the Addendum to Franchise Agreement, dated August 23, 2019, between BRCB and the Obligated Party.

This Guaranty (this "*Guaranty*") is given this 23rd day of August, 2019 by Mike Goergen (referred to in this Guaranty as "you" and like terms), with respect to the Guaranteed Agreement described above.

For good and valuable consideration, you unconditionally guarantee to BRCB, and to its successors and assigns, the full, complete, and timely payment and performance of each and all of the terms, covenants, and conditions of the Guaranteed Agreement (and any modification or amendment to the Guaranteed Agreement) arising under or relating to Section 15.7 (Right to Purchase Assets) to be kept and performed by the Obligated Party during the term of the Guaranteed Agreement, including any related representations, warranties or covenants in the Guaranteed Agreement.

You further agree as follows:

1.      This Guaranty will continue unchanged by the occurrence of any Insolvency Event as defined at Section 14.1 of the Guaranteed Agreement, with respect to the Obligated Party or any assignee or successor of the Obligated Party or by any disaffirmance or abandonment of the Guaranteed Agreement by a trustee in bankruptcy of the Obligated Party. Neither your obligation to make payment or render performance in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty will be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of the Obligated Party or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

2.      Your liability under this Guaranty is primary and independent of the liability of the Obligated Party. You waive any right to require BRCB to proceed against any other person or to proceed against or exhaust any security held by BRCB at any time or to pursue any right of action accruing to BRCB under the Guaranteed Agreement. BRCB may proceed against you and the Obligated Party jointly and severally or may, at its option, proceed against you without having commenced any action, or having obtained any judgment, against the Obligated Party. You waive the defense of the statute of limitations in any action under this Guaranty or for the collection of any indebtedness or the performance of any obligation guaranteed pursuant to this Guaranty.

3.      You agree to pay all attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the obligations guaranteed or in enforcing this Guaranty against you.

1

BRCB0038942
Ex. 14 to Asai Decl.
Page 10 of 11

4.      You waive notice of any demand by BRCB, any notice of default in the payment of rents or any other amounts contained or reserved in the Guaranteed Agreement, or any other notice of default under the Guaranteed Agreement. You expressly agree that the validity of this Guaranty and your obligations will in no way be terminated, affected, or impaired by reason of any waiver by BRCB; by its successors or assigns; by the failure of BRCB to enforce any of the terms, covenants, or conditions of the Guaranteed Agreement or this Guaranty; or by the granting of any indulgence or extension of time to the Obligated Party, all of which may be given or done without notice to you.

5.      This Guaranty will extend, in full force and effect, to any assignee or successor of BRCB and will be binding upon you and your successors and assigns.

6.      Until all obligations of the Obligated Party to BRCB have been paid or satisfied in full, you have no remedy or right of subrogation and you waive any right to enforce any remedy that BRCB has or may in the future have against the Obligated Party and any benefit of, and any right to participate in, and security now or in the future held by BRCB.

7.      All existing and future indebtedness of the Obligated Party to you is hereby subordinated to all indebtedness and other obligations guaranteed in this Guaranty and, without the prior written consent of BRCB, will not be paid in whole or in part, nor will you accept any payment of or on account of any such indebtedness while this Guaranty is in effect.

8.      This Guaranty will be construed in accordance with the laws of the state of Oregon, without giving effect to its conflict-of-laws principles.

"GUARANTOR"

Signature: _____

Name:    Mike Goergen

STATE OF NEVADA        )
                       ) ss.
COUNTY OF   CLARK      )

The foregoing instrument was acknowledged before me on this  4 day of September, 2019 by Mike Goergen.

_____
(Signature of notarial officer)
My Commission Expires: March 06, 2023

OFFICIAL STAMP
CURTIS DAWSON JOYNER
NOTARY PUBLIC - OREGON
COMMISSION NO. 984251
MY COMMISSION EXPIRES MARCH 06, 2023

2

CONFIDENTIAL

BRCB0038943
Ex. 14 to Asai Decl.
Page 11 of 11

Exhibit 2

## AMENDED AND RESTATED SECURED REVOLVING CREDIT NOTE

**Maximum Credit Amount: $2,500,000.00**                    **Effective Date: May 1, 2018**

FOR VALUE RECEIVED, the undersigned, BR Coffee, LLC; BR Coffee OP, LLC; BR Rainbow, LLC; BR Blue Diamond OP, LLC; BR Rainbow OP, LLC; BR Rainbow North OP, LLC; BR Silverado Ranch OP, LLC; DS Renaissance, LLC; BR Ft. Apache OP, LLC; MGCI, Inc.; Christopher Lattanzio; Mike Goergen, and their successors, assigns, parent companies, subsidiaries, and affiliates (individually and collectively "Borrower"), unconditionally promises to pay to Robert Lattanzio Living Trust, Dated June 23, 2006 and its successors, assigns, parent companies, subsidiaries, trustees, beneficiaries, trustors, and affiliates ("Lender") at its offices at 940 Calle Negocio, Suite 200, San Clemente, California, or at such other place as Lender may from time to time designate in writing, in lawful money of the United States of America and in immediately available funds, the maximum credit amount in the principal sum of $2,500,00.00, or if less, the aggregate unpaid principal amount of all Revolving Credit Loans made or deemed made by Lender to Borrower hereunder.

      **1.0  Prior Credit Loans.**  Pursuant to a Revolving Credit Agreement and Security Agreement made May 1, 2018, Lender has from time to time, issued Credit Loans to Borrower which are listed on Exhibit "A" attached hereto (Prior Credit Loans); these Prior Credit Loans are made a part of and incorporated into this Secured Revolving Credit Note (Note) and are considered Revolving Credit Loans made or deemed made by Lender to Borrower hereunder the repayment of which are secured by the Revolving Credit Security Agreement between Borrower and Lender of even date herewith as fully set forth in this Note. The Maximum Credit Amount stated in this Note is not increased by the amount of Prior Credit Loans. This Note shall amend, replace, and supersede the prior Revolving Credit Agreement and Security Agreement made May 1, 2018. The effective date of this Note shall be May 1, 2018. It was the intention of Borrower and Lender that the May 1, 2018 Revolving Credit Agreement and Security Agreement reflect the Borrower(s) listed in this Note and the security listed in this Note and corresponding/concurrent Amended and Restated Security Agreement.

      **1.1  Interest Rate.**  Credit Loans made shall bear interest at the rate of five percent (5%) per annum on the unpaid principal balance. Any interest rate payable hereunder shall be calculated on the basis of twelve (12) thirty (30) day months over a year of three hundred sixty (360) days. Notwithstanding anything in this Note to the contrary, to the extent the interest payments hereunder or any provision hereof is subject to limitation by usury law, that portion of the interest that is subject to and exceeds applicable usury law limitations shall be forgiven.

      **1.2  Payments.**  Commencing June 30, 2021, Borrower shall make quarterly payments (on the last day of March, June, September, and December), as follows:  all accrued interest in full, plus no less than 10% of the outstanding principal balance, until April 30, 2023 (Maturity Date). Regardless of the foregoing payment schedule, the outstanding principal balance plus interest shall not exceed $2,500,000.00.

      **1.3  Prepayment.**  All Credit Loans under this Agreement may be prepaid in whole or in part, at any time, without premium or penalty.

      **1.4  Maturity Date.**  The entire unpaid principal, accrued interest, and other costs and fees, as applicable, thereon are due on April 30, 2023 (Maturity Date).

      **1.5  Accounting Entries.**  Lender will maintain complete and accurate records of all Credit Loans hereunder, the Interest Rate applicable thereto, all accrued interest applicable to each Credit Loan and all Credit Loan repayments.

**1.6  Security for Repayment.**  All amounts due Lender under this Note are unconditionally secured by the assets of Borrower as described in that certain Revolving Credit Security Agreement between Borrower and Lender of even date herewith.

**1.7  Default.**  Borrower shall be in default of any Credit Loan issued under this Note on the occurrence of any of the following:  (a) Failure of Borrower to make payment of any amount under this Note when due, failing to maintain the maximum account balance of no more than $2,500,000.00, or Borrower becoming insolvent; (b) the filing by any one of the Borrower(s), or their creditor(s) or purported creditor(s), of a voluntary petition in bankruptcy, a petition for reorganization, arrangement or other relief under the United States Bankruptcy Act, or a voluntary petition for the appointment of a receiver or comparable relief from creditors under the laws of any state, or the making by the Borrower of an assignment of all or substantially all of its assets for the benefit of creditors; (c) the adjudication of the Borrower as a bankrupt or insolvent, the appointment of a receiver of all or substantially all of the Borrower's assets, or the entry of an order for the reorganization of the Borrower under the United States Bankruptcy Act, if such adjudication, appointment or order is made on a petition filed against the Borrower and is not, within 60 days after it is made, vacated or stayed on appeal or otherwise, or if the Borrower consents to the appointment, order or petition; (d) the filing by anyone of a lawsuit to collect, or seeking damages, against any one of the Borrower(s), of an amount in excess of $50,000.00, or against any asset that is pledged as security for this Note; (e) the inability of Borrower, or the admission by Borrower of its inability, to pay its debts as they mature, or the insolvency of Borrower, or (f) any "Event of Default" as defined in the corresponding Secured Revolving Credit Security Agreement of even date herewith, between Borrower and Lender.

**1.8  Acceleration Upon Event of Default.**  Upon the occurrence of a Default, all Credit Loans made pursuant to this Note, plus all accrued but unpaid interest, shall be immediately due and payable to Lender.

**1.9  Collection Costs.**  On any Default by Borrower, Lender shall be entitled to recover from the Borrower all costs of collection and enforcement, including, without limitation, reasonable attorneys' fees.

**2.0  Amendment.**  No change or modification of this Note will be valid or binding unless such change or modification is in writing and signed by or on behalf of Borrower and Lender.

**2.1  No Waiver.**  No single or partial exercise of any power hereunder shall preclude other or further exercise thereof or the exercise of any other power.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note.

No acceptance of a past due installment or indulgence granted from time to time shall be construed to be a waiver of the right to insist upon prompt payment thereafter or to preclude the exercise of any other rights which Lender may have.

**2.2  Borrower's Waiver.**  Borrower and all endorsers, guarantors and sureties severally waive the following: (a) protest, (b) presentment, (c) demand, (d) notice of protest on any Default and of any nonpayment under this Note, (e) notice of any renewal of this Note or any extension, acceleration, postponement of the time of payment or any other indulgences.

Borrower and all endorsers, guarantors and sureties severally waive all defenses given to Borrowers at law or in equity other than actual payment or performance of the obligations under this Note.

Borrower and all endorsers, guarantors and sureties severally agree the obligation of Borrower will not be released, diminished, impaired, reduced, or affected by any neglect, delay, omission, failure or refusal of Lender to take or prosecute any action for the collection of the obligations or breach of the Note or take or prosecute any action in connection with any lien, right, or security existing or to exist in connection with or as security for the Note.  Borrower's waiver includes but is not limited waiver of any applicable statute(s) of limitations for the maximum amount of time permitted by law for the time to commence an action for any of the foregoing.

Borrower and all endorsers, guarantors and sureties expressly agree that this Note or any payment under this Note may be extended by Lender from time to time without in any way affecting the liability of Borrower.

**2.3  Severability.**  Any provision of this Note that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**2.4  Governing Law and Forum.**  This Note shall be construed and governed by the laws, commercial usages, and customs of the State of California, without giving effect to the principles of conflict of laws thereof.  If any dispute, action, proceeding or litigation arises between the parties based on or arising out of this Note, or any agreement or instrument delivered to this Note, the parties agree to submit themselves to and irrevocably consent to the jurisdiction of the courts of the County of San Diego, State of California and any federal court located in the State of California.

**2.5  Assignability.**  Lender may assign its rights and obligations under this Note to any third party without the Borrower's consent.  Borrower may not sell, assign or transfer any interest in this Note, or any portion hereof, including, without limitation, any of Borrower's rights, title, interests, remedies, powers and duties hereunder or thereunder without Lenders express written consent; Borrower's assignment, without prior written consent from Lender shall constitute Default under this Note.

**2.6  Successors and Assigns.**  The provisions of this Note shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**2.7  Lender's Additional Rights.**  No exercise or non-exercise by Lender of any right or remedy of Lender will in any way affect any of Borrower's obligations hereunder or any security furnished by Borrower or give Borrower any recourse against Lender.

**2.8  Lender's Discretion.**  Borrower agrees it is within Lender's sole discretion, right, and control to issue any Credit Loan(s) under this Note up to the Maximum Credit Amount and under no circumstances is Lender obligated or required to issue any Credit Loan(s) to Borrower and such discretion shall be exercised by Lender without limitation and Lender can deny Borrower's request for a Credit Loan for any reason whatsoever and with or without cause or justification.

*[CONTINUES ON FOLLOWING PAGE]*

Intending to be legally bound, the undersigned had executed this Note under seal effective the day and year first hereinabove set forth.

BORROWER
BR Coffee, LLC

By: _____
Its:

BORROWER
BR Coffee OP, LLC

By: _____
Its:

BORROWER
BR Rainbow, LLC

By: _____
Its:

BORROWER
BR Blue Diamond OP, LLC

By: _____
Its:

BORROWER
BR Rainbow OP, LLC

By: _____
Its:

BORROWER
BR Rainbow North OP, LLC

By: _____
Its:

BORROWER
BR Silverado Ranch OP, LLC

By: _____
Its:

BORROWER
DS Renaissance, LLC

By: _____
Its:

BORROWER
BR Ft. Apache OP, LLC

By: _____
Its:

BORROWER
MGCI, Inc.

By: MICHAEL Goergen
Its:

BORROWER

_____
Christopher Lattanzio

BORROWER

_____
Mike Goergen

LENDER
Robert Lattanzio Living Trust 6/23/06

By: Robert Lattanzio
Its:  Trustee

## EXHIBIT "A"

[to follow]

**Black Rock Interest on Lease: Thru 5/12/2021**

| Type | Date | Num | Source Name | Memo | Amount | Balance | Daily Interest | # of Days | | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | $0.00 | | | | $0.00 |
| JE | 3/21/2018 | 095018-3 | Domphis LLC | Advance Costs | $105,717.46 | $105,717.46 | 17.38 | 8 | $139.04 | $139.04 |
| Bill | 6/4/2018 | 092998001-0418 | Kimley Horn and Associates Inc | Surveying & Civil Engineering | $10,015.00 | $115,730.46 | 19.02 | | $0.00 | $139.04 |
| Bill | 6/4/2018 | 52918 | Clark County Building | Plan Review Fee | $921.18 | $116,651.64 | 19.18 | | $0.00 | $139.04 |
| Bill | 6/4/2018 | 60418 | CCBD-Fire | Fire Prevention | $180.00 | $116,831.64 | 19.21 | | $0.00 | $139.04 |
| Bill | 6/4/2018 | 3504 | Sunbelt Engineering & Testing LLF | Update Letter Blackrock Rainbow LLC | $550.00 | $117,381.64 | 19.3 | 14 | $270.20 | $409.24 |
| Bill | 6/5/2018 | 153 | SJA Design Group, Corp | Architect | $2,720.00 | $120,101.64 | 19.74 | | $0.00 | $409.24 |
| Bill | 6/5/2018 | E2018-86 | OGI Environmental LLC | Phase I | $1,650.00 | $121,751.64 | 20.01 | 1 | $20.01 | $429.25 |
| Bill | 6/8/2018 | 3002571642 | NV Energy | Non refundable deposit for electric design | $1,500.00 | $123,251.64 | 20.26 | 3 | $60.78 | $490.03 |
| Bill | 6/20/2018 | 62018 | Latco Enterprises, Inc. | Fedex | $17.00 | $123,268.64 | 20.26 | 12 | $243.16 | $733.19 |
| Bill | 7/1/2018 | 14873 | Stone Law Offices LTD | BR Rainbow LLC Set up | $927.50 | $124,196.14 | 20.42 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 336310 | Hawley & Troxell Ennis & Hawley LLP | Blackrock Lease Agreement | $543.63 | $124,739.77 | 20.51 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 335068 | Hawley & Troxell Ennis & Hawley Inc | Blackrock Lease Agreement | $2,580.00 | $127,319.77 | 20.95 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 092998000-0118 | Kimley Horn and Associates Inc | Surveying & Civil Engineering | $1,500.00 | $128,819.77 | 21.18 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 1005 | MGCI, Inc | July Consulting Fee 2018 | $5,000.00 | $133,819.77 | 22 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | Jun-18 | Domphis LLC | June Consulting Fee 2018 | $5,000.00 | $138,819.77 | 22.82 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 166 | SJA Design Group, Corp | Architectural Design for new site 18013 W Sunset Rd | $1,360.00 | $140,179.77 | 23.04 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 092998000-0118 | Kimley Horn and Associates Inc | Surveying & Civil Engineering Spring Mountain | $1,500.00 | $141,679.77 | 23.29 | | $0.00 | $733.19 |
| Bill | 7/1/2018 | 092998001-0618 | Kimley Horn and Associates Inc | Project No. 092998001-10645611 | $2,304.00 | $143,983.77 | 23.67 | 11 | $260.35 | $993.54 |
| Bill | 7/27/2018 | 7218 | Latco Enterprises, Inc. | Fedex | $32.79 | $144,016.56 | 23.67 | 26 | $615.52 | $1,609.06 |
| Bill | 8/1/2018 | 15025 | Stone Law Offices LTD | BR Rainbow LLC Set up | $1,892.14 | $145,908.70 | 23.98 | | $0.00 | $1,609.06 |
| Bill | 8/1/2018 | 339250 | Hawley & Troxell Ennis & Hawley LLP | Blackrock Lease Agreement | $79.34 | $145,988.04 | 24 | | $0.00 | $1,609.06 |
| Bill | 8/1/2018 | 339251 | Hawley & Troxell Ennis & Hawley LLP | Blackrock Lease Agreement | $6,709.82 | $152,697.86 | 25.1 | | $0.00 | $1,609.06 |
| Bill | 8/1/2018 | 713 | MGCI, Inc | August Consulting Fee 2018 | $5,000.00 | $157,697.86 | 25.92 | | $0.00 | $1,609.06 |
| Bill | 8/1/2018 | 713 | MGCI, Inc | Airfare/Hotel/Car | $993.21 | $158,691.07 | 26.09 | | $0.00 | $1,609.06 |
| Bill | 8/1/2018 | 092998001-0718 | Kimley Horn and Associates Inc | Project No. 092998001 | $2,726.00 | $161,417.07 | 26.53 | 5 | $132.67 | $1,741.73 |
| Bill | 8/23/2018 | 82318 | Black Rock Development Company | Project: Rainbow & Maulding | $89,285.60 | $250,702.67 | 41.21 | | $0.00 | $1,741.73 |
| Bill | 8/23/2018 | 82318 | Latco Enterprises, Inc. | Fedex | $26.90 | $250,729.57 | 41.22 | 22 | $906.75 | $2,648.48 |
| Bill | 9/1/2018 | 15165 | Stone Law Offices LTD | BR Rainbow LLC Set up | $3,483.33 | $254,212.90 | 41.79 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 340542 | Hawley & Troxell Ennis & Hawley LLP | Black Rock Coffee / Chindn & Maple Grove | $960.00 | $255,172.90 | 41.95 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 90118 | MGCI, Inc | Marketing Budget | $1,650.00 | $256,822.90 | 42.22 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 90118 | MGCI, Inc | September Consultant Fee 2018 | $5,000.00 | $261,822.90 | 43.04 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 2000047180 | Swan & Gardiner CPA, LLC | 2018 Nevada Commerce Tax Return | $75.00 | $261,897.90 | 43.05 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 719 | MGCI, Inc | Marketing Budget | $1,650.00 | $263,547.90 | 43.32 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 719 | MGCI, Inc | October Consultant Fee 2018 | $5,000.00 | $268,547.90 | 44.14 | | $0.00 | $2,648.48 |
| Bill | 9/1/2018 | 719 | MGCI, Inc | Payroll Erik Sanders & Sapphire Jacobson | $7,500.00 | $276,047.90 | 45.38 | 9 | $408.40 | $3,056.88 |

| Type | Date | Num | Name | Memo | Amount | Balance | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| JE | 9/7/2018 | 093018-2 | | Purchase Rainbow/Maulding land | $538,495.82 | $814,543.72 | 133.9 | 8 | $1,071.18 | $4,128.06 |
| Bill | 9/15/2018 | 092998001-0818 | Kimley Horn and Associates Inc | Project No. 092998001 | $2,910.00 | $817,453.72 | 134.38 | 2 | $268.75 | $4,396.81 |
| Bill | 9/17/2018 | 3864 | Classic Investors, Inc. | 2nd Payment of 30% | $74,310.00 | $891,763.72 | 146.59 | 9 | $1,319.32 | $5,716.13 |
| Bill | 9/26/2018 | 93018 | Lasco Enterprises, Inc. | Fedex | $26.84 | $891,790.56 | 146.6 | | $0.00 | $5,716.13 |
| Bill | 10/1/2018 | 15348 | Stone Law Offices LTD | BR Rainbow LLC Set up | $2,090.35 | $893,880.91 | 146.94 | | $0.00 | $5,716.13 |
| Bill | 10/1/2018 | 342696 | Hawley & Troxell Ennis & Hawley LLP | Black Rock Coffee - Rainbow & Maulding | $870.00 | $894,750.91 | 147.08 | | $0.00 | $5,716.13 |
| Bill | 10/1/2018 | 092998001-0918 | Kimley Horn and Associates Inc | Project No. 092998001 | $2,325.00 | $897,075.91 | 147.46 | | $0.00 | $5,716.13 |
| Bill | 10/1/2018 | 338024 | Hawley & Troxell Ennis & Hawley LLP | Black Rock Coffee - Rainbow & Maulding | $1,771.42 | $898,847.33 | 147.76 | 5 | $738.78 | $6,454.91 |
| Bill | 10/2/2018 | 100218 | BR Coffee LLC | Loan to Open Bank Account | $100.00 | $898,947.33 | 147.77 | | $0.00 | $6,454.91 |
| Bill | 10/2/2018 | 100218 | BR Coffee LLC | Deposit on New Mexico Site | $10,000.00 | $908,947.33 | 149.42 | 1 | $149.42 | $6,604.33 |
| Bill | 10/9/2018 | 2034 | MOCI, Inc | Marketing Budget | $1,650.00 | $910,597.33 | 149.69 | | $0.00 | $6,604.33 |
| Bill | 10/9/2018 | 2054 | MOCI, Inc | October Consultant Fee 2018 | $5,000.00 | $915,597.33 | 150.51 | | $0.00 | $6,604.33 |
| Bill | 10/9/2018 | 2054 | MOCI, Inc | Payroll Erik Sanders & Sapphire Jocobson | $7,500.00 | $923,097.33 | 151.74 | | $0.00 | $6,604.33 |
| Bill | 10/9/2018 | 2054 | MOCI, Inc | Moving & Relocation Cost | $5,000.00 | $928,097.33 | 152.56 | 7 | $1,067.95 | $7,672.28 |
| Bill | 10/16/2018 | 343777 | Hawley & Troxell Ennis & Hawley LLP | Black Rock Lease | $0.00 | $928,097.33 | 152.56 | | $0.00 | $7,672.28 |
| Bill | 10/22/2018 | Draw 1 | BR Coffee LLC | Draw 1 | $7,474.77 | $935,572.10 | 153.79 | | $0.00 | $7,672.28 |
| Bill | 10/25/2018 | Draw 1 | BR Rainbow LLC | Draw 1 | $25,896.90 | $961,469.00 | 158.05 | 13 | $2,054.65 | $9,726.93 |
| Bill | 10/26/2018 | 102618 | Lasco Enterprises Inc | Fedex | $26.84 | $961,495.84 | 158.05 | 4 | $632.22 | $10,359.15 |
| Bill | 11/7/2018 | Draw 2 | BR Coffee LLC | Draw 2 | $26,080.41 | $987,576.25 | 162.34 | | $0.00 | $10,359.15 |
| Bill | 11/7/2018 | Draw 2 | BR Rainbow LLC | Draw 2 | $24,518.00 | $1,012,094.25 | 166.37 | 11 | $1,830.09 | $12,189.24 |
| Bill | 12/4/2018 | Draw 3 | BR Coffee LLC | Draw 3 | $29,041.22 | $1,041,135.47 | 171.15 | 26 | $4,449.78 | $16,639.02 |
| Bill | 12/18/2018 | Draw 4 | BR Coffee LLC | Draw 4 | $52,025.16 | $1,093,160.63 | 179.7 | 14 | $2,515.77 | $19,154.79 |
| Bill | 1/9/2019 | Draw 5 | BR Coffee LLC | Draw 5 | $24,039.51 | $1,117,200.14 | 183.65 | 22 | $4,040.29 | $23,195.08 |
| Bill | 1/24/2019 | Draw 6 | BR Coffee LLC | Draw 6 | $183,344.48 | $1,300,544.62 | 213.79 | 15 | $3,306.82 | $26,401.90 |
| Bill | 2/5/2019 | Draw 7 | BR Coffee LLC | Draw 7 | $81,493.72 | $1,382,038.34 | 227.18 | 20 | $4,543.69 | $30,945.59 |
| Bill | 2/25/2019 | Draw 8 | BR Coffee LLC | Draw 8 | $150,933.85 | $1,532,972.19 | 252 | 12 | $3,023.95 | $33,969.54 |
| Bill | 3/14/2019 | Draw 9 | BR Coffee LLC | Draw 9 | $245,356.56 | $1,778,328.75 | 292.33 | 20 | $5,846.56 | $39,816.10 |
| Bill | 3/21/2019 | Draw 10 | BR Coffee LLC | Draw 10 | $114,325.92 | $1,892,654.67 | 311.15 | 17 | $5,289.62 | $45,105.72 |
| Bill | 4/2/2019 | Draw 10 | BR Coffee LLC | Draw 10 | $44,823.75 | $1,937,678.42 | 318.52 | 12 | $3,822.27 | $48,927.99 |
| Bill | 4/19/2019 | Draw 11 | BR Coffee LLC | Draw 11 | $97,877.34 | $2,035,555.76 | 334.61 | 17 | $5,688.40 | $54,616.39 |
| Bill | 4/23/2019 | Draw 12 | BR Coffee LLC | Draw 12 | $37,500.00 | $2,073,055.96 | 340.78 | 4 | $1,363.11 | $55,979.50 |
| Bill | 4/30/2019 | Draw 12 | BR Coffee LLC | Draw 12 | $275,945.61 | $2,349,001.57 | 386.14 | 7 | $2,702.96 | $58,682.46 |
| Bill | 5/22/2019 | Draw 13 | BR Coffee LLC | Draw 13 | $144,635.66 | $2,493,637.03 | 409.91 | 22 | $9,018.08 | $67,700.54 |
| Bill | 5/31/2019 | Draw 14 | BR Coffee LLC | Draw 14 | $65,118.26 | $2,558,755.29 | 420.62 | 9 | $3,785.56 | $71,486.10 |
| Bill | 6/19/2019 | Draw 15 | BR Coffee LLC | Draw 15 | $38,913.91 | $2,597,669.20 | 427.01 | 19 | $8,113.27 | $79,599.57 |
| Bill | 7/1/2019 | Draw 16 Partial | BR Coffee LLC | Draw 16 Partial | $42,399.25 | $2,640,068.45 | 433.98 | 11 | $4,773.82 | $84,373.19 |
| Bill | 7/11/2019 | Draw 13-15 True up | BR Coffee LLC | Draw 13-15 True up | $22,161.69 | $2,662,230.14 | 437.63 | 11 | $4,815.90 | $89,187.09 |
| Bill | 7/11/2019 | Draw 16 remainder | BR Coffee LLC | Draw 16 remainder | $153,666.10 | $2,815,896.24 | 462.89 | 11 | $5,091.76 | $94,278.85 |
| Bill | 8/29/2019 | Draw 17 | BR Coffee LLC | Draw 17 | $137,138.36 | $2,953,034.60 | 485.43 | 48 | $23,300.66 | $117,579.51 |
| Bill | 9/17/2019 | Draw 18 | BR Coffee LLC | Draw 18 | $45,600.76 | $2,998,635.36 | 492.93 | 19 | $9,365.60 | $126,945.11 |
| Bill | 10/2/2019 | Draw 19 | BR Coffee LLC | Draw 19 | $94,947.22 | $3,093,582.58 | 508.53 | 15 | $7,628.01 | $134,573.12 |

| Bill | 10/16/2019 | Draw 20 | BR Coffee LLC | Draw 20 | | $101,468.97 | $3,195,051.55 | 525.21 | 14 | $7,353.00 | $141,926.12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 11/1/2019 | Draw 21 | BR Coffee LLC | Draw 21 | | $44,408.97 | $3,239,460.52 | 532.51 | 15 | $7,987.71 | $149,913.83 |
| Bill | 12/12/2019 | Draw 22 | BR Coffee LLC | Draw 22 | | $93,883.75 | $3,333,344.27 | 547.95 | 42 | $23,013.77 | $172,927.60 |
| Bill | 2/27/2020 | Draw 23 | BR Coffee LLC | Draw 23 | | $253,920.36 | $3,587,264.63 | 589.69 | 77 | $45,405.92 | $218,333.52 |
| Deposit | 3/6/2020 | | Rainbow Building sale | | | -1,519,478.67 | $2,067,785.96 | 339.91 | 8 | $2,719.28 | $221,052.80 |
| Bill | 3/13/2020 | Draw | Royal Coffe Draw March | | | 50,000.00 | $2,117,785.96 | 348.13 | 7 | $2,436.90 | $223,489.70 |
| Deposit | 4/17/2020 | | BR Rainbow Intrest pmt | | | -2,800.00 | $2,114,985.96 | 347.67 | 35 | $12,168.41 | $235,658.11 |
| Deposit | 5/1/2020 | | BR Rainbow Sale (remainder) | | | -562,800.00 | $1,552,185.96 | 255.15 | 13 | $3,317.00 | $258,975.11 |
| Bill | 6/23/2020 | | Royal Coffe Draw June | | | 12,400.23 | $1,564,586.19 | 257.19 | 53 | $13,631.19 | $252,606.30 |
| Bill | 7/6/2020 | Draw 24 | Royal Coffee Draw July | Draw 24 | | $267,708.61 | $1,832,294.80 | 301.2 | 13 | $5,915.59 | $256,521.89 |
| Bill | 8/20/2020 | Draw 26 | Royal Coffee Draw August | Draw 26 | | $100,000.00 | $1,932,294.80 | 317.64 | 45 | $14,293.69 | $270,815.58 |
| Bill | 9/14/2020 | Draw 26 | Royal Coffee Draw September | Draw 26 | | $140,000.00 | $2,072,294.80 | 340.65 | 25 | $8,516.28 | $279,331.86 |
| Bill | 9/25/2020 | Draw 26 | Royal Coffee Draw September | Draw 26 | | $133,130.82 | $2,205,425.62 | 362.54 | 11 | $3,987.89 | $283,319.75 |
| Bill | 12/10/2020 | Draw 27 | Royal Coffee Draw December | Draw 27 | | $30,000.00 | $2,235,425.62 | 367.47 | 15 | $5,512.01 | $288,831.76 |
| Bill | 12/15/2020 | Draw 27 | Royal Coffee Draw December | Draw 27 | | $65,000.00 | $2,300,425.62 | 378.15 | 41 | $15,504.24 | $304,336.00 |
| Bill | 1/20/2021 | Draw 27 | Royal Coffee Draw January | Draw 27 | | $35,000.00 | $2,335,425.62 | 383.91 | 19 | $7,294.21 | $311,630.21 |
| Bill | 2/8/2021 | Draw 27 | Royal Coffee Draw February | Draw 27 | | $5,000.00 | $2,340,425.62 | 384.73 | 93 | $35,779.66 | $347,409.87 |
| | | | | | | $2,340,425.62 | $2,340,425.62 | | | | $347,409.87 |



U210056609019



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210056609019

Date Filed: 6/15/2021

---

Submitter Information:

| | |
|---|---|
| Contact Name | Michael Riddell |
| Organization Name | Reden & Reden, APC |
| Phone Number | (619) 758-5015 |
| Email Address | mriddell@redenandreden.com |
| Address | 16885 VIA DEL CAMPO COURT SUITE 320 SAN DIEGO, CA 92127 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| Christopher Lattanzio | 940 Calle Negocio Suite 200 San Clemente, CA 92673 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| Robert Lattanzio Living Trust, dated 6/23/2006 | 940 Calle Negocio Suite 200 San Clemente, CA 92673 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All the tangible and intangible assets of Debtor whether now owned or later acquired by Debtor and all products of such assets, and all replacements, replenishments, additions, accessions, and substitutions of such assets and the proceeds of the same, including but not limited to, the following: 1. All patents, patent disclosures, trademarks, service marks, trade dress, logos, tradenames, copyrights, art and mask works, manuals and information, and all registrations, applications, reissues, continuations, continuations in part or extensions of the same, and all associated goodwill for each of the foregoing, and all computer software, computer programs, computer data bases and related documentation and materials, data, documentation, trade secrets, confidential business information (including ideas, formulas, compositions, inventions, know-how, business processes and techniques, research and development information, drawings, designs, plans, proposals and technical data, financial, marketing and business data, customer and supplier data, pricing and cost information) and other intellectual property rights (in whatever form or medium), whether owned or licensed by the Debtor 2. All inventory from any source or supplier; 3. All contract rights and other rights and privileges of Debtor under all leases, franchises, and other contracts between Debtor and any third party; 4. All equipment; 5. All cash, securities, certificates of deposit and similar items.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:
Not Applicable

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Not Applicable

Optional Filer Reference Information:
9454.0002

Miscellaneous Information:

Page 1 of 2

Search to Reflect:

☒ Order a Search to Reflect

Debtor Name                                    Christopher Lattanzio

B0403-5660 06/15/2021 9:09 AM Received by California Secretary of State

Exhibit 3

1

2

3

4

IN THE AMERICAN ARBITRATION ASSOCIATION

5

6

7

8

9

10

11

12

13

14

| | |
|---|---|
| BLACK ROCK COFFEE BAR, LLC, an Oregon limited liability company;<br><br>                Claimant,<br><br>        v.<br><br>BR COFFEE, LLC, a Nevada limited liability company; BR RAINBOW OP, LLC, a Nevada limited liability company; BR BLUE DIAMOND OP, LLC, a Nevada limited liability company; BR SILVERADO RANCH OP, LLC, a Nevada limited liability company; BR FT APACHE OP, LLC, a Nevada limited liability company; BR RAINBOW NORTH OP LLC, a Nevada limited liability company,<br><br>                Respondents. | Case No.<br><br>**ARBITRATION DEMAND** |

15    For its claims against Respondents, Claimant alleges as follows:

16                    **<u>INTRODUCTION</u>**

17                        1.

18    Black Rock Coffee Bar, LLC ("Black Rock") is a local company based in Bend, Oregon

19 that successfully developed a national retail chain of drive-thru, sit-down, or combination coffee

20 bars specializing in espresso, coffee, and related items with the Black Rock brand.

21 Respondents—a group of affiliated business entities associated with Chris Lattanzio and Michael

22 Goergen—approached Black Rock as part of their purported plan to open the first Black Rock-

23 branded franchises in Las Vegas, Nevada, but quickly demonstrated that they would not honor

24 the terms of the parties' agreements.

25 ///

26 ///

Page 1 -      ARBITRATION DEMAND

**HOLLAND & KNIGHT LLP**<br>601 SW Second Ave., Ste. 1800<br>Portland, OR 97204<br>Telephone: 503.243.2300

1                                          2.

2          Rather than comply with the terms of the various agreements, Respondents became

3   delinquent on their payment obligations, filed suit against Black Rock to rescind the agreements,

4   and immediately rebranded their Black Rock franchises into "Royal Coffee Roasting Co." stores

5   to avoid paying required royalties to Black Rock.  In other words, Respondents sought to

6   capitalize on Black Rock's experience, brand, and business model without paying the applicable

7   franchise costs, and in breach of the parties' agreements.

8                                      **PARTIES**

9                                          3.

10         Claimant Black Rock is an Oregon limited liability company with its principal place of

11  business in Bend, Oregon.

12                                         4.

13         Respondent BR Coffee, LLC ("BR Coffee") is a Nevada limited liability company.

14  Upon information and belief, BR Coffee's members, which are controlled by Lattanzio and

15  Goergen, reside in Nevada and Oregon.

16                                         5.

17         Respondent BR Rainbow OP, LLC ("BR Rainbow") is a Nevada limited liability

18  company.  On information and belief, BR Rainbow is owned by BR Coffee OP, LLC, is

19  controlled by Lattanzio and Goergen, and is an affiliate of BR Coffee.

20                                         6.

21         Respondent BR Blue Diamond OP, LLC ("BR Blue Diamond") is a Nevada limited

22  liability company.  On information and belief, BR Blue Diamond is owned by BR Coffee OP,

23  LLC, is controlled by Lattanzio and Goergen, and is an affiliate of BR Coffee.

24  ///

25  ///

26  ///

Page 2 -        ARBITRATION DEMAND                          **HOLLAND & KNIGHT LLP**
                                                            601 SW Second Ave., Ste. 1800
                                                            Portland, OR  97204
                                                            Telephone:  503.243.2300

7.

Respondent BR Silverado Ranch OP, LLC ("BR Silverado") is a Nevada limited liability company.  On information and belief, BR Silverado is owned by BR Coffee OP, LLC, is controlled by Lattanzio and Goergen, and is an affiliate of BR Coffee.

8.

Respondent BR Ft Apache OP, LLC ("BR Ft. Apache") is a Nevada limited liability company.  On information and belief, BR Ft. Apache is owned by BR Coffee OP, LLC, is controlled by Lattanzio and Goergen, and is an affiliate of BR Coffee.

9.

Respondent BR Rainbow North OP, LLC ("BR Rainbow North") is a Nevada limited liability company.  On information and belief, BR Rainbow North is owned by BR Coffee OP, LLC, is controlled by Lattanzio and Goergen, and is an affiliate of BR Coffee.

10.

In addition, Lattanzio and Goergen signed personal guarantees to secure BR Rainbow's, BR Blue Diamond's, and BR Silverado's obligations under their respective Franchise Agreements.

## JURISDICTION AND VENUE

11.

As of August 21, 2019, BR Coffee executed a Geographic Territory Agreement ("GTA") with Black Rock on behalf of itself and its "applicable affiliate(s)" that planned to operate multiple coffee bars in Las Vegas, Nevada.  A copy of the executed GTA is attached as Exhibit 1.

12.

Under the GTA, BR Coffee agreed that Respondents BR Rainbow, BR Blue Diamond, BR Rainbow North, BR Silverado, and BR Ft. Apache are affiliates of BR Coffee and each intended to execute Franchise Agreements with Black Rock.

13.

Pursuant to the GTA, BR Coffee and all other Respondents as "affiliates" of BR Coffee agreed that any and all "disputes and controversies between the parties, or arising out of or relating to the performance or interpretation" of the GTA, other than an application for a temporary restraining order, preliminary injunction, or similar emergency injunctive relief to prevent irreparable harm, shall be exclusively adjudicated in arbitration "in accordance with the Commercial Arbitration Rules of the American Arbitration Association."

14.

Respondents further agreed that the arbitration shall be held in Portland, Oregon, that any issues of arbitrability be governed by the Federal Arbitration Act, and that the GTA will be governed by the substantive law of Oregon.

15.

In addition, BR Rainbow, BR Blue Diamond, and BR Silverado agreed in their separate Franchise Agreements with Black Rock that the exclusive resolution of any disputes must occur through arbitration in Portland, Oregon.

## FACTUAL ALLEGATIONS

I.  **BR Coffee executes GTA for the exclusive right to open Black Rock-branded franchises in Clark County, Nevada.**

16.

On or about 2018, BR Coffee notified Black Rock that it was interested in opening the first Black Rock-branded franchises in Las Vegas, Nevada.

17.

Black Rock provided its Franchise Disclosure Document ("FDD") to BR Coffee, Lattanzio, and Goergen, among others, which summarized certain provisions of Black Rock's standard Franchise Agreement.  BR Coffee signed and confirmed that it received the FDDs at least 14 calendar days prior to the proposed franchise sale.

18.

To commit to open a series of exclusive Black Rock-branded franchises in Las Vegas, BR Coffee executed the GTA with Black Rock with an effective date of August 21, 2019. Among other things, the parties agreed that BR Coffee or its "affiliate" would execute franchise agreements relating to two franchises located at 7565 South Rainbow Boulevard, Las Vegas, Nevada ("Rainbow Store") and 4855 Blue Diamond, Las Vegas, Nevada ("Blue Diamond Store"), respectively, and that all franchise payments for the Rainbow and Blue Diamond Stores would be immediately due to Black Rock.

19.

The GTA provides that BR Coffee "or its applicable affiliate(s) plan to open and operate multiple Coffee Bars in the geographic territory set forth on Schedule 2.1 (the "Geographic Territory"), and [BR Coffee] wishes to develop Coffee Bars in the Geographic Territory, according to the terms and conditions set forth in this Agreement."  In addition, the GTA provides that each Coffee Bar (as defined in the GTA) operated by BR Coffee or its affiliates will be operated pursuant to an individual franchise agreement.

20.

The GTA grants to BR Coffee the exclusive right and obligation to develop ten Coffee Bars within Clark County, Nevada during the term of the agreement, including the Rainbow Store, Blue Diamond Store, and three other locations in Las Vegas based on leases with BR Coffee's affiliates BR Rainbow North, BR Silverado, and BR Ft. Apache.  The GTA precludes BR Coffee from opening more than ten Coffee Bars in that geographic area.  In exchange, Black Rock agreed that it will not operate, or grant a license or franchise to a third party to operate, a Coffee Bar in the geographic area during the term of the GTA.

21.

Under the GTA, BR Coffee must pay to Black Rock a "Development Fee" of $5,500 for each Coffee Bar it agreed to develop, not counting the first Coffee Bar it established in the

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1    geographic territory.  Because BR Coffee agreed to develop 10 Coffee Bars in the Las Vegas

2    area, it was required to pay a Development Fee of $49,500 ($5,500 x 10 Coffee Bars - $5,500 for

3    the initial Coffee Bar).  BR Coffee paid its Development Fee as required by the GTA.

4                                                    22.

5          BR Coffee also agreed under the GTA that it and its affiliates would not compete against

6    Black Rock during the term of the GTA and for two years following its termination, which

7    includes not operating or assisting in the operation of similar coffee businesses in Las Vegas,

8    Nevada.  BR Coffee specifically agreed that this noncompetition obligation applied to all persons

9    holding an interest in BR Coffee or any entity directly or indirectly controlling BR Coffee, as

10    well as any entity directly or indirectly controlled by Lattanzio or Goergen.

11                                                    23.

12          The parties further agreed that, in the event of a conflict between the GTA and the

13    specific franchise agreements to be executed by BR Coffee's affiliates, the GTA would control.

14    **II.    BR Rainbow and BR Blue Diamond execute Franchise Agreements with Black**
15    **         Rock.**

16                                                    24.

17          Consistent with the GTA, BR Rainbow and BR Blue Diamond each executed a Franchise

18    Agreement with Black Rock with an effective date of August 23, 2019 ("Franchise

19    Agreements").  A copy of the executed Franchise Agreement with BR Rainbow is attached as

20    Exhibit 2, and a copy of the executed Franchise Agreement with BR Blue Diamond is attached

21    as Exhibit 3.

22                                                    25.

23          The Franchise Agreements grant BR Rainbow and BR Blue Diamond the right to use

24    Black Rock's proprietary trademarks and its unique system for the establishment of the Coffee

25    Bar at the Rainbow Store and Blue Diamond Store, respectively, for a period of no less than 10

26    years.

1                                          26.

2          Pursuant to the Franchise Agreements, and as modified by the GTA, BR Rainbow and

3    BR Blue Diamond each agreed to pay a fixed Initial Franchise Fee of $22,000 upon executing

4    leases for their proposed franchise locations.  Because BR Rainbow and BR Blue Diamond had

5    already executed leases for their respective stores, the Initial Franchise Fees of $22,000 each

6    were immediately due to Black Rock.

7                                          27.

8          BR Rainbow and BR Blue Diamond also agreed they would each pay $38,500 to Black

9    Rock as a non-refundable "Grand Opening Deposit" for the grand openings of the Rainbow Store

10   and Blue Diamond Store.  As disclosed in the FDD, if the actual expenses for the grand openings

11   of the franchise stores exceeded the amount of the Grand Opening Deposit, BR Rainbow and BR

12   Blue Diamond agreed that Black Rock would invoice them for the overages.  If the actual

13   expenses for the grand openings were less than the amount of the Grand Opening Deposit, Black

14   Rock would apply the remainder toward future purchases.

15                                         28.

16         In addition, BR Rainbow and BR Blue Diamond agreed to pay a continuing royalty fee

17   ("Royalty Fee") of 5% of their gross sales for all services and products related to their respective

18   franchises or $1,500 per month during the term of the Franchise Agreements, whichever is

19   greater.  BR Rainbow and BR Blue Diamond also agreed to pay a monthly "Branding Fee" of

20   2% of gross sales for all services and products related to their franchises or $1,000 per month

21   during the term of the Franchise Agreements, whichever is greater.  To assist in calculating the

22   Royalty Fee and Branding Fee, BR Rainbow and BR Blue Diamond also agreed to provide a

23   monthly report to Black Rock itemizing the gross sales for the Rainbow Store and Blue Diamond

24   Store.

25   ///

26   ///

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1                                          29.

2          BR Rainbow and BR Blue Diamond further agreed that they could not withhold any of

3   the above payments owed to Black Rock based on Black Rock's alleged nonperformance.  BR

4   Rainbow and BR Blue Diamond agreed that any of their unpaid obligations shall incur a late fee

5   of $50 per day late, plus bear interest of 18% per annum or the maximum amount allowed by

6   applicable law.

7                                          30.

8          To secure their payment obligations, BR Rainbow and BR Blue Diamond each granted

9   Black Rock a security interest in all of their inventory, vehicles, equipment, and other material

10  related to the Rainbow Store or Blue Diamond Store.

11                                         31.

12         As a franchisee, BR Rainbow and BR Blue Diamond also agreed to maintain complete

13  and accurate financial records for their respective Coffee Bars, and to provide monthly financial

14  reports, including profit and loss statements, to Black Rock within 30 days after the end of each

15  month.  BR Rainbow and BR Blue Diamond further agreed that their failure to provide monthly

16  profit and loss statements would cause irreparable harm to Black Rock and entitle it to pursue

17  injunctive relief to compel performance of the obligation, in addition to other remedies.

18                                         32.

19         Pursuant to the Franchise Agreements, BR Rainbow and BR Blue Diamond agreed they

20  would not compete with Black Rock by operating or assisting in the operation of a similar coffee

21  store within the same geographic area during the 10-year term of the agreement, or for two years

22  after the termination of the Franchise Agreements.

23                                         33.

24         Among other things, BR Rainbow and BR Blue Diamond also agreed to strictly comply

25  with Black Rock's menu, standards, recipes, and other provisions in Black Rock's Operations

26  Manual, to use the premises only for their respective franchises, and to not discontinue operation

1   of the Rainbow Store or Blue Diamond Store without Black Rock's prior written consent.  If BR

2   Rainbow or BR Blue Diamond failed to comply with those requirements, they agreed to pay

3   Black Rock $1,100 per violation as liquidated damages in addition to any other remedies owed to

4   Black Rock.

5                                34.

6        Finally, BR Rainbow and BR Blue Diamond agreed that upon default of their respective

7   obligations under the Franchise Agreements, they would pay Black Rock all damages, costs, and

8   expenses incurred by Black Rock as a direct result of the default, including interest at 18% per

9   annum or the maximum rate allowable under applicable law, reasonable attorneys' fees, and the

10   right to appoint a receiver to take possession and manage their assets.  Upon termination of the

11   Franchise Agreements, BR Rainbow and BR Blue Diamond agreed to immediately return to

12   Black Rock all of Black Rock's proprietary information.

13                                 35.

14        Upon termination or expiration of the Franchise Agreements, or any time within six

15   months following the grand opening of the Rainbow and Blue Diamond Stores, BR Rainbow and

16   BR Blue Diamond also agreed that Black Rock had the right to purchase any and all tangible

17   assets or property used in the operation of the Coffee Bars at a specific purchase price designated

18   in the Franchise Agreements.  This purchase option gave Black Rock the ability to take back

19   control of its brand and ensure the greatest profitability for those stores, among other things.

20                                 36.

21        Consistent with the Franchise Agreements, GTA, and applicable provisions of the FDD,

22   BR Coffee paid the Initial Franchise Fees and Grand Opening Deposits for the Rainbow and

23   Blue Diamond Stores.  In addition, because the actual grand opening expenses for the Rainbow

24   and Blue Diamond Stores exceeded the Grand Opening Deposit amounts, Black Rock sent an

25   invoice to BR Coffee for the overage and BR Coffee paid that overage without objection.

26   ///

**HOLLAND & KNIGHT LLP**
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

**III.    BR Silverado executes a Franchise Agreement with Black Rock to open BR Coffee's third franchise in the exclusive Las Vegas territory.**

37.

As contemplated in the GTA, BR Silverado executed a Franchise Agreement with Black Rock with an effective date of October 11, 2019 to open a franchise location at 45 E. Silverado Ranch Blvd., Suite 115, Las Vegas, Nevada ("Silverado Store").  A copy of the executed Franchise Agreement with BR Silverado is attached as Exhibit 4.

38.

The Franchise Agreement between BR Silverado and Black Rock is materially similar to the Franchise Agreements with BR Rainbow and BR Blue Diamond described above.

**IV.    BR Coffee and its affiliate fail to make their required payments to Black Rock.**

39.

Despite executing the Franchise Agreement and opening the Silverado Store, BR Coffee and BR Silverado failed to pay the initial Franchise Fee or Black Rock's expenses exceeding the Grand Opening Deposit, which totaled $52,348.12.  Those fees remain unpaid and have incurred late fees under the Franchise Agreement since November 2019.

40.

From October 2019 through April 2020, Black Rock engaged in numerous discussions with BR Coffee and its affiliates relating to their failure to make all required payments under the Franchise Agreement or otherwise comply with their obligations under the applicable agreements, including sending invoices to BR Coffee and its affiliates for the unpaid amounts. During those discussions, BR Coffee and its affiliates gave several explanations and excuses for their delay, and assured Black Rock that BR Coffee and its affiliates would comply with their obligations.

///

///

**HOLLAND & KNIGHT LLP**
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1                                                          41.

2          In April 2020, Black Rock sent formal notice to BR Coffee and BR Silverado that their

3   repeated failures to pay equate to a violation of BR Silverado's Franchise Agreement and a

4   cross-default of the Franchise Agreements executed by each of BR Coffee's affiliates.  Black

5   Rock demanded financial information for each of BR Coffee's affiliates pursuant to Section 11.3

6   of the Franchise Agreements, which they previously failed to provide as required in those

7   agreements, and payment of the outstanding $56,749.29 in fees immediately or else Black

8   Rock would terminate its agreements with BR Coffee and its affiliates.

9                                                          42.

10         In response, BR Coffee and BR Silverado asserted that they did not owe the fees to Black

11   Rock and that Black Rock had no basis to terminate the various agreements.

12   **V.      BR Coffee seeks to rescind the agreements and immediately compete with Black
            Rock in the exclusive territory.**
13

14                                                         43.

15         Rather than comply with their obligations, BR Coffee and its affiliates attempted to

16   rescind their various agreements with Black Rock by filing a lawsuit in May 2020 in Orange

17   County Superior Court in California, in contravention of the exclusive arbitration provisions in

18   the GTA and Franchise Agreements.

19                                                         44.

20         BR Coffee and its affiliates also immediately began rebranding the Rainbow, Blue

21   Diamond, and Silverado Stores to operate competing coffee bars in violation of the GTA and

22   applicable Franchise Agreements.  Upon information and belief, BR Coffee or its affiliates are

23   already operating competing Coffee Bars in Las Vegas, Nevada under the brand name "Royal

24   Coffee Roasting Co."

25   ///

26   ///

Page 11 -       ARBITRATION DEMAND

1

## FIRST CLAIM FOR RELIEF

2

### Declaratory Judgment

3

### (Against all Respondents)

4

45.

5  Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

6  herein.

7

46.

8  A genuine dispute exists between the parties pertaining to the GTA and Franchise

9  Agreements, including whether Respondents are entitled to rescind those agreements and

10  whether Respondents have breached any duties owed to Black Rock.

11

47.

12  Pursuant to the Uniform Declaratory Judgments Act (ORS 28.010 *et seq*.), Claimant

13  seeks the following declarations:

14       a)     The GTA and Franchise Agreements are valid and enforceable;

15       b)     Respondents are not entitled to rescind the GTA or Franchise

16            Agreements;

17       c)     Respondents' claims in their lawsuit in Orange County Superior Court

18            are subject to arbitration pursuant to the GTA and/or Franchise

19            Agreements; and

20       d)     Respondents must reimburse Black Rock for any attorneys' fees and

21            related costs and disbursements incurred in this arbitration and the

22            Orange County Superior Court proceeding.

23  ///

24  ///

25  ///

26  ///

Page 12 -    ARBITRATION DEMAND

**SECOND CLAIM FOR RELIEF**

**Breach of Contract**

**(Count I – Failure to Pay Franchise Fees**
**Against BR Coffee and BR Silverado)**

48.

Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

49.

The GTA and Franchise Agreement with BR Silverado are valid, enforceable contracts.

50.

Claimant has fully performed all of its obligations under the GTA and Franchise Agreement.

51.

Respondents BR Coffee and BR Silverado have breached the GTA and Franchise Agreement, as well as the implied covenant of good faith and fair dealing contained therein, in several respects, including but not limited to by: (1) failing to pay the Initial Franchise Fee for the Silverado Store; (2) failing to pay the grand opening expenses for the Silverado Store in excess of the Grand Opening Deposit; and (3) failing to provide required financial information to Black Rock.

52.

Black Rock has been damaged by these breaches of contract and the failure of Respondents to discharge their contractual duties with good faith and fair dealing by, among other things, being wrongfully denied approximately $56,749.29 in payments and late fees under the GTA and Franchise Agreement.

///

///

Page 13 -    ARBITRATION DEMAND

1          53.

2          Among other things, Black Rock is entitled to relief of over $56,749.29 for Respondents'

3    breaches of contract, as well as its reasonable arbitration expenses and attorneys' fees.

4                         **(Count II – Failure to Operate Franchises**
                              **Against All Respondents)**
5

6          54.

7          Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

8    herein.

9          55.

10   The GTA and Franchise Agreements are valid, enforceable contracts.

11         56.

12   Claimant has fully performed all of its obligations under the GTA and Franchise

13   Agreements.

14         57.

15   Respondents have breached the GTA and Franchise Agreements, as well as the implied

16   covenant of good faith and fair dealing contained therein, in several respects, including but not

17   limited to by: (1) failing to operate and maintain the Rainbow Store; (2) failing to operate and

18   maintain the Blue Diamond Store; (3) failing to operate and maintain the Silverado Store; (4)

19   failing to develop and operate all ten stores outlined in the GTA; (5) failing to pay all required

20   Royalty Fees and Branding Fees; (6) failing to provide all required monthly reports and financial

21   information; (7) failing to strictly comply with the Operations Manual; and (8) preventing Black

22   Rock from exercising its right to purchase the Rainbow, Blue Diamond, and Silverado Stores, or

23   other franchises in the exclusive territory, at the agreed-upon purchase price.

24         58.

25   Black Rock has been damaged by these breaches of contract and the failure of

26   Respondents to discharge their contractual duties with good faith and fair dealing by, among

Page 14 -       ARBITRATION DEMAND                    **HOLLAND & KNIGHT LLP**
                                                          601 SW Second Ave., Ste. 1800
                                                            Portland, OR  97204
                                                        Telephone:  503.243.2300

1  other things, being wrongfully denied its Royalty Fees and Branding Fees for the ten exclusive

2  franchises, which results in damages of approximately $7 million, and being wrongfully denied

3  its buy-out options for the franchised stores, which results in additional damages of

4  approximately $900,000.  Black Rock reserves its right to seek liquidated damages arising from

5  Respondents' breaches of Section 8 of the Franchise Agreements.

6                                                59.

7         Among other things, Black Rock is entitled to relief of over $7.9 million for

8  Respondents' breaches of contract, as well as all reasonable arbitration expenses.

9              **(Count III – Violation of Noncompetition Obligations**
10                        **Against All Respondents)**

11                                              60.

12        Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

13  herein.

14                                              61.

15        The GTA and Franchise Agreements are valid, enforceable contracts.

16                                              62.

17        Claimant has fully performed all of its obligations under the GTA and Franchise

18  Agreements.

19                                              63.

20        Under the terms of the GTA and Franchise Agreements, Respondents had a duty not to:

21        (a)     Compete with Black Rock or engage in any business in competition with Black

22  Rock within 200 miles of Clark County, Nevada without Black Rock's express written consent

23  during the term of the GTA or Franchise Agreements and for a period of two years after their

24  expiration or termination; or

25  ///

26  ///

1       (b)     Employ or seek to employ any employee of Black Rock or any employee of Black

2 Rock's franchisees for a period of one year following the non-employment of such employee.

3                                      64.

4       This covenant not to compete is reasonable in duration, geographic scope, and its

5 limitation on the future employability of Respondents, and it is supported by consideration.

6                                      65.

7       These covenants not to compete reasonably protect Black Rock's legitimate interests.

8 Specifically, Black Rock has a legitimate interest in enforcing Respondents' non-competition

9 obligations because it is necessary to protect Black Rock's goodwill, trade secrets, and long-term

10 investment in developing its proprietary marks and system of Coffee Bars.  As the franchisor,

11 Black Rock equipped Respondents with the knowledge, goodwill, brand, valuable social media

12 presence, and secrets of its Coffee Bars in exchange for the expectation of continued royalty

13 payments from their franchise locations.  Without the non-competition obligation, Respondents

14 could—as they have done here—obtain all that crucial information, refuse to pay the required

15 royalties to Black Rock, and then cash in on the customer loyalty and goodwill created by Black

16 Rock at the franchise location.

17                                    66.

18       As part of the GTA and Franchise Agreements, Respondents agreed that Black Rock's

19 proprietary marks and system, reputation, goodwill, trade secrets, and confidential business

20 information are of considerable value, and that disclosure or use of that information outside the

21 restrictions of the GTA and Franchise Agreements will cause irreparable damage and harm to

22 Black Rock.

23                                    67.

24       These covenants also protect against customer confusion.  Customers who have

25 developed a relationship with Respondents' franchise locations may already associate those

26 Coffee Bars with Black Rock regardless of Respondents' attempt to rebrand those businesses.

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR 97204
Telephone: 503.243.2300

1    Customers may also believe that Black Rock sanctions Respondents' rebranded locations, and

2    are continuing to offer the same food and beverage offered through the Black Rock brand simply

3    under a different name.  This customer confusion can be avoided only through enforcement of

4    the noncompetition obligations.

5                                    68.

6            In addition, without enforcement of the noncompetition covenants, Black Rock is likely

7    prevented from engaging in any new franchises in Clark County, Nevada, because new

8    franchisees are generally uninterested in purchasing a franchise in a market where a competitor

9    continues to operate essentially the same business, in the same location, with the same customer

10   base while capitalizing on Black Rock's goodwill and proprietary business model.  Indeed, Black

11   Rock is currently prohibited under the GTA from operating itself or franchising any Black Rock-

12   branded Coffee Bars in the Las Vegas area.  Thus, Respondents' breach of their obligations

13   precludes Black Rock from obtaining any return on its investment in the Las Vegas area, whether

14   through royalty payments from franchisees or direct profits from a Black Rock Coffee Bar.

15                                   69.

16           Respondents have breached the noncompetition obligations in the GTA and Franchise

17   Agreements, in several respects, including but not limited to by: (1) rebranding the Rainbow,

18   Blue Diamond, and Silverado Stores and continuing to offer coffee bar services within Las

19   Vegas, Nevada; (2) establishing entities intended to manage or operate competing coffee bar

20   businesses; (3) employing or attempting to employ persons previously employed by Black

21   Rock's franchisees, including employees at the Rainbow, Blue Diamond, and Silverado Stores;

22   and (4) trading on Black Rock's brand and social media assets to convert Black Rock customers

23   or prospective customers to follow and/or patronize Respondents' competing coffee bar

24   businesses.  Upon information and belief, Respondents also intend to open additional competing

25   coffee bars in Las Vegas, Nevada in violation of the parties' contracts.

26   ///

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1              70.

2       As a result of the Respondents' continued operation of directly competitive businesses in

3 the same territory and same locations authorized by the GTA, Black Rock has suffered

4 irreparable harm to its business and brand, and will continue to suffer irreparable harm from the

5 Respondents' continued breach of their covenants not to compete.

6              71.

7       The damages from the Respondents' activities are considerable and continuing, and thus

8 cannot be fully ascertained at this time.  In addition, Black Rock reserves its rights to seek

9 temporary, preliminary, and permanent relief based on Respondents' ongoing breach of their

10 noncompetition obligations.

11              72.

12       Among other things, Black Rock is entitled to relief of over $7.9 million relating to

13 Black Rock's lost Royalty Fees and Branding Fees for the ten exclusive franchises and its lost

14 opportunity to buy-out the franchised stores as result of Respondents' breaches of contract, as

15 well as all reasonable arbitration expenses.  In addition, Black Rock is entitled to relief of over

16 $2 million due to damage to its goodwill and brand as a result of Respondents' breaches of

17 contract.

18              73.

19       To the extent the harm to Black Rock's substantial business and property rights cannot be

20 remedied at law, Black Rock reserves the right to seek temporary, preliminary, and permanent

21 injunctive relief prohibiting Respondents from competing with Black Rock within 200 miles of

22 Clark County, Nevada, including but not limited to operating the competing coffee bars now

23 located at the Rainbow, Blue Diamond, and Silverado Stores.

24 ///

25 ///

26 ///

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1

**(Count IV – Failure to Abide by Arbitration Provisions
Against All Respondents)**

2

3

74.

4

Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

5

herein.

6

75.

7

The GTA and Franchise Agreements with Respondents are valid, enforceable contracts.

8

76.

9

Claimant has fully performed all of its obligations under the GTA and Franchise

10

Agreements.

11

77.

12

Respondents have breached the GTA and Franchise Agreements by filing a lawsuit

13

against Black Rock in Orange County Superior Court in direct contravention of the exclusive

14

arbitration provisions of the GTA and Franchise Agreements, and by asserting claims in that

15

lawsuit that arise out of or relate to the performance of those agreements.

16

78.

17

Black Rock has been damaged by these breaches of contract by, among other things,

18

being forced to litigate outside the exclusive forum agreed to by the parties, and incurring court

19

costs and attorney fees to relating to that separate lawsuit.

20

79.

21

Among other things, Black Rock is entitled to relief of its incurred costs and fees for

22

Respondents' breaches of contract, as well as its reasonable arbitration expenses and attorneys'

23

fees.

24

///

25

///

26

///

**HOLLAND & KNIGHT LLP**
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1

**THIRD CLAIM FOR RELIEF**

2

**Misappropriation of Trade Secrets Under the DTSA - 18 U.S.C. § 1832**

3

**(Against All Respondents)**

4

80.

5

Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

6

herein.

7

81.

8

Black Rock operates its business in interstate commerce across the United States.

9

82.

10

Black Rock's proprietary business model and retail system of Coffee Bars, amongst other

11

proprietary business information, qualify as "trade secrets" under the DTSA, as defined under 18

12

U.S.C. § 1839(3).

13

83.

14

Black Rock's business model and retail system of Coffee Bars derives independent

15

economic value, actual or potential, from not being generally known; it is not readily

16

ascertainable through proper means and Black Rock has taken reasonable measures to keep such

17

information secret.  For example, Black Rock requires any potential franchisee to sign non-

18

disclosure and noncompetition covenants prohibiting the use and disclosure of such trade secrets

19

prior to being given access to the proprietary information.  Black Rock also requires former

20

franchisees to immediately return all of the company's confidential information upon termination

21

of the Franchise Agreements.

22

84.

23

The trade secrets misappropriated by Respondents ("trade secrets") include information

24

concerning Black Rock's competitive and proprietary pricing, business model, recipes, menus,

25

Operations Manual, and other information necessary to open a Black Rock-branded franchise.

26

///

**HOLLAND & KNIGHT LLP**
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1    Black Rock has expended substantial resources, time, and investment to create, collect, and/or

2    develop the trade secrets.

3                                            85.

4            During the course of their relationship, and as acknowledged in the GTA and Franchise

5    Agreements, Respondents were given access to Black Rock's trade secrets, and they had a duty

6    to keep such information confidential and refrain from using that information to Black Rock's

7    detriment, and to return all such information upon termination of the agreements.

8                                            86.

9            As expressly acknowledged in the GTA and Franchise Agreements, Black Rock

10   considers these items confidential and proprietary trade secrets, and it has taken reasonable steps

11   as part of its ongoing business operations to maintain the confidential nature of this information.

12                                           87.

13           Respondents have misappropriated Black Rock's trade secrets in the following ways:

14           (a)      By acquiring the trade secrets, knowingly or with reason to know, that they were

15   acquired through improper means, including but not limited to through misrepresentation or

16   breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade

17   secret; and

18           (b)      By disclosing or using the trade secrets without consent of Black Rock as part of

19   Respondents' competing businesses.

20                                           88.

21           Upon information and belief, Respondents executed the GTA and Franchise Agreements

22   with Black Rock to obtain access to Black Rock's trade secrets with no intention of complying

23   with the agreements, but to acquire those trade secrets for use in Respondents' competing

24   businesses.  Upon information and belief, Respondents are using and threaten to further

25   misappropriate Black Rock's trade secrets on behalf of their competing businesses unless

26   enjoined.

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1          89.

2          Respondents' actions described herein constitute willful and malicious misappropriation

3     of Black Rock's trade secrets under 18 U.S.C. § 1836(b)(2).

4          90.

5          Respondents' misappropriation of Black Rock's trade secrets is causing, and threatens to

6     continue causing, Black Rock to suffer irreparable harm, including but not limited to loss of

7     customers or franchisees, loss of reputation and goodwill, and loss of its investment in its trade

8     secrets.  This harm cannot be adequately remedied at law and Black Rock reserves the right to

9     seek temporary, preliminary, and permanent injunctive relief prohibiting Respondents from using

10    or misappropriating Black Rock's trade secrets.

11         91.

12         Black Rock is entitled to full compensatory and consequential damages for its actual loss

13    and for unjust enrichment caused by the misappropriation in Respondents' competing stores,

14    which is approximately $30 million.  Alternatively, or in addition to those damages, Black Rock

15    is entitled to a reasonable royalty for the unauthorized disclosure or use of the trade secrets under

16    the DTSA, and such other relief as the Court deems just and proper.

17         92.

18         In addition, on information and belief, Respondents' misappropriation was willful and

19    malicious and Black Rock is entitled to an award of exemplary damages and reasonable

20    attorneys' fees and costs incurred herein pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D).

21                        **FOURTH CLAIM FOR RELIEF**

22         **Misappropriation of Trade Secrets Under the OUTSA - ORS 646.465**

23                        **(Against All Respondents)**

24         93.

25         Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

26    herein.

Page 22 -      ARBITRATION DEMAND

1          94.

2          As set forth above and upon information and belief, Respondents acquired and

3   misappropriated Black Rock's proprietary business model and retail system of Coffee Bars,

4   including its competitive and proprietary pricing, business model, recipes, menus, and other

5   information necessary to open a Black Rock-branded franchise.

6          95.

7          This information qualifies as "trade secrets" under the Oregon Uniform Trade Secrets Act

8   ("OUTSA"), as that term is defined in ORS 646.461(4).

9          96.

10         Respondents have misappropriated Black Rock's trade secrets under the OUTSA in the

11  following ways:

12         (a)     By acquiring the trade secrets, knowingly or with reason to know, that they were

13  acquired through improper means, including but not limited to through misrepresentation or

14  breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade

15  secrets; and

16         (b)     By disclosing or using the trade secrets without consent of Black Rock as part of

17  Respondents' competing businesses.

18         97.

19         Upon information and belief, Respondents executed the GTA and Franchise Agreements

20  with Black Rock to obtain access to Black Rock's trade secrets with no intention of complying

21  with the agreements, but to acquire those trade secrets for use in Respondents' competing

22  businesses.  Upon information and belief, Respondents are using and threaten to further

23  misappropriate Black Rock's trade secrets on behalf of their competing businesses unless

24  enjoined.

25  ///

26  ///

Page 23 -      ARBITRATION DEMAND

1          98.

2          Respondents' actions described herein constitute willful and malicious misappropriation

3   of Black Rock's trade secrets under the OUTSA.

4          99.

5          Respondents' misappropriation of Black Rock's trade secrets is causing, and threatens to

6   continue causing, Black Rock to suffer irreparable harm, including but not limited to loss of

7   customers or franchisees, loss of reputation and goodwill, and loss of its investment in its trade

8   secrets.  This harm cannot be adequately remedied at law and Black Rock reserves the right to

9   seek temporary, preliminary, and permanent injunctive relief prohibiting Respondents from using

10  or misappropriating Black Rock's trade secrets.

11         100.

12         Black Rock is entitled to full compensatory and consequential damages for its actual loss

13  and for unjust enrichment caused by the misappropriation in Respondents' competing stores,

14  which is approximately $30 million.  Alternatively, or in addition to those damages, Black Rock

15  is entitled to a reasonable royalty for the unauthorized disclosure or use of the trade secrets under

16  the OUTSA, and such other relief as the Court deems just and proper.

17         101.

18         In addition, on information and belief, Respondents' misappropriation was willful and

19  malicious and Black Rock is entitled to an award of exemplary damages and reasonable

20  attorneys' fees and costs incurred herein pursuant to ORS 646.465 and ORS 646.467.

21                         **FIFTH CLAIM FOR RELIEF**

22                              **Unjust Enrichment**

23                           **(Against All Respondents)**

24         102.

25         Claimant repeats and realleges each of the foregoing paragraphs as if fully set forth

26  herein.

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1          103.

2          Black Rock provided to Respondents its supplies, promotional materials, signage, social

3     media assets, and other non-trade secret personal information necessary for Respondents to open

4     authorized Black Rock-branded franchisees ("Franchise Materials") pursuant to the GTA and

5     Franchise Agreements.  The Franchise Materials are valuable and rightfully belong to Black

6     Rock.

7          104.

8          Respondents contend that they have rescinded the GTA and Franchise Agreements, and

9     intend to keep the Franchise Materials under circumstances that are wrongful and inequitable,

10    including failing to make payments under the GTA and Franchise Agreements while maintaining

11    the valuable information in the Franchise Materials.

12         105.

13         To the extent that the GTA and Franchise Agreements are not held to be valid and

14    enforceable, Respondents have caused harm to Black Rock by, among other things, wrongfully

15    stealing the Franchise Materials from Black Rock without payment.

16         106.

17         Respondents have also been wrongfully enriched by retaining the value of the Franchise

18    Materials that rightfully belong to Black Rock and should be ordered to pay to Black Rock the

19    value of that information in the Franchise Materials they received as damages, in amount of

20    approximately $30 million.

21                                    **PRAYER FOR RELIEF**

22         WHEREFORE, Claimant requests the following:

23         (1)        Judgment in the Claimant's favor;

24         (2)        A declaration that the GTA and Franchise Agreements are valid and

25                    enforceable, that Respondents are not entitled to rescind the GTA or

26                    Franchise Agreements, that Respondents' claims in their lawsuit in Orange

HOLLAND & KNIGHT LLP
601 SW Second Ave., Ste. 1800
Portland, OR  97204
Telephone:  503.243.2300

1    County Superior Court are subject to arbitration; and that Respondents

2    must reimburse Black Rock for any attorneys' fees and related costs and

3    disbursements incurred in this arbitration or the Orange County Superior

4    Court proceeding;

5    (3)    Damages in an amount to be determined, but no less than $30 million;

6    (4)    An order requiring Respondents to disgorge all ill-gotten gains;

7    (5)    Prejudgment interest;

8    (6)    Attorneys' fees and related costs and disbursements; and

9    (7)    Such other relief as the arbitrator deems just and proper.

10   Dated this 29th day of May, 2020.

HOLLAND & KNIGHT LLP

By: _s/J. Matthew Donohue_
J. Matthew Donohue, OSB No. 065742
Email: matt.donohue@hklaw.com
Shannon Armstrong, OSB No. 060113
Email: shannon.armstrong@hklaw.com
Kristin Asai, OSB No. 103286
Email: kristin.asai@hklaw.com
Lisa Howley, OSB No. 150152
Email: lisa.howley@hklaw.com
601 SW Second Avenue, Suite 1800
Portland, OR 97204
Telephone: 503.243.2300
Fax: 503.241.8014

Attorneys for Claimant

CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing ARBITRATION DEMAND to be served on

the following person[s]:

Jonathan W. Fountain
Howard & Howard Attorneys PLLC
3800 Howard Hughes Parkway, Ste. 1000
Las Vegas, NV 89169
Telephone: 702.667.4823
Fax: 702.567.1568
Email: jwf@h2law.com

*Attorney for Respondents*

by the following indicated method or methods:

☑    by email to the to the parties and/or their attorneys as shown above on the date set forth below.

☑    by mailing full, true and correct copies thereof in sealed, first class postage prepaid envelopes, addressed to the parties and/or their attorneys as shown above, to the last-known office addresses of the parties and/or attorneys, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

☐    by causing full, true, and correct copies thereof to be hand-delivered to the parties and/or their attorneys at their last-known office addresses listed above on the date set forth below.

☐    by sending full, true, and correct copies thereof, via overnight courier in sealed, prepaid envelopes, addressed to the parties and/or their attorneys as shown above, to the last-known office addresses of the parties and/or their attorneys, on the date set forth below.

☐    by faxing full, true, and correct copies thereof to the fax machines which are the last-known fax numbers for the parties' and/or attorneys' offices, on the date set forth below.

DATED May 29, 2020.

*s/J. Matthew Donohue*
J. Matthew Donohue

Page 1 -    CERTIFICATE OF SERVICE

**HOLLAND & KNIGHT LLP**
601 SW Second Ave., Ste. 1800
Portland, OR 97204
Telephone: 503.243.2300

*Execution Version*

## BLACK ROCK COFFEE BAR

## GEOGRAPHIC TERRITORY AGREEMENT

This GEOGRAPHIC TERRITORY AGREEMENT (this "***Agreement***") is made and entered into as of August 21, 2019 (the "***Effective Date***") by and between Black Rock Coffee Bar, LLC, an Oregon limited liability company ("***BRCB***") and BR Coffee, LLC, a Nevada limited liability company ("***Developer***").

Whereas, BRCB has developed and established a uniform method of operation, customer service, advertising, publicity, processes, techniques, and technical knowledge in connection with its retail coffee bar business specializing in espresso, coffee, and related items in drive-thru, sit-down or combination locations (hereinafter referred to as "***Coffee Bars***").  These Coffee Bars do business under the trade name "*Black Rock Coffee Bar*". All of the knowledge, experience, processes, methods, specifications, techniques and proprietary marks and information of BRCB are referred to in this Agreement collectively as the "***BRCB System***"; and

Whereas, BRCB and Developer or its applicable affiliate(s) plan to open and operate multiple Coffee Bars in the geographic territory set forth on **Schedule 2.1** (the "***Geographic Territory***"), and Developer wishes to develop Coffee Bars in the Geographic Territory, according to the terms and conditions set forth in this Agreement; and

Whereas, each Coffee Bar opened by Developer or its applicable affiliate(s) will be operated under an individual franchise agreement with BRCB (a "***Franchise Agreement***"); and

Whereas, each Franchise Agreement for a Coffee Bar opened by Developer or its applicable affiliate(s) will be modified by the form of Addendum attached as **Schedule 5.5**.

Now, therefore, the parties agree as follows:

1.    **Definitions**.  Any capitalized terms used herein but not defined herein will have the meanings assigned to them in the form of Franchise Agreement that is attached to this Agreement as **Exhibit 1**. Unless otherwise stated, a reference to a "Section" is to a section of this Agreement, and a reference to an "Exhibit" or "Schedule" is to an exhibit or schedule to this Agreement. All definitions are equally applicable to plural and singular defined terms.

2.    **Development Right**.

2.1.    **Grant of Development Right**.  BRCB grants to Developer the right to develop Coffee Bars, solely within the Geographic Territory and during the term of this Agreement, both as and to the extent set forth on **Schedule 2.1**.  To the extent that the Geographic Territory is defined according to any city, county or political subdivision, the Geographic Territory is fixed as of the Effective Date, and any subsequent change in the

boundaries of such city, county or political subdivision will not affect a change in the Geographic Territory.

2.2.    **Limitations**.  The grant of the development right under Section 2.1 does not include any license to use the Proprietary Marks or the BRCB System, such license being granted only pursuant to the individual Franchise Agreement executed for each Coffee Bar.

2.3.    **Exclusivity of Development Right**.  During the term of this Agreement, BRCB will not operate, or grant a license or franchise to a third party to operate, a Coffee Bar within the Geographic Territory; provided, however, that any Coffee Bar already in operation within the Geographic Territory on the Effective Date may, subject to the terms and conditions of the Franchise Agreement pursuant to which such Coffee Bar is operating, continue to operate during the term of this Agreement.  Nothing in this Agreement will in any way restrict BRCB's right to (a) own or operate, or grant a franchise to operate, Coffee Bars outside the Geographic Territory, (b) advertise products and services using the Proprietary Marks in any medium as part of a national, regional, or local advertising campaign in any location, including within the Geographic Territory, (c) produce, license, distribute or market products using the Proprietary Marks, including without limitation prepackaged food and beverage products, clothing, souvenirs and novelty items, at or through any location other than a Coffee Bar (whether or not located within the Geographic Territory), and through any distribution channel, at wholesale or retail, including by means of mail order catalogs, direct mail, internet marketing and other distribution channels or (d) enforce the terms of any Franchise Agreement, so long as such enforcement does not circumvent Developer and its affiliates' rights under this Section 2.3.

2.4.    **Waiver**.  BRCB hereby waives the following violations existing as of the date of this Agreement by Developer or its affiliated entity as set forth below:

a.    BRCB subordinates its security interest for the Coffee Bars identified on the list attached on **Schedule 2.4**.

b.    BRCB has reviewed, and approves, the leases that have been signed by Developer's affiliates prior to the Effective Date, as listed on the attached **Schedule 2.4**. As of the date hereof, Developer has delivered executed a Conditional Assignment and Assumption of Lease with respect to each such lease in form and substance reasonably acceptable to BRCB, except as indicated on **Schedule 2.4** (each a "***Missing Conditional Assignment***"). Except with respect to the Rainbow North Coffee Bar (defined below), Developer shall obtain from each applicable landlord an executed copy of each Missing Conditional Assignment and promptly deliver such executed copy to BRCB.

The Coffee Bar Developer proposes to open located at 5650 S. Rainbow Blvd., Las Vegas, Nevada 89118 is referred to as the "***Rainbow North Coffee Bar***." From and after the date hereof, Developer shall exercise best efforts to obtain from the landlord for the Rainbow North Coffee Bar (together with its successors and assigns, the "***Rainbow North Landlord***") the Conditional Assignment and Assumption of Lease with respect to the lease

for the Rainbow North Coffee Bar, and promptly deliver such executed copy to BRCB. In connection therewith,

i.  BRCB may, but shall not be obligated to, participate in obtaining the Conditional Assignment and Assumption of Lease from the Rainbow North Landlord, and Developer shall cooperate with BRCB in connection therewith. BRCB may, without limitation, contact the Rainbow North Landlord regarding the Conditional Assignment and Assumption of Lease.

ii.  Developer will pay any charges imposed by the Rainbow North Landlord in connection with obtaining the Conditional Assignment and Assumption of Lease (or, if one is not obtained, any charges or increased rent imposed by the Rainbow North Landlord upon the exercise of the Purchase Right under the Franchise Agreement for the Rainbow North Coffee Bar in order to obtain a consent to the assignment at that time). BRCB shall have the right to offset any such charges not promptly paid against the purchase price payable in respect of the purchase option under the Franchise Agreement.

iii. If Developer does not deliver an executed Conditional Assignment and Assumption of Lease for the Rainbow North Coffee Bar prior to the execution of the Franchise Agreement for that location, then the addendum to the Franchise Agreement for that location shall grant BRCB the right to receive the cash flow from the Rainbow North Coffee Bar following the exercise of the Purchase Right under the Franchise Agreement if the consent of the Rainbow North Landlord to the assignment of the lease in connection with the closing of the Purchase Right cannot be obtained.

c.  Developer shall indemnify, defend and hold harmless BRCB and any of its affiliates for any losses BRCB suffers, directly or indirectly as a result of Developer's failure to obtain and deliver an executed copy of each Missing Conditional Assignment. Notwithstanding anything to the contrary contained in this Agreement, this indemnification obligation shall survive the termination or expiration of this Agreement indefinitely.

3.   **Development Obligation**.

3.1.   **Development of New Coffee Bars**.  During the term of this Agreement, Developer will acquire the rights to premises for, equip, and open at least the number of Coffee Bars specified on **Schedule 2.1**, within the Geographic Territory (which number includes the sites set forth on Schedule 2.4(b)).  Developer will satisfy the requirements of this Section if premises have been leased or purchased, and a Franchise Agreement has been signed, for the last Coffee Bar necessary to meet Developer's obligation, no later than ninety (90) days before the end of the term of this Agreement.

3.2.   **Force Majeure**.   If Developer is unable to satisfy the development obligation under Section 3.1 due to strike, riot, civil disorder, war, failure of supply, fire, flood, earthquake, natural catastrophe or other similar events beyond Developer's control,

then upon notice to BRCB, the term of this Agreement will be extended for a corresponding period, not to exceed 180 days.

     3.3.    **No Right to Open Additional Coffee Bars**.  The Developer may not, without express agreement in writing by BRCB, open Coffee Bars in the Geographic Territory in excess of the number specified on **Schedule 2.1**.

    4.    **Term and Termination**.

     4.1.    **Term**.  This Agreement will be coterminous with the term set forth on **Schedule 2.1**.

     4.2.    **Expiration**.  The term of this Agreement will expire prior to the term set forth on **Schedule 2.1** upon the execution of the Franchise Agreement for the last Coffee Bar necessary to meet Developer's obligation under Section 3.1, unless BRCB has agreed in writing to extend the term to permit the development of additional Coffee Bars in the Geographic Territory pursuant to Section 3.3.

     4.3.    **Termination for Cause**.  This Agreement may also be terminated for cause following a material breach by Developer.  A material breach includes, but is not limited to, any of the following: (a) a material breach of any Franchise Agreement between BRCB and Developer resulting in for-cause termination of said agreement; (b) a failure to meet the development obligation set out on **Schedule 2.1**; (c) any breach of the covenants of noncompetition and nonsolicitation set out in Section 8; (d) any unapproved transfer in violation of Section 9; (e) commission of an act of fraud by Developer with respect to its rights or obligations under this Agreement; or (f) any Insolvency Event.

     4.4.    **Franchise Agreements May Survive Expiration**.  Each of the Franchise Agreements between the parties is governed by its own provisions as to term and termination.

    5.    **Site Selection and Approval Process**.

     5.1.    **Site Proposal**.  Developer will initiate the process for opening a new Coffee Bar by proposing at least one (1), but not more than ten (10), potential sites within the Geographic Territory, using the site approval form provided by BRCB.  BRCB will evaluate the proposed site(s) and determine, in its sole discretion, whether any proposed site is acceptable.  Developer will not enter into an agreement to lease or purchase a proposed site unless and until the site has been approved pursuant to Section 5. BRCB will not unreasonably withhold its consent to a lease for a site it has previously approved that contains BRCB's Conditional Assignment of Lease.

     5.2.    **Site Security Interests and Documentation**. Developer shall submit to BRCB all leases, financing agreements, and operating agreements in connection with each proposed new Coffee Bar for its approval ("Documentation").  Developer shall not alter such Documentation in any material respect without the approval of BRCB. To the extent

BRCB asserts a security interest on the assets of any Coffee Bar, BRCB will subordinate its security interest to third-party, unaffiliated lender(s) and the bona fide third-party landlord identified in the Documentation provided that such security interests shall relate only to obligations of the Coffee Bar and BRCB shall have the right to cure any defaults and assume the obligations of such Coffee Bar.

5.3.    **Prompt Decision on Proposed Sites**.  BRCB will respond to a site proposal by approving, disapproving, or requesting additional information within thirty (30) days of receipt of the proposal.  If BRCB does not respond to a site proposal within thirty (30) days of its receipt of the proposal or additional information thereto, the proposal is deemed rejected.  Developer agrees that approval of a proposed site by BRCB does not constitute a representation by BRCB that a Coffee Bar at the proposed site will be successful or profitable, and Developer will not rely on BRCB's approval as such a representation. In the event BRCB either: (a) rejects Developer's site proposal; or (b) fails to approve Developer's site proposal within thirty (30) days of receipt such that the proposal is deemed rejected, then the deadlines set forth in Schedule 2.1 will be extended for thirty (30) days for each such rejection (or failure to respond), up to a maximum of six such extensions (i.e., the deadlines shall be extended for no more than 180 days).

5.4.    **Execution of Franchise Agreement**.  Following approval of a proposed site within the Geographic Territory, Developer will enter into BRCB's then-current form of Franchise Agreement for the Coffee Bar to be located at that site.   Developer acknowledges that future versions of the Franchise Agreement may vary substantially from the current Franchise Agreement, but in each case the Franchise Agreement will be modified by the form of Addendum attached as **Schedule 5.4**.

5.5.    **Social Media**.  Developer and its affiliates will be permitted to use the Proprietary Marks on social media channels to promote and market the Coffee Bar, for so long as Developer's use of the Proprietary Marks conforms to BRCB's guidelines for use and display of the Proprietary Marks then in effect. Developer acknowledges and agrees that BRCB may in the future revise its guidelines to provide that BRCB shall have exclusive control over social media or other digital marketing channels relating to Coffee Bars or the use of the Proprietary Marks and that such policies shall supersede Developer's rights under this Section 5.6.

6.    **Development Fee and Initial Franchise Fee**.

6.1.    **Development Fee**.  The "***Development Fee***" is Five Thousand Five Hundred Dollars ($5,500) per Coffee Bar, multiplied by the number of Coffee Bars to be opened in fulfillment of Developer's obligations under Section 3.1, not counting the first such Coffee Bar.  The Development Fee is due and payable on the Effective Date.  The Development Fee is deemed fully earned when paid and is non-refundable.

6.2.    **Initial Franchise Fee**.  The Initial Franchise Fee for each Coffee Bar after the first Coffee Bar to be opened pursuant to this Agreement will be fixed at the amount applicable to the first Coffee Bar opened by Developer, less Five Thousand Five Hundred

Dollars ($5,500). Any future increase in BRCB's Initial Franchise Fee will not affect the Initial Franchise Fee for Coffee Bars opened by Developer in the Geographic Territory, provided however that BRCB may increase the Initial Franchise Fee for any Coffee Bars opened by Developer in excess of the number set forth on **Schedule 2.1**, if BRCB agrees to allow Developer to open such additional Coffee Bars.

7.    **Training and Opening Assistance**.  Training and opening assistance for the first Coffee Bar to be opened by Developer will be as set forth in the Franchise Agreement.  For each subsequent BRCB outlet, BRCB will, at Developer's option, cost and expense, provide training for a designated store manager, on the terms set forth in the Franchise Agreement. In addition, BRCB shall have the right but not the obligation to assist with the grand opening of each subsequent BRCB outlet.

8.    **Noncompetition**.

8.1.    **Definition of Competition**.  For purposes of this Section 8, "competition" means (a) diverting business to any competitor of BRCB, by direct or indirect inducement or otherwise; (b) performing any act injurious or prejudicial to the goodwill associated with the BRCB Marks or the BRCB System; and (c) the operation of, or assisting in the operation of, a coffee business the same as or similar to a Coffee Bar, other than pursuant to a franchise agreement with BRCB, within the geographical area stated in Section 8.3.

8.2.    **Blue Pencil**.  If a judicial or quasi-judicial authority called upon to enforce this Section 8 deems any of its provisions to be unenforceable by reason of its scope or extent, the parties intend that such authority should enforce such provision to the maximum extent permitted by applicable law.

8.3.    **Noncompete and Nonsolicitation Covenants**.  During the term of this Agreement, and for a period of two (2) years after its expiration or termination, Developer will not (and will cause its affiliates (defined below) not to) (a) within 50 miles of any Coffee Bar that is open and operating prior to Developer's establishment or operation of a competing business in that area, or (b) within two hundred (200) miles of the Geographic Territory (including the Geographic Territory): (y) engage in competition with BRCB, or engage in any business in competition with any Coffee Bar, except as authorized in writing by BRCB, or (z) employ or seek to employ any employee of BRCB or of any BRCB franchisee or developer for a period of at least one (1) year following the non-employment of such employee.  The one and two-year terms set forth in this Section 8.3 will be extended by any time consumed in litigation or arbitration required to enforce it, including any appeals.  For purposes of this Section 8.3, (I) "engage in business" means in any capacity, including as a franchisee, sole proprietor, partner, limited partner, member, employer, franchisor, stockholder, officer, director, or employee, except in the capacity of shareholder of less than one percent (1%) beneficial interest in the stock of any publicly traded corporation; and (II) "affiliate" means all holders of an ownership interest in Developer and of any entity directly or indirectly controlling Developer (whether by contract or ownership of voting rights), and any other person or entity controlling, controlled by or under common control with Developer, including any entity directly or indirectly controlled by Chris Lattanzio or Michael Goergen. For purposes of the definition of

"affiliate", an entity shall deemed to be controlled by any entity or individual that owns, directly or indirectly, 20% or more of the outstanding equity interests in such entity, or has the ability to influence the management and control of such entity in any manner.

8.4. **Irreparable Harm**. Developer acknowledges that any violation of the terms of this Section 8 will cause irreparable harm to BRCB, entitling BRCB to injunctive relief. Developer agrees that the existence of any claims it may have against BRCB will not constitute a defense to the enforcement by BRCB of the provisions of this Section 8.

9. **Assignment and Transfer**.

9.1. **Definition of Transfer**. "***Transfer***" means any act or circumstance by which direct or indirect ownership or control is shifted in whole or in part from any individual or entity to another, including, if Developer is a corporation, any changes in the present ownership of the stock of Developer (as of the date of this Agreement) or the issuance of additional stock of Developer and, if Developer is a partnership, L.L.C., or L.L.P., any change in or addition of partners or members or alteration of any kind to a series, or creation of a new series, within a series L.L.C. whether directly or indirectly. Any assignment, transfer or other disposition by Developer of an individual Coffee Bar will be governed by the provisions of the Franchise Agreement applicable thereto.

9.2. **Development Rights Are Non-Transferable**. BRCB is entering into this Agreement based upon its knowledge of and faith in the ability of Developer. Therefore, this Agreement and all the rights granted by it are personal to Developer and may not be assigned or Transferred by Developer. Any attempt to assign or Transfer any right under this Agreement will cause this Agreement to terminate immediately, in addition to any remedies that BRCB may have for the breach of this covenant by reason of an attempted assignment or Transfer.

9.3. **Death or Incapacity of Developer**. Notwithstanding the provisions of Section 9.2, in the event of the death or incapacity of an individual Developer, or of any shareholder, partner, or member in Developer if Developer is a business entity, the legal representative of the individual Developer, or of the surviving shareholders, partners, or members in case of a business entity, may for a period of ninety (90) days from the date of death or incapacitation continue to operate under the terms of this Agreement, provided that the operation is conducted in accordance with the terms of this Agreement and any other agreements with BRCB.

a. **Continuation of Agreement**. If the legal representative of Developer desires to continue the operations of Developer beyond the ninety (90) day period, then before the expiration of this period, the legal representative of the individual Developer or the shareholder, partner, or member in Developer if Developer is a business entity, must apply jointly with all surviving shareholders, partners, or members in writing for the right to transfer Developer's rights under this Agreement (or the interest of the deceased or incapacitated shareholder, partner, or member in Developer, in the case that Developer is a business entity), to the person or persons (whether spouse, heir,

devisee, purchaser, surviving shareholder, partner, member, corporation, or any other person), as the legal representative and the surviving shareholder, partners, or members may specify. The application for transfer will be treated in the same manner as the proposed transfer of ownership of a franchised Coffee Bar under the Franchise Agreement, except that there will be no transfer fee due if BRCB approves the proposed transfer, nor will BRCB have a right of first refusal.

b. **Termination of Agreement**. If the legal representative of Developer and all surviving shareholders, partners, or members if a business entity do not comply with the provisions of this Section 9.3 or do not propose a transferee acceptable to BRCB, in the exercise of its reasonable business judgment, then all rights granted to Developer under this Agreement will immediately terminate and automatically revert to BRCB.

9.4. **Internal Transfers**. Notwithstanding anything to the contrary in Section 9.2, BRCB's consent shall not be required for a direct or indirect transfer by Robert Lattanzio of his direct or indirect interest in Developer to Mike Goergen or Chris Lattanzio; <u>provided</u>, that Developer provides BRCB with thirty (30) days' advanced notice of such transfer, together with copies of all documents and instruments effecting such transfer.

9.5. **Agreement for Developer Ownership Change**. If Developer is a corporation, partnership, limited liability company or other similar business entity, then each shareholder, partner, member or other owner ("***Owner***") of such entity will agree in writing (pursuant to a buy-sell agreement, shareholder agreement, operating agreement or other agreement) that upon the dissolution of such entity, or upon any decree of divorce affecting the interests of any Owner in Developer, ownership of the equity interests affected will be transferred, for agreed-upon consideration, to the Owner having primary responsibility for operations, sales and marketing activities. A transfer pursuant to such agreement will be treated in the manner set forth in Section 9.4.

9.6. **Sale or Assignment by BRCB**. This Agreement will inure to the benefit of the successors and assigns of BRCB. BRCB has the right to assign its rights and obligations under this Agreement to any person or entity, provided that the assignee agrees in writing to assume, at minimum, all obligations and liabilities of BRCB to Developer and the franchisees (as applicable) that arise after the closing date of the assignment of this Agreement by BRCB. Upon such assignment and assumption, BRCB will be under no further obligation under this Agreement, except for accrued liabilities, if any, not assumed by BRCB's assignee.

10. **Representations and Warranties of Developer.**

10.1. <u>Organization and Authority of Developer</u>. Developer has full right, power and authority to enter into this Agreement and all documents and instruments executed in connection herewith to which Developer is a party (the "<u>Developer Documents</u>"). The parties executing the Developer Documents on behalf of Developer have full power and

authority to bind such parties to their respective obligations set forth herein and therein. Developer is a duly formed and validly existing limited liability company and is in good standing under the laws of the State of Nevada. Developer has obtained all consents and approvals necessary to make the Developer Documents binding upon such party and to permit consummation of the transactions contemplated herein and therein in accordance with the terms of the Developer Documents.

10.2.   <u>Conflicts and Pending Actions</u>.  There is no agreement to which Developer (or any affiliate) is a party or binding on Developer (or any affiliate), which is in conflict with the Developer Documents, or which would otherwise preclude or prevent Developer from performing Developer's obligations contained in the Developer Documents. There is no pending or threatened litigation, governmental proceeding, notice of action required to be taken, judgment, cause of action, special assessment, charge against or related to the subject matter of the Developer Documents, or against Developer (or any affiliate) with respect thereto, and Developer does not have any actual knowledge of any uncured material violation of any rule, order, or regulation issued by any governmental agency with respect to Developer (or any affiliate).

10.3.   <u>Full Disclosure</u>.  No representation or warranty by Developer (or any affiliate) in the Developer Documents and no statement contained in the Developer Documents or any certificate or other document delivered or to be delivered to BRCB pursuant to the Developer Documents contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

Developer's representations and warranties in this <u>Section 10</u> shall survive termination or expiration of this Agreement for a period of twenty four (24) months.

11. **Acknowledgments; Release; Non-Disparagement.**

11.1.   <u>Acknowledgements Regarding Rainbow Store</u>. Prior to the date of this Agreement, and in anticipation of executing this Agreement, BR Rainbow, LLC, a Nevada limited liability company, an affiliate of Developer ("<u>BR Rainbow</u>"), opened a coffee retail store under the brand name "Black Rock Coffee Bar" located at 7565 South Rainbow Boulevard, Las Vegas, Nevada 89119 (the "<u>Rainbow Store</u>"). The grand opening of the Rainbow Store occurred on May 10, 2019, but no franchise agreement has been signed with respect to the Rainbow Store as of the date of this Agreement. Developer and BR Rainbow acknowledge and agree that BR Rainbow will be required to execute a Franchise Agreement with respect to the Rainbow Store simultaneously with the execution of this Agreement. In connection therewith, and without limiting the scope of Section 13.2, Developer and BR Rainbow acknowledge, agree and certify on behalf of themselves and their affiliates as follows:

a.   Developer and BR Rainbow received a copy of the Black Rock Coffee Bar Franchise Disclosure Document, dated September 30, 2018 (the "<u>Disclosure Document</u>"), on February 28, 2019.

b.  BRCB has provided the Disclosure Document to you Developer and BR Rainbow 14 calendar days before Developer or BR Rainbow signed a binding agreement with, or made a payment to, BRCB or an affiliate in connection with the proposed franchise sale. Due to a clerical error, a copy of the Receipt was not signed at the time of delivery. Since the time of delivery, Developer, BR Rainbow and BRCB have been represented by counsel and have been actively negotiating the terms of this Agreement and the Franchise Agreement.

c.  Developer and BR Rainbow acknowledge receipt of the Disclosure Document on February 28, 2019, which included the following exhibits: (1) Franchise Agreement, (2) Site Evaluation Agreement, (3) Operations Manual Table of Contents, (4) Agents for Service of Process, (5) List of State Administrators, (6) Financial Statements, (7) Geographic Territory Agreement, (8) Electronic Funds Transfer Authorization, (9) Power of Attorney (Telephone), (10) Power of Attorney (Tax), (11) Assumed Business Name Relinquishment, (12) Franchisee Information, and (13) Receipt.

d.  BRCB authorized the opening of the Rainbow Store in anticipation of reaching agreement with Developer and BR Rainbow regarding the terms of this Agreement and the Franchise Agreement. BRCB, Developer and BR Rainbow intended that the terms of the Franchise Agreement entered into by BR Rainbow with respect to the Rainbow Store apply retroactively to the date of the grand opening of the Rainbow Store. Accordingly, upon the mutual execution of the Franchise Agreement with respect to the Rainbow Store, any payments that BR Rainbow would have been required to make to BRCB or an affiliate under the Franchise Agreement had the Franchise Agreement for the Rainbow Store been executed as of the grand opening of the Rainbow Store shall be deemed to accrue from the date of the grand opening of the Rainbow Store and shall be immediately due and payable, to the extent not previously paid.

11.2.  <u>Release</u>. As a material inducement to enter this Agreement, each of Developer and BR Rainbow (on the one hand) and BRCB (on the other hand), on behalf of itself and themselves, their respective successors, assigns and affiliates (each a "***Releasing Party***" and collectively the "***Releasing Parties***"), do hereby irrevocably and unconditionally release, acquit, covenant not to sue and forever discharge one another, and each party's respective members, predecessors, successors, heirs, assigns, agents, principals, directors and officers (in their individual and representative capacities), employees, representatives, partners, attorneys, divisions, subsidiaries, parents, and affiliates (and the agents, directors, officers, partners, employees, representatives, and attorneys of each division, subsidiary, parent or affiliate), and all persons acting by, through, under, or in concert with them (herein "***Releasees***"), from any and all charges, complaints, claims, liabilities, obligations, agreements, controversies, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including those for attorney fees, costs incurred or liquidated damages, punitive damages or penalties) of any

nature whatsoever, known or unknown (individually a "***Claim***" or collectively "***Claims***"): (a) which the Releasing Party now has, owns or holds, or claims to have, own or hold; or (b) which the Releasing Party, at any time heretofore, had, owned or held, or claimed to have, own or hold; or (c) which the Releasing Party, at any time hereafter, may have, own or hold, or claim to have, own or hold, arising out of any transaction or occurrence occurring, accruing or arising on or before the Effective Date (including without limitation any Claim that the Franchise Agreement with respect to the Rainbow Store can be rescinded). Each Releasing Party further agrees to indemnify, defend and hold harmless each and all of the Releasees from any Claim made against any of them by a Releasing Party after the Effective Date relating to any of the matters included within the foregoing release, including any Claim for legal fees or related costs or expenses. This Agreement does not limit or impair any Claim by any Releasing Party against one another for breach of this Agreement.

11.3.    **Nondisparagement**.

a.    Developer acknowledges and agrees that, from and after the date hereof, it shall not and shall not permit any of their affiliates, officers, directors, shareholders, members, managers, representatives, and subcontractors (each a "***Developer Party***") to disparage, denigrate or comment negatively upon, either orally, in writing or electronically, BRCB or any of its officers, directors, managers, members, investors, customers, vendors, suppliers, or affiliates, to or in the presence of any person who is not affiliated, associated or employed with BRCB or its affiliates (or who is not an advisor of BRCB or its affiliates) unless pursuant to a legal dispute or proceeding, or compelled to act by a valid subpoena or other legal mandate or otherwise required by applicable law; provided, however, that if a party receives such a valid legal mandate or subpoena, such party shall provide the other party with written notice of the same at least 10 days prior to the date on which such person is required to make the disclosure. If the Developer Party breaches this Section 11.3, then Developer Parties shall be jointly and severally obligated to pay BRCB $50,000 in immediately available federal funds as liquidated damages, which amount represents a fair and reasonable estimate of the damages BRCB will incur by reason of such breach, considering all circumstances known to BRCB and Developer on the date hereof. Developer further agrees that proof of actual damages will be difficult or impossible. Nothing in this Section 11.3(a) will prevent any party from responding truthfully to an inquiry from a state bar organization.

b.    BRCB acknowledges and agrees that, from and after the date hereof, it shall not and shall not permit any of its affiliates, officers, directors, shareholders, members, managers, representatives, and subcontractors to disparage, denigrate or comment negatively upon, Developer or any of its officers, directors, managers, members, investors, customers, vendors, suppliers, or affiliates, by making knowingly false statements either orally, in writing or electronically, to or knowingly in the presence of any person who is

not affiliated, associated or employed with BRCB, Developer or their affiliates (or who is not an advisor of BRCB, Developer or their affiliates) unless pursuant to a legal dispute or proceeding, or compelled to act by a valid subpoena or other legal mandate or otherwise required by applicable law; provided, however, that if a party receives such a valid legal mandate or subpoena, such party shall provide the other party with written notice of the same at least 10 days prior to the date on which such person is required to make the disclosure. Nothing in this Section 11.3(b) will prevent any party from responding truthfully to an inquiry from a state bar organization.

12. **General Provisions**.

12.1.    **Indemnity**.  Developer will indemnify and hold BRCB and its officers, directors, and employees harmless from and against all fines, suits, proceedings, claims, causes of action, demands, or liabilities of any kind or of any nature arising out of or in connection with Developer's operations, except to the extent arising from BRCB's gross negligence of willful misconduct.

12.2.    **Independent Contractors**.  The relationship between BRCB and Developer is that of independent contractors.  Developer is in no way to be deemed a partner, joint venturer, agent, employee, or servant of BRCB.  Developer has no authority to bind BRCB to any contractual obligation or incur any liability for or on behalf of BRCB. Developer will identify itself as an independent owner of all Coffee Bars in all dealings with customers, lessors, contractors, suppliers, public officials, employees, and others. Developer will place such notices of this independent ownership on signs, forms, stationery, advertising, and other materials as BRCB may at any time require.

12.3.    **Governing Law, Governing Language, and Dispute Resolution**.  This Agreement shall be governed by the substantive law of the state of Oregon, without regard to conflicts-of-law rules and without regard to the United Nations Convention on Contracts for International Sale of Goods; provided, however, that the Federal Arbitration Act shall govern the provisions respecting arbitration and arbitrability. All disputes and controversies between the parties, or arising out of or relating to the performance or interpretation of this Agreement, which cannot be settled by mutual agreement of the parties, other than an application for a temporary restraining order, preliminary injunction or similar emergency injunctive relief to prevent irreparable harm, shall be finally and conclusively settled in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**_Rules_**"); provided, however, that: (a) the arbitration shall take place in Portland, Oregon; (b) the arbitrator will be appointed by the parties in accordance with the Rules; (c) the arbitration shall be conducted in the English language; (d) the arbitrator shall use reasonable efforts to schedule all matters regarding the arbitration so that the arbitration progresses in a timely fashion; (e) subject to legal privileges, each party shall be entitled to discovery in accordance with the Federal Rules of Civil Procedure; (f) at the arbitration hearing, each party may make written and oral presentations to the arbitrator, present testimony and written evidence and examine witnesses; (g) the arbitrator shall not have the power to award punitive damages; (h) the arbitrator shall issue a written

decision explaining the basis for such decision; (i) the arbitrator may not make any award that is inconsistent with any express term of this Agreement and may not use the equitable powers provided by the Rules to modify the express terms of this Agreement in any way; (j) such decision shall be final, binding and enforceable in any court of competent jurisdiction; (k) the parties shall share equally any fees and expenses of the arbitrator and of the American Arbitration Association, provided that the arbitrator shall have the authority to award, as part of the arbitrator's decision, to the prevailing party its costs and expenses of the arbitration proceeding, including reasonable attorneys' and experts' fees; and (l) the parties agree that the arbitration proceedings and any decision and award of the arbitrator shall be kept confidential and not be disclosed to third parties, except as necessary to enforce or effectuate the terms of such decision or award. The parties will not be compelled to participate in any alternative dispute resolution program created, administered, or effected by or through BRCB.

12.4. **Notices**. All notices specified by this Agreement or required by law must be in writing and given by personal delivery or sent by certified mail, return receipt requested to the address(es) set forth at the beginning of this Agreement or to such other address(es) as the parties may designate in writing before the giving of any notice. Notices to Developer may also be given at the location of the Premises, at the residence of Developer (if an individual), or at the residence of the principal shareholder(s), partner(s), or member(s) of Developer (if a business entity). Notices will be deemed to be "delivered" when actually left in the custody of an adult agent, employee, or resident at a place of business or residence if given by personal delivery or, if given by certified mail, when deposited with the U.S. Postal Service with proper address and postage paid. Developer will provide BRCB with Developer's current business and residential addresses, other than the address of the Premises. Each party will provide the other with updated contact information whenever changes occur.

12.5. **Compliance with the Laws**. The parties understand and intend that the terms of this Agreement and their relationship comply with all applicable laws, ordinances, and regulations. Further, during the term of and with respect to their performance under this Agreement, each party will remain in compliance with all applicable laws, ordinances and regulations.

12.6. **Integration and Priority**. This Agreement constitutes the entire agreement between the parties as to its subject matter and supersedes all prior communications, representations, and agreements, oral or written, of the parties with respect to its subject matter. No oral or other written understandings or agreements exist between the parties relating to the subject matter of this Agreement. In entering into this Agreement, Developer agrees that it did not rely on any promises, representations, or agreements not expressly contained in this Agreement. Any modifications to this Agreement must be in writing and signed by all of the parties to this Agreement. In the event of a conflict between this Agreement or any other Franchise Agreement between the parties or their affiliates, the terms of this Agreement shall be controlling. Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by BRCB in the Franchise Disclosure Document.

12.7.   **Modification**.  No modification of this Agreement will be valid unless in writing and signed by both parties.

12.8.   **Interpretation**.  The section and paragraph headings of this Agreement are for the convenience of the reader only, and are not intended to act as a limitation of the scope or meaning of the sections and paragraphs themselves.  This Agreement will not be construed against the drafting party. The initial draft of this Agreement was prepared by counsel to BRCB.  Developer acknowledges that Developer had an opportunity to consult with separate legal counsel prior to executing this Agreement, that this Agreement was negotiated by the parties, and that the Addendum attached as Schedule 5.5 was negotiated by the parties.  Developer and BRCB waive any claim that any term or condition of this Agreement or the Addendum should be construed against the drafter.  This Agreement will be construed as if it had been prepared by both of the parties hereto.

12.9.   **Approvals**.   Except when this Agreement expressly obligates BRCB reasonably to approve or not unreasonably to withhold its approval of any action or request by Developer, BRCB has the absolute right to refuse any request by Developer or to withhold its approval of any action that requires its approval.

12.10.  **Severability and Waiver**.  The invalidity of any term or provision of this Agreement will not affect the validity of any other provision.  The parties intend that if any of the terms, conditions, or provisions of this Agreement violates applicable law, such terms, conditions, or provisions will be deemed not a part of this Agreement, and the remainder of this Agreement will remain in full force and effect.  Waiver by any party of strict performances of any provision of this Agreement will not be a waiver of or prejudice any party's right to require strict performance of the same provision in the future or of any other provision of this Agreement.

12.11.  **Third-Party Beneficiaries**.  The affiliated entities of Developer that enter into a Franchise Agreement with BRCB for an individual Coffee Bar under this Agreement are third party beneficiaries to this Agreement and are entitled to the rights and benefits hereunder and may enforce the provisions enumerated in Section 5.5 as if it were a party hereto. Other than the foregoing, this Agreement creates no third-party rights or obligations between BRCB or Developer and any other person.

12.12.  **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute one agreement binding on all parties, notwithstanding that all parties are not signatories to the same counterpart. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000) or other transmission method and any counterpart so delivered shall be deemed an original and shall be binding upon each of the undersigned as if signed and delivered in the original.

12.13.  **Attorney Fees**. If either party initiates a judicial or other proceeding, the prevailing party in such proceeding will be entitled to reimbursement of its costs and

expenses, including reasonable attorney fees. "Costs and expenses" mean all reasonable pre-award expenses of the arbitration, including arbitrator fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, expert witness fees, costs of investigation and proof of facts, court costs, other arbitration or litigation expenses, and attorney fees. "Prevailing party" is the party which has obtained the greatest net award in terms of money or money equivalent. If money or money equivalent has not been awarded, then the prevailing party will be that party which has prevailed on a majority of the material issues decided.

12.14.   **Conflicts and Pending Actions**.   There is no agreement to which any Developer is a party or binding on Developer which is in conflict with this Agreement, or which would otherwise preclude or prevent Developer from performing Developer's obligations contained in this Agreement. There is no pending or threatened litigation, governmental proceeding, notice of action required to be taken, judgment, cause of action, special assessment, charge against or related to the subject matter of this Agreement (including Developer's already-built Coffee Bars located on Rainbow and Blue Diamond, respectively), or against Developer with respect thereto, and Developer does not have any actual knowledge of any uncured material violation of any rule, order, or regulation issued by any governmental agency with respect to any Developer.

13. **Acknowledgements**.

13.1.   **Representations and Warranties**.   Developer has read and understood the representations and warranties set forth in Section 10 and acknowledgments set forth in Section 11.

 _[Please initial to acknowledge that you have read and understand this Section 13.1].

13.2.   **Compliance with Applicable Laws**.   Developer acknowledges, by its signature hereto, that it received from BRCB a Franchise Disclosure Document for the state in which the business will be located, or the Developer's place of residence, as appropriate, at least fourteen (14) calendar days prior to the execution of this Agreement.

 _[Please initial to acknowledge that you have read and understand this Section 13.2].

13.3.   **Receipt of Agreement**.   Developer acknowledges that it received from BRCB this Agreement with all blanks filled in at least five (5) days prior to the execution of this Agreement.  Developer represents that it has read this Agreement in its entirety and that it has been given the opportunity to clarify any provisions that it did not understand and to consult with an attorney or other professional advisor.  Developer further represents that it understands the terms, conditions and obligations of this Agreement and agrees to be bound by them.

 _[Please initial to acknowledge that you have read and understand this Section 13.3].

13.4.  **Acknowledgement Regarding Future Results**.  The Developer acknowledges and accepts the following:

THE SUCCESS OF THE DEVELOPER IN ACQUIRING THE RIGHTS TO DEVELOP THE GEOGRAPHIC TERRITORY IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, THE DEVELOPER'S INDEPENDENT BUSINESS ABILITY.  THIS OFFERING IS NOT A SECURITY AS THAT TERM IS DEFINED UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS.  THE OBLIGATION TO TRAIN, MANAGE, PAY, RECRUIT AND SUPERVISE EMPLOYEES OF DEVELOPER RESTS SOLELY WITH THE DEVELOPER.  THE DEVELOPER HAS NOT RELIED ON ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL SUCCESS OR PROJECTED INCOME OF THE BUSINESS VENTURE CONTEMPLATED HEREBY.    NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY BRCB TO INDUCE THE DEVELOPER TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED HEREIN.  BRCB HAS NOT MADE ANY REPRESENTATION, WARRANTY OR GUARANTY, EXPRESS OR IMPLIED, AS TO THE POTENTIAL REVENUES, PROFITS OR SERVICES OF THE BUSINESS VENTURE TO THE DEVELOPER AND CANNOT, EXCEPT UNDER THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER THE DEVELOPER'S BUSINESS.    THE DEVELOPER ACKNOWLEDGES AND AGREES THAT IT HAS NO KNOWLEDGE OF ANY REPRESENTATION MADE BY BRCB OR ITS REPRESENTATIVES OF ANY INFORMATION THAT IS CONTRARY TO THE TERMS CONTAINED HEREIN.

_ [Please initial to acknowledge that you have read and understand this Section 13.4].

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Geographic Territory Agreement to be duly executed as of the Effective Date.


**BRCB:**

**BLACK ROCK COFFEE BAR, LLC,**
**an Oregon limited liability company**

    By: Black Rock Coffee Holdings, LLC,
    a Delaware limited liability company
    Its: Member

    By: _Jake Spellmeyer_____
        Jake Spellmeyer, Chief Financial Officer


**DEVELOPER:**


BR COFFEE LLC,
a Nevada limited liability company

**By:** BR Coffee Series of the DS Renaissance, LLC,
its Manager

**By:** _Chris Lattanzio_____
    Christopher Lattanzio, its Manager


TIN of Developer: 83-1443815


**ACKNOWLEDGED WITH RESPECT TO SECTION  11:**

BR RAINBOW, LLC,
a Nevada limited liability company

**By:** BR Coffee Series of the DS Renaissance, LLC,
its Manager

**By:** _Chris Lattanzio_____
    Christopher Lattanzio, its Manager


[Signature Page to Geographic Territory Agreement]

**Exhibit 1**
**Franchise Agreement**

[See Attached]

EXHIBIT 1 – Franchise Agreement

Ex. 1 to Arb. Demand
Page 18 of 83

# FRANCHISE AGREEMENT

**PARTIES:**

**Black Rock Coffee Bar, Inc.**                                    ("***BRCB***")
an Oregon Corporation
616 NW Arizona Avenue
Bend, OR 97703

                                                           ("***Franchisee***")

_____

_____

_____

**Franchise Agreement Effective Date:** _____

**RECITALS:**

A.     Black Rock Coffee Bar, Inc. ("***BRCB***") has over a period of time and at considerable expense developed and established a uniform and unique method of operation, customer service, advertising, publicity, processes, techniques, and technical knowledge in connection with its drive-thru, sit-down or combination retail business specializing in espresso, coffee, and related items. These retail outlets (sometimes referred to as "***Coffee Bars***") do business under the trade name "Black Rock Coffee Bar". Many of these techniques and much of the information constitute trade secrets. All of the knowledge, experience, processes, methods, specifications, techniques and proprietary marks and information of BRCB are referred to in this Agreement as the "***BRCB System***."

B.     The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme, and furnishings; proprietary products and ingredients; special menu items; proprietary and uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; a recommended standardized system for the operation of the business; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time.

C.     Franchisor identifies the System by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "Black Rock Coffee Bar" and such other trade names, service marks, and trademarks as are now designated (and may hereafter be designated by Franchisor in writing) for use in connection with the System (hereinafter referred to as "Marks" or "Proprietary Marks"). BRCB owns certain federally registered trademarks including "Black Rock Coffee Bar," Reg. No. 3489718.

D.     Franchisor continues to develop, use and control the use of such Marks in order to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance and service.

i

E.      Franchisor intends to control the use of the System and the Proprietary Marks for the benefit and exclusive use of itself and its franchisees in order to identify the franchise to the public as a franchise which represents the highest standards of quality and service.

F.      Franchisee understands and recognizes that (l) the BRCB System and the Proprietary Marks are of considerable value and (2) it is of importance to BRCB and all of its franchisees to maintain the development of the BRCB System in a uniform and distinctive manner, allowing Franchisee and all other franchisees of BRCB to enjoy a public image and reputation greatly in excess of that which any single Franchisee could establish.

G.      Franchisee desires to make use of the Proprietary Marks and the BRCB System, and to establish a "Black Rock Coffee Bar" drive-thru, sit-down or combination retail establishment (the "***Coffee Bar***") to be operated under the terms and conditions of this Franchise Agreement and in accordance with the methods, practices, and procedures set forth from time to time by BRCB in its operations manual (the "***Operations Manual***").   BRCB is willing to grant Franchisee the right to do so under the terms, conditions, and provisions set forth in this Agreement.  (This Agreement, along with the Appendices, Addenda, Attachments, and Exhibits attached to it and/or executed with it constitute the Franchise Agreement and are referred to in this Agreement as the "***Franchise Agreement***" or this "***Agreement***").

H.      Franchisee recognizes the necessity and desirability of protecting the reputation, goodwill, trade secrets, and confidential business information of BRCB and also recognizes that disclosure of trade secrets and confidential business information, including specifics of Black Rock Coffee Bar System to any third party, will cause irreparable damage and harm to BRCB.

[This space intentionally left blank]

**BLACK ROCK COFFEE BAR**
**FRANCHISE AGREEMENT**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| Section 1. | The Franchise. | 1 |
| **1.1** | Franchise Grant | 1 |
| **1.2** | Territory | 1 |
| **1.3** | Limitation to Coffee Bar Site | 1 |
| **1.4** | Existence of Various Forms of Franchise Agreements | 1 |
| **1.5** | Guaranty of Franchise Agreement | 2 |
| Section 2. | Fees. | 2 |
| **2.1** | Site Evaluation Fee | 2 |
| **2.2** | Initial Franchise Fee | 2 |
| **2.3** | Royalty | 2 |
| **2.4** | Gross Sales | 4 |
| **2.5** | Branding | 4 |
| **2.6** | Late Fee | 5 |
| **2.7** | Security Interest | 5 |
| **2.8** | Grand Opening Deposit | 5 |
| Section 3. | Term | 6 |
| Section 4. | License and Use of Proprietary Marks | 6 |
| **4.1** | Grant | 6 |
| **4.2** | Acknowledgements | 6 |
| **4.3** | Agreements | 7 |
| **4.4** | Infringement | 8 |
| **4.5** | Nonexclusive License | 9 |
| **4.6** | Maintenance of BRCB's Goodwill | 9 |
| **4.7** | Trade Dress | 9 |
| **4.8** | Use of Proprietary Marks on the Internet | 9 |
| Section 5. | Confidentiality | 10 |
| **5.1** | Definition of Proprietary Information | 10 |
| **5.2** | Use and Protection of Proprietary Information | 10 |
| **5.3** | Operations Manual | 10 |
| **5.4** | Irreparable Harm | 10 |
| Section 6. | Covenants Against Competition and Competitive Solicitation | 11 |
| **6.1** | Definition of Competition | 11 |
| **6.2** | Blue Pencil | 11 |
| **6.3** | Noncompete and Nonsolicitation Covenants | 11 |
| **6.4** | Irreparable Harm | 11 |
| Section 7. | Establishment of the Franchise | 11 |

iii

| | | |
|---|---|---|
| **7.1** | Layout and Design | 11 |
| **7.2** | Landscaping and Site Improvements | 12 |
| **7.3** | Licenses and Permits | 12 |
| **7.4** | Equipment | 12 |
| **7.5** | Signage | 12 |
| **7.6** | Fax Machine and Computer Equipment | 12 |
| **7.7** | Grand Opening Requirements | 13 |
| Section 8. | Operation of the BRCB Coffee Bar | 13 |
| **8.1** | Operations Manual and Alternative Approval Procedure | 13 |
| **8.2** | Restricted Use of the Premises | 13 |
| **8.3** | Supplies | 13 |
| **8.4** | Coffee and Espresso Beans | 13 |
| **8.5** | Logo Cups | 14 |
| **8.6** | Other BRCB Branded Products | 14 |
| **8.7** | Advertising and Promotions | 14 |
| **8.8** | Consumer Engagement | 14 |
| **8.9** | Continued Operation of the BRCB Coffee Bar | 14 |
| **8.10** | Hours of Operation | 15 |
| **8.11** | Social Media Policy | 15 |
| **8.12** | General Operating Requirements | 15 |
| **8.13** | Violations Fee | 15 |
| Section 9. | Franchisee's Designated Manager and Structure | 15 |
| **9.1** | General Manager | 15 |
| **9.2** | No Third-Party Management Services | 16 |
| Section 10. | Services Provided by BRCB | 16 |
| **10.1** | Initial Training | 16 |
| **10.2** | Supplemental Training | 16 |
| **10.3** | Operations Manual | 16 |
| **10.4** | Assistance at Opening | 16 |
| **10.5** | Optional On-Site Assistance | 16 |
| **10.6** | Advertising and Point-of-Sale Materials | 17 |
| **10.7** | Approval of Advertising | 17 |
| Section 11. | Inspections, Audits and Accounting | 17 |
| **11.1** | BRCB's Right To Inspect | 17 |
| **11.2** | BRCB's Right to Audit | 18 |
| **11.3** | Provision of Monthly and Annual Financial Records | 18 |
| **11.4** | Preservation of Business Records | 19 |
| **11.5** | Tax Returns | 19 |
| Section 12. | Assignment, Transfer and Sale | 19 |
| **12.1** | Definition of Transfer | 19 |
| **12.2** | No Transfer Without BRCB's Consent | 19 |
| **12.3** | Advance Notice of Proposed Terms and Right of First Refusal | 19 |

iv

| | | |
|---|---|---|
| **12.4** | Requirements for Consent to Transfer | 20 |
| **12.5** | Death or Incapacity of Franchisee | 21 |
| **12.6** | Internal Transfers | 22 |
| **12.7** | Sale or Assignment by BRCB | 22 |

**Section 13.**   Indemnification and Insurance ........ 23

| | | |
|---|---|---|
| **13.1** | Indemnity | 23 |
| **13.2** | Insurance | 23 |

**Section 14.**   Defaults and Opportunities to Cure ........ 23

| | | |
|---|---|---|
| **14.1** | Default for Insolvency | 23 |
| **14.2** | Default for Material Breach of the Franchise Agreement | 23 |
| **14.3** | Default for Material Breach of Other Agreements | 23 |
| **14.4** | Default for Violation of Health and Safety Standards | 24 |
| **14.5** | Cure Periods | 24 |
| **14.6** | Remedies for Defaults Not Cured | 24 |
| **14.7** | Cross-Default | 25 |

**Section 15.**   Termination ........ 25

| | | |
|---|---|---|
| **15.1** | Termination for Default | 25 |
| **15.2** | Discontinuation of Use of BRCB System and Proprietary Marks | 25 |
| **15.3** | De-Identification of the Premises | 25 |
| **15.4** | Return of Operations Manual and Other Proprietary Information | 26 |
| **15.5** | Survival of Covenants Against Competition and Solicitation | 26 |
| **15.6** | Transfer of Telephone Numbers and Other Listings | 26 |
| **15.7** | Right to Purchase Assets | 27 |
| **15.8** | Assignment of Leasehold Interest to BRCB | 27 |
| **15.9** | Cross-Termination | 28 |

**Section 16.**   Miscellaneous Provisions ........ 28

| | | |
|---|---|---|
| **16.1** | Independent Contractors | 28 |
| **16.2** | Franchisee's Principals and Controlling Principals | 28 |
| **16.3** | Illegality and Survival | 28 |
| **16.4** | Mediation | 29 |
| **16.5** | Arbitration | 29 |
| **16.6** | Governing Law and Venue | 31 |
| **16.7** | Mutual Benefit | 32 |
| **16.8** | Performance in Bend, Oregon | 32 |
| **16.9** | Dispute Resolution Program | 32 |
| **16.10** | Waiver of Certain Damages | 33 |
| **16.11** | Notices | 33 |
| **16.12** | No Waivers | 34 |
| **16.13** | Entire Agreement | 34 |
| **16.14** | Interpretation | 34 |
| **16.15** | Approvals | 34 |
| **16.16** | Effective Date | 34 |

Section 17.      Franchisee's Representations, Warranties and Acknowledgements ..................... 34

**17.1**  Execution by Authorized Parties ................................................................... 34
**17.2**  Compliance with Applicable Laws ............................................................... 35
**17.3**  Receipt of Agreement .................................................................................. 35
**17.4**  Acknowledgement Regarding Future Results ............................................. 35

STATE-SPECIFIC ADDENDA TO THE FRANCHISE AGREEMENT ................................ 38

Schedule 1.5  GUARANTY OF FRANCHISE AGREEMENT .................................................. 41

Schedule 9.1  MANAGER'S CONFIDENTIALITY AGREEMENT ......................................... 43

Schedule 15.8  CONDITIONAL ASSIGNMENT OF LEASE .................................................. 44

# BLACK ROCK COFFEE BAR
# FRANCHISE AGREEMENT

**Section 1.**    <u>**The Franchise.**</u>

    **1.1**    <u>**Franchise Grant**</u>.  BRCB grants Franchisee a franchise that includes the right to use the Proprietary Marks and the BRCB System as provided in this Agreement in connection with the operation of the BRCB Coffee Bar, at the following location (the "***Premises***"):

Street Address _____

City _____

County _____

State/ZIP Code _____

    **1.2**    <u>**Territory**</u>.

        **1.2.1**    <u>No Exclusive Territory</u>.  BRCB does not grant Franchisee an exclusive territory.  BRCB and its affiliates and other franchisees may own and operate Coffee Bars or otherwise market and sell products and services using the Proprietary Marks in the immediate vicinity of the Premises.  BRCB retains the right, for BRCB and its affiliates and other franchisees, to: (a) own, acquire, establish and/or operate, and license others to establish and operate, businesses using the Proprietary Marks and BRCB System at any location, (b) own, acquire, establish and/or operate, and license others to establish and operate, businesses under other proprietary marks or other systems, at any location; (c) to sell or distribute, at retail or wholesale or otherwise, directly or indirectly, or license others to sell or distribute, any products which bear any proprietary marks, including the Proprietary Marks, at any location; (d) to acquire, or be acquired by, any competing system, including a competing system that has one or more units in the immediate vicinity of the Premises; and (e) to market and sell coffee and espresso beans, equipment, clothing, and other items at any location through other distribution methods, such as via the Internet or catalogs.

    **1.3**    <u>**Limitation to Coffee Bar Site**</u>.  This franchise is granted only for the Premises and, except as provided in Section 1.2, grants no rights outside that site.  Except as provided in Section 1.2, BRCB reserves the sole and unlimited right to establish and operate, or permit others to operate, BRCB Coffee Bars at, or grant BRCB franchises for, any locations.

    **1.4**    <u>**Existence of Various Forms of Franchise Agreements**</u>.    Franchisee acknowledges that present and future franchisees of BRCB may operate under a number of forms of franchise agreements, and, consequently, BRCB's obligations and rights with respect to its various franchisees may differ materially in certain instances.  The existence of different forms or versions of the Franchise Agreement does not entitle Franchisee to benefit from any such

1

difference, nor does it operate to alter or amend the agreement of the parties set forth in this Agreement.

**1.5    Guaranty of Franchise Agreement**.  If Franchisee is a corporation, limited liability company, limited partnership, general partnership or any form of business entity other than a sole proprietorship, whether upon signing this Agreement or at any time during the term or renewal term of this Agreement, each person who owns twenty-five percent (25%) or more of the Franchisee shall sign and deliver to BRCB the Guaranty of Franchise Agreement attached as Schedule 1.5 at the end of this Agreement, or agrees to otherwise guaranty Franchisee's performance under this Agreement according to the terms of such Guaranty of Franchise Agreement.

**Section 2.    Fees.**

**2.1    Site Evaluation Fee**.  Upon the execution of this Agreement, BRCB will apply any Site Evaluation Fee paid by Franchisee pursuant to a Site Evaluation Agreement between Franchisee and BRCB to the Initial Franchise Fee, as defined below.

**2.2    Initial Franchise Fee**.  The fee for the rights granted under this Agreement (the "***Initial Franchise Fee***") is (i) Twenty-Seven Thousand Five Hundred Dollars ($27,500) for Franchisee's first Coffee Bar, (ii) Twenty-Two Thousand Dollars ($22,000) for Franchisee's second Coffee Bar, and (iii) Sixteen Thousand Five Hundred Dollars ($16,500) for each Coffee Bar thereafter.  The outstanding balance of the Initial Franchise Fee shall be due and payable upon the earliest of the following events: (i) ten days following the execution of a lease agreement by Franchisee for the Premises, (ii) ten days following the issuance of a building permit for the Premises with respect to the Coffee Bar, or (iii) the one-year anniversary of this Agreement.  If a license or permit from a governmental agency is required in order for Franchisee to operate the franchised business, and the agency refuses to grant Franchisee a license after Franchisee has taken all required and reasonable steps to obtain the license, then Franchisee shall be entitled to a refund of ninety percent (90%) of the Franchise Fee, less travel expenses incurred by Franchisor.

**2.3    Royalty**

**2.3.1    Royalty Fee**.  During the term of this Agreement, except as set forth below, Franchisee shall pay to Franchisor, in partial consideration for the rights herein granted, a continuing royalty fee ("Royalty Fee") of five percent (5%) of Gross Sales.  Such royalty fee shall be due and payable each calendar month ("Accounting Period") based on the Gross Sales for the preceding calendar so that it is received by Franchisor by electronic fund transfer ("EFT") on or before the tenth day following the end of each Accounting Period.  Notwithstanding the foregoing, Franchisee shall pay a monthly Royalty Fee of no less than Fifteen Hundred Dollars ($1,500).  Franchisee shall pay the greater of the $1,500 minimum amount set forth herein or the five per cent (5%) royalty.

**2.3.2    Royalty Report**.  Each such royalty fee shall be preceded by a royalty report itemizing the Gross Sales for the preceding Accounting Period ("Royalty Report") and any other reports required hereunder.  Notwithstanding the foregoing, Franchisee shall provide Franchisor with such Gross Sales information on the tenth

day following the Accounting Period (or next business day if the tenth day is not a business day) by modem or, if not reasonably available, by facsimile transmission or such other method of delivery as Franchisor may reasonably direct.

**2.3.3** <u>Electronic Funds Transfer</u>. Franchisee agrees that Franchisor shall have the right to withdraw funds from Franchisee's designated bank account each Accounting Period by EFT in the amount of the royalty fee described above. Such withdrawals shall be drawn on the tenth day of each month for the amount of the royalty due with respect to Franchisee's Gross Sales for the preceding Accounting Period, as evidenced by the Royalty Report. If the Royalty Report has not been received within the time period required by this Agreement, then Franchisor may process an EFT for the royalty for the subject Accounting Period based on (i) information regarding Franchisee's Gross Sales for the preceding Accounting Period obtained by Franchisor in the manner contemplated by Section 2.3, or (ii) the most recent Royalty Report provided to Franchisor by Franchisee; provided that if a Royalty Report for the subject Accounting Period is subsequently received and reflects (A) that the actual amount of the royalty due was more than the amount of the EFT by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (B) that the actual amount of the royalty due was less than the amount of the EFT by Franchisor, then Franchisor shall, at its option, return the excess amount to Franchisee or credit the excess amount to the payment of Franchisee's future royalty obligations.

Upon execution of this Agreement and at any time thereafter at Franchisor's request, Franchisee shall execute such documents or forms as Franchisor deems necessary for Franchisor to process EFTs from Franchisee's designated bank account for the payments due hereunder. Should any EFT not be honored by Franchisee's bank for any reason, Franchisee agrees that it shall be responsible for that payment plus a service charge applied by Franchisor and the bank, if any. Franchisee further agrees that it shall at all times maintain in the designated bank account funds sufficient to pay all royalty and required Fund contributions when due. If royalty payments are not received when due, interest may be charged by Franchisor in accordance with Section 2.3.4. Upon written notice to Franchisee, Franchisee may be required to pay such royalty fees directly to Franchisor, by another method of payment, in lieu of EFT at Franchisor's sole discretion. Franchisee shall coordinate with Franchisor any changes in its depository account so that no interruptions in the automatic disbursement of the Royalty Fee or other amounts occur.

**2.3.4** <u>Interest</u>. Franchisee shall not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder. Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue. Time is of the essence with respect to all payments to be made by Franchisee to Franchisor. All unpaid obligations under this Agreement shall bear interest from the date due until paid at the lesser of (i) eighteen percent (18%) per annum, or (ii) the maximum rate allowed by applicable law. Notwithstanding anything to the contrary contained herein, no

3

provision of this Agreement shall require the payment or permit the collection of interest in excess of the maximum rate allowed by applicable law.  If any excess of interest is provided for herein, or shall be adjudicated to be so provided in this Agreement, the provisions of this paragraph shall govern and prevail, and neither Franchisee nor its Principals shall be obligated to pay the excess amount of such interest.  If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts that may be due and owing hereunder, and if no such amounts are due and owing hereunder then such excess shall be repaid to the party that paid such interest.

  **2.4**   **Gross Sales.**  For the purposes of this Agreement, "Gross Sales" shall mean the total selling price of all services and products and all income of every other kind and nature related to the Franchise (including, without limitation, income related to beverage and food and delivery activities, and any sales or orders of beverage and food products or food preparation services provided from or related to the Franchise), whether for cash or credit and regardless of collection in the case of credit.  Gross Sales shall be reduced by discounts and coupons.  Gross Sales shall expressly exclude the following:

  Sums representing sales taxes collected directly from customers, based upon present or future laws of federal, state or local governments, collected by Franchisee in the operation of the Franchise, and any other tax, excise or duty that is levied or assessed against Franchisee by any federal, state, municipal or local authority, based on sales of specific merchandise sold at or from the Franchise, provided that such taxes are actually transmitted to the appropriate taxing authority;

  Proceeds from isolated sales of trade fixtures not constituting any part of Franchisee's products and services offered for resale at the Franchise nor having any material effect upon the ongoing operation of the Franchise required under this Agreement; and

  Other items authorized by Franchisor in writing to be excluded from Gross Sales.  Any such authorization may be revoked or withdrawn at any time in writing by Franchisor in its discretion.

  **2.5**   **Branding.**  As the result of the expenditure of time, skill, effort and money, Franchisor has developed and owns a unique and distinctive system ("System") relating to the establishment and operation of its drive-thru, sit-down or combination retail business specializing in espresso, coffee, and related items under the tradename "Black Rock Coffee Bar."  The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme, and furnishings; proprietary products and ingredients; special menu items; proprietary and uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; a recommended standardized system for the operation of the business; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time.  Therefore, to maintain the integrity of the System, and to further develop the System, Franchisor charges a Branding Fee.

    **2.5.1**   <u>Branding Fee</u>. During the term of this Agreement, except as set forth below, Franchisee shall pay to Franchisor, in partial consideration for the rights herein granted, a continuing royalty fee ("Branding Fee") of two percent (2%) of Gross Sales.  Such Branding Fee shall be due and payable each calendar month

4

("Accounting Period") based on the Gross Sales for the preceding calendar so that it is received by Franchisor by electronic fund transfer ("EFT") on or before the tenth day following the end of each Accounting Period. Notwithstanding the foregoing, Franchisee shall pay a monthly Branding Fee of no less than One Thousand Dollars ($1,000). Franchisee shall pay the greater of the $1,000 minimum amount set forth herein or the two per cent (2%) Branding Fee.

**2.5.2** <u>Branding Report</u>. Each such Branding Fee shall be preceded by a Branding Report itemizing the Gross Sales for the preceding Accounting Period ("Branding Report") and any other reports required hereunder. Notwithstanding the foregoing, Franchisee shall provide Franchisor with such Gross Sales information on the tenth day following the Accounting Period (or next business day if the tenth day is not a business day) by modem or, if not reasonably available, by facsimile transmission or such other method of delivery as Franchisor may reasonably direct.

**2.5.3** <u>Payment</u>. The Branding Fee shall be paid at the same time and in the same manner as the Royalty Fee, described above.

**2.6** **<u>Late Fee</u>.** If the payments or reports are not received by Franchisor as required by this Section, Franchisee shall pay to Franchisor, in addition to the overdue amount, a fee of Fifty Dollars ($50) per day for each day that the fees are unpaid or the report is not received. This fee is reasonably related to Franchisor's costs resulting from the delay in payment and/or receipt of any report, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement for Franchisee's failure to pay royalties and/or submit reports in accordance with the terms of this Agreement. If for any reason the fee of Fifty Dollars ($50) is deemed to be interest charged, required or permitted, in excess of the maximum rate allowed by applicable law, any such excess shall be applied as a payment and reduction of any other amounts that may be due and owing hereunder, and if no such amounts are due and owing hereunder, then such excess shall be repaid to the party that paid such amount.

**2.7** **<u>Security Interest</u>.** Franchisee hereby grants Franchisor a security interest in the following, whether now owned or hereafter acquired: all of Franchisee's inventory; Franchisee's motor vehicles; Franchisee's equipment; Franchisee's accounts; Franchisee's accounts receivable; Franchisee's general intangibles; Franchisee's furniture, furnishings and equipment; replacement parts and accessories; supplies; proceeds from collateral, all returns, replacements, substitutions, and the like.

**2.8** **<u>Grand Opening Deposit</u>**. Franchisee shall conduct a grand opening at the commencement of opening the Coffee Bar to the public, including the initial Friday and Saturday that you are open for business, that will include advertising and promotion which meets BRCB's approval (the "***<u>Grand Opening</u>***"). Franchisee shall pay to BRCB's affiliate Black Rock Roasting Company, an Oregon corporation, ("***<u>BRRC</u>***") a deposit (the "***<u>Grand Opening Deposit</u>***") not later than two weeks prior to the Grand Opening that will be applied toward the costs of promotional materials, opening inventory, supplies, food, and BRRC's assistance (including lodging and labor). The Grand Opening Deposit shall be in the amount of $27,500 if the Premises are within a fifty (50) mile radius of the BRRC office at 616 NW Arizona Avenue, Bend OR 97703, or $38,500 if farther than 50 miles. The Grand Opening Deposit is nonrefundable to the extent spent, however, BRRC will refund such deposit if this Agreement is duly terminated before the Grand Opening.

BRRC will provide Franchisee with an accounting of how the deposit was spent, and Franchisee agrees to apply any unspent deposit toward future purchases of inventory.

**Section 3.**     **Term.** The term of this Agreement shall be ten (10) years from the execution of this Agreement.  Franchisee shall not have the right to renew the franchise unless BRCB elects, in its sole and absolute discretion, to offer such option to Franchisee, which renewal shall upon such terms as BRCB determines in its sole and absolute discretion.

**Section 4.**     **License and Use of Proprietary Marks.**

     **4.1**     **Grant**.  Franchisor grants Franchisee the right to use the Marks during the term of this Agreement in accordance with the System and related standards and specifications.  Franchisee shall operate under the trade names of "Black Rock Coffee Bar" as authorized herein, and shall use no other name in conducting the business franchised under this Agreement without the prior written consent of Franchisor.  Franchisee shall comply with all applicable fictitious name statutes, with evidence of such compliance to be furnished to Franchisor.  If Franchisee is a corporation, partnership, or limited liability company, it shall not legally or otherwise incorporate the name "Black Rock Coffee Bar" in its corporate, company or partnership name.

     **4.2**     **Acknowledgements**.  Franchisee expressly understands and acknowledges that:

          **4.2.1**     **Ownership**.  Franchisor authorizes Franchisee to use the System, the Marks, the trade secrets and goodwill, and any improvements and modifications of these items, in the operation of Franchisee's business at the franchise location.  Franchisee expressly agrees that the ownership of all right, title and interest in and to the System, the Marks, trade names, copyrighted materials, trade secrets and goodwill, and any improvements and modifications of these items shall remain solely owned by Franchisor and that the materials and information now and hereafter provided or revealed to Franchisee under and pursuant to this Agreement are revealed in confidence.  Franchisor may change or modify the System, modify or discontinue certain Marks or copyrighted material or adopt new Marks or copyrighted material.  Franchisee agrees at its own expense to discontinue, adopt and/or use any such changed items.

          **4.2.2**     **No Interference**.  Neither Franchisee nor any Controlling Principal shall take any action that would prejudice or interfere with the validity of Franchisor's rights with respect to the Marks.   Nothing in this Agreement shall give the Franchisee any right, title, or interest in or to any of the Marks or any of Franchisor's service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Marks and the System in accordance with the terms and conditions of this Agreement for the operation of the Franchise and only at or from its Location or in approved advertising related to the Franchise.

          **4.2.3**     **Goodwill**.  Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Marks and the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned

6

as attributable to any goodwill associated with Franchisee's use of the Marks. So long as this Franchise Agreement shall remain in effect, Franchisee agrees to maintain a clean and attractive store which meets the specifications provided by Franchisor to preserve, maintain and enhance the reputation and goodwill built up by Franchisor and its franchisees and the value of the Marks. In developing and maintaining those high and uniform standards of quality and service to protect the reputation and goodwill of Franchisor, Franchisee further agrees to use only the Marks Franchisor designates and to use them solely in the manner authorized by Franchisor. Franchisee further agrees to use the Marks only for the operation of the franchised business and only at the Assigned Area or in advertising related to the franchised business and only during the term of this Agreement.

**4.2.4**   <u>Validity</u>.  Franchisee shall not contest the validity of or Franchisor's interest in the Marks or assist others to contest the validity of or Franchisor's interest in the Marks.

**4.2.5**   <u>Infringement</u>.  Franchisee acknowledges that any unauthorized use of the Marks shall constitute an infringement of Franchisor's rights in the Marks and a material event of default hereunder.  Franchisee agrees that it shall provide Franchisor with all assignments, affidavits, documents, information and assistance Franchisor reasonably requests to fully vest in Franchisor all such rights, title and interest in and to the Marks, including all such items as are reasonably requested by Franchisor to register, maintain and enforce such rights in the Marks.  Franchisee agrees to neither infringe upon nor use or imitate the System or any part of the System, except under a written franchise agreement and license from Franchisor.

**4.2.6**   <u>Substitution</u>.  Franchisor reserves the right to substitute different Marks for use in identifying the System and the Franchise if the current Marks no longer can be used, or if Franchisor, in its sole discretion, determines that substitution of different Marks will be beneficial to the System.  In such event, Franchisor may require Franchisee, at Franchisee's expense, to discontinue or modify Franchisee's use of any of the Marks or to use one or more additional or substitute Marks.

**4.3**   <u>Agreements</u>.  With respect to Franchisee's franchised use of the Marks pursuant to this Agreement, Franchisee further agrees that:

**4.3.1**   <u>Exact Use</u>.   Unless otherwise authorized or required by Franchisor, Franchisee shall advertise the Franchise only under "Black Rock Coffee Bar" without prefix or suffix.  Franchisee shall not use the Marks as part of its corporate or other legal name, and shall obtain the Franchisor's approval of such corporate or other legal name prior to filing it with the applicable state authority.  Franchisee shall not advertise, publish, or circulate any documents or other items using the Marks except in strict compliance with the latest edition of Franchisor's Manuals.

**4.3.2**   <u>Identification</u>.  During the term of this Agreement and any renewal hereof, Franchisee shall identify itself as the owner of the Franchise in conjunction with any use of the Marks, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Franchise as Franchisor may designate in writing.

7

**4.3.3**   Debt.   Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**4.3.4**   Trade Names.   Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

**4.3.5**   Identification as Independent Operator.   Franchisee shall prominently display a sign in the retail portion of the franchise premises to the effect that Franchisee is "An Independent Franchise of 'Black Rock Coffee Bar' Franchise System," or other similar statement approved in writing by Franchisor.

**4.3.6**   Unauthorized Use.   Any compensation received by Franchisee in connection with the unauthorized use of the Marks shall be held in trust for and paid to Franchisor.

**4.3.7**   Inspections.   In order to preserve the validity and integrity of the System and the Marks, and to assure that Franchisee is properly using authorized Marks in the operation of Franchisee's business, Franchisor may inspect Franchisee's operations from time to time.  Franchisor will advise Franchisee of any deficient or improper use of the Marks following such inspection.  Franchisee shall cooperate with Franchisor's representative in such inspection and render any assistance that is requested.

**4.3.8**   Termination and Use.   Upon termination or expiration of this Agreement, Franchisee immediately shall cease use of the Marks and shall immediately remove the Marks from the Assigned Area and to cancel any advertising relating to Franchisee's use of the Marks.

**4.4**   **Infringement**.   Franchisee shall notify Franchisor immediately by telephone and thereafter in writing of any apparent infringement of or challenge to Franchisee's use of any Mark, of any claim by any person of any rights in any Mark, and Franchisee and the Controlling Principals shall not communicate with any person other than Franchisor or any designated affiliate thereof, their counsel and Franchisee's counsel in connection with any such infringement, challenge or claim.  Franchisor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates of, any settlement, litigation or Patent and Trademark Office or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Mark.  Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any other person or entity in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Marks.  Franchisor will indemnify Franchisee against and reimburse Franchisee for all damages for which Franchisee is held liable in any proceeding arising out of Franchisee's use of any of the Marks (including settlement amounts), provided that the conduct of Franchisee and the Controlling Principals with respect to such proceeding and use of the Marks is in full compliance with the terms of this Agreement.

8

**4.5**   <u>**Nonexclusive License**</u>.  The right and license of the Marks granted hereunder to Franchisee is nonexclusive and Franchisor thus has and retains the following rights, among others, subject only to the limitations of this Agreement.

    **4.5.1**   <u>Other Licenses</u>.  To grant other licenses for use of the Marks, in addition to those licenses already granted to existing franchisees;

    **4.5.2**   <u>Other Systems</u>.  To develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to Franchisee; and

    **4.5.3**   <u>Production and Distribution</u>.  To engage, directly or indirectly, through its employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in (1) the production, distribution, license and sale of products and services, and (2) the use in connection with such production, distribution and sale, of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Franchisor.

**4.6**   <u>**Maintenance of BRCB's Goodwill**</u>.  Franchisee agrees to refrain from performing any act or engaging in any conduct, either directly or indirectly, that is or may be injurious or prejudicial to the goodwill associated with the Proprietary Marks or the BRCB System.  Franchisee acknowledges that any such acts or conduct will cause irreparable harm to BRCB and will entitle BRCB to seek and obtain injunctive relief.

**4.7**   <u>**Trade Dress**</u>.  Franchisee acknowledges that certain portions of the Premises decor and design constitute unique and protectable images to the consumer that are identified with BRCB and that are part of the goodwill associated with the BRCB System.  This "trade dress" is exclusively owned by BRCB, and this Agreement does not grant any ownership interest in the trade dress to Franchisee.  Usage of the trade dress by Franchisee, and any goodwill established by that usage, inures to the exclusive benefit of BRCB.

**4.8**   <u>**Use of Proprietary Marks on the Internet**</u>.  Franchisee will not maintain a website or otherwise maintain a presence or advertise on the Internet or any other publicly accessible computer network in connection with the franchised business without BRCB's prior written approval, which BRCB may withhold for any reason or no reason. Franchisee agrees to submit to BRCB for approval before use true and correct printouts of all Web site pages Franchisee proposes to use in its Web site in connection with the franchised business.  Franchisee understands and agrees that BRCB's right of approval of all such Web material is inextricably linked with the Proprietary Marks.  Franchisee will use only material that BRCB has approved.  Franchisee's website must conform to all of BRCB's website requirements, whether set forth in the Operations Manual or otherwise.  Franchisee agrees to include all hyperlinks or other links that BRCB requires.  If BRCB grants approval for a website, Franchisee will not use any of the Proprietary Marks at the site except as BRCB expressly permits.  If Franchisee wishes to modify its approved site, all proposed modifications must also receive BRCB's prior written approval.  Franchisee will not post on its website any material in which any third party has any direct or indirect ownership interest (including video clips, photographs, sound bites, copyrighted text, trademarks or service marks, or any other text or image in which any third party may claim intellectual property ownership interests) without authorization from the owner of the rights and from BRCB.

9

Franchisee agrees to obtain BRCB's prior approval for any Internet domain name and/or home page address. The requirements for BRCB's prior approval set forth in this Section will apply to all activities directly related to the franchised business on the Internet or other communications network to be conducted by Franchisee, except that Franchisee may maintain one or more e-mail addresses and may conduct e-mail communications and online business-to-business transactions without BRCB's prior written approval, provided that the address and communications comply with all of the requirements (including those pertaining to the use of the Proprietary Marks) contained in this Agreement. Franchisee agrees to obtain BRCB's prior approval as provided above if it proposes to send advertising to multiple addresses via e-mail.

**Section 5.** **Confidentiality**.

    **5.1** **Definition of Proprietary Information**. BRCB's "***Proprietary Information***" means all elements of the BRCB System that are not publicly known, whether or not entitled to protection as a trade secret, including without limitation: (1) ingredients, recipes, and methods of preparing food and drink products; (2) methods of operation of BRCB Coffee Bars; (3) information about products, supplies, services, or procedures; (4) the entire contents of the Operations Manual; and (5) any other information disclosed to Franchisee through confidential notifications from BRCB. Franchisee acknowledges that BRCB is the sole owner of the Proprietary Information.

    **5.2** **Use and Protection of Proprietary Information**. Franchisee agrees not to disclose any of BRCB's Proprietary Information to any person, other than to Franchisee's employees, and then only to the extent necessary for the operation of the BRCB Coffee Bar. Franchisee will require its General Manager, as defined in Section 9.1 of this Agreement, to execute a Manager's Confidentiality Agreement substantially in the form attached to this Agreement, unless Franchisee's General Manager is the same person as Franchisee or an owner of at least a one-half undivided ownership interest in Franchisee. Franchisee will keep the Operations Manual and all other tangible records of Proprietary Information in a secure location at the BRCB Coffee Bar, and will take reasonable precautions to prevent the disclosure of any of the Proprietary Information to any unauthorized person. Franchisee will not make copies of any of the Proprietary Information fixed in any medium. Franchisee will be responsible to BRCB for any misuse or publication of BRCB's Proprietary Information by any of Franchisee's employees.

    **5.3** **Operations Manual**. Franchisee agrees to adhere to the policies, procedures and specifications of the BRCB System as set forth in the Operations Manual, as it may be revised by BRCB from time to time in the sole discretion of BRCB, provided that such revisions will not effect any material change in the terms of this Agreement. In the event of any dispute as to the contents of the Operations Manual, or any of them, the terms of the master copy maintained by BRCB will be controlling. Franchisee's authorized copy or copies of the Operations Manual remain at all times the property of BRCB.

    **5.4** **Irreparable Harm**. Franchisee acknowledges that any violation of the terms of this Section 5 will cause irreparable harm to BRCB, entitling BRCB to injunctive relief.

**Section 6.**     <u>**Covenants Against Competition and Competitive Solicitation**</u>.

    **6.1**     <u>**Definition of Competition**</u>.  For purposes of this Section 6, "***Competition***" means the operation of or assisting in the operation of a drive-thru, sit-down or combination coffee store the same as or similar to the BRCB Coffee Bar, and within a geographical area consisting of (1) during the term of this Agreement, anywhere, and (2) after termination of this Agreement, a ten (10) mile radius from the location of any BRCB Coffee Bar now or hereafter operated by BRCB or its licensees or franchisees, including the Coffee Bar licensed by this Agreement.

    **6.2**     <u>**Blue Pencil**</u>.  If a judicial or quasi-judicial authority called upon to enforce this Section 6 deems any of its provisions to be unenforceable by reason of its scope or extent, the parties intend that such authority should enforce such provision to the maximum extent permitted by applicable law.

    **6.3**     <u>**Noncompete and Nonsolicitation Covenants**</u>.  During the term of this Agreement, and for a period of two (2) years after its expiration or termination, Franchisee will not (a) engage in any business in Competition with any BRCB Coffee Bar, except as authorized in writing by BRCB, or (b) employ or seek to employ any employee of BRCB or of any BRCB franchisee or developer for a period of at least one (1) year following the non-employment of such employee. The one and two-year terms set forth in this Section 6.3 will be extended by any time consumed in litigation or arbitration required to enforce it, including any appeals.  For purposes of this Section 6.3, "engage in any business" means in any capacity, including as a franchisee, sole proprietor, partner, limited partner, member, employer, franchisor, stockholder, officer, director, or employee, except in the capacity of shareholder of less than five percent (5%) beneficial interest in the stock of any publicly traded corporation.

    **6.4**     <u>**Irreparable Harm**</u>.  Franchisee acknowledges that any violation of the terms of this Section 6 will cause irreparable harm to BRCB, entitling BRCB to injunctive relief.

**Section 7.**     <u>**Establishment of the Franchise**</u>.

    **7.1**     <u>**Layout and Design**</u>.

        **7.1.1**     <u>Site Remodels, Interior End Cap Build-Outs, and Other Site Construction</u>**.** Upon written notice to BRCB that a Franchisee desires to remodel an existing building, construct an interior end cap drive thru build-out, or perform any other construction, remodeling, or improvement of any current or prospective Coffee Bar location, BRCB shall provide Franchisee with building specifications, which Franchisee shall incorporate into building plans or blueprints at its sole expense. Franchisee shall submit plans or blueprints for all such construction, improvements and remodeling to BRCB for its approval, and will make such changes in the plans or blueprints as BRCB requests.  Expenditure of funds on design or drafting by Franchisee does not obligate BRCB to approve the plans.  BRCB reserves the right to approve or disapprove the design or plans, in its sole discretion.  All such construction, improvements and remodeling of the Premises will meet or exceed any applicable building codes and any other regulations of any local governing

11

body (city, county, or state).  Franchisee shall not begin any construction, improvements, or remodeling until it has received final written approval from BRCB and all required licenses, permits, zoning variances, or other clearances from any applicable governing body.

**7.1.2**   New Site Construction.  If Franchisee desires to build a new standalone BRCB Coffee Bar, Franchisee must either i) contract with BRCB's designated approved builder for construction of the Coffee Bar, or ii) purchase a prototype building design from BRCB and contract with a builder of Franchisee's choice, subject to BRCB's prior approval, which shall be given in BRCB's sole discretion. If Franchisee contracts with a builder other than BRCB's designated approved builder for construction of the Coffee Bar, Franchisee shall ensure that the Coffee Bar conforms to the prototype building design and that a modular building sticker is placed on the building indicating state approval of a prefabricated building.

**7.2**   **Landscaping and Site Improvements**.   All plans for the development and landscaping of the site of the BRCB Coffee Bar, including drive-thru directional striping and parking spaces, must be submitted to BRCB for its approval in writing before the plans are implemented.

**7.3**   **Licenses and Permits**.  Franchisee will obtain any licenses or permits required for any construction, improvement, or remodeling of the premises of the BRCB Coffee Bar, and for the operation of the BRCB Coffee Bar.

**7.4**   **Equipment**.  Franchisee will acquire equipment to be used in the operation of the Coffee Bar from BRCB or from approved suppliers only.  Any and all equipment used in the operation of the Coffee Bar must be in accordance with the standards and specifications set forth by BRCB in the Operations Manual or other documents provided or approved by BRCB as they presently exist or may exist in the future.  BRCB may at its option require you to upgrade your cash register to a networked cash register system capable of allowing BRCB independent access to the system, and to enter into an ongoing contract for the maintenance, upgrading and repair of the system.  During any ten-year period, you will not be required to spend more than $7,700 for upgrades to fulfill the obligation described in the preceding sentence.

**7.5**   **Signage**.  Franchisee must acquire signs for advertising and identifying the Franchisee's business as a BRCB Coffee Bar from a BRCB-approved supplier, or according to the Alternative Approval Procedure set forth in Section 8.1.  All signs must be in accordance with the standards and specifications of BRCB and any local governing body.  Franchisee acknowledges that quality control is essential to protect and promote BRCB's Proprietary Marks, standards, and uniform image.

**7.6**   **Fax Machine and Computer Equipment**.  Franchisee will be required to have a facsimile machine and related telephone line for supply ordering and report sending.  Franchisee is not now, but may in the future be required by BRCB to purchase or obtain computer hardware and software, and to maintain an Internet service provider account, which includes the ability to send and receive e-mail over the Internet; provided, however, that in no case shall Franchisee be

required to pay any fee to BRCB for the use of such hardware or software. The computer equipment would be used for providing reports to BRCB, for communications with BRCB, and for communications between third parties and Franchisee. BRCB may provide specifications that Franchisee must follow for the hardware, software, and Internet provider. BRCB may require Franchisee to upgrade the hardware and software as reasonably necessary to provide reports and information required by BRCB.

       7.7    **Grand Opening Requirements**. Franchisee cannot open Franchisee's Coffee Bar before the Grand Opening, unless prior written authorization has been given by BRCB. Franchisee must have in stock a sufficient quantity of inventory, supplies, promotional materials and signage, as well as food and labor, to conduct the Grand Opening. In addition, Franchisee's Coffee Bar must be "fully operational", determined in BRCB's sole discretion, but generally meaning without limitation that Franchisee's Coffee Bar has, at a minimum, all equipment and furniture installed, and all licenses, permits or other approvals necessary to operate have been obtained.

**Section 8.**    **Operation of the BRCB Coffee Bar.**

       8.1    **Operations Manual and Alternative Approval Procedure**. Franchisee acknowledges that uniformity in all aspects of the operation of the BRCB Coffee Bar is necessary to protect BRCB's goodwill in the Proprietary Marks, and that such uniformity will be achieved by Franchisee's strict compliance with all provisions of the Operations Manual and any other customer service guidelines implemented by BRCB from time to time. Except as provided in this Section 8.1, Franchisee will strictly comply with the menus, procedures, standards, recipes, and provisions set forth in the Operations Manual, and will not sell any product at the BRCB Coffee Bar that is not authorized by the Operations Manual or otherwise approved by BRCB. Franchisee may make a request in writing to deviate from any of the requirements set forth in the Operations Manual, including the specifications relating to equipment, supplies, recipes, and other aspects of operation. BRCB will evaluate all such requests and either approve or disapprove, in its sole discretion, within thirty (30) days of its receipt of the request (the "***Alternative Approval Procedure***"). If BRCB fails to respond to any request made pursuant to this Section 8.1 within the prescribed time period, the request will be deemed disapproved.

       8.2    **Restricted Use of the Premises**. The Premises will be used only for the operation of the BRCB Coffee Bar. Franchisee will not conduct any other businesses or activities on the Premises. Franchisee will not wholly or partially let or sublet the Premises without BRCB's prior written consent.

       8.3    **Supplies**. Subject to the Alternative Approval Procedure, Franchisee shall use only supplies and ingredients that are in compliance with the standards as set forth in the Operations Manual or other documents provided or approved by BRCB as they presently exist or may exist in the future. Franchisee may purchase all necessary supplies, other than logo cups, coffee and espresso beans and products, and other products bearing the BRCB Marks, from the supplier of Franchisee's choice.

       8.4    **Coffee and Espresso Beans**. Franchisee shall purchase only from BRCB's approved distributor all of Franchisee's requirements for coffee and espresso beans, as specified in

13

the Operations Manual, or other documents provided or approved by BRCB as they presently exist or may exist in the future. No coffee or espresso may be served at the BRCB Coffee Bar that is not purchased through the BRCB-designated supplier. Franchisee acknowledges that BRCB's coffee and espresso bean blends and roasts are trade secrets of BRCB, and that Franchisee's breach of this Section 8.4 shall be grounds for immediate termination of this Agreement by BRCB without opportunity to cure. Franchisee will pay BRCB-designated coffee or espresso bean vendors within vendor terms.

      **8.5**    **Logo Cups**. Franchisee shall purchase only from BRCB's approved distributor all of Franchisee's requirements for logo cups, as specified in the Operations Manual.

      **8.6**    **Other BRCB Branded Products**. If BRCB's approved distributor offers any products for sale to Franchisee, Franchisee shall purchase all of Franchisee's requirements for such products only from BRCB's approved distributor.

      **8.7**    **Advertising and Promotions**. Franchisee will use its best efforts to promote and advertise the opening of the BRCB Coffee Bar. BRCB recommends that Franchisee spend at least One Thousand One Hundred Dollars ($1,100) on advertising within the first six (6) months following the opening of the BRCB Coffee Bar. All local advertising and promotions to be offered or published by or for Franchisee in any medium, including without limitation print, radio, television and Internet advertising, will be submitted to BRCB for approval or disapproval in advance of its use, and no advertisement or promotion will be used by Franchisee unless it has first been approved by BRCB. Advertising materials made available to Franchisee pursuant to Section 10.6 of this Agreement are deemed approved if used without change. BRCB will evaluate all proposed advertising and promotions and either approve or disapprove, in its sole discretion, within fourteen (14) days of its receipt of the request. If BRCB fails to respond to any request for evaluation of proposed advertising or promotion within the prescribed time period, the proposed advertisement or promotion will be deemed disapproved.

      **8.8**    **Consumer Engagement**. Franchisee shall utilize any and all consumer engagement services and/or software as required by Franchisor, including but not limited to payroll and scheduling software, customer interaction media from loyalty apps and remote order apps, document storage media (e.g. Smugmug, Box, Google), social media (e.g. Facebook, Instagram, Snapchat), and digital ads (e.g. Google). Franchisee must utilize only those consumer engagement services and software approved by Franchisor and may not utilize any non-approved services or software. Franchisor shall be provided real-time access to all consumer engagement services and software used by Franchisee. For any consumer engagement services and software without the capability of real-time access, Franchisee shall provide Franchisor unrestricted access to that data.

      **8.9**    **Continued Operation of the BRCB Coffee Bar**. After Franchisee has begun full operation of the Coffee Bar, Franchisee may not discontinue operation of the Coffee Bar without BRCB's prior written consent. Franchisee will be considered to have discontinued operation of the Coffee Bar if the Coffee Bar is non-operational for more than 24-hours, excluding scheduled full day closures allowed in accordance with Section 8.10, below. If BRCB, in its sole discretion, consents to a temporary discontinuance of operation, then Franchisee must reopen the Coffee Bar

14

no later than the date designated by BRCB in its written consent. Failure to comply with these operational requirements shall be considered a default of this Agreement.

**8.10    Hours of Operation**.  Unless otherwise agreed to in writing by BRCB, Franchisee shall keep its BRCB Coffee Bar open for business to the public and lighted and staffed seven days per week at least from 5 a.m. to 9 p.m. or during the hours BRCB may designate from time to time in the Operations Manual.  Franchisee's Coffee Bar shall not be closed more than three (3) days in any calendar year during the term of this Agreement.

**8.11    Social Media Policy**.  Franchisee shall institute a social media policy of its choosing, provided that, at a minimum it (i) prohibits defamatory or offensive posts, (ii) prohibits posts that infringe the intellectual property of a third-party or disclose confidential information, (iii) requires all posts to comply with the law and (iv) seeks to avoid potentially divisive religious or political posts.  Franchisee acknowledges and agrees that it shall remove any social media posts or message that BRCB deems objectionable as soon as possible but in any event within 2 hours of notification from BRCB.

**8.12    General Operating Requirements**.  Franchisee shall operate the BRCB Coffee Bar in accordance with BRCB's standards of drink quality, cleanliness, and customer service and shall conduct and maintain the BRCB Coffee Bar and the Premises so as not to distract from, interfere with, or damage the integrity and standards of BRCB or its brand(s).  Franchisee shall at all times comply with the provisions of the Operations Manual, any other customer service guidelines implemented by BRCB from time to time, and all applicable laws, rules, ordinances, and regulations of governmental authorities pertaining to the operation of the BRCB Coffee Bar.  Franchisee shall at all times maintain the building, equipment, fixtures, and the Premises to the standards of BRCB.

**8.13    Violations Fee**.  For any violation of Sections 8.1 through 8.12, Franchisee agrees to pay BRCB $1,100 per violation, as liquidated damages, upon written demand by BRCB.  The remedies available to BRCB under this Section 8.13 will not affect the availability of other remedies under this Agreement, including termination.

**Section 9.    Franchisee's Designated Manager and Structure**.

**9.1    General Manager**.  Franchisee will appoint an individual with primary overall responsibility for the day-to-day operations of the BRCB Coffee Bar (the "***General Manager***").  The General Manager will personally oversee the day-to-day operations of the Coffee Bar, use its best efforts and constant personal attention in the day-to-day operations of the Coffee Bar, and live in the general area where the Coffee Bar is located.  Franchisee represents and warrants that Franchisee's General Manager will have authority to ensure that the BRCB Coffee Bar is operated according to the terms of this Agreement and the procedures set forth in the Operations Manual.  Franchisee will identify the General Manager to BRCB, and the General Manager will undergo training in the BRCB system pursuant to Section 10.1 of this Agreement.  Franchisee will enter into the Manager's Confidentiality Agreement attached hereto as Schedule 9.1 at the end of this Agreement, or a different agreement so long as it is similarly restrictive, and will provide a copy to BRCB upon request.  Franchisee or its General Manager, whoever is involved with the daily

15

operations of the BRCB Coffee Bar, must possess literacy and fluency in the English language sufficient, in the opinion of BRCB, to communicate with employees, customers, and suppliers.

      **9.2**    **No Third-Party Management Services**.  Franchisee represents and warrants that Franchisee is, and will remain for the entire term of this Agreement, the sole entity entitled to share in the profits from the BRCB Coffee Bar, and that Franchisee will not circumvent the requirements of this Section 9.2 by entering into any management or consulting agreement with any third party. Without limiting any other provision of this Section 9, Franchisee is expressly prohibited from engaging or appointing any third-party entity to manage, operate, or oversee operations of the BRCB Coffee Bar without the prior written consent of BRCB. Franchisee shall not use any operational manuals, documents, or other resources not prepared by BRCB for purposes of managing or operating the BRCB Coffee Bar without the prior written consent of BRCB.

**Section 10.**    **Services Provided by BRCB**.

      **10.1**    **Initial Training**.  BRCB has developed a training program for the BRCB System. BRCB will provide initial training, and such additional training as BRCB may in its sole discretion deem necessary from time to time during the term of this Agreement, to Franchisee or its General Manager.  There will be no fee for this training, however, Franchisee will bear the costs of transportation, lodging, and meals to the extent such costs are incurred.  Franchisee acknowledges that the training described in this Section 10.1 is necessary to the operations of the Coffee Bar, and agrees that Franchisee or its General Manager will undergo the training required by this Section. If, in BRCB's reasonable business judgment, Franchisee or its General Manager is unable to successfully complete the initial training, BRCB may require that the training be repeated or supplemented, and if such additional training is required, BRCB may impose a reasonable fee for such training.  Nothing contained in this Agreement will be deemed to limit or restrict BRCB's right to modify or alter its training programs and offerings in any way.

      **10.2**    **Supplemental Training**.  Franchisee or its General Manager will participate in any continuing training program provided by BRCB through the medium of inspections, bulletins, manuals, and other literature, and will comply with the directives and instructions contained in those documents or delivered during or after inspections.  This Section 10.2 will not be interpreted to require BRCB to provide any training beyond the initial training.

      **10.3**    **Operations Manual**.  BRCB will loan to Franchisee one BRCB Operations Manual for each BRCB Coffee Bar.  BRCB may, but is not obligated to, update and revise the Operations Manual from time to time during the term of this Agreement as it deems appropriate.

      **10.4**    **Assistance at Opening**.  BRCB will provide, at BRCB's expense, on-site assistance to Franchisee for the opening of the BRCB Coffee Bar in the form of a representative of BRCB familiar with the BRCB System.  The on-site assistance will be available in connection with the Grand Opening of the Coffee Bar.

      **10.5**    **Optional On-Site Assistance**.  BRCB will provide reasonable ongoing support to the Coffee Bar, at Franchisee's request, during the term of this Agreement.  BRCB will meet its obligation under this Section 10.5 by responding in a reasonably prompt manner to written or

16

telephonic queries from Franchisee.  BRCB will, upon Franchisee's request, make a representative of BRCB available for on-site assistance at the Coffee Bar (in addition to the on-site assistance provided at the opening of the Coffee Bar), and BRCB will charge a fee for such on-site assistance. Currently the fee is fifty dollars ($50) per hour, but the fee is subject to adjustment in BRCB's sole discretion.  In addition, Franchisee will bear the costs of transportation, lodging and meals for the BRCB representative providing the on-site assistance.

**10.6    Advertising and Point-of-Sale Materials**.  BRCB may make available to Franchisee, without charge, certain advertising, promotional, bookkeeping and point-of-sale systems selected or prepared by or for BRCB.  Franchisee may use any such advertising materials in its own local advertising, provided that Franchisee submits any proposed modifications to BRCB for evaluation according to the procedure set forth in Section 8.7 of this Agreement. Franchisee will be required to use such bookkeeping and point-of-sale systems in the Coffee Bar as BRCB may direct, and provide BRCB real-time access to the same.  Nothing in this Section 10.6 will be interpreted to require BRCB to provide Franchisee with any advertising, promotional, bookkeeping or point-of-sale display materials.

**10.7    Approval of Advertising**.  All advertising and promotion by Franchisee in any medium shall be conducted in a professional manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals or otherwise.  Franchisee shall submit to Franchisor for its approval samples of all advertising and promotional plans and materials and public relations programs that Franchisee desires to use, including, without limitation, any materials in digital, electronic or computerized form, or in any form of media now or hereafter developed (e.g., materials to be made available through a computer or telecommunications net-work such as the Internet), that have not been either provided or previously approved by Franchisor.  Franchisor shall approve or disapprove such plans and materials within fifteen (15) business days of Franchisor's receipt thereof.  Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor, and shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor.  Franchisee shall not advertise or use the Franchisor's Marks in any fashion on the Internet, World Wide Web or via other means of advertising through telecommunication, or establish any website listing on the Internet or World Wide Web, without the express written consent of Franchisor.  Any advertising, marketing, or sales concepts, programs or materials proposed or developed by Franchisee for the Franchise and approved by Franchisor may be used by other System Franchises without any compensation to Franchisee.

**Section 11.    Inspections, Audits and Accounting**.

**11.1    BRCB's Right To Inspect**.  Representatives or agents of BRCB have the right to enter and examine or inspect the Coffee Bar, or any part of the Premises, at any time during normal business hours.  In addition to the Consumer Engagement data and services described in Section 8.8, Franchisee must use a bookkeeping and/or Point of Sale system that provides BRCB real-time access, including real-time access to all transactions, including but not limited to the time, amount, and description of items sold in a form specified by or otherwise acceptable to BRCB. BRCB is authorized to access such systems and consumer engagement at any time and without notice.  At the time of such examination or inspection, BRCB or its representatives or designees may give

17

advice and assistance to Franchisee to assist in the management and operation of the Coffee Bar, without charge. Franchisee must remedy any deficiencies found by the inspector in a timely manner as provided in Section 14.5 of this Agreement.

      **11.2**   **BRCB's Right to Audit**. At all times, representatives of BRCB will be given free access to Franchisee's books and records pertaining to the franchised business, and they may audit those books and records if BRCB, in its sole discretion, deems an audit necessary. BRCB may, in its sole discretion, conduct such test and inspections, as it deems necessary to verify Gross Sales Revenues and compliance with this Agreement. If an audit results from Franchisee's failure to prepare, deliver, or preserve statements, reports, or records required by this Agreement, or if any inspection or audit reveals that Franchisee has underreported Gross Sales Revenues or purchases by more than two percent (2%) during the period covered by the audit, Franchisee will, within thirty (30) days, pay to BRCB, or reimburse BRCB for, (1) all of the costs and expenses incurred by BRCB in conducting the audit or inspection, including attorneys' and accounting fees and costs, (2) all revenue otherwise due BRCB in relation to inventory and/or supplies not purchased from approved vendors, and (3) interest on applicable revenue at a rate of eighteen percent (18%) per annum or the highest permissible rate, whichever is less. These payments will be without prejudice to any other remedies BRCB may have under this Agreement or the law, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional underreporting of Gross Sales Revenues or purchases, or purchasing inventory or supplies from other than an approved vendor.

      **11.3**   **Provision of Monthly and Annual Financial Records**. Franchisee will keep full, complete, and accurate books and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed below or as from time to time further prescribed by BRCB. Franchisee agrees to submit the following reports and data to BRCB electronically, using the equipment, software and protocols specified in the Operations Manual:

            **11.3.1**  Monthly Profit and Loss Statement. Not later than thirty (30) days after the end of each calendar month, on a BRCB-approved form, a profit and loss statement of the Coffee Bar for the preceding calendar month prepared in accordance with generally accepted accounting principles.

            **11.3.2**  Annual Profit and Loss Statement and Balance Sheet. Not later than thirty (30) days after the end of each calendar year, commencing with the opening date of the Coffee Bar, on a BRCB-approved form, a profit and loss statement for the year and a balance sheet (including a statement of retained earnings or partnership accounts) as of the end of the period.

            **11.3.3**  Other Reports. At the times required, such other periodic forms, reports, and information as may from time to time be prescribed by BRCB.

            **11.3.4**  Failure to Submit Reports. If Franchisee fails to submit the profit and loss statements required by this Section 11.3 on a timely basis, then BRCB will be entitled to pursue injunctive relief granting specific performance of this obligation. Franchisee acknowledges that BRCB will be irreparably harmed by the failure to

18

receive timely reports.  Pursuit of these remedies by BRCB does not constitute a waiver by BRCB of its right to pursue any and all other remedies available to it, including termination of this Agreement.

**11.4**   **Preservation of Business Records**.   Franchisee will preserve, in the English language and for the time periods set forth below, all accounting records and supporting documents relating to the Franchisee's operation of the Coffee Bar, including:

**11.4.1**   Daily cash reports and cash register tapes or backup files;

**11.4.2**   Cash disbursement journal;

**11.4.3**   Monthly bank statements;

**11.4.4**   Supplier invoices (paid and unpaid); and

**11.4.5**   Such other records as BRCB may from time to time request.

**11.5**   **Tax Returns**.   Franchisee will file all federal and state tax returns for the franchised business on a timely basis.  BRCB may require that tax returns from the Franchisee and all shareholders, members, or partners of Franchisee be provided to BRCB if BRCB determines, in accordance with the provisions of Section 11.1 of this Agreement, that an audit is necessary.

**Section 12.**   **Assignment, Transfer and Sale**.

**12.1**   **Definition of Transfer**.  "*Transfer*" means any act or circumstance by which ownership or control is shifted, whether by sale, assignment, foreclosure, or otherwise, in whole or in part, from any individual or entity to another, including, if Franchisee is a corporation, any changes in the present ownership of the stock of Franchisee (as of the date of this Agreement) or the issuance of additional stock of Franchisee and, if Franchisee is a partnership, L.L.C., or L.L.P., any change in or addition of partners or members.

**12.2**   **No Transfer Without BRCB's Consent**.  BRCB is entering into this Agreement based upon its knowledge of and faith in the ability of Franchisee.  Therefore, this Agreement and all the rights granted by it are personal to Franchisee and may not be Transferred by Franchisee without the prior written consent of BRCB.  Any attempt to Transfer any right under this Agreement, or any interest in any entity holding an interest in this Agreement, without the prior written consent of BRCB, will be null and void and will give BRCB the right to terminate this Agreement and Franchisee's rights under it, in addition to any remedies that BRCB may have for the breach of this covenant by reason of an attempted Transfer.

**12.3**   **Advance Notice of Proposed Terms and Right of First Refusal**.  If Franchisee, or any shareholder, member, or partner of Franchisee, has received and desires to accept a signed bona fide written offer from a third party to acquire Franchisee's franchised business, then before making any binding commitment regarding such Transfer, Franchisee will notify BRCB and provide BRCB with a complete copy of the offer, which must include for every proposed

transferee: (1) name, address and telephone number; (2) business experience and present occupation; and (3) credit rating and financial status. Franchisee must also include information as to the identity of all who will own an interest in the franchisee business after the completion of the Transfer, their respective interests, and the proposed terms and conditions of sale and payment.

**12.3.1** <u>BRCB's Right of First Refusal</u>. BRCB will have the right and option, exercisable within thirty (30) days after the date BRCB receives its copy of the offer, to purchase the interest proposed to be Transferred, at the price and upon the same terms and conditions specified on the notice.

**12.3.2** <u>Transfer After BRCB Rejects Offer</u>. If BRCB does not exercise this option, and the terms of the unaccepted offer are altered, BRCB must, in each such instance, be notified by Franchisee of the changed offer, and BRCB will again have thirty (30) days to exercise its right to purchase on the altered terms. If BRCB does not exercise the option, the Transfer may take place on the terms and price set forth in the notice, provided (1) BRCB gives its written consent, (2) the Transfer takes place no later than six (6) months from the receipt of BRCB's written refusal to exercise its option to purchase, and (3) all the conditions set forth in Section 12.4 of this Agreement are satisfied.

**12.4** <u>**Requirements for Consent to Transfer**</u>. If a Transfer of all or a partial interest in this Agreement or in the franchisee business is proposed and BRCB does not exercise its right to purchase pursuant to the preceding Section, then BRCB will not unreasonably withhold consent to the Transfer provided that each of the following conditions is met:

**12.4.1** <u>Transferee Suitable</u>. Each transferee is, in the reasonable business judgment of BRCB, (a) financially acceptable, (b) not associated with a competitor of BRCB, (c) of good moral character and reputation, and (d) otherwise in accordance with BRCB's criteria, which include work experience and aptitude, ability to devote time and best efforts to the franchised business, residence in the locality where the franchised business is located, equity interest in the franchise, absence of conflicting interests, and other criteria and conditions that BRCB reasonably applies to new franchisees;

**12.4.2** <u>Transfer Terms Feasible</u>. Following an analysis of the terms and conditions of the proposed Transfer, BRCB, in the exercise of its reasonable business judgment, concludes that the terms will not interfere with the financial feasibility or future operation of the franchise;

**12.4.3** <u>Training</u>. If necessary, in BRCB's reasonable business judgment, transferee obtains training by BRCB and pays BRCB a training fee in the amount of Three Hundred Thirty Dollars ($330) per day, with transferee bearing any travel and room and board expenses;

**12.4.4** <u>Execution of Current Agreements</u>. Each transferee enters into all current forms of agreements then being required of new franchisees. This Agreement is

20

not assignable, and any assignment of this Agreement will be null and void. Any transferee must execute BRCB's then current form of the Franchise Agreement;

**12.4.5** <u>Improvements</u>.    Transferee agrees to complete all remodeling and improvements as required by BRCB, within the time period specified by BRCB;

**12.4.6** <u>Transfer Fee</u>.  The transferee shall pay to Franchisor a transfer fee of the greater of Fifteen Thousand Dollars ($15,000) or fifty percent (50%) of the then current initial franchise fee charged to new franchisees, or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the application to transfer, including, without limitation, legal and accounting fees;

**12.4.7** <u>No Outstanding Balance</u>.  Franchisee is in full compliance with this Agreement and has paid all amounts owing to BRCB and its approved vendors;

**12.4.8** <u>General Release</u>.  Franchisee has executed a general release, in a form satisfactory to BRCB, of any and all claims against BRCB or its officers, directors, agents, or employees, to the maximum extent permitted by applicable law; and

**12.4.9** <u>Financing Subordination</u>.  If Franchisee or any owners of Franchisee finance any part of the sale price of the transferred interest, Franchisee or such entity owners have agreed that all obligations of transferee under any promissory notes, agreements, or security interests will be subordinate to transferee's obligations to BRCB.

**12.5** **<u>Death or Incapacity of Franchisee</u>**.  In the event of the death or incapacity of an individual Franchisee, or of any shareholder, partner, or member in a franchise that is a business entity, the legal representative of the individual Franchisee, or of the surviving shareholders, partners, or members in case of a business entity, may for a period of ninety (90) days from the date of death or incapacitation continue to operate the franchise, provided that the operation is conducted in accordance with the terms of this Agreement and any other agreements with BRCB.

**12.5.1** <u>Transfer of Franchise</u>.  If the legal representative of Franchisee desires to continue the operation of the franchise beyond the ninety (90) day period, then before the expiration of this period, the legal representative of the individual Franchisee or the shareholder, partner, or member in a franchise that is a business entity, must apply jointly with all surviving shareholders, partners, or members in writing for the right to Transfer the franchise (or the interest of the deceased or incapacitated shareholder, partner, or member in the franchise in the case of a business entity), to the person or persons (whether spouse, heir, devisee, purchaser, surviving shareholder, partner, member, corporation, or any other person), as the legal representative and the surviving shareholder, partners, or members may specify.  The application for Transfer will be treated in the same manner as any other proposed Transfer under this Agreement.

**12.5.2**  Termination of Franchise.  If the legal representative of Franchisee and all surviving shareholders, partners, or members of a business entity do not comply with the provisions of this Section 12.5 or do not propose a transferee acceptable to BRCB under the standards set forth in this Agreement, all rights licensed to Franchisee under this Agreement will immediately terminate and automatically revert to BRCB.  BRCB will have the right and option, exercisable upon such termination, to purchase the building, fixtures, equipment, and supplies and inventory at a price to be agreed upon by the parties or, if no agreement as to the price is reached by the parties, at such price as may be determined by the appraisal process described in Section 15.7 of this Agreement.  BRCB will give notice of its intent to exercise the option no later than twenty-one (21) days before termination.

**12.6**    **Internal Transfers**.  If a proposed Transfer is to an immediate family member of Franchisee or any shareholder, member, or partner of Franchisee, then the provisions of Section 12.4.6 (transfer fee) and Section 12.3 (right of first refusal) will not apply; provided, however, that the other provisions of Section 12.4 will apply to such Transfers.  The transfer fee provided for in Section 12.4.6 of this Agreement will also be waived by BRCB in the case of a Transfer by an individual Franchisee to a corporation or other legal entity owned or controlled by the individual Franchisee, and no consent is required for such Transfer, nor will BRCB enjoy the right of first refusal under Section 12.3, provided that the Transfer is made within one hundred twenty (120) days of the Effective Date of this Agreement.  The transfer fee provided for in Section 12.4.6 of this Agreement will also be waived by BRCB, and no consent will be required, nor will BRCB enjoy the right of first refusal under Section 12.3, in the case of a Transfer in any single transaction of less than 49% of the equity interest in Franchisee to an employee or officer of Franchisee who has been directly involved in the operation of the Coffee Bar on a full-time basis for at least one year as of the time of the proposed Transfer, or in the case of a Transfer of up to 49% of the equity interest in Franchisee to any person owning shares of common voting stock or other ownership interest coupled with voting rights in Franchisee, provided, however, that in either case such Transfer, when combined with all other Transfers that have occurred since Franchisee will first have become a franchisee of BRCB, does not exceed 49.9% of the total equity interest in Franchisee or otherwise effect a change in control of Franchisee.

**12.7**    **Sale or Assignment by BRCB**.  This Agreement will inure to the benefit of the successors and assigns of BRCB.  BRCB has the right to assign its rights and obligations under this Agreement to any person or entity, provided that the assignee agrees in writing to assume, at minimum, all obligations and liabilities of BRCB to Franchisee that arise after the closing date of the assignment of this Agreement by BRCB.  Upon such assignment and assumption, BRCB will be under no further obligation under this Agreement, except for accrued liabilities, if any, not assumed by BRCB's assignee.

**Section 13.**     **Indemnification and Insurance**.

    **13.1**     **Indemnity**. Franchisee shall indemnify and hold BRCB and its officers, directors, shareholders and employees harmless from and against all fines, suits, proceedings, claims, causes of action, demands, or liabilities of any kind or of any nature arising out of or in connection with the construction or operation of Franchisee's Coffee Bar.

    **13.2**     **Insurance**. Franchisee, at its sole expense, shall at all times keep in force an insurance policy or policies, in a form approved by BRCB, which approval will not unreasonably be withheld, insuring BRCB and its officers, directors, and employees and Franchisee against any and all loss, liability, or expense whatsoever arising from the construction, ownership, or operation of Franchisee's Coffee Bar. The policies must have limits as may be from time to time prescribed by BRCB, but not less than Two Million Dollars ($2,000,000) coverage per occurrence. This insurance must include, without limitation, coverage of product liability, fire, personal injury, death, and property damage. A certificate of insurance, evidencing coverage amounts and proof of payment of premium, together with the proof of renewal when applicable, must be promptly furnished to BRCB by Franchisee. All policies must (1) provide that they can be canceled only after at least thirty (30) days' prior written notice to BRCB, (2) show BRCB as a named "insured," (3) contain provisions denying to the insured the acquisition by subrogation of rights of recovery against BRCB, and (4) provide that coverage is not limited in any way by reason of any insurance that may be maintained by BRCB.

**Section 14.**     **Defaults and Opportunities to Cure**.

    **14.1**     **Default for Insolvency**. Franchisee will be in default if Franchisee becomes insolvent or makes an assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or if such a petition is filed against and consented to by Franchisee or is not dismissed within thirty (30) days; if Franchisee is adjudicated as bankrupt; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and is consented to by Franchisee or is not dismissed within thirty (30) days; if a receiver or other custodian is appointed, or if proceeding for composition with the creditors under any state or federal law is instituted by or against Franchisee; or if the real or personal property of Franchisee is sold at levy thereupon by any sheriff, marshal, or constable. Each of the foregoing is an "***Insolvency Event***."

    **14.2**     **Default for Material Breach of the Franchise Agreement**. Franchisee will be in default if Franchisee fails to perform, observe, or comply with any of Franchisee's material duties and obligations under this Agreement.

    **14.3**     **Default for Material Breach of Other Agreements**. Franchisee will be in default if Franchisee fails to carry out in all respects its obligations under any lease, mortgage, equipment agreement, promissory note, conditional sales contract, or other contract materially affecting the Coffee Bar to which Franchisee is a party or by which Franchisee is bound, whether or not BRCB is a party thereto, including but not limited to the Area Development Agreement, if any, or any other franchise agreement between Franchisee and BRCB, or if Franchisee's lease for the Premises is terminated for reason of default by Franchisee.

**14.4    Default for Violation of Health and Safety Standards**.  Franchisee will be in default if BRCB or any government agency determines that a serious health or safety problem exists at the Coffee Bar.

**14.5    Cure Periods**.  Except as otherwise provided in this Section 14.5, Franchisee will have the right to cure any default under this Agreement within thirty (30) days after written notice of default from BRCB is received or refused, as the case may be.  Notwithstanding the foregoing, the following lesser periods will apply under the circumstances described:

**14.5.1  Seven-Day Cure Period**.  A seven (7) day cure period will apply if Franchisee fails to maintain the insurance coverage required by Section 13.2 of this Agreement.

**14.5.2  Business Day Cure Periods**.  A three (3) business day cure period will apply to the violation by Franchisee of any law, regulation, or order, or any of BRCB's standards relating to health, sanitation, or safety.  A one (1) business day cure period will apply if the Franchisee ceases to operate the Coffee Bar for a period of more than twenty-four (24) hours without the prior written consent of BRCB; provided, however, that if the Coffee Bar is abandoned by Franchisee, no cure period will apply.

**14.5.3  No Cure Period**.  No cure period will be available, and BRCB may terminate this Agreement, (1) if Franchisee is in default under or breaches its covenants or obligations under Sections 5.2 (proprietary information) or 6.3 (noncompetition and nonsolicitation) of this Agreement; (2) if Franchisee abandons the Coffee Bar; (3) if Franchisee commits an act of fraud with respect to its rights or obligations under this Agreement; (4) if Franchisee's lease for the Premises of the Coffee Bar is terminated; (5) if Franchisee repeatedly fails to comply with the provisions of this Agreement, whether or not subsequently cured; (6) if Franchisee, having twice previously cured a default or breach of this Agreement, commits the same breach or default again; or (7) in the case of an Insolvency Event.

**14.5.4  Statutory Cure Period**.  If a statute in the state in which the Coffee Bar is located requires application of that state's law, and that state's statute requires a cure period for the applicable default that is longer than any cure period specified in this Section 14, the statutory cure period will apply.

**14.6    Remedies for Defaults Not Cured**.

**14.6.1  Interests and Costs**.  If Franchisee fails to cure a default, following notice, within the applicable time period set forth in Section 14.5, or if this Agreement is terminated as a result of Franchisee's default, Franchisee will pay to BRCB all damages, costs, and expenses incurred by BRCB as a direct result of Franchisee's default, including, without limitation, interest at eighteen percent (18%) per annum, or the maximum rate allowable under applicable law, whichever is less, and

reasonable attorneys' fees and costs, and the interest and all damages, costs, and expenses, including reasonable attorneys' fees, may be included in and form part of the judgment awarded to BRCB in any proceedings brought by BRCB against Franchisee.

**14.6.2  Appointment of a Receiver**.  If this Agreement is terminated by reason of Franchisee's default, BRCB will have the right, at its option, to have a receiver appointed to take possession, manage and control the assets, collect the profits, and make all other necessary arrangements for the operation of the Coffee Bar, as ordered by a court of competent jurisdiction.  The right to appoint a receiver will be available regardless of whether waste or danger of loss or destruction of the assets exists and without the necessity of notice to Franchisee.

**14.7    Cross-Default**. If there are multiple franchise agreements in effect between Franchisee and BRCB, any default by Franchisee under this Agreement will be deemed a default of all franchise agreements between Franchisee and BRCB.  A default by Franchisee under any other franchise agreement between BRCB and Franchisee will be deemed a default under this Agreement.  A default by the guarantor(s) of this Agreement under this Agreement or any other guaranty related to this Agreement will be deemed a default of this Agreement.

**Section 15.    Termination**.

**15.1    Termination for Default**.  If Franchisee fails to cure any default to BRCB's satisfaction within the applicable period following notice from BRCB, BRCB may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  This termination will be effective immediately upon receipt of a written notice of termination from BRCB.  Notwithstanding the foregoing, this Agreement will immediately terminate upon the occurrence of any event set forth in Section 14.5.3, without notice or opportunity to cure or notice of termination.  Upon termination or expiration of this Agreement, BRCB may advise all suppliers of BRCB proprietary products and other supplies bearing BRCB's trademarks or service marks to cease delivering the items and products to Franchisee.

**15.2    Discontinuation of Use of BRCB System and Proprietary Marks**.  Upon termination or expiration of this Agreement, Franchisee will immediately cease to use any and all parts of the BRCB System and any and all Proprietary Marks, trade secrets, confidential information, operating manuals, slogans, signs symbols, or devices used in connection with the operation of the Coffee Bar.  The prohibition on use of the Proprietary Marks after termination or expiration applies to the use of the words "formerly," "former," "formerly associated," or any words conveying similar meaning and used in conjunction with the Proprietary Marks.  Franchisee agrees that any such unauthorized use or continued use of the Proprietary Marks after the termination of this Agreement will constitute willful trademark infringement by Franchisee, causing irreparable harm to BRCB.

**15.3    De-Identification of the Premises**.  Franchisee will, within thirty (30) days after termination or expiration of this Agreement, provide BRCB with pictures of the entire interior and exterior of the Premises showing that all signs, posters, menu boards, wall hangings, and other

DocuSign Envelope ID: DC18787C-2D4D-46A3-A578-825B6C8549DB

items bearing any of the Proprietary Marks or constituting an element of the trade dress of BRCB have been removed. These pictures will be signed and dated on the back by Franchisee. If Franchisee fails to provide pictures showing the entire interior and exterior of the Premises within this time period, BRCB may send a representative of BRCB, or other person, to the Premises to take the pictures. In this case, Franchisee will reimburse BRCB for its reasonable expenses incurred in getting the pictures, including travel expenses of BRCB's employee or representative. If BRCB is not satisfied that Franchisee has de-identified the Premises, BRCB may, at its option, require Franchisee to (1) repaint the interior and/or exterior of the Premises in colors and schemes acceptable to BRCB and (2) make alterations in the Premises, including in the layout of the interior of the building, to de-identify the Premises. BRCB may enter the Premises without being guilty of trespass or any other tort to satisfy itself that the Premises have been de-identified to its satisfaction and may remove and retain any items and make changes necessary in its sole opinion to de-identify the Premises. Any expenses incurred by BRCB in removing any signs, insignia, or other material from the Premises, or making the changes required, will be paid to BRCB by Franchisee upon demand, together with interest upon the expenses at the highest lawful rate from the date of expenditure until paid. BRCB will also have any other remedy for a breach available at law or in equity.

      **15.4**   **Return of Operations Manual and Other Proprietary Information**. Upon termination or expiration of this Agreement, Franchisee will immediately return to BRCB any and all copies of the Operations Manual issued to Franchisee, and all other Proprietary Information in Franchisee's possession in whatever form, including without limitation plans, specifications, recipes, and menus.

      **15.5**   **Survival of Covenants Against Competition and Solicitation**. The provisions relating to confidentiality set forth in Section 5 of this Agreement, and the covenants against competition and solicitation set forth in Section 6 of this Agreement, will survive any expiration or termination of this Agreement.

      **15.6**   **Transfer of Telephone Numbers and Other Listings**. Upon termination or expiration of this Agreement, Franchisee will cease using all Listings, and at BRCB's election execute all forms and documents required by BRCB and any service provider at any time to transfer such service and any related Listings to BRCB, and refrain from entering into any "call forwarding" or similar instruction with a service provider that has the effect of circumventing the unconditional obligation of Franchisee to surrender and cease using all Listings. For purposes of this Agreement, "***Listings***" means, as related to the Coffee Bar, telephone or facsimile numbers and Yellow Pages listings/advertisements or other business listings or directories, including any website, domain name, or other Internet usage. Upon termination, BRCB will have the immediate right to the Listings and to have the service transferred to BRCB. Franchisee appoints BRCB its true and lawful agent and attorney in fact with full power and authority for the sole purpose of taking such action as is necessary to complete this assignment. The obligation of this Section 15.6 and this power of attorney will survive the termination of this Agreement. Franchisee or its officers, shareholders, partners, and members will not thereafter use the Listings at or in connection with any subsequent business owned or operated by Franchisee or its officers, shareholders, partners, or members or for any other purpose.

26

15.7    **Right to Purchase Assets**.   Subject to applicable law, upon termination or expiration of this Agreement, or at any time after the initial six (6) months following the Grand Opening, BRCB will have the right, but not the obligation, to purchase from Franchisee any and all tangible assets or property used in the operation of the Coffee Bar that BRCB may specify, including the Franchisee's rights as a tenant to any real estate, at the purchase price set forth in this section, exclusive of personalized materials with no value to BRCB and inventory and supplies not reasonably required in the operation of the business (the "***Purchase Right***").

> **15.7.1** Purchase Price.  The purchase price for the BRCB's exercise of the Purchase Right shall be as follows: (i) if Franchisee has been in operation for at least twelve (12) months after the Grand Opening, the purchase price shall be an amount equal to the product of five (5) multiplied by Franchisee's earnings before interest, taxes, depreciation and amortization ("***EBITDA***") for the twelve month period ended as of the last day of the month immediately preceding BRCB's exercise of the Purchase Right, less all of Franchisee's outstanding indebtedness, or (ii) if Franchisee has been in operation less than twelve months after the Grand Opening, the purchase price shall be the product of twelve (12) times the most recent month's EBITDA less all of Franchisee's outstanding indebtedness.

> **15.7.2** Payment of the Purchase Price.  The purchase price for the Purchase Right shall be payable in cash or readily available funds, with at least twenty (20%) due at closing and the remainder due in equal monthly amounts on a monthly basis pursuant to a promissory note with a maturity date no greater than five (5) years from the closing.

> **15.7.3** Tenancy Rights.  Franchisee shall assign all tenancy rights to the real estate to BRCB at closing.  If Franchisee owns said real estate, the parties agree to a lease at a fair rental value.  If Franchisee and BRCB cannot agree upon a fair rental value, then the fair rental value will be determined by a qualified and independent MAI appraiser (the "***Appraiser***").   The parties shall mutually agree upon one (1) Appraiser to make this determination, and if they are unable to agree upon one (1) Appraiser, they shall each appoint one Appraiser forthwith, and, if the two Appraisers cannot reach agreement upon the fair market rental rate, then the two (2) Appraisers so appointed shall appoint a third (3rd) Appraiser.  The three (3) Appraisers shall make a determination of fair market rental rate with all reasonable dispatch, and a decision of any two (2) of the three (3) Appraisers shall be final and binding upon the parties hereto.

> **15.7.4** Cooperation.  Franchisee agrees to cooperate with BRCB's exercise of the Purchase Right, and to take all actions to facilitate a smooth and orderly transition of ownership.

15.8    **Assignment of Leasehold Interest to BRCB**.  Upon entering any lease agreement covering the Premises, Franchisee shall cause the execution by the Franchisee and lessor of the Conditional Assignment of Lease in the form attached hereto as Schedule 15.8, and will provide a copy to BRCB upon request. If Franchisee is a party to a lease assignment or lease option

27

agreement covering the Premises, Franchisee will, upon BRCB's written request at any time during the term or renewal term and without regard to whether this Agreement is terminated, do whatever is necessary to effectuate and complete the assignment to BRCB of Franchisee's lease for the Premises. If Franchisee is not a party to a lease assignment or lease option agreement covering the Premises, Franchisee will, upon BRCB's written request at any time during the term or renewal term and without regard to whether this Agreement is terminated, do whatever is necessary to assign Franchisee's lease for the Premises to BRCB. Franchisee will, in the latter case, make its best efforts to obtain the lessor's consent to the assignment to BRCB of Franchisee's lease for the Premises.

**15.9    Cross-Termination**. If this Agreement is terminated as a result of a default by Franchisee, BRCB may, at its option, elect to terminate any or all other franchise agreements between Franchisee and BRCB. If any other franchise agreement between Franchisee and BRCB is terminated as a result of a default by Franchisee, BRCB may, at its option, elect to terminate this Agreement. It is agreed that an incurable or uncured default under this Agreement or any other franchise agreement between Franchisee and BRCB will be grounds for termination of this Agreement and/or any and all franchise agreements between Franchisee and BRCB without additional notice or opportunity to cure.

## Section 16.    Miscellaneous Provisions.

**16.1    Independent Contractors**. The relationship between BRCB and Franchisee is that of independent contractors. Franchisee is in no way to be deemed a partner, joint venturer, agent, employee, or servant of BRCB. Franchisee has no authority to bind BRCB to any contractual obligation or incur any liability for or on behalf of BRCB. Franchisee will identify itself as an independent owner of the Coffee Bar in all dealings with customers, lessors, contractors, suppliers, public officials, employees, and others. Franchisee will place such notices of this independent ownership on signs, forms, stationery, advertising, and other materials as BRCB may at any time require.

**16.2    Franchisee's Principals and Controlling Principals**. The term "Franchisee's Principals" shall include, collectively and individually, Franchisee's spouse, if Franchisee is an individual, all officers and directors of Franchisee (including the officers and directors of any entity that controls Franchisee) whom Franchisor designates as Franchisee's Principals and all holders of an ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee, and any other person or entity controlling, controlled by or under common control with Franchisee. The initial Franchisee's Principals shall be listed on Attachment A. The term "Controlling Principals" shall include, collectively and individually, any Franchisee's Principal who has been designated by Franchisor as a Controlling Principal hereunder. For purposes of this Agreement, a publicly held corporation is a corporation registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Section 15(d) of such Act.

**16.3    Illegality and Survival**. The parties intend that if any of the terms, conditions, or provisions of this Agreement violates applicable law, such term, condition, or provision will be deemed not a part of this Agreement, and the remainder of this Agreement will remain in full force and effect.

DocuSign Envelope ID: DC18787C-2D4D-46A3-A57C-825B6C9549DB

**16.4    Mediation**.    THE PARTIES AGREE TO SUBMIT ANY CLAIM, CON-
TROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND
ATTACHMENTS) OR THE RELATIONSHIP CREATED BY THIS AGREEMENT TO NON-
BINDING MEDIATION PRIOR TO BRINGING SUCH CLAIM, CONTROVERSY OR
DISPUTE IN A COURT OR BEFORE ANY OTHER TRIBUNAL. THE MEDIATION SHALL
BE CONDUCTED THROUGH EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATOR
APPOINTED BY A MEDIATION SERVICES ORGANIZATION OR BODY, EXPERIENCED
IN THE MEDIATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES,
AGREED UPON BY THE PARTIES AND, FAILING SUCH AGREEMENT WITHIN A
REASONABLE PERIOD OF TIME AFTER EITHER PARTY HAS NOTIFIED THE OTHER
OF ITS DESIRE TO SEEK MEDIATION OF ANY CLAIM, CONTROVERSY OR DISPUTE
(NOT TO EXCEED FIFTEEN (15) DAYS), BY THE ARBITRATION SERVICE OF
PORTLAND IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION, AT
FRANCHISOR'S CORPORATE HEADQUARTERS IN BEND, OREGON. THE COSTS AND
EXPENSES OF MEDIATION, INCLUDING COMPENSATION AND EXPENSES OF THE
MEDIATOR (AND EXCEPT FOR THE ATTORNEYS FEES INCURRED BY EITHER
PARTY), SHALL BE BORNE BY THE PARTIES EQUALLY. IF THE PARTIES ARE
UNABLE TO RESOLVE THE CLAIM, CONTROVERSY OR DISPUTE WITHIN NINETY
(90) DAYS AFTER THE MEDIATOR HAS BEEN CHOSEN, THEN THE MATTER SHALL
BE SUBMITTED TO ARBITRATION IN ACCORDANCE WITH SECTION 16.4 TO
RESOLVE SUCH CLAIM, CONTROVERSY OR DISPUTE UNLESS SUCH TIME PERIOD
IS EXTENDED BY WRITTEN AGREEMENT OF THE PARTIES. NOTWITHSTANDING
THE FOREGOING, FRANCHISOR MAY BRING AN ACTION (1) FOR MONIES OWED,
(2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, OR (3) INVOLVING THE
POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL
PROPERTY IN A COURT HAVING JURISDICTION AND IN ACCORDANCE WITH
SECTION 16.6, WITHOUT FIRST SUBMITTING SUCH ACTION TO MEDIATION OR
ARBITRATION.

**16.5    Arbitration**.

**16.5.1** PROCEDURE.    EXCEPT AS PROVIDED IN THIS AGREEMENT,
FRANCHISOR, FRANCHISEE AND THE CONTROLLING PRINCIPALS
AGREE THAT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT
OF OR RELATING TO THE FRANCHISE, FRANCHISEE'S
ESTABLISHMENT OR OPERATION OF ANY FRANCHISE UNDER THIS
AGREEMENT (AND ANY AMENDMENTS THERETO) INCLUDING, BUT
NOT LIMITED TO, ANY CLAIM BY FRANCHISEE, OR ANY OF THE
CONTROLLING PRINCIPALS, OR PERSONS CLAIMING ON BEHALF OF
FRANCHISEE OR THE CONTROLLING PRINCIPALS, CONCERNING THE
ENTRY INTO, THE PERFORMANCE UNDER OR THE TERMINATION OF
THE AGREEMENT, OR ANY OTHER AGREEMENT BETWEEN
FRANCHISOR, OR ITS AFFILIATES, AND FRANCHISEE, ANY CLAIM
AGAINST A PAST OR PRESENT OFFICER, DIRECTOR, EMPLOYEE OR
AGENT OF FRANCHISOR, INCLUDING THOSE OCCURRING
SUBSEQUENT TO THE TERMINATION OF THIS AGREEMENT, THAT
CANNOT BE AMICABLY SETTLED AMONG THE PARTIES OR THROUGH

MEDIATION SHALL, EXCEPT AS SPECIFICALLY SET FORTH HEREIN AND IN SECTION 16.6, BE REFERRED TO ARBITRATION. THE ARBITRATION SHALL BE CONDUCTED THROUGH AN ORGANIZATION OR BODY EXPERIENCED IN THE ARBITRATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES DESIGNATED BY FRANCHISOR. IF FRANCHISOR FAILS TO DESIGNATE AN ORGANIZATION OR BODY WITHIN A REASONABLE TIME AFTER THE DISPUTE HAS BEEN REFERRED FOR ARBITRATION (NOT TO EXCEED FIFTEEN (15) DAYS), ARBITRATION SHALL BE CONDUCTED BY THE ARBITRATION SERVICE OF PORTLAND IN ACCORDANCE WITH THE RULES OF THE ARBITRATION SERVICE OF PORTLAND, AS AMENDED, EXCEPT THAT THE ARBITRATOR SHALL APPLY THE FEDERAL RULES OF EVIDENCE DURING THE CONDUCT OF THE HEARING SESSIONS WITH RESPECT TO THE ADMISSIBILITY OF EVIDENCE. IF SUCH RULES ARE IN ANY WAY CONTRARY TO OR IN CONFLICT WITH THIS AGREEMENT, THE TERMS OF THE AGREEMENT SHALL CONTROL. ONLY CLAIMS, CONTROVERSIES OR DISPUTES INVOLVING FRANCHISEE AND THE CONTROLLING PRINCIPALS MAY BE BROUGHT HEREUNDER. NO CLAIM FOR OR ON BEHALF OF ANY OTHER FRANCHISEE OR SUPPLIER, OR CLASS, REPRESENTATIVE OR ASSOCIATION THEREOF, MAY BE BROUGHT BY FRANCHISEE OR THE CONTROLLING PRINCIPALS HEREUNDER.

**16.5.2** <u>ARBITRATOR</u>. THE PARTIES SHALL AGREE ON AN ARBITRATOR WITHIN FIFTEEN (15) DAYS OF THE FILING OF ARBITRATION. IF THE PARTIES CANNOT AGREE ON A SINGLE ARBITRATOR, FRANCHISOR AND FRANCHISEE (OR CONTROLLING PRINCIPAL, AS APPLICABLE) SHALL EACH SELECT ONE ARBITRATOR. IF THE PARTY UPON WHOM THE DEMAND FOR ARBITRATION IS SERVED FAILS TO SELECT AN ARBITRATOR WITHIN FIFTEEN (15) DAYS AFTER THE RECEIPT OF THE DEMAND FOR ARBITRATION, THEN THE ARBITRATOR SO DESIGNATED BY THE PARTY REQUESTING ARBITRATION SHALL ACT AS THE SOLE ARBITRATOR TO RESOLVE THE CONTROVERSY AT HAND. THE TWO ARBITRATORS DESIGNATED BY THE PARTIES SHALL SELECT A THIRD ARBITRATOR. IF THE TWO ARBITRATORS DESIGNATED BY THE PARTIES FAIL TO SELECT A THIRD ARBITRATOR WITHIN FIFTEEN (15) DAYS, THE THIRD ARBITRATOR SHALL BE SELECTED BY THE ORGANIZATION AGREED UPON OR THE ARBITRATION SERVICE OF PORTLAND OR ANY SUCCESSOR THERETO, UPON APPLICATION BY EITHER PARTY. ALL OF THE ARBITRATORS SHALL BE EXPERIENCED IN THE ARBITRATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES. THE ARBITRATION SHALL TAKE PLACE AT FRANCHISOR'S CORPORATE OFFICES. THE AWARD OF THE ARBITRATORS SHALL BE FINAL AND JUDGMENT UPON THE AWARD RENDERED IN ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. THE COSTS AND EXPENSES OF ARBITRATION MAY BE ENTERED IN ANY COURT

HAVING JURISDICTION THEREOF. THE ARBITRATORS SHALL BE REQUIRED TO SUBMIT WRITTEN FINDINGS OF FACT AND CONCLU-SIONS OF LAW WITHIN THIRTY (30) BUSINESS DAYS FOLLOWING THE FINAL HEARING SESSION OF THE ARBITRATION. THE COSTS AND EXPENSES OF ARBITRATION, INCLUDING COMPENSATION AND EXPENSES OF THE ARBITRATORS, SHALL BE BORNE BY THE PARTIES AS THE ARBITRATORS DETERMINE.

**16.5.3** <u>EXCEPTIONS</u>. NOTWITHSTANDING THE ABOVE, THE FOL-LOWING SHALL NOT BE SUBJECT TO ARBITRATION:

>16.5.3.1    DISPUTES AND CONTROVERSIES ARISING FROM THE SHERMAN ACT, THE CLAYTON ACT OR ANY OTHER FEDERAL OR STATE ANTITRUST LAW;

>16.5.3.2    DISPUTES AND CONTROVERSIES BASED UPON OR ARISING UNDER THE LANHAM ACT, AS NOW OR HEREAFTER AMENDED, RELATING TO THE OWNERSHIP OR VALIDITY OF THE MARKS; AND

>16.5.3.3    DISPUTES AND CONTROVERSIES RELATING TO ACTIONS TO OBTAIN POSSESSION OF THE PREMISES OF THE FRANCHISE UNDER LEASE OR SUBLEASE.

**16.5.4** <u>SPECIFIC PERFORMANCE</u>. IF FRANCHISOR SHALL DESIRE TO SEEK SPECIFIC PERFORMANCE OR OTHER EXTRAORDINARY RELIEF INCLUDING, BUT NOT LIMITED TO, INJUNCTIVE RELIEF UNDER THIS AGREEMENT AND ANY AMENDMENTS THERETO, OR TO COLLECT MONIES DUE, THEN ANY SUCH ACTION SHALL NOT BE SUBJECT TO ARBITRATION AND FRANCHISOR SHALL HAVE THE RIGHT TO BRING SUCH ACTION AS DESCRIBED IN SECTION 16.6.

**16.5.5** <u>LIMITS ON ARBITRATOR</u>. IN PROCEEDING WITH ARBITRATION AND IN MAKING DETERMINATIONS HEREUNDER, THE ARBITRATORS SHALL NOT EXTEND, MODIFY OR SUSPEND ANY TERMS OF THIS AGREEMENT OR THE REASONABLE STANDARDS OF BUSINESS PERFORMANCE AND OPERATION ESTABLISHED BY FRANCHISOR IN GOOD FAITH. NOTICE OF OR REQUEST TO OR DEMAND FOR ARBITRATION SHALL NOT STAY, POSTPONE OR RESCIND THE EFFECTIVENESS OF ANY TERMINATION OF THIS AGREEMENT. THE ARBITRATORS SHALL APPLY OREGON LAW AND THE TERMS OF THIS AGREEMENT IN REACHING THEIR DECISION.

**16.6** **<u>Governing Law and Venue</u>**. WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES THAT ARE NOT FINALLY RESOLVED THROUGH MEDIATION OR ARBITRATION, OR AS OTHERWISE PROVIDED ABOVE, FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE JURISDICTION OF THE STATE COURTS OF OREGON AND THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF OREGON. FRANCHISEE AND THE

31

CONTROLLING PRINCIPALS HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON ANY OF THEM IN ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY OREGON OR FEDERAL LAW. FRANCHISEE AND THE CONTROLLING PRINCIPALS FURTHER AGREE THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE DESCHUTES COUNTY, OREGON; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR MONIES OWED, (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, OR (3) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, FRANCHISOR MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT THAT HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES OR ACTIONS, RELATED TO THIS AGREEMENT OR THE RELATIONSHIP CREATED THEREBY, THIS AGREEMENT AND ANY SUCH RELATED CLAIMS, CONTROVERSIES, DISPUTES OR ACTIONS SHALL BE GOVERNED, ENFORCED AND INTERPRETED UNDER OREGON LAW.

16.7    **Mutual Benefit**.  FRANCHISEE, THE CONTROLLING PRINCIPALS AND FRANCHISOR ACKNOWLEDGE THAT THE PARTIES' AGREEMENT REGARDING APPLICABLE STATE LAW AND FORUM SET FORTH IN SECTION 16.6 PROVIDE EACH OF THE PARTIES WITH THE MUTUAL BENEFIT OF UNIFORM INTERPRETATION OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP CREATED BY THIS AGREEMENT.  EACH OF FRANCHISEE, THE CONTROLLING PRINCIPALS AND FRANCHISOR FURTHER ACKNOWLEDGES THE RECEIPT AND SUFFICIENCY OF MUTUAL CONSIDERATION FOR SUCH BENEFIT AND THAT EACH PARTY'S AGREEMENT REGARDING APPLICABLE STATE LAW AND CHOICE OF FORUM HAVE BEEN NEGOTIATED FOR IN GOOD FAITH AND ARE PART OF THE BENEFIT OF THE BARGAIN REFLECTED BY THIS AGREEMENT.

16.8    **Performance in Bend, Oregon**.    FRANCHISEE, THE CONTROLLING PRINCIPALS AND FRANCHISOR ACKNOWLEDGE THAT THE EXECUTION OF THIS AGREEMENT AND ACCEPTANCE OF THE TERMS BY THE PARTIES OCCURRED IN BEND, OREGON, AND FURTHER ACKNOWLEDGE THAT THE PERFORMANCE OF CERTAIN OBLIGATIONS OF FRANCHISEE ARISING UNDER THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, THE PAYMENT OF MONIES DUE HEREUNDER AND THE SATISFACTION OF CERTAIN TRAINING REQUIREMENTS OF FRANCHISOR, SHALL OCCUR IN BEND, OREGON.

16.9    **Dispute Resolution Program**.    WITHOUT LIMITING ANY OF THE FOREGOING, FRANCHISOR RESERVES THE RIGHT, AT ANY TIME, TO CREATE A DISPUTE RESOLUTION PROGRAM AND RELATED SPECIFICATIONS, STANDARDS, PROCEDURES AND RULES FOR THE IMPLEMENTATION THEREOF TO BE ADMINISTERED BY FRANCHISOR OR ITS DESIGNEES FOR THE BENEFIT OF ALL FRANCHISEES CONDUCTING BUSINESS UNDER THE SYSTEM.  THE STANDARDS, SPECIFICATIONS, PROCEDURES AND RULES FOR SUCH DISPUTE RESOLUTION PROGRAM SHALL BE MADE PART OF THE MANUALS AND IF MADE PART OF THE

32

DocuSign Envelope ID: DC18787C-2D4D-46A3-A578-825B6C8549DB

MANUALS, ON EITHER A VOLUNTARY OR MANDATORY BASIS, FRANCHISEE SHALL COMPLY WITH ALL SUCH STANDARDS, SPECIFICATIONS, PROCEDURES AND RULES IN SEEKING RESOLUTION OF ANY CLAIMS, CONTROVERSIES OR DISPUTES WITH OR INVOLVING FRANCHISOR OR OTHER FRANCHISEES, IF APPLICABLE UNDER THE PROGRAM.  IF SUCH DISPUTE RESOLUTION PROGRAM IS MADE MANDATORY, THEN FRANCHISEE AND FRANCHISOR AGREE TO SUBMIT ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND ATTACHMENTS) OR THE RELATIONSHIP CREATED BY THIS AGREEMENT FOR RESOLUTION IN ACCORDANCE WITH SUCH DISPUTE RESOLUTION PROGRAM PRIOR TO SEEKING RESOLUTION OF SUCH CLAIMS, CONTROVERSIES OR DISPUTES IN THE MANNER DESCRIBED IN SECTIONS 16.3 to 16.6 (PROVIDED THAT THE PROVISIONS OF SECTION 16.6 CONCERNING FRAN-CHISOR'S RIGHT TO SEEK RELIEF IN A COURT FOR CERTAIN ACTIONS INCLUDING FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF SHALL NOT BE SUPER-SEDED OR AFFECTED BY THIS SECTION) OR IF SUCH CLAIM, CONTROVERSY OR DISPUTE RELATES TO ANOTHER FRANCHISEE, FRANCHISEE AGREES TO PARTI-CIPATE IN THE PROGRAM AND SUBMIT ANY SUCH CLAIMS, CONTROVERSIES OR DISPUTES IN ACCORDANCE WITH THE PROGRAM'S STANDARDS, SPECIFICATIONS, PROCEDURES AND RULES, PRIOR TO SEEKING RESOLUTION OF SUCH CLAIM BY ANY OTHER JUDICIAL OR LEGALLY AVAILABLE MEANS.

**16.10  Waiver of Certain Damages**.  FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) AGAINST FRANCHISOR, ITS AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREES THAT IN THE EVENT OF A DISPUTE, FRANCHISEE AND THE CONTROLLING PRINCIPALS SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT.  IF ANY OTHER TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) SHALL CONTINUE IN FULL FORCE AND EFFECT.

**16.11  Notices**.  All notices specified by this Agreement or required by law must be in writing and given by personal delivery or sent by certified mail, return receipt requested to the address(es) set forth at the beginning of this Agreement or to such other address(es) as the parties may designate in writing before the giving of any notice.  Notices to Franchisee may also be given at the location of the Premises, at the residence of Franchisee (if an individual), or at the residence of the principal shareholder(s), partner(s), or member(s) of Franchisee (if a business entity).

Notices will be deemed to be "delivered" when actually left in the custody of an adult agent, employee, or resident at a place of business or residence if given by personal delivery or, if given by certified mail, when deposited with the U.S. Postal Service with proper address and postage paid. Franchisee will provide BRCB with Franchisee's current business and residential addresses, other than the address of the Premises. Each party will provide the other with updated contact information whenever changes occur.

**16.12**  **No Waivers**.  Failure of a party to insist upon the strict performance of any term, covenant, or condition contained in this Agreement will not constitute or be construed as a waiver or relinquishment of that party's rights to enforce thereafter any such term, covenant, or condition and it will continue in full force and effect.

**16.13**  **Entire Agreement**.  This Agreement constitutes the entire agreement between the parties as to its subject matter and supersedes all prior communications, representations, and agreements, oral or written, of the parties with respect to its subject matter.  No oral or other written understandings or agreements exist between the parties relating to the subject matter of this Agreement.  In entering into this Agreement, Franchisee agrees that it did not rely on any promises, representations, or agreements not expressly contained in this Agreement.  Any modifications to this Agreement must be in writing and signed by all of the parties to this Agreement.  Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by BRCB in the Franchise Disclosure Document.

**16.14**  **Interpretation**.  The table of contents, and the section and paragraph headings of this Agreement, are for the convenience of the reader only, and are not intended to act as a limitation of the scope or meaning of the sections and paragraphs themselves.  This Agreement is not to be construed against the drafting party.  Words in the singular number include the plural when the sense requires (and vice versa).

**16.15**  **Approvals**.  Except when this Agreement expressly obligates BRCB reasonably to approve or not unreasonably to withhold its approval of any action or request by Franchisee, BRCB has the absolute right to refuse any request by Franchisee or to withhold its approval of any action that requires its approval.

**16.16**  **Effective Date**. This Agreement will become effective when signed by both parties, unless the parties have agreed upon a different effective date and such date is listed at the beginning of this Agreement.

**Section 17.**  **Franchisee's Representations, Warranties and Acknowledgements**.

**17.1**  **Execution by Authorized Parties**. Franchisee and all shareholders, partners, and members of Franchisee represent and warrant that each individual is a U.S. citizen or a lawful resident alien of the United States; that each corporation or other business entity that is a party to this Agreement is and will remain duly organized and in good standing during the term of this Agreement; and that all financial and other information that Franchisee has provided to BRCB in connection with Franchisee's application for this BRCB franchise is true and accurate.

34

___ [Please initial to acknowledge that you have read and understand this Section 17.1].

**17.2**   <u>**Compliance with Applicable Laws**</u>.  Franchisee acknowledges, by its signature hereto, that it received from BRCB a Franchise Disclosure Document for the state in which the business will be located, or the Franchisee's place of residence, as appropriate, at least fourteen (14) calendar days prior to the execution of this Agreement.

___ [Please initial to acknowledge that you have read and understand this Section 17.2].

**17.3**   <u>**Receipt of Agreement**</u>.  Franchisee acknowledges that it received from BRCB this Agreement with all blanks filled in at least five (5) days prior to the execution of this Agreement. Franchisee represents that it has read this Agreement in its entirety and that it has been given the opportunity to clarify any provisions that it did not understand and to consult with an attorney or other professional advisor.  Franchisee further represents that it understands the terms, conditions and obligations of this Agreement and agrees to be bound by them.

___ [Please initial to acknowledge that you have read and understand this Section 17.3].

**17.4**   <u>**Acknowledgement Regarding Future Results**</u>.  The Franchisee acknowledges and accepts the following:

THE SUCCESS OF THE FRANCHISEE IN OPERATING A FRANCHISE IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, THE FRANCHISEE'S INDEPENDENT BUSINESS ABILITY.  THIS OFFERING IS NOT A SECURITY AS THAT TERM IS DEFINED UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS.  THE OBLIGATION TO TRAIN, MANAGE, PAY, RECRUIT AND SUPERVISE EMPLOYEES OF THE FRANCHISED BUSINESS RESTS SOLELY WITH THE FRANCHISEE.  THE FRANCHISEE HAS NOT RELIED ON ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL SUCCESS OR PROJECTED INCOME OF THE BUSINESS VENTURE CONTEMPLATED HEREBY.  NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY BRCB TO INDUCE THE FRANCHISEE TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED HEREIN. BRCB HAS NOT MADE ANY REPRESENTATION, WARRANTY OR GUARANTY, EXPRESS OR IMPLIED, AS TO THE POTENTIAL REVENUES, PROFITS OR SERVICES OF THE BUSINESS VENTURE TO THE FRANCHISEE AND CANNOT, EXCEPT UNDER THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER THE FRANCHISEE'S BUSINESS.  THE FRANCHISEE ACKNOWLEDGES AND AGREES THAT IT HAS NO KNOWLEDGE OF ANY REPRESENTATION MADE BY BRCB OR ITS REPRESENTATIVES OF ANY INFORMATION THAT IS CONTRARY TO THE TERMS CONTAINED HEREIN.

___ [Please initial to acknowledge that you have read and understand this Section 17.4].

35

In witness whereof, the parties hereto have executed and delivered this Franchise Agreement on the effective date stated in Section 16.9, above.

**BLACK ROCK COFFEE BAR, INC.**
     "BRCB"

By:_____

Name: _____

Title:_____

Date:_____

_____
        "Franchisee"

By:_____

Name: _____

Title:_____

Date:_____

       S.S.N.s or T.I.N. of Franchisee

_____

36

ATTACHMENT A

## STATEMENT OF OWNERSHIP INTERESTS
## AND FRANCHISEES PRINCIPALS

The following is a list of all shareholders, partners, or other investors in Franchisee, including all investors who own or hold a direct or indirect interest in Franchisee, and a description of the nature of their interest:

| <u>Name</u> | <u>Percentage of Ownership</u> | <u>Nature of Interest</u> |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(I)    FRANCHISEE'S PRINCIPALS

In addition to the persons listed in Paragraph I, the following is a list of all of Franchisee's Principals described in and designated pursuant to Section 16.2 of the Franchise Agreement:

_____

_____

_____

_____

37

DocuSign Envelope ID: DC187879-2D4D-46A3-A579-825B6C8549DB

# STATE-SPECIFIC ADDENDA TO THE FRANCHISE AGREEMENT

## ADDENDUM TO THE BLACK ROCK COFFEE BAR, INC. FRANCHISE AGREEMENT FOR USE IN WASHINGTON

This ADDENDUM is made and entered into as of this _____ day of _____, 20_, by and between Black Rock Coffee Bar, Inc., an Oregon corporation ("**_BRCBB_**"), and _____, whose principle business address is _____ ("**_Franchisee_**").

## RECITALS

BRCB and Franchisee are parties to a certain Franchise Agreement of even date herewith. This Addendum is annexed to, and forms part of, the Franchise Agreement. This Addendum is being executed because (a) Franchisee is a resident of the state of Washington; and/or (b) the Coffee Bar that Franchisee will operate under the Franchise Agreement will be located in the state of Washington.

1.    **Initial Franchise Fee**. Section 2.1 of the Franchise Agreement is deleted in its entirety and replaced with the following:

The fee for the rights granted under this Agreement (the "**_Initial Franchise Fee_**") is (i) Twenty-Seven Thousand Five Hundred Dollars ($27,500) for Franchisee's first Coffee Bar, (ii) Twenty-Two Thousand Dollars ($22,000) for Franchisee's second Coffee Bar, and (iii) Sixteen Thousand Five Hundred Dollars ($16,500) for each Coffee Bar thereafter. The outstanding balance of the Initial Franchise Fee shall be due and payable, in its entirety, upon the Grand Opening. If your BRCB Coffee Bar does not open for business within one year of the execution of this Agreement, then at its option, BRCB may terminate this Agreement and keep the nonrefundable portion of the Initial Franchise Fee ($5,500) as liquidated damages.

2.    **Disputes**. Section 16.4 of the Franchise Agreement is deleted in its entirety and replaced with the following:

This Agreement shall be governed by the substantive law of the State of Oregon, USA, without regard to conflicts-of-law rules and without regard to the United Nations Convention on Contracts for International Sale of Goods; provided, however, that the Federal Arbitration Act shall govern the provisions respecting arbitration and arbitrability. If this Agreement is translated into a language other than English for any reason, this English version of the Agreement shall be the controlling translation. All disputes and controversies arising out of or relating in any way to the performance or interpretation of this Agreement, or the transaction incidental to this Agreement, which dispute or controversy cannot be settled by mutual agreement of the parties, will be finally and conclusively settled in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "**_AAA Rules_**"); provided, however, that: (a) the arbitration shall take place in Vancouver, Washington; (b) there shall be a panel of three (3) arbitrators (collectively,

38

the "**_Tribunal_**"), with each party selecting one (1) arbitrator and the third arbitrator to be appointed by the other two arbitrators in accordance with the AAA Rules; (c) the arbitration shall be conducted in the English language; (d) the Tribunal shall use reasonable efforts to schedule all matters regarding the arbitration so that the arbitration progresses in a timely fashion; (e) subject to legal privileges, each party shall be entitled to discovery in accordance with the Federal Rules of Civil Procedure; (f) at the arbitration hearing, each party may make written and oral presentations to the Tribunal, present testimony and written evidence and examine witnesses; (g) the Tribunal shall not have the power to award punitive damages; (h) the Tribunal shall issue a written decision explaining the basis for such decision; (i) the Tribunal may not make any award that is inconsistent with any express term of this Agreement and may not use the equitable powers provided by the AAA Rules to modify the express terms of this Agreement in any way; (j) such decision shall be final, binding and enforceable in any court of competent jurisdiction; (k) the parties shall share equally any fees and expenses of the Tribunal and of the American Arbitration Association, provided that the Tribunal shall have the authority to award, as part of the arbitrator's decision, to the prevailing party its costs and expenses of the arbitration proceeding, including but not limited to the Tribunals' own fees, and the prevailing party's reasonable attorneys' and experts' fees; and (l) the parties agree that the arbitration proceedings and any decision and award of the arbitrator shall be kept confidential and not be disclosed to third parties, except as necessary to enforce or effectuate the terms of such decision or award.

3.    **Entire Agreement**. The following is added to Section 16.13 of the Franchise Agreement:

The provisions of this Section notwithstanding, nothing in this Agreement waives any rights the Franchisee may have under Washington law, including RCW 19.100.180.

4.    **Additional Provisions**.

The state of Washington has a statute, RCW 19.100.180 which may supersede the Franchise Agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Franchise Agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

In witness whereof, the parties hereto have executed and delivered this Addendum effective on the date stated above.

**BLACK ROCK COFFEE BAR, INC.**
      "BRCB"

By:_____

Name: _____

Title:_____

Date:_____

                   "Franchisee"

By:_____

Name: _____

Title:_____

Date:_____

       S.S.N.s or T.I.N. of Franchisee

40

DocuSign Envelope ID: DC18787C-2D4D-46A3-A578-825B6C8549DB

## Schedule 1.5  GUARANTY OF FRANCHISE AGREEMENT
## BLACK ROCK COFFEE BAR

The Guaranteed Agreement means that Franchise Agreement, dated _____, 20___, between **Black Rock Coffee Bar, Inc**. (**"*BRCB*"**) and _____ _____ (the **"*Obligated Party*"**).

This Guaranty (this **"*Guaranty*"**) is given this ___ day of_____, 20__ by _____ (referred to in this Guaranty as "you" and like terms), with respect to the Guaranteed Agreement described above.

For good and valuable consideration, you unconditionally guarantee to BRCB, and to its successors and assigns, the full, complete, and timely payment and performance of each and all of the terms, covenants, and conditions of the Guaranteed Agreement (and any modification or amendment to the Guaranteed Agreement) to be kept and performed by the Obligated Party during the term of the Guaranteed Agreement, including the payment of all royalties, rents, fees, and other charges accruing pursuant to the Guaranteed Agreement.

You further agree as follows:

1.      This Guaranty will continue unchanged by the occurrence of any Insolvency Event as defined at Section 14.1 of the Guaranteed Agreement, with respect to the Obligated Party or any assignee or successor of the Obligated Party or by any disaffirmance or abandonment of the Guaranteed Agreement by a trustee in bankruptcy of the Obligated Party.  Neither your obligation to make payment or render performance in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty will be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of the Obligated Party or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

2.      Your liability under this Guaranty is primary and independent of the liability of the Obligated Party. You waive any right to require BRCB to proceed against any other person or to proceed against or exhaust any security held by BRCB at any time or to pursue any right of action accruing to BRCB under the Guaranteed Agreement. BRCB may proceed against you and the Obligated Party jointly and severally or may, at its option, proceed against you without having commenced any action, or having obtained any judgment, against the Obligated Party. You waive the defense of the statute of limitations in any action under this Guaranty or for the collection of any indebtedness or the performance of any obligation guaranteed pursuant to this Guaranty.

3.      You agree to pay all attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the obligations guaranteed or in enforcing this Guaranty against you.

41

4.      You waive notice of any demand by BRCB, any notice of default in the payment of rents or any other amounts contained or reserved in the Guaranteed Agreement, or any other notice of default under the Guaranteed Agreement.  You expressly agree that the validity of this Guaranty and your obligations will in no way be terminated, affected, or impaired by reason of any waiver by BRCB; by its successors or assigns; by the failure of BRCB to enforce any of the terms, covenants, or conditions of the Guaranteed Agreement or this Guaranty; or by the granting of any indulgence or extension of time to the Obligated Party, all of which may be given or done without notice to you.

5.      This Guaranty will extend, in full force and effect, to any assignee or successor of BRCB and will be binding upon you and your successors and assigns.

6.      Until all obligations of the Obligated Party to BRCB have been paid or satisfied in full, you have no remedy or right of subrogation and you waive any right to enforce any remedy that BRCB has or may in the future have against the Obligated Party and any benefit of, and any right to participate in, and security now or in the future held by BRCB.

7.      All existing and future indebtedness of the Obligated Party to you is hereby subordinated to all indebtedness and other obligations guaranteed in this Guaranty and, without the prior written consent of BRCB, will not be paid in whole or in part, nor will you accept any payment of or on account of any such indebtedness while this Guaranty is in effect.

8.      This Guaranty will be construed in accordance with the laws of the state of Oregon, without giving effect to its conflict-of-laws principles.

"GUARANTOR"

Signature:_____

Name:_____

STATE OF_____)
                                               )ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this ___ day of _____, 20___ by_____.


_____
NOTARY PUBLIC
My Commission Expires:


_____
Residing at:_____

42

## Schedule 9.1  MANAGER'S CONFIDENTIALITY AGREEMENT

**EMPLOYER**:  _____

(name)

_____

(address)

**MANAGER**:  _____

(name)

_____

(address)

Manager wishes to be employed to manage the operations of Employer's franchised Black Rock Coffee Bar.

1.      Manager acknowledges that Manager's employment will require Employer to share with Manager certain valuable information (the "***Proprietary Information***" as defined below) that is the property of Black Rock Coffee Bar, Inc., the franchisor of Employer's Black Rock Coffee Bar (the "***Coffee Bar***").

2.      The Proprietary Information means all aspects of the system of operations used in Employer's Coffee Bar that are not publicly known, whether or not entitled to protection as a trade secret, including without limitation: (1) ingredients, recipes, and methods of preparing food and drink products; (2) methods of operation; (3) information about products, supplies, services, or procedures; (4) the entire contents of the Operations Manual; and (5) any other information disclosed to Employer through confidential notifications from Black Rock Coffee Bar, Inc.

3.      Manager agrees not to disclose any of the Proprietary Information to any person, other than to Employer's other employees, and then only to the extent necessary for the operation of the Coffee Bar.  Manager will keep the Operations Manual and all other tangible records of Proprietary Information in a secure location at the Coffee Bar, and will take reasonable precautions to prevent the disclosure of any of the Proprietary Information to any unauthorized person.  Manager will not make copies of any of the Proprietary Information.

4.      Manager's obligations of confidentiality under this Agreement will survive the termination of Manager's employment by Employer.  Manager acknowledges that any violation of the terms of this Agreement will cause irreparable harm to the owner of the Proprietary Information.  The parties acknowledge that Black Rock Coffee Bar, Inc. is intended to be a third-party beneficiary of this Agreement, with the right to enforce the terms of this Agreement.

Dated this _____ day of _____, 20__.

_____
      (Manager's Signature)

43

## Schedule 15.8  CONDITIONAL ASSIGNMENT OF LEASE

**THIS CONDITIONAL ASSIGNMENT OF LEASE** (the "***Conditional Assignment***") is made and entered into _____, 20___, by and among _____ (the "***Landlord***"), _____ (the "***Tenant***"), and Black Rock Coffee Bar, Inc., an Oregon corporation whose principal place of business is 616 NW Arizona Avenue, Bend, Oregon 97703 ("***BRCB***").

RECITALS

A.  This Conditional Assignment supplements and forms part of the attached Lease Agreement between the Landlord and the Tenant dated _____ (the "***Lease***") for the premises situated at _____ (the "***Premises***") to be used by the Tenant as a Black Rock Coffee Bar.

B.  This Conditional Assignment is entered into in connection with BRCB's approval of the location of the Premises as a Black Rock Coffee Bar and the grant of a franchise to the Tenant pursuant to the Franchise Agreement dated _____, 20__ (the "***Franchise Agreement***").

C.  This Conditional Assignment is intended to provide BRCB the opportunity to reserve the Premises as a Black Rock Coffee Bar under the circumstances set out below.

D.  The Landlord agrees that BRCB shall have the right but not the obligation to assume the Lease of the Premises on the terms, covenants and conditions contained in this Conditional Assignment.

Now, therefore, the parties hereby agree:

**1.**    **Default of Tenant Under the Lease.**  The Landlord agrees to send to BRCB a copy of any notice of default that is given to the Tenant concurrently with the giving of such notice to the Tenant. If the Tenant fails to cure any default within the period specified in the notice, the Landlord shall promptly give to BRCB further written notice specifying the default(s) the Tenant has failed to cure. BRCB shall have forty-five (45) days following receipt of the second written notice to exercise its right to assume the Lease on the same terms as apply to the Tenant by written notice to the Landlord and the Tenant. In the event that BRCB exercises its right to assume the Lease, BRCB shall begin paying rent upon the Landlord delivering possession of the premises to BRCB.

**2.**    **Default or Termination of the Franchise Agreement.**  BRCB may assume the Lease in the event of any default by the Tenant under the Franchise Agreement or termination of the Franchise Agreement for any reason by giving the Landlord written notice of its election to assume the Lease, and no further consent of the Landlord or Tenant shall be required.

**3.**    **Non-Renewal of the Lease Term.**  If the Lease contains term renewal or extension rights and if the Tenant allows the term to expire without exercising such rights, the Landlord shall give BRCB written notice and BRCB shall have the option for thirty (30) days following receipt of such

notice to exercise the Tenant's renewal or extension rights on the same terms and conditions as are contained in the Lease. If BRCB elects to exercise such rights it shall notify the Landlord in writing, whereupon the Landlord and BRCB shall promptly execute and exchange an agreement under which BRCB assumes the Lease effective at the date of termination of any holding over period by the Tenant to the effect that such extension or renewal term shall have subtracted from it the number of days constituting such holding over period.

**4.      Additional Provisions**

**1.1**      The Tenant agrees that termination of the Franchise Agreement shall be a default under the Lease. In the event of termination of the Franchise Agreement, or if the Tenant fails to timely cure any defaults under the Lease, the Tenant shall within ten (10) days after written demand by BRCB, assign all of its right, title and interest in and to the Lease to BRCB. If the Tenant fails to do so within the said ten (10) days, the Tenant hereby designates BRCB as its agent to execute any and all documents, agreements and to take all action as may be necessary or desirable to effect the assignment of the Lease and the relinquishment of any and all of the Tenant's rights thereunder. The Landlord hereby consents to such assignment subject to BRCB executing an assignment of the Lease and curing all defaults of the Tenant under the Lease before taking possession of the Premises. The Tenant further agrees to promptly and peaceably vacate the Premises and to remove its personal property at the written request of BRCB. Any property not so removed by the Tenant within ten (10) days following receipt of such written request shall be deemed abandoned by the Tenant and immediately and permanently relinquished to BRCB.

**1.2**      The Tenant shall be and remain liable to the Landlord for all of its obligations under the Lease, notwithstanding any assignment of the Lease to BRCB. BRCB shall be entitled to recover from the Tenant all amounts it pays to the Landlord to cure the Tenant's defaults under the Lease, including interest thereon and BRCB's reasonable collection costs.

**1.3**      BRCB, upon taking possession of the Premises, shall cure the defaults specified by the Landlord in its written notice and shall execute and deliver to the Landlord its assumption of the Tenant's rights and obligations under the Lease. BRCB shall pay, perform and be bound by all the duties and obligations under the Lease. BRCB may elect not to be bound by the terms of any amendment to the Lease executed by the Tenant without obtaining BRCB's prior written approval to such amendment, which approval shall not be unreasonably withheld or delayed.

**1.4**      In the event that BRCB assumes the Tenant's interest under the Lease, BRCB may, at any time, sublet the Premises to a BRCB franchisee without having to obtain the prior written consent of the Landlord.

**1.5**      In the event that BRCB assumes the Tenant's interest under the Lease, BRCB may, at any time, assign its interest under the Lease but only with the prior written consent of the Landlord, and the provisions of the Lease concerning consent shall apply. Upon receipt by the Landlord of an assignment agreement pursuant to which the assignee agrees to assume the Lease and observe the terms, conditions and agreements on the part of the tenant to be performed under the Lease, BRCB shall thereupon be released from all liability as tenant under the Lease from and

45

after the date of assignment, without any need of a written acknowledgment of such release by the Landlord.

     **1.6**    If the Lease or Franchise Agreement is terminated and BRCB fails to exercise its right to assume the Lease as described above, the Tenant agrees to de-identify the Premises as a Black Rock Coffee Bar and to promptly remove signs, decor and other items which BRCB reasonably requests be removed as being distinctive and indicative of a Black Rock Coffee Bar. BRCB may enter upon the Premises to effect de-identification if the Tenant fails to do so within ten (10) days after receipt of written demand from BRCB, following termination of the Franchise Agreement or Lease. The Tenant shall pay BRCB for its reasonable costs and expenses in effecting the de-identification. The Tenant agrees and accepts that its obligations to the Landlord in respect to the provisions of the Lease concerning the removal of signage and additions and alterations at the termination of the Lease subsist notwithstanding the right made available to BRCB pursuant to this clause.

     **1.7**    BY EXECUTING THIS CONDITIONAL ASSIGNMENT, BRCB DOES NOT ASSUME ANY LIABILITY WITH RESPECT TO THE PREMISES OR ANY OBLIGATION AS TENANT UNDER THE LEASE UNLESS AND UNTIL BRCB EXPRESSLY AND IN A SEPARATE WRITING AGREES TO ASSUME SUCH LIABILITY AND/OR OBLIGATION DESCRIBED ABOVE.

     **1.8**    All notices pursuant to this Conditional Assignment shall be in writing and shall be personally delivered, sent by registered mail or reputable overnight delivery service or by other means which afford the sender evidence of delivery or rejected delivery to the addresses described above or to such other address as any party to this Conditional Assignment may instruct that notices be given.

| **Landlord** | **Tenant** | **Black Rock Coffee Bar, Inc.** |
|---|---|---|
| By:_____ | By:_____ | By:_____ |
| (Signature) | (Signature) | (Signature) |
| Printed Name: _____ | Printed Name: _____ | Printed Name: _____ |
| Title: _____ | Title: _____ | Title: _____ |

46

**Schedule 2.1**

**Geographic Territory**: The county of Clark County, Nevada

**Term years from the Effective Date of this Agreement**: 5 years

**Development Obligation**:

Coffee Bars by halfway through the term: 7

Coffee Bars by the end of the term: 10

**Schedule 2.4**

**List of Leases / Subordinated Coffee Bars**

| Leases | Conditional Assignment Obtained? |
|---|---|
| Retail Lease dated December 13, 2018 between SB-DB & DECATUR, L.L.C., a Nevada limited liability company, as landlord, and BR BLUE DIAMOND OP, LLC, a Nevada limited liability company, as tenant, and that certain First Amendment to Lease dated January 30, 2019, for the premises located at 4855 Blue Diamond, Las Vegas, Nevada 89139 (Blue Diamond and Decatur). | Yes. |
| Triple Net (NNN) Shopping Center Lease dated December 19, 2018 between SIENA XVI HOLDING LIMITED PARTNERSHIP, a Nevada limited partnership, as landlord, and BR RAINBOW NORTH LLC, a Nevada limited liability company, as tenant, for the premises located at 5650 S. Rainbow Blvd., Las Vegas, Nevada 89118 (Rainbow and Russell). [In process of being amended to correct typo in name (should be BR Rainbow North OP, LLC]. | No. |
| Lease dated April 29, 2019 between SILVERADO PROMENADE, LLC, a Nevada limited liability company, as landlord, and BR SILVERADO RANCH OP, LLC, a Nevada limited liability company, as tenant, for the premises located at 45 E. Silverado Ranch Blvd., Suite 115, Las Vegas, Nevada 89183 (Silverado Ranch). | No. |
| Shopping Center Lease dated June 20, 2019 between PENNANT FORT APACHE, LLC, a Nevada limited liability company, as landlord, and BR FT APACHE OP, LLC, a Nevada limited liability company, as tenant, for the premises known as APN: 163-30-818-002 (Ft. Apache and Russell). | No. |
| **Subordinated Coffee Bars:** | |
| Each of the above locations, as well as the Coffee Bar located at 7565 S Rainbow Blvd, Las Vegas, NV 89119. | Yes. |

**Schedule 5.4**
**Form of Franchise Agreement Addendum**

[See Attached]

**BLACK ROCK COFFEE BAR**

**ADDENDUM TO FRANCHISE AGREEMENT**

This ADDENDUM (this "***Addendum***") to the franchise agreement (the "***Franchise Agreement***") between Black Rock Coffee Bar, LLC, an Oregon limited liability company ("***BRCB***") and _____ ("***Franchisee***") is made this _____ day of 20___.

Whereas, BRCB has developed and established a uniform method of operation, customer service, advertising, publicity, processes, techniques, and technical knowledge in connection with its retail coffee bar business specializing in espresso, coffee, and related items in drive-thru, sit-down or combination locations (hereinafter referred to as "***Coffee Bars***"). These Coffee Bars do business under the trade name "*Black Rock Coffee Bar*". All of the knowledge, experience, processes, methods, specifications, techniques and proprietary marks and information of BRCB are referred to in this Addendum collectively as the "***BRCB System***"; and

Whereas, BR Coffee, LLC ("***Developer***") is an affiliate of Franchisee and is a party to a Geographic Territory Agreement with BRCB dated July _____, 2019 (the "***Geographic Territory Agreement***") allowing Developer the right to open and operate multiple Coffee Bars within the geographic territory identified in the Geographic Territory Agreement (the "***Geographic Territory***"), each of which must be operated under a separate franchise agreement with BRCB; and

Whereas, under the Geographic Territory Agreement, Developer and BRCB agreed that each individual franchise agreement entered into under the Geographic Territory Agreement by Developer or an affiliate of Developer will be amended as set forth in this Addendum.

Now, therefore, the parties agree to amend the Franchise Agreement as follows:

1. **Definitions**. Any capitalized terms used but not defined herein will have the meanings assigned to them in the Franchise Agreement.

2. **Guaranty**. The Guaranty of Franchise Agreement attached as Schedule 1.5 at the end of the Franchise Agreement is replaced in its entirety by the Limited Guaranty of Franchise Agreement attached hereto as Exhibit A.

3. **Term**. The term of the Franchise Agreement will be coterminous with the term of the subject lease for the Coffee Bar, including all extensions thereof. Franchisee agrees that in no event will the Coffee Bar's lease have an initial term greater than 15 years, or have more than 2 options to renew that are greater than 5 years each.

4. **Exercise of Purchase Right**. Section 15.7 the Franchise Agreement grants BRCB the right to purchase from Franchisee assets or property used in the operation of the Coffee Bar that BRCB may specify. The provisions of this Section 4 modify the terms and conditions of the exercise of the Purchase Right. Except to the extent specifically modified or supplemented by this Section 4, Section 15.7 of the Franchise Agreement shall be unaffected.

4.1. **Assets Delivered Free and Clear**. In the event BRCB, as franchisor, exercises its Purchase Right (as defined in the Franchise Agreement) for the Coffee Bar (or its assets) owned

1

and operated by Franchisee, then as of the applicable closing date, Franchisee will deliver good and valid title to all of the assets (tangible and intangible, including real and personal property) of Franchisee subject to such Purchase Right, free and clear of all liens, security interests and other encumbrances other than (a) liens for taxes not yet due and payable and (b) with respect to Franchisee's rights as a tenant to any real estate, the lease for such real estate and any covenants, conditions, restrictions and easements of record related to such real estate.

4.2. **Delivery of Audited Financial Statements**.  Upon delivery of notice by BRCB that BRCB desires to exercise the Purchase Right under the Franchise Agreement, Franchisee shall promptly deliver audited financial statements of Franchisee and any affiliates specified by BRCB. Such audited financial statements shall be prepared either by (a) an accounting firm mutually reasonably agreeable to BRCB and Franchisee or (b) if BRCB and Franchisee are unable to agree on such firm, the Phoenix, Arizona office of a national accounting firm selected by BRCB in its reasonable discretion. The fees and costs of the audit shall be paid by Franchisee. For the avoidance of doubt, the foregoing rights of BRCB and obligations of Franchisee shall not be a one time right or obligation, as applicable, and shall not be affected by BRCB's failure to consummate the transactions contemplated by the Purchase Right for any reason.

4.3. **Covenant Regarding Operations**.  From the date BRCB notifies Franchisee that it is exercising the Purchase Right until the closing of the purchase transaction, except as consented to in writing by BRCB (which consent shall not be unreasonably withheld, conditioned or delayed), Franchisee shall (x) conduct the business of Franchisee in the ordinary course of business consistent with past practice; and (y) use best efforts to maintain and preserve intact its current business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the business of Franchisee. In furtherance and not in limitation of the foregoing, Franchisee shall: (a) preserve and maintain all permits required for the conduct of its business as currently conducted or the ownership and use of the purchased assets; (b) pay the debts, taxes and other obligations of the Franchisee's business when due; (c) continue to collect accounts receivable in a manner consistent with past practice, without discounting such accounts receivable; (d) maintain the properties and assets included in the purchased assets in the same condition as they were on the date of the receipt of notice from BRCB that it was exercising the Purchase Right, subject to reasonable wear and tear; (e) continue in full force and effect without modification all insurance policies; (f) defend and protect the properties and assets included in the purchased assets from infringement or usurpation; (g) maintain the books and records in accordance with past practice; (h) comply in all material respects with all laws applicable to the conduct of the business of Franchisee or the ownership and use of the purchased assets; and (i) not take or permit any action that would cause any of the changes, events or conditions described in this Section 4.3 to occur.

5. **Modifications to Lease**. Franchisee will not, without BRCB's prior written consent (which consent shall not be unreasonably conditioned, withheld or delayed) consent to any modification of any lease for the Coffee Bar that would materially increase the obligations or responsibilities of tenant thereunder; however, the foregoing shall not prohibit Franchisee (and shall not require BRCB's consent) from exercising any express rights granted to it under the applicable lease (including, without limitation, to extend the term of the lease or transfer or assign the lease as permitted under the lease and which does not require landlord's consent).

4817-6818-1661, v. 5

6. **Area of Protection.**  Notwithstanding anything to the contrary contained in the Franchise Agreement, during the term of the Franchise Agreement, BRCB will not operate, or grant a license or franchise to a third party to operate, a new Coffee Bar within a one (1) mile radius of the Coffee Bar.

7. **Site Security Interests and Documentation**. Franchisee has previously submitted to BRCB all leases, financing agreements, and operating agreements in connection with its Coffee Bar for which BRCB has approved ("***Documentation***").  Franchisee shall not substantially alter such Documentation without the approval of BRCB. To the extent BRCB asserts a security interest on the assets of any Coffee Bar, BRCB will subordinate its security interest to third-party, unaffiliated commercial banking institutions and the bona fide third-party landlord identified in the Documentation provided that such security interests shall relate only to obligations of the Coffee Bar and BRCB shall have the right to cure any defaults and assume the obligations of such Coffee Bar. Notwithstanding the foregoing, the security interest granted by Franchisee pursuant to Section 2.7 of the Franchise Agreement shall secure the payment and performance of all obligations under the Franchise Agreement, including without limitation the payment of fees and charges pursuant to Section 2 and the Purchase Right under Section 15.7. Franchisee authorizes and consents to BRCB filing financing statements in any jurisdiction where BRCB determines it is reasonably required to perfect the security interest granted thereby.

8. **Opening of Coffee Bar**.  Franchisee must equip and open the Coffee Bar on the approved site within one year of the execution of the Franchise Agreement.  Franchisee and its affiliates will be permitted to use the Proprietary Marks on social media channels to promote and market the Coffee Bar, for so long as Franchisee's use of the Proprietary Marks conforms to BRCB's guidelines for use and display of the Proprietary Marks then in effect. Franchisee acknowledges and agrees the BRCB may in the future revise its guidelines to provide that BRCB shall have exclusive control over social media or other digital marketing channels relating to Coffee Bars or the use of the Proprietary Marks and that such policies shall supersede Franchisee's rights under this Section.

9. **Initial Franchise Fee**. In recognition of Developer's having paid a portion of the Initial Franchise Fee when it paid a development fee under the Geographic Territory Agreement, the Initial Franchise Fee is hereby reduced by Five Thousand Five Hundred Dollars ($5,500).

10. **Training and Opening Assistance**. If this is not the first Coffee Bar opened under the Geographic Territory Agreement, then: (a) BRCB will, at Franchisee's option, cost and expense, provide training for a designated store manager, on the terms set forth in the Franchise Agreement; and (b) BRCB has the right (but not the obligation) to assist with the Grand Opening of the Coffee Bar.

11. **Noncompetition**.  Section 6.1 and 6.3 of the Franchise Agreement are hereby deleted in their entirety and replaced with the following:

"6.1        **Definition of Competition**.  For purposes of this Section 6, "competition" means (a) diverting business to any competitor of BRCB, by direct or indirect inducement or otherwise; (b) performing any act injurious or prejudicial to the goodwill associated with the BRCB Marks or the BRCB System; and (c) the operation of, or assisting in the operation of, a coffee business the same as or similar to the Coffee Bar, other than pursuant to the Franchise Agreement with BRCB, within the geographical area stated in Section 6.3."

4817-6818-1661, v. 5

"6.3     **Noncompete and Nonsolicitation Covenants**.  During the term of the Franchise Agreement, and for a period of two (2) years after its expiration or termination, Franchisee will not (a) within 50 miles of any Coffee Bar that is open and operating prior to Franchisee's establishment or operation of a competing business in that area, or (b) within two hundred (200) miles of the Geographic Territory (including within the Geographic Territory) (as defined in the Recitals to this Addendum):  (y) engage in competition with BRCB, or engage in any business in competition with any Coffee Bar, except as authorized in writing by BRCB, or (z) employ or seek to employ any employee of BRCB or of any BRCB franchisee or developer (other than Franchisee's affiliates) for a period of at least one (1) year following the non-employment of such employee.  The one and two-year terms set forth in this Section 6.3 will be extended by any time consumed in litigation or arbitration required to enforce it, including any appeals.  For purposes of this Section 6.3, "engage in business" means in any capacity, including as a franchisee, sole proprietor, partner, limited partner, member, employer, franchisor, stockholder, officer, director, or employee, except in the capacity of shareholder of less than one percent (1%) beneficial interest in the stock of any publicly traded corporation."

12. **Transfers**.  Notwithstanding anything to the contrary in Section 12.2 of the Franchise Agreement, BRCB's consent shall not be required for a direct or indirect transfer by Robert Lattanzio of his direct or indirect interest in Franchisee to Mike Goergen or Chris Lattanzio; provided, that Franchisee provides BRCB with thirty (30) days' advanced notice of such transfer, together with copies of all documents and instruments effecting such transfer.  All other provisions of the Franchise Agreement regarding transfers shall not be modified by this Addendum.

13. **Termination**. The expiration of the Geographic Territory Agreement, or the termination of the Geographic Territory Agreement due to Developer's failure to meet its development obligation or schedule, will not and cannot be cause for termination of the Franchise Agreement.

14. **Arbitration and Dispute Resolution**. Notwithstanding anything to the contrary in the Franchise Agreement: (i) any arbitration between the parties will be resolved by a single arbitrator in Portland, Oregon, who will be selected in the manner stated in the American Arbitration Association's Commercial Arbitration Rules; and (ii) the parties will not be compelled to participate in any alternative dispute resolution program created, administered, or effected by or through BRCB.

15. **Franchisee's Representations and Warranties**.

(a)     <u>Organization and Authority of Franchisee</u>.  Franchisee has full right, power and authority to enter into the Franchisee Agreement (including this Addendum) and all documents and instruments executed in connection therewith to which Franchisee is a party (the "<u>Franchise Documents</u>").  The parties executing the Franchise Documents on behalf of Franchisee have full power and authority to bind such parties to their respective obligations set forth herein and therein. Franchisee is a duly formed and validly existing limited liability company and is in good standing under the laws of the State of Nevada.  Franchisee has obtained all consents and approvals necessary to make the Franchise Documents binding upon such party and to permit consummation of the transactions contemplated herein and therein in accordance with the terms of the Franchise Documents.

(b)     <u>Conflicts and Pending Actions</u>.  There is no agreement to which Franchisee (or any

4

affiliate) is a party or binding on Franchisee (or any affiliate), which is in conflict with the Franchise Document, or which would otherwise preclude or prevent Franchisee from performing Franchisee's obligations contained in the Franchise Documents. There is no pending or threatened litigation, governmental proceeding, notice of action required to be taken, judgment, cause of action, special assessment, charge against or related to the subject matter of the Franchise Documents, or against Franchisee (or any affiliate) with respect thereto, and Franchisee does not have any actual knowledge of any uncured material violation of any rule, order, or regulation issued by any governmental agency with respect to Franchisee (or any affiliate).

(c)    <u>Full Disclosure</u>.  No representation or warranty by Franchisee (or any affiliate) in the Franchise Documents and no statement contained in the Franchise Documents or any certificate or other document delivered or to be delivered to BRCB pursuant to the Franchise Documents contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

Franchisee's representations and warranties in this <u>Section 15</u> shall survive termination or expiration of the Franchise Agreement for a period of twenty four (24) months.

16. **General Provisions**.

16.1.    <u>**Conflicts.**</u> In the event of any conflict between the terms of this Addendum and the Franchise Agreement, this Addendum shall govern and control.  Other than as amended herein, the Franchise Agreement remains in full force and effect.

16.2.    <u>**Severability and Waiver**</u>.   The invalidity of any term or provision of this Addendum will not affect the validity of any other provision.  The parties intend that if any of the terms, conditions, or provisions of this Addendum violates applicable law, such terms, conditions, or provisions will be deemed not a part of this Addendum, and the remainder of this Addendum will remain in full force and effect.  Waiver by any party of strict performances of any provision of this Addendum will not be a waiver of or prejudice any party's right to require strict performance of the same provision in the future or of any other provision of this Addendum.

16.3.    <u>**Counterparts**</u>. This Addendum may be executed in any number of counterparts, all of which when taken together shall constitute one agreement binding on all parties, notwithstanding that all parties are not signatories to the same counterpart. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000) or other transmission method and any counterpart so delivered shall be deemed an original and shall be binding upon each of the undersigned as if signed and delivered in the original.

16.4.    <u>**Attorney Fees**</u>. If either party initiates a judicial or other proceeding, the prevailing party in such proceeding will be entitled to reimbursement of its costs and expenses, including reasonable attorney fees. "Costs and expenses" mean all reasonable pre-award expenses of the arbitration, including arbitrator fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, expert witness fees, costs of investigation and proof of facts, court costs, other arbitration or litigation expenses, and attorney fees. "Prevailing party" is the party which has obtained the greatest net award in terms of money or money equivalent. If money or

money equivalent has not been awarded, then the prevailing party will be that party which has prevailed on a majority of the material issues decided.

     16.5.  **<u>Negotiation</u>**. BRCB and Franchisee acknowledge and agree that this Addendum was fully negotiated by the Parties.

[Signature Page Follows]

6

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed as of the Effective Date.

**BRCB:**

**BLACK ROCK COFFEE BAR, LLC,**
**an Oregon limited liability company**

By: Black Rock Coffee Holdings, LLC,
a Delaware limited liability company
Its: Member


By:_____
Jake Spellmeyer, Chief Financial Officer


**FRANCHISEE:**


_____,
**an** _____


By:_____
_____, _____


TIN of Franchisee:_____

1

**Exhibit A**

**Limited Guaranty of Franchise Agreement**

[See Attached]

# LIMITED GUARANTY OF FRANCHISE AGREEMENT
# BLACK ROCK COFFEE BAR

The "***Guaranteed Agreement***" means that Franchise Agreement, dated _____, 20___, between **Black Rock Coffee Bar, LLC, an Oregon limited liability company ("*BRCB*")** and _ _____ (the "***Obligated Party***"), together with the Addendum to Franchise Agreement, dated _____, 20___, between BRCB and the Obligated Party.

This Guaranty (this "***Guaranty***") is given this ___ day of_____, 20__ by _____ (referred to in this Guaranty as "you" and like terms), with respect to the Guaranteed Agreement described above.

For good and valuable consideration, you unconditionally guarantee to BRCB, and to its successors and assigns, the full, complete, and timely payment and performance of each and all of the terms, covenants, and conditions of the Guaranteed Agreement (and any modification or amendment to the Guaranteed Agreement) to be kept and performed by the Obligated Party during the term of the Guaranteed Agreement arising under or relating to Section 15.7 (Right to Purchase Assets), including any related representations, warranties or covenants in the Guaranteed Agreement.

You further agree as follows:

1.      This Guaranty will continue unchanged by the occurrence of any Insolvency Event as defined at Section 14.1 of the Guaranteed Agreement, with respect to the Obligated Party or any assignee or successor of the Obligated Party or by any disaffirmance or abandonment of the Guaranteed Agreement by a trustee in bankruptcy of the Obligated Party.  Neither your obligation to make payment or render performance in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty will be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of the Obligated Party or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

2.      Your liability under this Guaranty is primary and independent of the liability of the Obligated Party. You waive any right to require BRCB to proceed against any other person or to proceed against or exhaust any security held by BRCB at any time or to pursue any right of action accruing to BRCB under the Guaranteed Agreement. BRCB may proceed against you and the Obligated Party jointly and severally or may, at its option, proceed against you without having commenced any action, or having obtained any judgment, against the Obligated Party. You waive the defense of the statute of limitations in any action under this Guaranty or for the collection of any indebtedness or the performance of any obligation guaranteed pursuant to this Guaranty.

3.      You agree to pay all attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the obligations guaranteed or in enforcing this Guaranty against you.

4817-6818-1661, v. 5

4.      You waive notice of any demand by BRCB, any notice of default in the payment of rents or any other amounts contained or reserved in the Guaranteed Agreement, or any other notice of default under the Guaranteed Agreement.  You expressly agree that the validity of this Guaranty and your obligations will in no way be terminated, affected, or impaired by reason of any waiver by BRCB; by its successors or assigns; by the failure of BRCB to enforce any of the terms, covenants, or conditions of the Guaranteed Agreement or this Guaranty; or by the granting of any indulgence or extension of time to the Obligated Party, all of which may be given or done without notice to you.

5.      This Guaranty will extend, in full force and effect, to any assignee or successor of BRCB and will be binding upon you and your successors and assigns.

6.      Until all obligations of the Obligated Party to BRCB have been paid or satisfied in full, you have no remedy or right of subrogation and you waive any right to enforce any remedy that BRCB has or may in the future have against the Obligated Party and any benefit of, and any right to participate in, and security now or in the future held by BRCB.

7.      All existing and future indebtedness of the Obligated Party to you is hereby subordinated to all indebtedness and other obligations guaranteed in this Guaranty and, without the prior written consent of BRCB, will not be paid in whole or in part, nor will you accept any payment of or on account of any such indebtedness while this Guaranty is in effect.

8.      This Guaranty will be construed in accordance with the laws of the state of Oregon, without giving effect to its conflict-of-laws principles.

"GUARANTOR"

Signature:_____

Name:_____

STATE OF_____)
                                                    ) ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this ___ day of _____, 20___ by_____.


_____
NOTARY PUBLIC

My Commission Expires:

_____

Residing at:_____

## FRANCHISE AGREEMENT

**PARTIES:**

**Black Rock Coffee Bar, LLC**                                        ("***BRCB***")
an Oregon limited liability company
616 NW Arizona Avenue
Bend, OR 97703


BR Rainbow OP, LLC                                          ("***Franchisee***")
940 Calle Negocio, Suite 200
San Clemente, CA 92673

**Franchise Agreement Effective Date:** August 23, 2019

**RECITALS:**


A.      Black Rock Coffee Bar, LLC ("***BRCB***") has over a period of time and at considerable expense developed and established a uniform and unique method of operation, customer service, advertising, publicity, processes, techniques, and technical knowledge in connection with its drive-thru, sit-down or combination retail business specializing in espresso, coffee, and related items. These retail outlets (sometimes referred to as "***Coffee Bars***") do business under the trade name "Black Rock Coffee Bar". Many of these techniques and much of the information constitute trade secrets. All of the knowledge, experience, processes, methods, specifications, techniques and proprietary marks and information of BRCB are referred to in this Agreement as the "***BRCB System***."

B.      The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme, and furnishings; proprietary products and ingredients; special menu items; proprietary and uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; a recommended standardized system for the operation of the business; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time.

C.      Franchisor identifies the System by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "Black Rock Coffee Bar" and such other trade names, service marks, and trademarks as are now designated (and may hereafter be designated by Franchisor in writing) for use in connection with the System (hereinafter referred to as "Marks" or "Proprietary Marks"). BRCB owns certain federally registered trademarks including "Black Rock Coffee Bar," Reg. No. 3489718.

D.      Franchisor continues to develop, use and control the use of such Marks in order to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance and service.

E.      Franchisor intends to control the use of the System and the Proprietary Marks for the benefit and exclusive use of itself and its franchisees in order to identify the franchise to the public as a franchise which represents the highest standards of quality and service.

F.      Franchisee understands and recognizes that (l) the BRCB System and the Proprietary Marks are of considerable value and (2) it is of importance to BRCB and all of its franchisees to maintain the development of the BRCB System in a uniform and distinctive manner, allowing Franchisee and all other franchisees of BRCB to enjoy a public image and reputation greatly in excess of that which any single Franchisee could establish.

G.      Franchisee desires to make use of the Proprietary Marks and the BRCB System, and to establish a "Black Rock Coffee Bar" drive-thru, sit-down or combination retail establishment (the **_"Coffee Bar"_**) to be operated under the terms and conditions of this Franchise Agreement and in accordance with the methods, practices, and procedures set forth from time to time by BRCB in its operations manual (the **_"Operations Manual"_**).  BRCB is willing to grant Franchisee the right to do so under the terms, conditions, and provisions set forth in this Agreement.  (This Agreement, along with the Appendices, Addenda, Attachments, and Exhibits attached to it and/or executed with it constitute the Franchise Agreement and are referred to in this Agreement as the "**_Franchise Agreement_**" or this **_"Agreement"_**).

H.      Franchisee recognizes the necessity and desirability of protecting the reputation, goodwill, trade secrets, and confidential business information of BRCB and also recognizes that disclosure of trade secrets and confidential business information, including specifics of Black Rock Coffee Bar System to any third party, will cause irreparable damage and harm to BRCB.

[This space intentionally left blank]

# BLACK ROCK COFFEE BAR
# FRANCHISE AGREEMENT
## TABLE OF CONTENTS

| | | |
|---|---|---|
| Section 1. | The Franchise................................................................ | 1 |
| 1.1 | Franchise Grant | 1 |
| 1.2 | Territory | 1 |
| 1.3 | Limitation to Coffee Bar Site | 1 |
| 1.4 | Existence of Various Forms of Franchise Agreements................... | 1 |
| 1.5 | Guaranty of Franchise Agreement........................................... | 2 |
| Section 2. | Fees. | 2 |
| 2.1 | Site Evaluation Fee | 2 |
| 2.2 | Initial Franchise Fee | 2 |
| 2.3 | Royalty | 2 |
| 2.4 | Gross Sales | 4 |
| 2.5 | Branding | 4 |
| 2.6 | Late Fee | 5 |
| 2.7 | Security Interest | 5 |
| 2.8 | Grand Opening Deposit | 5 |
| Section 3. | Term | 6 |
| Section 4. | License and Use of Proprietary Marks................................... | 6 |
| 4.1 | Grant | 6 |
| 4.2 | Acknowledgements | 6 |
| 4.3 | Agreements | 7 |
| 4.4 | Infringement | 8 |
| 4.5 | Nonexclusive License | 9 |
| 4.6 | Maintenance of BRCB's Goodwill | 9 |
| 4.7 | Trade Dress | 9 |
| 4.8 | Use of Proprietary Marks on the Internet | 9 |
| Section 5. | Confidentiality ............................................................... | 10 |
| 5.1 | Definition of Proprietary Information | 10 |
| 5.2 | Use and Protection of Proprietary Information | 10 |
| 5.3 | Operations Manual | 10 |
| 5.4 | Irreparable Harm | 10 |
| Section 6. | Covenants Against Competition and Competitive Solicitation | 11 |
| 6.1 | Definition of Competition | 11 |
| 6.2 | Blue Pencil | 11 |
| 6.3 | Noncompete and Nonsolicitation Covenants | 11 |
| 6.4 | Irreparable Harm | 11 |
| Section 7. | Establishment of the Franchise | 11 |

iii

| | | |
|---|---|---|
| 7.1 | Layout and Design | 11 |
| 7.2 | Landscaping and Site Improvements | 12 |
| 7.3 | Licenses and Permits | 12 |
| 7.4 | Equipment | 12 |
| 7.5 | Signage | 12 |
| 7.6 | Fax Machine and Computer Equipment | 12 |
| 7.7 | Grand Opening Requirements | 13 |

Section 8.    Operation of the BRCB Coffee Bar ................................. 13

| | | |
|---|---|---|
| 8.1 | Operations Manual and Alternative Approval Procedure | 13 |
| 8.2 | Restricted Use of the Premises | 13 |
| 8.3 | Supplies | 13 |
| 8.4 | Coffee and Espresso Beans | 13 |
| 8.5 | Logo Cups | 14 |
| 8.6 | Other BRCB Branded Products | 14 |
| 8.7 | Advertising and Promotions | 14 |
| 8.8 | Consumer Engagement | 14 |
| 8.9 | Continued Operation of the BRCB Coffee Bar | 14 |
| 8.10 | Hours of Operation | 15 |
| 8.11 | Social Media Policy | 15 |
| 8.12 | General Operating Requirements | 15 |
| 8.13 | Violations Fee | 15 |

Section 9.    Franchisee's Designated Manager and Structure ................ 15

| | | |
|---|---|---|
| 9.1 | General Manager | 15 |
| 9.2 | No Third-Party Management Services | 16 |

Section 10.    Services Provided by BRCB ........................................ 16

| | | |
|---|---|---|
| 10.1 | Initial Training | 16 |
| 10.2 | Supplemental Training | 16 |
| 10.3 | Operations Manual | 16 |
| 10.4 | Assistance at Opening | 16 |
| 10.5 | Optional On-Site Assistance | 16 |
| 10.6 | Advertising and Point-of-Sale Materials | 17 |
| 10.7 | Approval of Advertising | 17 |

Section 11.    Inspections, Audits and Accounting ............................. 17

| | | |
|---|---|---|
| 11.1 | BRCB's Right To Inspect | 17 |
| 11.2 | BRCB's Right to Audit | 18 |
| 11.3 | Provision of Monthly and Annual Financial Records | 18 |
| 11.4 | Preservation of Business Records | 19 |
| 11.5 | Tax Returns | 19 |

Section 12.    Assignment, Transfer and Sale .................................... 19

| | | |
|---|---|---|
| 12.1 | Definition of Transfer | 19 |
| 12.2 | No Transfer Without BRCB's Consent | 19 |
| 12.3 | Advance Notice of Proposed Terms and Right of First Refusal | 19 |

iv

| | | |
|---|---|---|
| **12.4** | Requirements for Consent to Transfer | 20 |
| **12.5** | Death or Incapacity of Franchisee | 21 |
| **12.6** | Internal Transfers | 22 |
| **12.7** | Sale or Assignment by BRCB | 22 |
| Section 13. | Indemnification and Insurance | 23 |
| **13.1** | Indemnity | 23 |
| **13.2** | Insurance | 23 |
| Section 14. | Defaults and Opportunities to Cure | 23 |
| **14.1** | Default for Insolvency | 23 |
| **14.2** | Default for Material Breach of the Franchise Agreement | 23 |
| **14.3** | Default for Material Breach of Other Agreements | 23 |
| **14.4** | Default for Violation of Health and Safety Standards | 24 |
| **14.5** | Cure Periods | 24 |
| **14.6** | Remedies for Defaults Not Cured | 24 |
| **14.7** | Cross-Default | 25 |
| Section 15. | Termination | 25 |
| **15.1** | Termination for Default | 25 |
| **15.2** | Discontinuation of Use of BRCB System and Proprietary Marks | 25 |
| **15.3** | De-Identification of the Premises | 25 |
| **15.4** | Return of Operations Manual and Other Proprietary Information | 26 |
| **15.5** | Survival of Covenants Against Competition and Solicitation | 26 |
| **15.6** | Transfer of Telephone Numbers and Other Listings | 26 |
| **15.7** | Right to Purchase Assets | 27 |
| **15.8** | Assignment of Leasehold Interest to BRCB | 27 |
| **15.9** | Cross-Termination | 28 |
| Section 16. | Miscellaneous Provisions | 28 |
| **16.1** | Independent Contractors | 28 |
| **16.2** | Franchisee's Principals and Controlling Principals | 28 |
| **16.3** | Illegality and Survival | 28 |
| **16.4** | Mediation | 29 |
| **16.5** | Arbitration | 29 |
| **16.6** | Governing Law and Venue | 31 |
| **16.7** | Mutual Benefit | 32 |
| **16.8** | Performance in Bend, Oregon | 32 |
| **16.9** | Dispute Resolution Program | 32 |
| **16.10** | Waiver of Certain Damages | 33 |
| **16.11** | Notices | 33 |
| **16.12** | No Waivers | 34 |
| **16.13** | Entire Agreement | 34 |
| **16.14** | Interpretation | 34 |
| **16.15** | Approvals | 34 |
| **16.16** | Effective Date | 34 |

v

DocuSign Envelope ID: QEEFD244-8D1D-49DF-BF84-D6089435802A

Section 17.    Franchisee's Representations, Warranties and Acknowledgements.................... 34

**17.1** Execution by Authorized Parties ............................................................. 34
**17.2** Compliance with Applicable Laws............................................................. 35
**17.3** Receipt of Agreement ............................................................................ 35
**17.4** Acknowledgement Regarding Future Results ............................................ 35

STATE-SPECIFIC ADDENDA TO THE FRANCHISE AGREEMENT .................................. 38

Schedule 1.5  GUARANTY OF FRANCHISE AGREEMENT ................................... 41

Schedule 9.1  MANAGER'S CONFIDENTIALITY AGREEMENT ......................... 43

Schedule 15.8  CONDITIONAL ASSIGNMENT OF LEASE .................................... 44

vi

# BLACK ROCK COFFEE BAR
# FRANCHISE AGREEMENT

**Section 1.**   **The Franchise.**

 **1.1**   **Franchise Grant**.  BRCB grants Franchisee a franchise that includes the right to use the Proprietary Marks and the BRCB System as provided in this Agreement in connection with the operation of the BRCB Coffee Bar, at the following location (the "***Premises***"):

Street Address: 7565 S Rainbow Blvd.

City: Las Vegas

County: Clark

State/ZIP Code: Nevada 89119

 **1.2**   **Territory**.

  **1.2.1**   <u>No Exclusive Territory</u>.  BRCB does not grant Franchisee an exclusive territory.  BRCB and its affiliates and other franchisees may own and operate Coffee Bars or otherwise market and sell products and services using the Proprietary Marks in the immediate vicinity of the Premises.  BRCB retains the right, for BRCB and its affiliates and other franchisees, to: (a) own, acquire, establish and/or operate, and license others to establish and operate, businesses using the Proprietary Marks and BRCB System at any location, (b) own, acquire, establish and/or operate, and license others to establish and operate, businesses under other proprietary marks or other systems, at any location; (c) to sell or distribute, at retail or wholesale or otherwise, directly or indirectly, or license others to sell or distribute, any products which bear any proprietary marks, including the Proprietary Marks, at any location; (d) to acquire, or be acquired by, any competing system, including a competing system that has one or more units in the immediate vicinity of the Premises; and (e) to market and sell coffee and espresso beans, equipment, clothing, and other items at any location through other distribution methods, such as via the Internet or catalogs.

 **1.3**   **Limitation to Coffee Bar Site**.  This franchise is granted only for the Premises and, except as provided in Section 1.2, grants no rights outside that site.  Except as provided in Section 1.2, BRCB reserves the sole and unlimited right to establish and operate, or permit others to operate, BRCB Coffee Bars at, or grant BRCB franchises for, any locations.

 **1.4**   **Existence of Various Forms of Franchise Agreements**.     Franchisee acknowledges that present and future franchisees of BRCB may operate under a number of forms of franchise agreements, and, consequently, BRCB's obligations and rights with respect to its various franchisees may differ materially in certain instances.  The existence of different forms or versions of the Franchise Agreement does not entitle Franchisee to benefit from any such

1

difference, nor does it operate to alter or amend the agreement of the parties set forth in this Agreement.

**1.5** **Guaranty of Franchise Agreement**.  If Franchisee is a corporation, limited liability company, limited partnership, general partnership or any form of business entity other than a sole proprietorship, whether upon signing this Agreement or at any time during the term or renewal term of this Agreement, each person who owns twenty-five percent (25%) or more of the Franchisee shall sign and deliver to BRCB the Guaranty of Franchise Agreement attached as Schedule 1.5 at the end of this Agreement, or agrees to otherwise guaranty Franchisee's performance under this Agreement according to the terms of such Guaranty of Franchise Agreement.

**Section 2.** **Fees.**

**2.1** **Site Evaluation Fee**.  Upon the execution of this Agreement, BRCB will apply any Site Evaluation Fee paid by Franchisee pursuant to a Site Evaluation Agreement between Franchisee and BRCB to the Initial Franchise Fee, as defined below.

**2.2** **Initial Franchise Fee**.  The fee for the rights granted under this Agreement (the "***Initial Franchise Fee***") is (i) Twenty-Seven Thousand Five Hundred Dollars ($27,500) for Franchisee's first Coffee Bar, (ii) Twenty-Two Thousand Dollars ($22,000) for Franchisee's second Coffee Bar, and (iii) Sixteen Thousand Five Hundred Dollars ($16,500) for each Coffee Bar thereafter.  The outstanding balance of the Initial Franchise Fee shall be due and payable upon the earliest of the following events: (i) ten days following the execution of a lease agreement by Franchisee for the Premises, (ii) ten days following the issuance of a building permit for the Premises with respect to the Coffee Bar, or (iii) the one-year anniversary of this Agreement.  If a license or permit from a governmental agency is required in order for Franchisee to operate the franchised business, and the agency refuses to grant Franchisee a license after Franchisee has taken all required and reasonable steps to obtain the license, then Franchisee shall be entitled to a refund of ninety percent (90%) of the Franchise Fee, less travel expenses incurred by Franchisor.

**2.3** **Royalty**

**2.3.1** Royalty Fee.  During the term of this Agreement, except as set forth below, Franchisee shall pay to Franchisor, in partial consideration for the rights herein granted, a continuing royalty fee ("Royalty Fee") of five percent (5%) of Gross Sales.  Such royalty fee shall be due and payable each calendar month ("Accounting Period") based on the Gross Sales for the preceding calendar so that it is received by Franchisor by electronic fund transfer ("EFT") on or before the tenth day following the end of each Accounting Period.  Notwithstanding the foregoing, Franchisee shall pay a monthly Royalty Fee of no less than Fifteen Hundred Dollars ($1,500).  Franchisee shall pay the greater of the $1,500 minimum amount set forth herein or the five per cent (5%) royalty.

**2.3.2** Royalty Report.  Each such royalty fee shall be preceded by a royalty report itemizing the Gross Sales for the preceding Accounting Period ("Royalty Report") and any other reports required hereunder.  Notwithstanding the foregoing, Franchisee shall provide Franchisor with such Gross Sales information on the tenth

Ex. 2 to Arb. Demand
Page 8 of 62

day following the Accounting Period (or next business day if the tenth day is not a business day) by modem or, if not reasonably available, by facsimile transmission or such other method of delivery as Franchisor may reasonably direct.

**2.3.3**  Electronic Funds Transfer.  Franchisee agrees that Franchisor shall have the right to withdraw funds from Franchisee's designated bank account each Accounting Period by EFT in the amount of the royalty fee described above.  Such withdrawals shall be drawn on the tenth day of each month for the amount of the royalty due with respect to Franchisee's Gross Sales for the preceding Accounting Period, as evidenced by the Royalty Report.  If the Royalty Report has not been received within the time period required by this Agreement, then Franchisor may process an EFT for the royalty for the subject Accounting Period based on (i) information regarding Franchisee's Gross Sales for the preceding Accounting Period obtained by Franchisor in the manner contemplated by Section 2.3, or (ii) the most recent Royalty Report provided to Franchisor by Franchisee; provided that if a Royalty Report for the subject Accounting Period is subsequently received and reflects (A) that the actual amount of the royalty due was more than the amount of the EFT by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (B) that the actual amount of the royalty due was less than the amount of the EFT by Franchisor, then Franchisor shall, at its option, return the excess amount to Franchisee or credit the excess amount to the payment of Franchisee's future royalty obligations.

Upon execution of this Agreement and at any time thereafter at Franchisor's request, Franchisee shall execute such documents or forms as Franchisor deems necessary for Franchisor to process EFTs from Franchisee's designated bank account for the payments due hereunder.  Should any EFT not be honored by Franchisee's bank for any reason, Franchisee agrees that it shall be responsible for that payment plus a service charge applied by Franchisor and the bank, if any.  Franchisee further agrees that it shall at all times maintain in the designated bank account funds sufficient to pay all royalty and required Fund contributions when due.  If royalty payments are not received when due, interest may be charged by Franchisor in accordance with Section 2.3.4.  Upon written notice to Franchisee, Franchisee may be required to pay such royalty fees directly to Franchisor, by another method of payment, in lieu of EFT at Franchisor's sole discretion.  Franchisee shall coordinate with Franchisor any changes in its depository account so that no interruptions in the automatic disbursement of the Royalty Fee or other amounts occur.

**2.3.4**  Interest.  Franchisee shall not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder.  Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue.  Time is of the essence with respect to all payments to be made by Franchisee to Franchisor.  All unpaid obligations under this Agreement shall bear interest from the date due until paid at the lesser of (i) eighteen percent (18%) per annum, or (ii) the maximum rate allowed by applicable law.  Notwithstanding anything to the contrary contained herein, no

4834-3118-5826, v. 7

Ex. 2 to Arb. Demand
Page 9 of 62

provision of this Agreement shall require the payment or permit the collection of interest in excess of the maximum rate allowed by applicable law.  If any excess of interest is provided for herein, or shall be adjudicated to be so provided in this Agreement, the provisions of this paragraph shall govern and prevail, and neither Franchisee nor its Principals shall be obligated to pay the excess amount of such interest.  If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts that may be due and owing hereunder, and if no such amounts are due and owing hereunder then such excess shall be repaid to the party that paid such interest.

2.4    **Gross Sales.**  For the purposes of this Agreement, "Gross Sales" shall mean the total selling price of all services and products and all income of every other kind and nature related to the Franchise (including, without limitation, income related to beverage and food and delivery activities, and any sales or orders of beverage and food products or food preparation services provided from or related to the Franchise), whether for cash or credit and regardless of collection in the case of credit.  Gross Sales shall be reduced by discounts and coupons.  Gross Sales shall expressly exclude the following:

Sums representing sales taxes collected directly from customers, based upon present or future laws of federal, state or local governments, collected by Franchisee in the operation of the Franchise, and any other tax, excise or duty that is levied or assessed against Franchisee by any federal, state, municipal or local authority, based on sales of specific merchandise sold at or from the Franchise, provided that such taxes are actually transmitted to the appropriate taxing authority;

Proceeds from isolated sales of trade fixtures not constituting any part of Franchisee's products and services offered for resale at the Franchise nor having any material effect upon the ongoing operation of the Franchise required under this Agreement; and

Other items authorized by Franchisor in writing to be excluded from Gross Sales.  Any such authorization may be revoked or withdrawn at any time in writing by Franchisor in its discretion.

2.5    **Branding.**  As the result of the expenditure of time, skill, effort and money, Franchisor has developed and owns a unique and distinctive system ("System") relating to the establishment and operation of its drive-thru, sit-down or combination retail business specializing in espresso, coffee, and related items under the tradename "Black Rock Coffee Bar."  The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme, and furnishings; proprietary products and ingredients; special menu items; proprietary and uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; a recommended standardized system for the operation of the business; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time.  Therefore, to maintain the integrity of the System, and to further develop the System, Franchisor charges a Branding Fee.

2.5.1    <u>Branding Fee</u>. During the term of this Agreement, except as set forth below, Franchisee shall pay to Franchisor, in partial consideration for the rights herein granted, a continuing royalty fee ("Branding Fee") of two percent (2%) of Gross Sales.  Such Branding Fee shall be due and payable each calendar month

4

("Accounting Period") based on the Gross Sales for the preceding calendar so that it is received by Franchisor by electronic fund transfer ("EFT") on or before the tenth day following the end of each Accounting Period. Notwithstanding the foregoing, Franchisee shall pay a monthly Branding Fee of no less than One Thousand Dollars ($1,000). Franchisee shall pay the greater of the $1,000 minimum amount set forth herein or the two per cent (2%) Branding Fee.

**2.5.2** <u>Branding Report</u>. Each such Branding Fee shall be preceded by a Branding Report itemizing the Gross Sales for the preceding Accounting Period ("Branding Report") and any other reports required hereunder. Notwithstanding the foregoing, Franchisee shall provide Franchisor with such Gross Sales information on the tenth day following the Accounting Period (or next business day if the tenth day is not a business day) by modem or, if not reasonably available, by facsimile transmission or such other method of delivery as Franchisor may reasonably direct.

**2.5.3** <u>Payment</u>. The Branding Fee shall be paid at the same time and in the same manner as the Royalty Fee, described above.

**2.6** **<u>Late Fee</u>.** If the payments or reports are not received by Franchisor as required by this Section, Franchisee shall pay to Franchisor, in addition to the overdue amount, a fee of Fifty Dollars ($50) per day for each day that the fees are unpaid or the report is not received. This fee is reasonably related to Franchisor's costs resulting from the delay in payment and/or receipt of any report, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement for Franchisee's failure to pay royalties and/or submit reports in accordance with the terms of this Agreement. If for any reason the fee of Fifty Dollars ($50) is deemed to be interest charged, required or permitted, in excess of the maximum rate allowed by applicable law, any such excess shall be applied as a payment and reduction of any other amounts that may be due and owing hereunder, and if no such amounts are due and owing hereunder, then such excess shall be repaid to the party that paid such amount.

**2.7** **<u>Security Interest</u>.** Franchisee hereby grants Franchisor a security interest in the following, whether now owned or hereafter acquired: all of Franchisee's inventory; Franchisee's motor vehicles; Franchisee's equipment; Franchisee's accounts; Franchisee's accounts receivable; Franchisee's general intangibles; Franchisee's furniture, furnishings and equipment; replacement parts and accessories; supplies; proceeds from collateral, all returns, replacements, substitutions, and the like.

**2.8** **<u>Grand Opening Deposit</u>.** Franchisee shall conduct a grand opening at the commencement of opening the Coffee Bar to the public, including the initial Friday and Saturday that you are open for business, that will include advertising and promotion which meets BRCB's approval (the "***Grand Opening***"). Franchisee shall pay to BRCB's affiliate Black Rock Roasting Company, an Oregon corporation, ("***BRRC***") a deposit (the "***Grand Opening Deposit***") not later than two weeks prior to the Grand Opening that will be applied toward the costs of promotional materials, opening inventory, supplies, food, and BRRC's assistance (including lodging and labor). The Grand Opening Deposit shall be in the amount of $27,500 if the Premises are within a fifty (50) mile radius of the BRRC office at 616 NW Arizona Avenue, Bend OR 97703, or $38,500 if farther than 50 miles. The Grand Opening Deposit is nonrefundable to the extent spent, however, BRRC will refund such deposit if this Agreement is duly terminated before the Grand Opening.

BRRC will provide Franchisee with an accounting of how the deposit was spent, and Franchisee agrees to apply any unspent deposit toward future purchases of inventory.

**Section 3.**     <u>**Term.**</u> The term of this Agreement shall be ten (10) years from the execution of this Agreement.  Franchisee shall not have the right to renew the franchise unless BRCB elects, in its sole and absolute discretion, to offer such option to Franchisee, which renewal shall upon such terms as BRCB determines in its sole and absolute discretion.

**Section 4.**     <u>**License and Use of Proprietary Marks.**</u>

    **4.1**     <u>**Grant**</u>.  Franchisor grants Franchisee the right to use the Marks during the term of this Agreement in accordance with the System and related standards and specifications.  Franchisee shall operate under the trade names of "Black Rock Coffee Bar" as authorized herein, and shall use no other name in conducting the business franchised under this Agreement without the prior written consent of Franchisor.  Franchisee shall comply with all applicable fictitious name statutes, with evidence of such compliance to be furnished to Franchisor.  If Franchisee is a corporation, partnership, or limited liability company, it shall not legally or otherwise incorporate the name "Black Rock Coffee Bar" in its corporate, company or partnership name.

    **4.2**     <u>Acknowledgements</u>.  Franchisee expressly understands and acknowledges that:

        **4.2.1**     <u>Ownership</u>.  Franchisor authorizes Franchisee to use the System, the Marks, the trade secrets and goodwill, and any improvements and modifications of these items, in the operation of Franchisee's business at the franchise location.  Franchisee expressly agrees that the ownership of all right, title and interest in and to the System, the Marks, trade names, copyrighted materials, trade secrets and goodwill, and any improvements and modifications of these items shall remain solely owned by Franchisor and that the materials and information now and hereafter provided or revealed to Franchisee under and pursuant to this Agreement are revealed in confidence.  Franchisor may change or modify the System, modify or discontinue certain Marks or copyrighted material or adopt new Marks or copyrighted material.  Franchisee agrees at its own expense to discontinue, adopt and/or use any such changed items.

        **4.2.2**     <u>No Interference</u>.  Neither Franchisee nor any Controlling Principal shall take any action that would prejudice or interfere with the validity of Franchisor's rights with respect to the Marks.   Nothing in this Agreement shall give the Franchisee any right, title, or interest in or to any of the Marks or any of Franchisor's service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Marks and the System in accordance with the terms and conditions of this Agreement for the operation of the Franchise and only at or from its Location or in approved advertising related to the Franchise.

        **4.2.3**     <u>Goodwill</u>.  Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Marks and the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned

DocuSign Envelope ID: QE5FD244-8D1D-49DF1BF84-D6089435802A

as attributable to any goodwill associated with Franchisee's use of the Marks.  So long as this Franchise Agreement shall remain in effect, Franchisee agrees to maintain a clean and attractive store which meets the specifications provided by Franchisor to preserve, maintain and enhance the reputation and goodwill built up by Franchisor and its franchisees and the value of the Marks.  In developing and maintaining those high and uniform standards of quality and service to protect the reputation and goodwill of Franchisor, Franchisee further agrees to use only the Marks Franchisor designates and to use them solely in the manner authorized by Franchisor.  Franchisee further agrees to use the Marks only for the operation of the franchised business and only at the Assigned Area or in advertising related to the franchised business and only during the term of this Agreement.

**4.2.4**    <u>Validity</u>.  Franchisee shall not contest the validity of or Franchisor's interest in the Marks or assist others to contest the validity of or Franchisor's interest in the Marks.

**4.2.5**    <u>Infringement</u>.  Franchisee acknowledges that any unauthorized use of the Marks shall constitute an infringement of Franchisor's rights in the Marks and a material event of default hereunder.  Franchisee agrees that it shall provide Franchisor with all assignments, affidavits, documents, information and assistance Franchisor reasonably requests to fully vest in Franchisor all such rights, title and interest in and to the Marks, including all such items as are reasonably requested by Franchisor to register, maintain and enforce such rights in the Marks.  Franchisee agrees to neither infringe upon nor use or imitate the System or any part of the System, except under a written franchise agreement and license from Franchisor.

**4.2.6**    <u>Substitution</u>.  Franchisor reserves the right to substitute different Marks for use in identifying the System and the Franchise if the current Marks no longer can be used, or if Franchisor, in its sole discretion, determines that substitution of different Marks will be beneficial to the System.  In such event, Franchisor may require Franchisee, at Franchisee's expense, to discontinue or modify Franchisee's use of any of the Marks or to use one or more additional or substitute Marks.

**4.3**    **Agreements**.  With respect to Franchisee's franchised use of the Marks pursuant to this Agreement, Franchisee further agrees that:

**4.3.1**    <u>Exact Use</u>.  Unless otherwise authorized or required by Franchisor, Franchisee shall advertise the Franchise only under "Black Rock Coffee Bar" without prefix or suffix.  Franchisee shall not use the Marks as part of its corporate or other legal name, and shall obtain the Franchisor's approval of such corporate or other legal name prior to filing it with the applicable state authority.  Franchisee shall not advertise, publish, or circulate any documents or other items using the Marks except in strict compliance with the latest edition of Franchisor's Manuals.

**4.3.2**    <u>Identification</u>.  During the term of this Agreement and any renewal hereof, Franchisee shall identify itself as the owner of the Franchise in conjunction with any use of the Marks, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Franchise as Franchisor may designate in writing.

**4.3.3** <u>Debt</u>. Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**4.3.4** <u>Trade Names</u>. Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

**4.3.5** <u>Identification as Independent Operator</u>. Franchisee shall prominently display a sign in the retail portion of the franchise premises to the effect that Franchisee is "An Independent Franchise of 'Black Rock Coffee Bar' Franchise System," or other similar statement approved in writing by Franchisor.

**4.3.6** <u>Unauthorized Use</u>. Any compensation received by Franchisee in connection with the unauthorized use of the Marks shall be held in trust for and paid to Franchisor.

**4.3.7** <u>Inspections</u>. In order to preserve the validity and integrity of the System and the Marks, and to assure that Franchisee is properly using authorized Marks in the operation of Franchisee's business, Franchisor may inspect Franchisee's operations from time to time. Franchisor will advise Franchisee of any deficient or improper use of the Marks following such inspection. Franchisee shall cooperate with Franchisor's representative in such inspection and render any assistance that is requested.

**4.3.8** <u>Termination and Use</u>. Upon termination or expiration of this Agreement, Franchisee immediately shall cease use of the Marks and shall immediately remove the Marks from the Assigned Area and to cancel any advertising relating to Franchisee's use of the Marks.

**4.4** **Infringement**. Franchisee shall notify Franchisor immediately by telephone and thereafter in writing of any apparent infringement of or challenge to Franchisee's use of any Mark, of any claim by any person of any rights in any Mark, and Franchisee and the Controlling Principals shall not communicate with any person other than Franchisor or any designated affiliate thereof, their counsel and Franchisee's counsel in connection with any such infringement, challenge or claim. Franchisor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates of, any settlement, litigation or Patent and Trademark Office or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Mark. Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any other person or entity in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Marks. Franchisor will indemnify Franchisee against and reimburse Franchisee for all damages for which Franchisee is held liable in any proceeding arising out of Franchisee's use of any of the Marks (including settlement amounts), provided that the conduct of Franchisee and the Controlling Principals with respect to such proceeding and use of the Marks is in full compliance with the terms of this Agreement.

8

**4.5**     **Nonexclusive License**.  The right and license of the Marks granted hereunder to Franchisee is nonexclusive and Franchisor thus has and retains the following rights, among others, subject only to the limitations of this Agreement.

    **4.5.1**   Other Licenses.  To grant other licenses for use of the Marks, in addition to those licenses already granted to existing franchisees;

    **4.5.2**   Other Systems.  To develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to Franchisee; and

    **4.5.3**   Production and Distribution.  To engage, directly or indirectly, through its employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in (1) the production, distribution, license and sale of products and services, and (2) the use in connection with such production, distribution and sale, of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Franchisor.

**4.6**     **Maintenance of BRCB's Goodwill**.  Franchisee agrees to refrain from performing any act or engaging in any conduct, either directly or indirectly, that is or may be injurious or prejudicial to the goodwill associated with the Proprietary Marks or the BRCB System.  Franchisee acknowledges that any such acts or conduct will cause irreparable harm to BRCB and will entitle BRCB to seek and obtain injunctive relief.

**4.7**     **Trade Dress**.  Franchisee acknowledges that certain portions of the Premises decor and design constitute unique and protectable images to the consumer that are identified with BRCB and that are part of the goodwill associated with the BRCB System.  This "trade dress" is exclusively owned by BRCB, and this Agreement does not grant any ownership interest in the trade dress to Franchisee.  Usage of the trade dress by Franchisee, and any goodwill established by that usage, inures to the exclusive benefit of BRCB.

**4.8**     **Use of Proprietary Marks on the Internet**.  Franchisee will not maintain a website or otherwise maintain a presence or advertise on the Internet or any other publicly accessible computer network in connection with the franchised business without BRCB's prior written approval, which BRCB may withhold for any reason or no reason. Franchisee agrees to submit to BRCB for approval before use true and correct printouts of all Web site pages Franchisee proposes to use in its Web site in connection with the franchised business.  Franchisee understands and agrees that BRCB's right of approval of all such Web material is inextricably linked with the Proprietary Marks.  Franchisee will use only material that BRCB has approved.  Franchisee's website must conform to all of BRCB's website requirements, whether set forth in the Operations Manual or otherwise.  Franchisee agrees to include all hyperlinks or other links that BRCB requires.  If BRCB grants approval for a website, Franchisee will not use any of the Proprietary Marks at the site except as BRCB expressly permits.  If Franchisee wishes to modify its approved site, all proposed modifications must also receive BRCB's prior written approval.  Franchisee will not post on its website any material in which any third party has any direct or indirect ownership interest (including video clips, photographs, sound bites, copyrighted text, trademarks or service marks, or any other text or image in which any third party may claim intellectual property ownership interests) without authorization from the owner of the rights and from BRCB.

9

Franchisee agrees to obtain BRCB's prior approval for any Internet domain name and/or home page address. The requirements for BRCB's prior approval set forth in this Section will apply to all activities directly related to the franchised business on the Internet or other communications network to be conducted by Franchisee, except that Franchisee may maintain one or more e-mail addresses and may conduct e-mail communications and online business-to-business transactions without BRCB's prior written approval, provided that the address and communications comply with all of the requirements (including those pertaining to the use of the Proprietary Marks) contained in this Agreement. Franchisee agrees to obtain BRCB's prior approval as provided above if it proposes to send advertising to multiple addresses via e-mail.

**Section 5.      Confidentiality**.

    **5.1      Definition of Proprietary Information**. BRCB's "***Proprietary Information***" means all elements of the BRCB System that are not publicly known, whether or not entitled to protection as a trade secret, including without limitation: (1) ingredients, recipes, and methods of preparing food and drink products; (2) methods of operation of BRCB Coffee Bars; (3) information about products, supplies, services, or procedures; (4) the entire contents of the Operations Manual; and (5) any other information disclosed to Franchisee through confidential notifications from BRCB. Franchisee acknowledges that BRCB is the sole owner of the Proprietary Information.

    **5.2      Use and Protection of Proprietary Information**. Franchisee agrees not to disclose any of BRCB's Proprietary Information to any person, other than to Franchisee's employees, and then only to the extent necessary for the operation of the BRCB Coffee Bar. Franchisee will require its General Manager, as defined in Section 9.1 of this Agreement, to execute a Manager's Confidentiality Agreement substantially in the form attached to this Agreement, unless Franchisee's General Manager is the same person as Franchisee or an owner of at least a one-half undivided ownership interest in Franchisee. Franchisee will keep the Operations Manual and all other tangible records of Proprietary Information in a secure location at the BRCB Coffee Bar, and will take reasonable precautions to prevent the disclosure of any of the Proprietary Information to any unauthorized person. Franchisee will not make copies of any of the Proprietary Information fixed in any medium. Franchisee will be responsible to BRCB for any misuse or publication of BRCB's Proprietary Information by any of Franchisee's employees.

    **5.3      Operations Manual**. Franchisee agrees to adhere to the policies, procedures and specifications of the BRCB System as set forth in the Operations Manual, as it may be revised by BRCB from time to time in the sole discretion of BRCB, provided that such revisions will not effect any material change in the terms of this Agreement. In the event of any dispute as to the contents of the Operations Manual, or any of them, the terms of the master copy maintained by BRCB will be controlling. Franchisee's authorized copy or copies of the Operations Manual remain at all times the property of BRCB.

    **5.4      Irreparable Harm**. Franchisee acknowledges that any violation of the terms of this Section 5 will cause irreparable harm to BRCB, entitling BRCB to injunctive relief.

10

**Section 6.**     **Covenants Against Competition and Competitive Solicitation**.

    **6.1**     **Definition of Competition**.  For purposes of this Section 6, "***Competition***" means the operation of or assisting in the operation of a drive-thru, sit-down or combination coffee store the same as or similar to the BRCB Coffee Bar, and within a geographical area consisting of (1) during the term of this Agreement, anywhere, and (2) after termination of this Agreement, a ten (10) mile radius from the location of any BRCB Coffee Bar now or hereafter operated by BRCB or its licensees or franchisees, including the Coffee Bar licensed by this Agreement.

    **6.2**     **Blue Pencil**.  If a judicial or quasi-judicial authority called upon to enforce this Section 6 deems any of its provisions to be unenforceable by reason of its scope or extent, the parties intend that such authority should enforce such provision to the maximum extent permitted by applicable law.

    **6.3**     **Noncompete and Nonsolicitation Covenants**.  During the term of this Agreement, and for a period of two (2) years after its expiration or termination, Franchisee will not (a) engage in any business in Competition with any BRCB Coffee Bar, except as authorized in writing by BRCB, or (b) employ or seek to employ any employee of BRCB or of any BRCB franchisee or developer for a period of at least one (1) year following the non-employment of such employee. The one and two-year terms set forth in this Section 6.3 will be extended by any time consumed in litigation or arbitration required to enforce it, including any appeals.  For purposes of this Section 6.3, "engage in any business" means in any capacity, including as a franchisee, sole proprietor, partner, limited partner, member, employer, franchisor, stockholder, officer, director, or employee, except in the capacity of shareholder of less than five percent (5%) beneficial interest in the stock of any publicly traded corporation.

    **6.4**     **Irreparable Harm**.  Franchisee acknowledges that any violation of the terms of this Section 6 will cause irreparable harm to BRCB, entitling BRCB to injunctive relief.

**Section 7.**     **Establishment of the Franchise**.

    **7.1**     **Layout and Design**.

        **7.1.1**     **Site Remodels, Interior End Cap Build-Outs, and Other Site Construction**.  Upon written notice to BRCB that a Franchisee desires to remodel an existing building, construct an interior end cap drive thru build-out, or perform any other construction, remodeling, or improvement of any current or prospective Coffee Bar location, BRCB shall provide Franchisee with building specifications, which Franchisee shall incorporate into building plans or blueprints at its sole expense. Franchisee shall submit plans or blueprints for all such construction, improvements and remodeling to BRCB for its approval, and will make such changes in the plans or blueprints as BRCB requests.  Expenditure of funds on design or drafting by Franchisee does not obligate BRCB to approve the plans.  BRCB reserves the right to approve or disapprove the design or plans, in its sole discretion.  All such construction, improvements and remodeling of the Premises will meet or exceed any applicable building codes and any other regulations of any local governing

DocuSign Envelope ID: QEEED244-8D1D-49DF-BF64-D6089435802A

body (city, county, or state).  Franchisee shall not begin any construction, improvements, or remodeling until it has received final written approval from BRCB and all required licenses, permits, zoning variances, or other clearances from any applicable governing body.

**7.1.2**  New Site Construction**.**  If Franchisee desires to build a new standalone BRCB Coffee Bar, Franchisee must either i) contract with BRCB's designated approved builder for construction of the Coffee Bar, or ii) purchase a prototype building design from BRCB and contract with a builder of Franchisee's choice, subject to BRCB's prior approval, which shall be given in BRCB's sole discretion. If Franchisee contracts with a builder other than BRCB's designated approved builder for construction of the Coffee Bar, Franchisee shall ensure that the Coffee Bar conforms to the prototype building design and that a modular building sticker is placed on the building indicating state approval of a prefabricated building.

**7.2**    **Landscaping and Site Improvements**.  All plans for the development and landscaping of the site of the BRCB Coffee Bar, including drive-thru directional striping and parking spaces, must be submitted to BRCB for its approval in writing before the plans are implemented.

**7.3**    **Licenses and Permits**.  Franchisee will obtain any licenses or permits required for any construction, improvement, or remodeling of the premises of the BRCB Coffee Bar, and for the operation of the BRCB Coffee Bar.

**7.4**    **Equipment**.  Franchisee will acquire equipment to be used in the operation of the Coffee Bar from BRCB or from approved suppliers only.  Any and all equipment used in the operation of the Coffee Bar must be in accordance with the standards and specifications set forth by BRCB in the Operations Manual or other documents provided or approved by BRCB as they presently exist or may exist in the future.  BRCB may at its option require you to upgrade your cash register to a networked cash register system capable of allowing BRCB independent access to the system, and to enter into an ongoing contract for the maintenance, upgrading and repair of the system.  During any ten-year period, you will not be required to spend more than $7,700 for upgrades to fulfill the obligation described in the preceding sentence.

**7.5**    **Signage**.  Franchisee must acquire signs for advertising and identifying the Franchisee's business as a BRCB Coffee Bar from a BRCB-approved supplier, or according to the Alternative Approval Procedure set forth in Section 8.1.  All signs must be in accordance with the standards and specifications of BRCB and any local governing body.  Franchisee acknowledges that quality control is essential to protect and promote BRCB's Proprietary Marks, standards, and uniform image.

**7.6**    **Fax Machine and Computer Equipment**.  Franchisee will be required to have a facsimile machine and related telephone line for supply ordering and report sending.  Franchisee is not now, but may in the future be required by BRCB to purchase or obtain computer hardware and software, and to maintain an Internet service provider account, which includes the ability to send and receive e-mail over the Internet; provided, however, that in no case shall Franchisee be

required to pay any fee to BRCB for the use of such hardware or software. The computer equipment would be used for providing reports to BRCB, for communications with BRCB, and for communications between third parties and Franchisee. BRCB may provide specifications that Franchisee must follow for the hardware, software, and Internet provider. BRCB may require Franchisee to upgrade the hardware and software as reasonably necessary to provide reports and information required by BRCB.

      7.7    **Grand Opening Requirements**. Franchisee cannot open Franchisee's Coffee Bar before the Grand Opening, unless prior written authorization has been given by BRCB. Franchisee must have in stock a sufficient quantity of inventory, supplies, promotional materials and signage, as well as food and labor, to conduct the Grand Opening. In addition, Franchisee's Coffee Bar must be "fully operational", determined in BRCB's sole discretion, but generally meaning without limitation that Franchisee's Coffee Bar has, at a minimum, all equipment and furniture installed, and all licenses, permits or other approvals necessary to operate have been obtained.

**Section 8.**    **Operation of the BRCB Coffee Bar.**

      8.1    **Operations Manual and Alternative Approval Procedure**. Franchisee acknowledges that uniformity in all aspects of the operation of the BRCB Coffee Bar is necessary to protect BRCB's goodwill in the Proprietary Marks, and that such uniformity will be achieved by Franchisee's strict compliance with all provisions of the Operations Manual and any other customer service guidelines implemented by BRCB from time to time. Except as provided in this Section 8.1, Franchisee will strictly comply with the menus, procedures, standards, recipes, and provisions set forth in the Operations Manual, and will not sell any product at the BRCB Coffee Bar that is not authorized by the Operations Manual or otherwise approved by BRCB. Franchisee may make a request in writing to deviate from any of the requirements set forth in the Operations Manual, including the specifications relating to equipment, supplies, recipes, and other aspects of operation. BRCB will evaluate all such requests and either approve or disapprove, in its sole discretion, within thirty (30) days of its receipt of the request (the "***Alternative Approval Procedure***"). If BRCB fails to respond to any request made pursuant to this Section 8.1 within the prescribed time period, the request will be deemed disapproved.

      8.2    **Restricted Use of the Premises**. The Premises will be used only for the operation of the BRCB Coffee Bar. Franchisee will not conduct any other businesses or activities on the Premises. Franchisee will not wholly or partially let or sublet the Premises without BRCB's prior written consent.

      8.3    **Supplies**. Subject to the Alternative Approval Procedure, Franchisee shall use only supplies and ingredients that are in compliance with the standards as set forth in the Operations Manual or other documents provided or approved by BRCB as they presently exist or may exist in the future. Franchisee may purchase all necessary supplies, other than logo cups, coffee and espresso beans and products, and other products bearing the BRCB Marks, from the supplier of Franchisee's choice.

      8.4    **Coffee and Espresso Beans**. Franchisee shall purchase only from BRCB's approved distributor all of Franchisee's requirements for coffee and espresso beans, as specified

13

in the Operations Manual, or other documents provided or approved by BRCB as they presently exist or may exist in the future.  No coffee or espresso may be served at the BRCB Coffee Bar that is not purchased through the BRCB-designated supplier.  Franchisee acknowledges that BRCB's coffee and espresso bean blends and roasts are trade secrets of BRCB, and that Franchisee's breach of this Section 8.4 shall be grounds for immediate termination of this Agreement by BRCB without opportunity to cure.  Franchisee will pay BRCB-designated coffee or espresso bean vendors within vendor terms.

**8.5    Logo Cups**.  Franchisee shall purchase only from BRCB's approved distributor all of Franchisee's requirements for logo cups, as specified in the Operations Manual.

**8.6    Other BRCB Branded Products**.  If BRCB's approved distributor offers any products for sale to Franchisee, Franchisee shall purchase all of Franchisee's requirements for such products only from BRCB's approved distributor.

**8.7    Advertising and Promotions**.  Franchisee will use its best efforts to promote and advertise the opening of the BRCB Coffee Bar.  BRCB recommends that Franchisee spend at least One Thousand One Hundred Dollars ($1,100) on advertising within the first six (6) months following the opening of the BRCB Coffee Bar.  All local advertising and promotions to be offered or published by or for Franchisee in any medium, including without limitation print, radio, television and Internet advertising, will be submitted to BRCB for approval or disapproval in advance of its use, and no advertisement or promotion will be used by Franchisee unless it has first been approved by BRCB.  Advertising materials made available to Franchisee pursuant to Section 10.6 of this Agreement are deemed approved if used without change.  BRCB will evaluate all proposed advertising and promotions and either approve or disapprove, in its sole discretion, within fourteen (14) days of its receipt of the request.  If BRCB fails to respond to any request for evaluation of proposed advertising or promotion within the prescribed time period, the proposed advertisement or promotion will be deemed disapproved.

**8.8    Consumer Engagement**.  Franchisee shall utilize any and all consumer engagement services and/or software as required by Franchisor, including but not limited to payroll and scheduling software, customer interaction media from loyalty apps and remote order apps, document storage media (e.g. Smugmug, Box, Google), social media (e.g. Facebook, Instagram, Snapchat), and digital ads (e.g. Google).  Franchisee must utilize only those consumer engagement services and software approved by Franchisor and may not utilize any non-approved services or software.  Franchisor shall be provided real-time access to all consumer engagement services and software used by Franchisee.  For any consumer engagement services and software without the capability of real-time access, Franchisee shall provide Franchisor unrestricted access to that data.

**8.9    Continued Operation of the BRCB Coffee Bar**.  After Franchisee has begun full operation of the Coffee Bar, Franchisee may not discontinue operation of the Coffee Bar without BRCB's prior written consent.  Franchisee will be considered to have discontinued operation of the Coffee Bar if the Coffee Bar is non-operational for more than 24-hours, excluding scheduled full day closures allowed in accordance with Section 8.10, below. If BRCB, in its sole discretion, consents to a temporary discontinuance of operation, then Franchisee must reopen the Coffee Bar

14

no later than the date designated by BRCB in its written consent. Failure to comply with these operational requirements shall be considered a default of this Agreement.

**8.10** **Hours of Operation**. Unless otherwise agreed to in writing by BRCB, Franchisee shall keep its BRCB Coffee Bar open for business to the public and lighted and staffed seven days per week at least from 5 a.m. to 9 p.m. or during the hours BRCB may designate from time to time in the Operations Manual. Franchisee's Coffee Bar shall not be closed more than three (3) days in any calendar year during the term of this Agreement.

**8.11** **Social Media Policy**. Franchisee shall institute a social media policy of its choosing, provided that, at a minimum it (i) prohibits defamatory or offensive posts, (ii) prohibits posts that infringe the intellectual property of a third-party or disclose confidential information, (iii) requires all posts to comply with the law and (iv) seeks to avoid potentially divisive religious or political posts. Franchisee acknowledges and agrees that it shall remove any social media posts or message that BRCB deems objectionable as soon as possible but in any event within 2 hours of notification from BRCB.

**8.12** **General Operating Requirements**. Franchisee shall operate the BRCB Coffee Bar in accordance with BRCB's standards of drink quality, cleanliness, and customer service and shall conduct and maintain the BRCB Coffee Bar and the Premises so as not to distract from, interfere with, or damage the integrity and standards of BRCB or its brand(s). Franchisee shall at all times comply with the provisions of the Operations Manual, any other customer service guidelines implemented by BRCB from time to time, and all applicable laws, rules, ordinances, and regulations of governmental authorities pertaining to the operation of the BRCB Coffee Bar. Franchisee shall at all times maintain the building, equipment, fixtures, and the Premises to the standards of BRCB.

**8.13** **Violations Fee**. For any violation of Sections 8.1 through 8.12, Franchisee agrees to pay BRCB $1,100 per violation, as liquidated damages, upon written demand by BRCB. The remedies available to BRCB under this Section 8.13 will not affect the availability of other remedies under this Agreement, including termination.

**Section 9.** **Franchisee's Designated Manager and Structure**.

**9.1** **General Manager**. Franchisee will appoint an individual with primary overall responsibility for the day-to-day operations of the BRCB Coffee Bar (the "***General Manager***"). The General Manager will personally oversee the day-to-day operations of the Coffee Bar, use its best efforts and constant personal attention in the day-to-day operations of the Coffee Bar, and live in the general area where the Coffee Bar is located. Franchisee represents and warrants that Franchisee's General Manager will have authority to ensure that the BRCB Coffee Bar is operated according to the terms of this Agreement and the procedures set forth in the Operations Manual. Franchisee will identify the General Manager to BRCB, and the General Manager will undergo training in the BRCB system pursuant to Section 10.1 of this Agreement. Franchisee will enter into the Manager's Confidentiality Agreement attached hereto as Schedule 9.1 at the end of this Agreement, or a different agreement so long as it is similarly restrictive, and will provide a copy to BRCB upon request. Franchisee or its General Manager, whoever is involved with the daily

15

operations of the BRCB Coffee Bar, must possess literacy and fluency in the English language sufficient, in the opinion of BRCB, to communicate with employees, customers, and suppliers.

      **9.2**    **No Third-Party Management Services**.  Franchisee represents and warrants that Franchisee is, and will remain for the entire term of this Agreement, the sole entity entitled to share in the profits from the BRCB Coffee Bar, and that Franchisee will not circumvent the requirements of this Section 9.2 by entering into any management or consulting agreement with any third party. Without limiting any other provision of this Section 9, Franchisee is expressly prohibited from engaging or appointing any third-party entity to manage, operate, or oversee operations of the BRCB Coffee Bar without the prior written consent of BRCB. Franchisee shall not use any operational manuals, documents, or other resources not prepared by BRCB for purposes of managing or operating the BRCB Coffee Bar without the prior written consent of BRCB.

**Section 10.**    **Services Provided by BRCB**.

      **10.1**    **Initial Training**.  BRCB has developed a training program for the BRCB System. BRCB will provide initial training, and such additional training as BRCB may in its sole discretion deem necessary from time to time during the term of this Agreement, to Franchisee or its General Manager.  There will be no fee for this training, however, Franchisee will bear the costs of transportation, lodging, and meals to the extent such costs are incurred.  Franchisee acknowledges that the training described in this Section 10.1 is necessary to the operations of the Coffee Bar, and agrees that Franchisee or its General Manager will undergo the training required by this Section. If, in BRCB's reasonable business judgment, Franchisee or its General Manager is unable to successfully complete the initial training, BRCB may require that the training be repeated or supplemented, and if such additional training is required, BRCB may impose a reasonable fee for such training.  Nothing contained in this Agreement will be deemed to limit or restrict BRCB's right to modify or alter its training programs and offerings in any way.

      **10.2**    **Supplemental Training**.  Franchisee or its General Manager will participate in any continuing training program provided by BRCB through the medium of inspections, bulletins, manuals, and other literature, and will comply with the directives and instructions contained in those documents or delivered during or after inspections.  This Section 10.2 will not be interpreted to require BRCB to provide any training beyond the initial training.

      **10.3**    **Operations Manual**.  BRCB will loan to Franchisee one BRCB Operations Manual for each BRCB Coffee Bar.  BRCB may, but is not obligated to, update and revise the Operations Manual from time to time during the term of this Agreement as it deems appropriate.

      **10.4**    **Assistance at Opening**.  BRCB will provide, at BRCB's expense, on-site assistance to Franchisee for the opening of the BRCB Coffee Bar in the form of a representative of BRCB familiar with the BRCB System.  The on-site assistance will be available in connection with the Grand Opening of the Coffee Bar.

      **10.5**    **Optional On-Site Assistance**.  BRCB will provide reasonable ongoing support to the Coffee Bar, at Franchisee's request, during the term of this Agreement.  BRCB will meet its obligation under this Section 10.5 by responding in a reasonably prompt manner to written or

telephonic queries from Franchisee.  BRCB will, upon Franchisee's request, make a representative of BRCB available for on-site assistance at the Coffee Bar (in addition to the on-site assistance provided at the opening of the Coffee Bar), and BRCB will charge a fee for such on-site assistance. Currently the fee is fifty dollars ($50) per hour, but the fee is subject to adjustment in BRCB's sole discretion.  In addition, Franchisee will bear the costs of transportation, lodging and meals for the BRCB representative providing the on-site assistance.

**10.6    Advertising and Point-of-Sale Materials**.    BRCB  may  make  available  to Franchisee, without charge, certain advertising, promotional, bookkeeping and point-of-sale systems selected or prepared by or for BRCB.  Franchisee may use any such advertising materials in its own local advertising, provided that Franchisee submits any proposed modifications to BRCB for evaluation according to the procedure set forth in Section 8.7 of this Agreement. Franchisee will be required to use such bookkeeping and point-of-sale systems in the Coffee Bar as BRCB may direct, and provide BRCB real-time access to the same.  Nothing in this Section 10.6 will be interpreted to require BRCB to provide Franchisee with any advertising, promotional, bookkeeping or point-of-sale display materials.

**10.7    Approval of Advertising**.  All advertising and promotion by Franchisee in any medium shall be conducted in a professional manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals or otherwise.  Franchisee shall submit to Franchisor for its approval samples of all advertising and promotional plans and materials and public relations programs that Franchisee desires to use, including, without limitation, any materials in digital, electronic or computerized form, or in any form of media now or hereafter developed (e.g., materials to be made available through a computer or telecommunications net-work such as the Internet), that have not been either provided or previously approved by Franchisor.  Franchisor shall approve or disapprove such plans and materials within fifteen (15) business days of Franchisor's receipt thereof.  Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor, and shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor.  Franchisee shall not advertise or use the Franchisor's Marks in any fashion on the Internet, World Wide Web or via other means of advertising through telecommunication, or establish any website listing on the Internet or World Wide Web, without the express written consent of Franchisor.  Any advertising, marketing, or sales concepts, programs or materials pro-posed or developed by Franchisee for the Franchise and approved by Franchisor may be used by other System Franchises without any compensation to Franchisee.

**Section 11.    Inspections, Audits and Accounting**.

**11.1    BRCB's Right To Inspect**.  Representatives or agents of BRCB have the right to enter and examine or inspect the Coffee Bar, or any part of the Premises, at any time during normal business hours.  In addition to the Consumer Engagement data and services described in Section 8.8, Franchisee must use a bookkeeping and/or Point of Sale system that provides BRCB real-time access, including real-time access to all transactions, including but not limited to the time, amount, and description of items sold in a form specified by or otherwise acceptable to BRCB. BRCB is authorized to access such systems and consumer engagement at any time and without notice.  At the time of such examination or inspection, BRCB or its representatives or designees may give

17

DocuSign Envelope ID: QEEFD244-8D1D-49DF-BF64-D60894356B2A

advice and assistance to Franchisee to assist in the management and operation of the Coffee Bar, without charge. Franchisee must remedy any deficiencies found by the inspector in a timely manner as provided in Section 14.5 of this Agreement.

      **11.2**    **BRCB's Right to Audit**. At all times, representatives of BRCB will be given free access to Franchisee's books and records pertaining to the franchised business, and they may audit those books and records if BRCB, in its sole discretion, deems an audit necessary. BRCB may, in its sole discretion, conduct such test and inspections, as it deems necessary to verify Gross Sales Revenues and compliance with this Agreement. If an audit results from Franchisee's failure to prepare, deliver, or preserve statements, reports, or records required by this Agreement, or if any inspection or audit reveals that Franchisee has underreported Gross Sales Revenues or purchases by more than two percent (2%) during the period covered by the audit, Franchisee will, within thirty (30) days, pay to BRCB, or reimburse BRCB for, (1) all of the costs and expenses incurred by BRCB in conducting the audit or inspection, including attorneys' and accounting fees and costs, (2) all revenue otherwise due BRCB in relation to inventory and/or supplies not purchased from approved vendors, and (3) interest on applicable revenue at a rate of eighteen percent (18%) per annum or the highest permissible rate, whichever is less. These payments will be without prejudice to any other remedies BRCB may have under this Agreement or the law, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional underreporting of Gross Sales Revenues or purchases, or purchasing inventory or supplies from other than an approved vendor.

      **11.3**    **Provision of Monthly and Annual Financial Records**. Franchisee will keep full, complete, and accurate books and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed below or as from time to time further prescribed by BRCB. Franchisee agrees to submit the following reports and data to BRCB electronically, using the equipment, software and protocols specified in the Operations Manual:

            **11.3.1**   <u>Monthly Profit and Loss Statement</u>. Not later than thirty (30) days after the end of each calendar month, on a BRCB-approved form, a profit and loss statement of the Coffee Bar for the preceding calendar month prepared in accordance with generally accepted accounting principles.

            **11.3.2**   <u>Annual Profit and Loss Statement and Balance Sheet</u>. Not later than thirty (30) days after the end of each calendar year, commencing with the opening date of the Coffee Bar, on a BRCB-approved form, a profit and loss statement for the year and a balance sheet (including a statement of retained earnings or partnership accounts) as of the end of the period.

            **11.3.3**   <u>Other Reports</u>. At the times required, such other periodic forms, reports, and information as may from time to time be prescribed by BRCB.

            **11.3.4**   <u>Failure to Submit Reports</u>. If Franchisee fails to submit the profit and loss statements required by this Section 11.3 on a timely basis, then BRCB will be entitled to pursue injunctive relief granting specific performance of this obligation. Franchisee acknowledges that BRCB will be irreparably harmed by the failure to

receive timely reports.  Pursuit of these remedies by BRCB does not constitute a waiver by BRCB of its right to pursue any and all other remedies available to it, including termination of this Agreement.

**11.4**    **Preservation of Business Records**.  Franchisee will preserve, in the English language and for the time periods set forth below, all accounting records and supporting documents relating to the Franchisee's operation of the Coffee Bar, including:

> **11.4.1**  Daily cash reports and cash register tapes or backup files;

> **11.4.2**  Cash disbursement journal;

> **11.4.3**  Monthly bank statements;

> **11.4.4**  Supplier invoices (paid and unpaid); and

> **11.4.5**  Such other records as BRCB may from time to time request.

**11.5**    **Tax Returns**.  Franchisee will file all federal and state tax returns for the franchised business on a timely basis.  BRCB may require that tax returns from the Franchisee and all shareholders, members, or partners of Franchisee be provided to BRCB if BRCB determines, in accordance with the provisions of Section 11.1 of this Agreement, that an audit is necessary.

**Section 12.**    **Assignment, Transfer and Sale**.

**12.1**    **Definition of Transfer**.  "***Transfer***" means any act or circumstance by which ownership or control is shifted, whether by sale, assignment, foreclosure, or otherwise, in whole or in part, from any individual or entity to another, including, if Franchisee is a corporation, any changes in the present ownership of the stock of Franchisee (as of the date of this Agreement) or the issuance of additional stock of Franchisee and, if Franchisee is a partnership, L.L.C., or L.L.P., any change in or addition of partners or members.

**12.2**    **No Transfer Without BRCB's Consent**.  BRCB is entering into this Agreement based upon its knowledge of and faith in the ability of Franchisee.  Therefore, this Agreement and all the rights granted by it are personal to Franchisee and may not be Transferred by Franchisee without the prior written consent of BRCB.  Any attempt to Transfer any right under this Agreement, or any interest in any entity holding an interest in this Agreement, without the prior written consent of BRCB, will be null and void and will give BRCB the right to terminate this Agreement and Franchisee's rights under it, in addition to any remedies that BRCB may have for the breach of this covenant by reason of an attempted Transfer.

**12.3**    **Advance Notice of Proposed Terms and Right of First Refusal**.  If Franchisee, or any shareholder, member, or partner of Franchisee, has received and desires to accept a signed bona fide written offer from a third party to acquire Franchisee's franchised business, then before making any binding commitment regarding such Transfer, Franchisee will notify BRCB and provide BRCB with a complete copy of the offer, which must include for every proposed

transferee: (1) name, address and telephone number; (2) business experience and present occupation; and (3) credit rating and financial status. Franchisee must also include information as to the identity of all who will own an interest in the franchised business after the completion of the Transfer, their respective interests, and the proposed terms and conditions of sale and payment.

**12.3.1** <u>BRCB's Right of First Refusal</u>.  BRCB will have the right and option, exercisable within thirty (30) days after the date BRCB receives its copy of the offer, to purchase the interest proposed to be Transferred, at the price and upon the same terms and conditions specified on the notice.

**12.3.2** <u>Transfer After BRCB Rejects Offer</u>.  If BRCB does not exercise this option, and the terms of the unaccepted offer are altered, BRCB must, in each such instance, be notified by Franchisee of the changed offer, and BRCB will again have thirty (30) days to exercise its right to purchase on the altered terms.  If BRCB does not exercise the option, the Transfer may take place on the terms and price set forth in the notice, provided (1) BRCB gives its written consent, (2) the Transfer takes place no later than six (6) months from the receipt of BRCB's written refusal to exercise its option to purchase, and (3) all the conditions set forth in Section 12.4 of this Agreement are satisfied.

**12.4** <u>**Requirements for Consent to Transfer**</u>.  If a Transfer of all or a partial interest in this Agreement or in the franchise business is proposed and BRCB does not exercise its right to purchase pursuant to the preceding Section, then BRCB will not unreasonably withhold consent to the Transfer provided that each of the following conditions is met:

**12.4.1** <u>Transferee Suitable</u>.  Each transferee is, in the reasonable business judgment of BRCB, (a) financially acceptable, (b) not associated with a competitor of BRCB, (c) of good moral character and reputation, and (d) otherwise in accordance with BRCB's criteria, which include work experience and aptitude, ability to devote time and best efforts to the franchised business, residence in the locality where the franchised business is located, equity interest in the franchise, absence of conflicting interests, and other criteria and conditions that BRCB reasonably applies to new franchisees;

**12.4.2** <u>Transfer Terms Feasible</u>.  Following an analysis of the terms and conditions of the proposed Transfer, BRCB, in the exercise of its reasonable business judgment, concludes that the terms will not interfere with the financial feasibility or future operation of the franchise;

**12.4.3** <u>Training</u>.  If necessary, in BRCB's reasonable business judgment, transferee obtains training by BRCB and pays BRCB a training fee in the amount of Three Hundred Thirty Dollars ($330) per day, with transferee bearing any travel and room and board expenses;

**12.4.4** <u>Execution of Current Agreements</u>.  Each transferee enters into all current forms of agreements then being required of new franchisees.  This Agreement is

20

DocuSign Envelope ID: QEEFD244-8D1D-49DF-BF64-D6089435802A

not assignable, and any assignment of this Agreement will be null and void. Any transferee must execute BRCB's then current form of the Franchise Agreement;

**12.4.5** <u>Improvements</u>.    Transferee agrees to complete all remodeling and improvements as required by BRCB, within the time period specified by BRCB;

**12.4.6** <u>Transfer Fee</u>.  The transferee shall pay to Franchisor a transfer fee of the greater of Fifteen Thousand Dollars ($15,000) or fifty percent (50%) of the then current initial franchise fee charged to new franchisees, or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the application to transfer, including, without limitation, legal and accounting fees;

**12.4.7** <u>No Outstanding Balance</u>.  Franchisee is in full compliance with this Agreement and has paid all amounts owing to BRCB and its approved vendors;

**12.4.8** <u>General Release</u>.  Franchisee has executed a general release, in a form satisfactory to BRCB, of any and all claims against BRCB or its officers, directors, agents, or employees, to the maximum extent permitted by applicable law; and

**12.4.9** <u>Financing Subordination</u>.  If Franchisee or any owners of Franchisee finance any part of the sale price of the transferred interest, Franchisee or such entity owners have agreed that all obligations of transferee under any promissory notes, agreements, or security interests will be subordinate to transferee's obligations to BRCB.

**12.5** **<u>Death or Incapacity of Franchisee</u>**.  In the event of the death or incapacity of an individual Franchisee, or of any shareholder, partner, or member in a franchise that is a business entity, the legal representative of the individual Franchisee, or of the surviving shareholders, partners, or members in case of a business entity, may for a period of ninety (90) days from the date of death or incapacitation continue to operate the franchise, provided that the operation is conducted in accordance with the terms of this Agreement and any other agreements with BRCB.

**12.5.1** <u>Transfer of Franchise</u>.  If the legal representative of Franchisee desires to continue the operation of the franchise beyond the ninety (90) day period, then before the expiration of this period, the legal representative of the individual Franchisee or the shareholder, partner, or member in a franchise that is a business entity, must apply jointly with all surviving shareholders, partners, or members in writing for the right to Transfer the franchise (or the interest of the deceased or incapacitated shareholder, partner, or member in the franchise in the case of a business entity), to the person or persons (whether spouse, heir, devisee, purchaser, surviving shareholder, partner, member, corporation, or any other person), as the legal representative and the surviving shareholder, partners, or members may specify.  The application for Transfer will be treated in the same manner as any other proposed Transfer under this Agreement.

DocuSign Envelope ID: QEEFD244-8D1D-49DF-BF64-D60894358D2A

**12.5.2**  <u>Termination of Franchise</u>.  If the legal representative of Franchisee and all surviving shareholders, partners, or members of a business entity do not comply with the provisions of this Section 12.5 or do not propose a transferee acceptable to BRCB under the standards set forth in this Agreement, all rights licensed to Franchisee under this Agreement will immediately terminate and automatically revert to BRCB.  BRCB will have the right and option, exercisable upon such termination, to purchase the building, fixtures, equipment, and supplies and inventory at a price to be agreed upon by the parties or, if no agreement as to the price is reached by the parties, at such price as may be determined by the appraisal process described in Section 15.7 of this Agreement.  BRCB will give notice of its intent to exercise the option no later than twenty-one (21) days before termination.

**12.6**  **<u>Internal Transfers</u>**.  If a proposed Transfer is to an immediate family member of Franchisee or any shareholder, member, or partner of Franchisee, then the provisions of Section 12.4.6 (transfer fee) and Section 12.3 (right of first refusal) will not apply; provided, however, that the other provisions of Section 12.4 will apply to such Transfers.  The transfer fee provided for in Section 12.4.6 of this Agreement will also be waived by BRCB in the case of a Transfer by an individual Franchisee to a corporation or other legal entity owned or controlled by the individual Franchisee, and no consent is required for such Transfer, nor will BRCB enjoy the right of first refusal under Section 12.3, provided that the Transfer is made within one hundred twenty (120) days of the Effective Date of this Agreement.  The transfer fee provided for in Section 12.4.6 of this Agreement will also be waived by BRCB, and no consent will be required, nor will BRCB enjoy the right of first refusal under Section 12.3, in the case of a Transfer in any single transaction of less than 49% of the equity interest in Franchisee to an employee or officer of Franchisee who has been directly involved in the operation of the Coffee Bar on a full-time basis for at least one year as of the time of the proposed Transfer, or in the case of a Transfer of up to 49% of the equity interest in Franchisee to any person owning shares of common voting stock or other ownership interest coupled with voting rights in Franchisee, provided, however, that in either case such Transfer, when combined with all other Transfers that have occurred since Franchisee will first have become a franchisee of BRCB, does not exceed 49.9% of the total equity interest in Franchisee or otherwise effect a change in control of Franchisee.

**12.7**  **<u>Sale or Assignment by BRCB</u>**.  This Agreement will inure to the benefit of the successors and assigns of BRCB.  BRCB has the right to assign its rights and obligations under this Agreement to any person or entity, provided that the assignee agrees in writing to assume, at minimum, all obligations and liabilities of BRCB to Franchisee that arise after the closing date of the assignment of this Agreement by BRCB.  Upon such assignment and assumption, BRCB will be under no further obligation under this Agreement, except for accrued liabilities, if any, not assumed by BRCB's assignee.

**Section 13.**     **Indemnification and Insurance**.

    **13.1**     **Indemnity**.  Franchisee shall indemnify and hold BRCB and its officers, directors, shareholders and employees harmless from and against all fines, suits, proceedings, claims, causes of action, demands, or liabilities of any kind or of any nature arising out of or in connection with the construction or operation of Franchisee's Coffee Bar.

    **13.2**     **Insurance**.  Franchisee, at its sole expense, shall at all times keep in force an insurance policy or policies, in a form approved by BRCB, which approval will not unreasonably be withheld, insuring BRCB and its officers, directors, and employees and Franchisee against any and all loss, liability, or expense whatsoever arising from the construction, ownership, or operation of Franchisee's Coffee Bar.  The policies must have limits as may be from time to time prescribed by BRCB, but not less than Two Million Dollars ($2,000,000) coverage per occurrence.  This insurance must include, without limitation, coverage of product liability, fire, personal injury, death, and property damage.  A certificate of insurance, evidencing coverage amounts and proof of payment of premium, together with the proof of renewal when applicable, must be promptly furnished to BRCB by Franchisee.  All policies must (1) provide that they can be canceled only after at least thirty (30) days' prior written notice to BRCB, (2) show BRCB as a named "insured," (3) contain provisions denying to the insured the acquisition by subrogation of rights of recovery against BRCB, and (4) provide that coverage is not limited in any way by reason of any insurance that may be maintained by BRCB.

**Section 14.**     **Defaults and Opportunities to Cure**.

    **14.1**     **Default for Insolvency**.  Franchisee will be in default if Franchisee becomes insolvent or makes an assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or if such a petition is filed against and consented to by Franchisee or is not dismissed within thirty (30) days; if Franchisee is adjudicated as bankrupt; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and is consented to by Franchisee or is not dismissed within thirty (30) days; if a receiver or other custodian is appointed, or if proceeding for composition with the creditors under any state or federal law is instituted by or against Franchisee; or if the real or personal property of Franchisee is sold at levy thereupon by any sheriff, marshal, or constable. Each of the foregoing is an "***Insolvency Event***."

    **14.2**     **Default for Material Breach of the Franchise Agreement**.  Franchisee will be in default if Franchisee fails to perform, observe, or comply with any of Franchisee's material duties and obligations under this Agreement.

    **14.3**     **Default for Material Breach of Other Agreements**.  Franchisee will be in default if Franchisee fails to carry out in all respects its obligations under any lease, mortgage, equipment agreement, promissory note, conditional sales contract, or other contract materially affecting the Coffee Bar to which Franchisee is a party or by which Franchisee is bound, whether or not BRCB is a party thereto, including but not limited to the Area Development Agreement, if any, or any other franchise agreement between Franchisee and BRCB, or if Franchisee's lease for the Premises is terminated for reason of default by Franchisee.

23

**14.4    Default for Violation of Health and Safety Standards**.  Franchisee will be in default if BRCB or any government agency determines that a serious health or safety problem exists at the Coffee Bar.

**14.5    Cure Periods**.  Except as otherwise provided in this Section 14.5, Franchisee will have the right to cure any default under this Agreement within thirty (30) days after written notice of default from BRCB is received or refused, as the case may be.  Notwithstanding the foregoing, the following lesser periods will apply under the circumstances described:

**14.5.1    Seven-Day Cure Period**.  A seven (7) day cure period will apply if Franchisee fails to maintain the insurance coverage required by Section 13.2 of this Agreement.

**14.5.2    Business Day Cure Periods**.  A three (3) business day cure period will apply to the violation by Franchisee of any law, regulation, or order, or any of BRCB's standards relating to health, sanitation, or safety.  A one (1) business day cure period will apply if the Franchisee ceases to operate the Coffee Bar for a period of more than twenty-four (24) hours without the prior written consent of BRCB; provided, however, that if the Coffee Bar is abandoned by Franchisee, no cure period will apply.

**14.5.3    No Cure Period**.  No cure period will be available, and BRCB may terminate this Agreement, (1) if Franchisee is in default under or breaches its covenants or obligations under Sections 5.2 (proprietary information) or 6.3 (noncompetition and nonsolicitation) of this Agreement; (2) if Franchisee abandons the Coffee Bar; (3) if Franchisee commits an act of fraud with respect to its rights or obligations under this Agreement; (4) if Franchisee's lease for the Premises of the Coffee Bar is terminated; (5) if Franchisee repeatedly fails to comply with the provisions of this Agreement, whether or not subsequently cured; (6) if Franchisee, having twice previously cured a default or breach of this Agreement, commits the same breach or default again; or (7) in the case of an Insolvency Event.

**14.5.4    Statutory Cure Period**.  If a statute in the state in which the Coffee Bar is located requires application of that state's law, and that state's statute requires a cure period for the applicable default that is longer than any cure period specified in this Section 14, the statutory cure period will apply.

**14.6    Remedies for Defaults Not Cured**.

**14.6.1    Interests and Costs**.  If Franchisee fails to cure a default, following notice, within the applicable time period set forth in Section 14.5, or if this Agreement is terminated as a result of Franchisee's default, Franchisee will pay to BRCB all damages, costs, and expenses incurred by BRCB as a direct result of Franchisee's default, including, without limitation, interest at eighteen percent (18%) per annum, or the maximum rate allowable under applicable law, whichever is less, and

DocuSign Envelope ID: QEEFD244-8D1D-49DF-BF64-D6089435602A

reasonable attorneys' fees and costs, and the interest and all damages, costs, and expenses, including reasonable attorneys' fees, may be included in and form part of the judgment awarded to BRCB in any proceedings brought by BRCB against Franchisee.

**14.6.2  Appointment of a Receiver**.  If this Agreement is terminated by reason of Franchisee's default, BRCB will have the right, at its option, to have a receiver appointed to take possession, manage and control the assets, collect the profits, and make all other necessary arrangements for the operation of the Coffee Bar, as ordered by a court of competent jurisdiction.  The right to appoint a receiver will be available regardless of whether waste or danger of loss or destruction of the assets exists and without the necessity of notice to Franchisee.

**14.7  Cross-Default**.  If there are multiple franchise agreements in effect between Franchisee and BRCB, any default by Franchisee under this Agreement will be deemed a default of all franchise agreements between Franchisee and BRCB.  A default by Franchisee under any other franchise agreement between BRCB and Franchisee will be deemed a default under this Agreement.  A default by the guarantor(s) of this Agreement under this Agreement or any other guaranty related to this Agreement will be deemed a default of this Agreement.

**Section 15.    Termination**.

**15.1  Termination for Default**.  If Franchisee fails to cure any default to BRCB's satisfaction within the applicable period following notice from BRCB, BRCB may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  This termination will be effective immediately upon receipt of a written notice of termination from BRCB.  Notwithstanding the foregoing, this Agreement will immediately terminate upon the occurrence of any event set forth in Section 14.5.3, without notice or opportunity to cure or notice of termination.  Upon termination or expiration of this Agreement, BRCB may advise all suppliers of BRCB proprietary products and other supplies bearing BRCB's trademarks or service marks to cease delivering the items and products to Franchisee.

**15.2  Discontinuation of Use of BRCB System and Proprietary Marks**.  Upon termination or expiration of this Agreement, Franchisee will immediately cease to use any and all parts of the BRCB System and any and all Proprietary Marks, trade secrets, confidential information, operating manuals, slogans, signs symbols, or devices used in connection with the operation of the Coffee Bar.  The prohibition on use of the Proprietary Marks after termination or expiration applies to the use of the words "formerly," "former," "formerly associated," or any words conveying similar meaning and used in conjunction with the Proprietary Marks.  Franchisee agrees that any such unauthorized use or continued use of the Proprietary Marks after the termination of this Agreement will constitute willful trademark infringement by Franchisee, causing irreparable harm to BRCB.

**15.3  De-Identification of the Premises**.  Franchisee will, within thirty (30) days after termination or expiration of this Agreement, provide BRCB with pictures of the entire interior and exterior of the Premises showing that all signs, posters, menu boards, wall hangings, and other

items bearing any of the Proprietary Marks or constituting an element of the trade dress of BRCB have been removed. These pictures will be signed and dated on the back by Franchisee. If Franchisee fails to provide pictures showing the entire interior and exterior of the Premises within this time period, BRCB may send a representative of BRCB, or other person, to the Premises to take the pictures. In this case, Franchisee will reimburse BRCB for its reasonable expenses incurred in getting the pictures, including travel expenses of BRCB's employee or representative. If BRCB is not satisfied that Franchisee has de-identified the Premises, BRCB may, at its option, require Franchisee to (1) repaint the interior and/or exterior of the Premises in colors and schemes acceptable to BRCB and (2) make alterations in the Premises, including in the layout of the interior of the building, to de-identify the Premises. BRCB may enter the Premises without being guilty of trespass or any other tort to satisfy itself that the Premises have been de-identified to its satisfaction and may remove and retain any items and make changes necessary in its sole opinion to de-identify the Premises. Any expenses incurred by BRCB in removing any signs, insignia, or other material from the Premises, or making the changes required, will be paid to BRCB by Franchisee upon demand, together with interest upon the expenses at the highest lawful rate from the date of expenditure until paid. BRCB will also have any other remedy for a breach available at law or in equity.

**15.4** **Return of Operations Manual and Other Proprietary Information**. Upon termination or expiration of this Agreement, Franchisee will immediately return to BRCB any and all copies of the Operations Manual issued to Franchisee, and all other Proprietary Information in Franchisee's possession in whatever form, including without limitation plans, specifications, recipes, and menus.

**15.5** **Survival of Covenants Against Competition and Solicitation**. The provisions relating to confidentiality set forth in Section 5 of this Agreement, and the covenants against competition and solicitation set forth in Section 6 of this Agreement, will survive any expiration or termination of this Agreement.

**15.6** **Transfer of Telephone Numbers and Other Listings**. Upon termination or expiration of this Agreement, Franchisee will cease using all Listings, and at BRCB's election execute all forms and documents required by BRCB and any service provider at any time to transfer such service and any related Listings to BRCB, and refrain from entering into any "call forwarding" or similar instruction with a service provider that has the effect of circumventing the unconditional obligation of Franchisee to surrender and cease using all Listings. For purposes of this Agreement, "***Listings***" means, as related to the Coffee Bar, telephone or facsimile numbers and Yellow Pages listings/advertisements or other business listings or directories, including any website, domain name, or other Internet usage. Upon termination, BRCB will have the immediate right to the Listings and to have the service transferred to BRCB. Franchisee appoints BRCB its true and lawful agent and attorney in fact with full power and authority for the sole purpose of taking such action as is necessary to complete this assignment. The obligation of this Section 15.6 and this power of attorney will survive the termination of this Agreement. Franchisee or its officers, shareholders, partners, and members will not thereafter use the Listings at or in connection with any subsequent business owned or operated by Franchisee or its officers, shareholders, partners, or members or for any other purpose.

26

4834-3118-5826, v. 7

**15.7**    **Right to Purchase Assets**.    Subject to applicable law, upon termination or expiration of this Agreement, or at any time after the initial six (6) months following the Grand Opening, BRCB will have the right, but not the obligation, to purchase from Franchisee any and all tangible assets or property used in the operation of the Coffee Bar that BRCB may specify, including the Franchisee's rights as a tenant to any real estate, at the purchase price set forth in this section, exclusive of personalized materials with no value to BRCB and inventory and supplies not reasonably required in the operation of the business (the "***Purchase Right***").

        **15.7.1** Purchase Price.  The purchase price for the BRCB's exercise of the Purchase Right shall be as follows: (i) if Franchisee has been in operation for at least twelve (12) months after the Grand Opening, the purchase price shall be an amount equal to the product of five (5) multiplied by Franchisee's earnings before interest, taxes, depreciation and amortization ("***EBITDA***") for the twelve month period ended as of the last day of the month immediately preceding BRCB's exercise of the Purchase Right, less all of Franchisee's outstanding indebtedness, or (ii) if Franchisee has been in operation less than twelve months after the Grand Opening, the purchase price shall be the product of twelve (12) times the most recent month's EBITDA less all of Franchisee's outstanding indebtedness.

        **15.7.2** Payment of the Purchase Price.  The purchase price for the Purchase Right shall be payable in cash or readily available funds, with at least twenty (20%) due at closing and the remainder due in equal monthly amounts on a monthly basis pursuant to a promissory note with a maturity date no greater than five (5) years from the closing.

        **15.7.3** Tenancy Rights.  Franchisee shall assign all tenancy rights to the real estate to BRCB at closing.  If Franchisee owns said real estate, the parties agree to a lease at a fair rental value.  If Franchisee and BRCB cannot agree upon a fair rental value, then the fair rental value will be determined by a qualified and independent MAI appraiser (the "***Appraiser***").    The parties shall mutually agree upon one (1) Appraiser to make this determination, and if they are unable to agree upon one (1) Appraiser, they shall each appoint one Appraiser forthwith, and, if the two Appraisers cannot reach agreement upon the fair market rental rate, then the two (2) Appraisers so appointed shall appoint a third (3rd) Appraiser.  The three (3) Appraisers shall make a determination of fair market rental rate with all reasonable dispatch, and a decision of any two (2) of the three (3) Appraisers shall be final and binding upon the parties hereto.

        **15.7.4** Cooperation.  Franchisee agrees to cooperate with BRCB's exercise of the Purchase Right, and to take all actions to facilitate a smooth and orderly transition of ownership.

    **15.8**    **Assignment of Leasehold Interest to BRCB**.  Upon entering any lease agreement covering the Premises, Franchisee shall cause the execution by the Franchisee and lessor of the Conditional Assignment of Lease in the form attached hereto as Schedule 15.8, and will provide a copy to BRCB upon request. If Franchisee is a party to a lease assignment or lease option

4834-3118-5826, v. 7

DocuSign Envelope ID: QEEFD244-8D1D-49DF-BF84-D6089435602A

agreement covering the Premises, Franchisee will, upon BRCB's written request at any time during the term or renewal term and without regard to whether this Agreement is terminated, do whatever is necessary to effectuate and complete the assignment to BRCB of Franchisee's lease for the Premises. If Franchisee is not a party to a lease assignment or lease option agreement covering the Premises, Franchisee will, upon BRCB's written request at any time during the term or renewal term and without regard to whether this Agreement is terminated, do whatever is necessary to assign Franchisee's lease for the Premises to BRCB. Franchisee will, in the latter case, make its best efforts to obtain the lessor's consent to the assignment to BRCB of Franchisee's lease for the Premises.

**15.9    Cross-Termination**. If this Agreement is terminated as a result of a default by Franchisee, BRCB may, at its option, elect to terminate any or all other franchise agreements between Franchisee and BRCB. If any other franchise agreement between Franchisee and BRCB is terminated as a result of a default by Franchisee, BRCB may, at its option, elect to terminate this Agreement. It is agreed that an incurable or uncured default under this Agreement or any other franchise agreement between Franchisee and BRCB will be grounds for termination of this Agreement and/or any and all franchise agreements between Franchisee and BRCB without additional notice or opportunity to cure.

**Section 16.    Miscellaneous Provisions**.

**16.1    Independent Contractors**. The relationship between BRCB and Franchisee is that of independent contractors. Franchisee is in no way to be deemed a partner, joint venturer, agent, employee, or servant of BRCB. Franchisee has no authority to bind BRCB to any contractual obligation or incur any liability for or on behalf of BRCB. Franchisee will identify itself as an independent owner of the Coffee Bar in all dealings with customers, lessors, contractors, suppliers, public officials, employees, and others. Franchisee will place such notices of this independent ownership on signs, forms, stationery, advertising, and other materials as BRCB may at any time require.

**16.2    Franchisee's Principals and Controlling Principals**. The term "Franchisee's Principals" shall include, collectively and individually, Franchisee's spouse, if Franchisee is an individual, all officers and directors of Franchisee (including the officers and directors of any entity that controls Franchisee) whom Franchisor designates as Franchisee's Principals and all holders of an ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee, and any other person or entity controlling, controlled by or under common control with Franchisee. The initial Franchisee's Principals shall be listed on Attachment A. The term "Controlling Principals" shall include, collectively and individually, any Franchisee's Principal who has been designated by Franchisor as a Controlling Principal hereunder. For purposes of this Agreement, a publicly held corporation is a corporation registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Section 15(d) of such Act.

**16.3    Illegality and Survival**. The parties intend that if any of the terms, conditions, or provisions of this Agreement violates applicable law, such term, condition, or provision will be deemed not a part of this Agreement, and the remainder of this Agreement will remain in full force and effect.

28

**16.4**  **Mediation**.  THE PARTIES AGREE TO SUBMIT ANY CLAIM, CON-
TROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND
ATTACHMENTS) OR THE RELATIONSHIP CREATED BY THIS AGREEMENT TO NON-
BINDING MEDIATION PRIOR TO BRINGING SUCH CLAIM, CONTROVERSY OR
DISPUTE IN A COURT OR BEFORE ANY OTHER TRIBUNAL.  THE MEDIATION SHALL
BE CONDUCTED THROUGH EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATOR
APPOINTED BY A MEDIATION SERVICES ORGANIZATION OR BODY, EXPERIENCED
IN THE MEDIATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES,
AGREED UPON BY THE PARTIES AND, FAILING SUCH AGREEMENT WITHIN A
REASONABLE PERIOD OF TIME AFTER EITHER PARTY HAS NOTIFIED THE OTHER
OF ITS DESIRE TO SEEK MEDIATION OF ANY CLAIM, CONTROVERSY OR DISPUTE
(NOT TO EXCEED FIFTEEN (15) DAYS), BY THE ARBITRATION SERVICE OF
PORTLAND IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION, AT
FRANCHISOR'S CORPORATE HEADQUARTERS IN BEND, OREGON.  THE COSTS AND
EXPENSES OF MEDIATION, INCLUDING COMPENSATION AND EXPENSES OF THE
MEDIATOR (AND EXCEPT FOR THE ATTORNEYS FEES INCURRED BY EITHER
PARTY), SHALL BE BORNE BY THE PARTIES EQUALLY.  IF THE PARTIES ARE
UNABLE TO RESOLVE THE CLAIM, CONTROVERSY OR DISPUTE WITHIN NINETY
(90) DAYS AFTER THE MEDIATOR HAS BEEN CHOSEN, THEN THE MATTER SHALL
BE SUBMITTED TO ARBITRATION IN ACCORDANCE WITH SECTION 16.4 TO
RESOLVE SUCH CLAIM, CONTROVERSY OR DISPUTE UNLESS SUCH TIME PERIOD
IS EXTENDED BY WRITTEN AGREEMENT OF THE PARTIES.  NOTWITHSTANDING
THE FOREGOING, FRANCHISOR MAY BRING AN ACTION (1) FOR MONIES OWED,
(2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, OR (3) INVOLVING THE
POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL
PROPERTY IN A COURT HAVING JURISDICTION AND IN ACCORDANCE WITH
SECTION 16.6, WITHOUT FIRST SUBMITTING SUCH ACTION TO MEDIATION OR
ARBITRATION.

**16.5**  **Arbitration**.

**16.5.1** PROCEDURE.  EXCEPT AS PROVIDED IN THIS AGREEMENT,
FRANCHISOR, FRANCHISEE AND THE CONTROLLING PRINCIPALS
AGREE THAT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT
OF    OR    RELATING    TO    THE    FRANCHISE,    FRANCHISEE'S
ESTABLISHMENT OR OPERATION OF ANY FRANCHISE UNDER THIS
AGREEMENT (AND ANY AMENDMENTS THERETO) INCLUDING, BUT
NOT LIMITED TO, ANY CLAIM BY FRANCHISEE, OR ANY OF THE
CONTROLLING PRINCIPALS, OR PERSONS CLAIMING ON BEHALF OF
FRANCHISEE OR THE CONTROLLING PRINCIPALS, CONCERNING THE
ENTRY INTO, THE PERFORMANCE UNDER OR THE TERMINATION OF
THE    AGREEMENT,    OR    ANY    OTHER    AGREEMENT    BETWEEN
FRANCHISOR, OR ITS AFFILIATES, AND FRANCHISEE, ANY CLAIM
AGAINST A PAST OR PRESENT OFFICER, DIRECTOR, EMPLOYEE OR
AGENT    OF    FRANCHISOR,    INCLUDING    THOSE    OCCURRING
SUBSEQUENT TO THE TERMINATION OF THIS AGREEMENT, THAT
CANNOT BE AMICABLY SETTLED AMONG THE PARTIES OR THROUGH

29

MEDIATION SHALL, EXCEPT AS SPECIFICALLY SET FORTH HEREIN AND IN SECTION 16.6, BE REFERRED TO ARBITRATION. THE ARBITRATION SHALL BE CONDUCTED THROUGH AN ORGANIZATION OR BODY EXPERIENCED IN THE ARBITRATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES DESIGNATED BY FRANCHISOR. IF FRANCHISOR FAILS TO DESIGNATE AN ORGANIZATION OR BODY WITHIN A REASONABLE TIME AFTER THE DISPUTE HAS BEEN REFERRED FOR ARBITRATION (NOT TO EXCEED FIFTEEN (15) DAYS), ARBITRATION SHALL BE CONDUCTED BY THE ARBITRATION SERVICE OF PORTLAND IN ACCORDANCE WITH THE RULES OF THE ARBITRATION SERVICE OF PORTLAND, AS AMENDED, EXCEPT THAT THE ARBITRATOR SHALL APPLY THE FEDERAL RULES OF EVIDENCE DURING THE CONDUCT OF THE HEARING SESSIONS WITH RESPECT TO THE ADMISSIBILITY OF EVIDENCE. IF SUCH RULES ARE IN ANY WAY CONTRARY TO OR IN CONFLICT WITH THIS AGREEMENT, THE TERMS OF THE AGREEMENT SHALL CONTROL. ONLY CLAIMS, CONTROVERSIES OR DISPUTES INVOLVING FRANCHISEE AND THE CONTROLLING PRINCIPALS MAY BE BROUGHT HEREUNDER. NO CLAIM FOR OR ON BEHALF OF ANY OTHER FRANCHISEE OR SUPPLIER, OR CLASS, REPRESENTATIVE OR ASSOCIATION THEREOF, MAY BE BROUGHT BY FRANCHISEE OR THE CONTROLLING PRINCIPALS HEREUNDER.

**16.5.2** <u>ARBITRATOR</u>. THE PARTIES SHALL AGREE ON AN ARBITRATOR WITHIN FIFTEEN (15) DAYS OF THE FILING OF ARBITRATION. IF THE PARTIES CANNOT AGREE ON A SINGLE ARBITRATOR, FRANCHISOR AND FRANCHISEE (OR CONTROLLING PRINCIPAL, AS APPLICABLE) SHALL EACH SELECT ONE ARBITRATOR. IF THE PARTY UPON WHOM THE DEMAND FOR ARBITRATION IS SERVED FAILS TO SELECT AN ARBITRATOR WITHIN FIFTEEN (15) DAYS AFTER THE RECEIPT OF THE DEMAND FOR ARBITRATION, THEN THE ARBITRATOR SO DESIGNATED BY THE PARTY REQUESTING ARBITRATION SHALL ACT AS THE SOLE ARBITRATOR TO RESOLVE THE CONTROVERSY AT HAND. THE TWO ARBITRATORS DESIGNATED BY THE PARTIES SHALL SELECT A THIRD ARBITRATOR. IF THE TWO ARBITRATORS DESIGNATED BY THE PARTIES FAIL TO SELECT A THIRD ARBITRATOR WITHIN FIFTEEN (15) DAYS, THE THIRD ARBITRATOR SHALL BE SELECTED BY THE ORGANIZATION AGREED UPON OR THE ARBITRATION SERVICE OF PORTLAND OR ANY SUCCESSOR THERETO, UPON APPLICATION BY EITHER PARTY. ALL OF THE ARBITRATORS SHALL BE EXPERIENCED IN THE ARBITRATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES. THE ARBITRATION SHALL TAKE PLACE AT FRANCHISOR'S CORPORATE OFFICES. THE AWARD OF THE ARBITRATORS SHALL BE FINAL AND JUDGMENT UPON THE AWARD RENDERED IN ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. THE COSTS AND EXPENSES OF ARBITRATION MAY BE ENTERED IN ANY COURT

4834-3118-5826, v. 7

HAVING JURISDICTION THEREOF. THE ARBITRATORS SHALL BE REQUIRED TO SUBMIT WRITTEN FINDINGS OF FACT AND CONCLU-SIONS OF LAW WITHIN THIRTY (30) BUSINESS DAYS FOLLOWING THE FINAL HEARING SESSION OF THE ARBITRATION. THE COSTS AND EXPENSES OF ARBITRATION, INCLUDING COMPENSATION AND EXPENSES OF THE ARBITRATORS, SHALL BE BORNE BY THE PARTIES AS THE ARBITRATORS DETERMINE.

**16.5.3** <u>EXCEPTIONS</u>. NOTWITHSTANDING THE ABOVE, THE FOLLOWING SHALL NOT BE SUBJECT TO ARBITRATION:

16.5.3.1    DISPUTES AND CONTROVERSIES ARISING FROM THE SHERMAN ACT, THE CLAYTON ACT OR ANY OTHER FEDERAL OR STATE ANTITRUST LAW;

16.5.3.2    DISPUTES AND CONTROVERSIES BASED UPON OR ARISING UNDER THE LANHAM ACT, AS NOW OR HEREAFTER AMENDED, RELATING TO THE OWNERSHIP OR VALIDITY OF THE MARKS; AND

16.5.3.3    DISPUTES AND CONTROVERSIES RELATING TO ACTIONS TO OBTAIN POSSESSION OF THE PREMISES OF THE FRANCHISE UNDER LEASE OR SUBLEASE.

**16.5.4** <u>SPECIFIC PERFORMANCE</u>. IF FRANCHISOR SHALL DESIRE TO SEEK SPECIFIC PERFORMANCE OR OTHER EXTRAORDINARY RELIEF INCLUDING, BUT NOT LIMITED TO, INJUNCTIVE RELIEF UNDER THIS AGREEMENT AND ANY AMENDMENTS THERETO, OR TO COLLECT MONIES DUE, THEN ANY SUCH ACTION SHALL NOT BE SUBJECT TO ARBITRATION AND FRANCHISOR SHALL HAVE THE RIGHT TO BRING SUCH ACTION AS DESCRIBED IN SECTION 16.6.

**16.5.5** <u>LIMITS ON ARBITRATOR</u>. IN PROCEEDING WITH ARBITRATION AND IN MAKING DETERMINATIONS HEREUNDER, THE ARBITRATORS SHALL NOT EXTEND, MODIFY OR SUSPEND ANY TERMS OF THIS AGREEMENT OR THE REASONABLE STANDARDS OF BUSINESS PERFORMANCE AND OPERATION ESTABLISHED BY FRANCHISOR IN GOOD FAITH. NOTICE OF OR REQUEST TO OR DEMAND FOR ARBITRATION SHALL NOT STAY, POSTPONE OR RESCIND THE EFFECTIVENESS OF ANY TERMINATION OF THIS AGREEMENT. THE ARBITRATORS SHALL APPLY OREGON LAW AND THE TERMS OF THIS AGREEMENT IN REACHING THEIR DECISION.

**16.6    <u>Governing Law and Venue</u>**. WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES THAT ARE NOT FINALLY RESOLVED THROUGH MEDIATION OR ARBITRATION, OR AS OTHERWISE PROVIDED ABOVE, FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE JURISDICTION OF THE STATE COURTS OF OREGON AND THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF OREGON. FRANCHISEE AND THE