# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MICHAEL GOERGEN**, as an individual, | Case No. 3:22-cv-1258-SI (Lead) |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **BLACK ROCK COFFEE BAR, LLC**, an Oregon limited liability company, | |
| Defendant. | |

| | |
|---|---|
| **CHRISTOPHER LATTANZIO**, as an individual, | Case No. 3:22-cv-1259-SI (Consolidated) |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **BLACK ROCK COFFEE BAR, LLC**, an Oregon limited liability company, | |
| Defendant. | |

| | |
|---|---|
| **THE ROBERT LATTANZIO TRUST DATED 6/23/2006** by and through Trustee, Robert Lattanzio, | Case No. 3:22-cv-1260-SI (Consolidated) |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **BLACK ROCK COFFEE BAR, LLC**, an Oregon limited liability company, | |
| Defendant. | |

Justin G. Reden, REDEN & REDEN APC, 16885 Via Del Campo Court, Suite 320, San Diego, CA 92127; and Casey M. Arbenz, PUGET LAW GROUP, 938 Broadway, Tacoma, WA 98402. Of Attorneys for Plaintiffs.

J. Matthew Donahue, Joseph L. Franco, and Kristin Asai, HOLLAND & KNIGHT LLP, 601 SW Second Avenue, Suite 1800, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

These cases arise from a dispute between franchisor Black Rock Coffee Bar LLC (Black Rock), the Defendant in the three above-captioned cases, and its franchisees, entities owned in part or otherwise affiliated with Plaintiffs in these cases, Michael Goergen (Goergen), Christopher Lattanzio (Lattanzio), and the Robert Lattanzio Trust (Trust). In June 2020, Black Rock filed a petition to compel arbitration against six limited liability companies (LLC), BR Coffee LLC, BR Rainbow OP LLC, BR Blue Diamond OP LLC, BR Silverado Ranch OP LLC, BR Rainbow North OP LLC, and BR Ft. Apache OP LLC (collectively, the BR Entities). In August 2020, the Court granted Black Rock's petition and ordered the six BR Entities to participate in an arbitration proceeding initiated by Black Rock. *Black Rock Coffee Bar, LLC v. BR Coffee, LLC*, Case No. 3:20-cv-976-SI, 2020 WL 4728877 (D. Or. Aug. 14, 2020). Black Rock, however, did not include in its petition to compel arbitration any Plaintiffs in the above-captioned cases. Accordingly, the Court did not order any of these Plaintiffs to participate in the arbitration between Black Rock and the BR Entities.

During the arbitration between Black Rock and BR Entities, Black Rock asked the arbitrator for leave to amend its complaint to add Goergen, Lattanzio, and the Trust as additional parties in the arbitration proceeding. Plaintiffs objected, arguing that there was no contract requiring arbitration between them and Black Rock and that the arbitrator lacked authority to determine whether these Plaintiffs could be required to participate in the arbitration then pending among Black Rock and the BR Entities. The arbitrator granted Black Rock's motion, but

Plaintiffs refused to participate in the arbitration. Instead, they filed an action in federal court in California to determine whether the arbitrator had the authority to determine the threshold issue of arbitrability. Meanwhile, the arbitrator concluded that he did have the authority to determine whether Plaintiffs could be required to arbitrate, determined that they were subject to the arbitration provisions contained in the contracts between Black Rock and the BR Entities, and made substantive findings against Plaintiffs, even though they did not participate in the arbitration. The arbitrator ultimately found in favor of Black Rock and awarded Black Rock tens of millions of dollars in damages, plus attorney's fees.

The federal court in California transferred Plaintiffs' lawsuit to this Court. The Court directed the parties to brief two questions: (1) whether the federal court or the arbitrator was the proper decisionmaker to determine whether Plaintiffs had a valid arbitration agreement with Black Rock; and (2) whether Plaintiffs were subject to the arbitration agreement contained in the contracts between Black Rock and the BR Entities. On January 10, 2023, the Court concluded that it was for the Court, and not the arbitrator, to determine whether Plaintiffs were bound to a valid arbitration agreement with Black Rock. *Goergen v. Black Rock Coffee Bar, LLC*, 2023 WL 142911, at *3-4 (D. Or. Jan. 10, 2023). The Court then allowed the parties one final simultaneous brief on the question of whether Plaintiffs, as nonsignatories, were nevertheless bound by the underlying contracts between Black Rock and the BR Entities, including the mandatory arbitration provision contained in those agreements. The parties have fully briefed that issue and the question now before the Court is whether Plaintiffs are subject to the arbitration clause contained in the contracts between Black Rock and the BR Entities. The Court does not believe that oral argument will be helpful in resolving this question.

For the following reasons, the Court concludes that Plaintiffs, who are nonsignatories to the contracts between Black Rock and the BR Entities, are *not* bound by the arbitration agreement in those contracts and there is no valid contract between Plaintiffs and Black Rock requiring arbitration. Although Black Rock ultimately might prevail on the merits of its dispute with Plaintiffs in an appropriate court if a lawsuit were filed, Black Rock is hereby enjoined from directly enforcing against any of the Plaintiffs the arbitration award issued in favor of Black Rock.

## STANDARDS

In all contracts involving interstate commerce, the Federal Arbitration Act (FAA) specifies that "written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (emphasis in original) (citing 9 U.S.C. §§ 3-4). The district court must limit itself "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Under the FAA, "any doubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983) (emphasis added). But the "liberal federal policy regarding the scope of arbitrable issues is inapposite" to the question of whether a party assented to the arbitration agreement. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006). The existence of a valid arbitration

agreement remains "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation marks omitted). Because arbitration is "a matter of contract," the FAA "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation omitted). Courts also should generally "apply ordinary state-law principles that govern the formation of contracts" to determine whether the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

A court must decide "the threshold issue of the *existence* of an agreement to arbitrate." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) (emphasis in original). "[P]arties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence," but "before referring a dispute to an arbitrator, the *court* determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (quoting *First Options*, 514 U.S. at 944) (emphasis added). In deciding whether an agreement to arbitrate exists, a court should apply a summary judgment-style standard. "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law" that an agreement to arbitrate exists. *Three Valleys*, 925 F.2d at 1141 (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). A court also must give the party opposing a motion to compel arbitration "the benefit of all reasonable doubts and inferences that may arise." *Id.* The party seeking to compel arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). When "the making of the arbitration

agreement" is at issue, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "The court shall hear and determine such issue" if the party alleged to be in violation of the agreement does not demand a jury trial. *Id.*

## DISCUSSION

**A.  Procedural Arguments**

Plaintiffs raise several procedural arguments, asserting that the Court should not reach the merits of whether Plaintiffs are subject to arbitration under the franchise agreements among Black Rock and the BR Entities. Plaintiffs first argue that the Court should not decide whether Plaintiffs are subject to arbitration because Black Rock never petitioned to compel arbitration against these Plaintiffs. The Court previously explained that given the unique procedural circumstances of this case, the Court will consider the arbitrability issue on the merits. Plaintiffs filed these three actions in federal court, seeking a declaration that they were *not* subject to arbitration and requested expedited consideration. The *Court* asked for briefing specifically on the issue of whether Plaintiffs could be compelled to arbitrate. Thus, there was no need for Black Rock separately to file a petition to compel arbitration.

Plaintiffs next argue that there is no arbitration in which to compel Plaintiffs to participate because the American Arbitration Association (AAA) recently informed Plaintiffs that the earlier arbitration between Black Rock and the BR Entities is closed. Plaintiffs contend the closure of the earlier arbitration between Black Rock and the BR Entities moots any petition to compel Plaintiffs to arbitrate. Plaintiffs, however, could be compelled to participate in a new arbitration if they are judicially-determined to be bound under arbitration provisions contained in contracts between Black Rock and the BR Entities. Plaintiffs have asked the Court to decide whether they are subject to arbitration under the franchise agreements between Black Rock and the BR Entities, and that is what the Court will determine in this decision.

Plaintiffs' final procedural argument is that Black Rock waived its right to compel Plaintiffs to arbitrate by failing to raise it for more than two years and then improperly raising it before the arbitrator instead of a federal court. Black Rock moved to add Plaintiffs to the arbitration shortly after learning about Plaintiffs' secured interest in assets held by the BR Entities, which Black Rock considers to be fraudulent. Black Rock contended that the arbitrator had the authority under the rules of the AAA to determine whether there was a valid and binding agreement to arbitrate among Plaintiffs and Black Rock. For the reasons explained in *Goergen*, the Court concluded that Black Rock's substantive argument was not correct, but the Court did not—and now does not—find that Black Rock's delay in adding Plaintiffs to the earlier arbitration or asking the arbitrator rather than a court to add them constitutes waiver. Waiver is a voluntary relinquishment of a known right, and Black Rock has not done that.

## B.  Evidentiary Disputes

The parties raise many evidentiary objections and other disputes. Plaintiffs request that the Court take judicial notice of many documents and court opinions, and Black Rock objects to many of these. For example, Black Rock argues that taking judicial notice of the entirety of a document is improper and Plaintiffs must identify specific facts within the document of which the Court should take judicial notice. Although it is proper to take judicial notice of a public *record*, that does not allow a court to take judicial notice of the facts contained in that record. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (stating that when a court takes judicial notice of public records such as court opinions, it does so "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity").

In addition, Plaintiffs lodge many evidentiary objections to Black Rock's evidence, based on various grounds such as relevance, speculation, personal knowledge, hearsay, and the like.

The Court, however, construes Plaintiffs' pending request for declaratory relief akin to a petition to compel arbitration, which is viewed under a summary judgment standard. In evaluating facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment and noting that "[i]f the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment"). At summary judgment, a court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016)

In conclusion, the Court overrules all evidentiary objections. The Court will rely only on appropriate evidence in deciding the pending issue.

## C.  Whether a Contract to Arbitrate Exists

"To interpret the parties' contract, a court should look to general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1018 (9th Cir. 2016) (applying Oregon law of contract interpretation); *see also United States ex rel. Welch v. My Left Foot Child.'s Therapy, LL*C, 871 F.3d 791, 796 (9th Cir. 2017) ("Under the FAA, the interpretation of an arbitration agreement is generally a matter of state law." (quotation marks omitted) (applying Nevada law)). Here, Plaintiffs did not sign the franchise agreements between Black Rock and the BR Entities that

included the arbitration clauses. The question, therefore, is whether Plaintiffs, as nonsignatories, nevertheless can be bound to the agreement to arbitrate entered into between Black Rock and the BR Entities.

"Arbitration arises as 'a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Drury v. Assisted Living Concepts, Inc.*, 245 Or. App. 217, 221 (2011) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)); *see also Johnson v. Walmart Inc.*, 57 F.4th 677 (9th Cir. 2023) (same). "General contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009). "[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel . . . . " *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotation marks omitted); *see also Mundi*, 555 F.3d at 1045.

Black Rock argues that Plaintiffs are bound under the terms of the franchise agreements because Plaintiffs are designated "Controlling Principals." Black Rock also argues that Plaintiffs can be bound under common law agency principles, as third-party beneficiaries of the franchise agreements, under principles of estoppel, because the guarantees signed by Plaintiffs incorporated the arbitration clause by reference, and under the alter ego doctrine.

### 1. Controlling Principals

Black Rock's primary argument for why Plaintiffs are subject to arbitration is that Plaintiffs are "Controlling Principals," as that term is used in the franchise agreements between Black Rock and the BR Entities. The arbitration agreement expressly states that Controlling Principals are bound to its terms. There likely are some circumstances under which Controlling

Principals, even if nonsignatories, could be bound under the arbitration agreement. As explained below, however, that is not relevant here because Plaintiffs are *not* Controlling Principals under a proper interpretation of the relevant contracts and actions.

Under Oregon law there is three-step process to interpret contracts, outlined in *Yogman v. Parrott*, 325 Or. 358, 361 (1997). A court first "examines the text of the disputed provision, in the context of the document as a whole. If the provision is clear, the analysis ends." *Yogman v. Parrott*, 325 Or. 358, 361 (1997). If the provision is ambiguous, meaning it can reasonably be given more than one meaning, the trier of fact examines extrinsic evidence of the contracting parties' intent. *Id.* at 364. Without either direct or circumstantial evidence to aid the trier of fact in determining the parties' intent, or if the contract remains ambiguous even after considering that evidence, the third step is to apply any relevant maxims of construction. *Id.* When a contractual provision is ambiguous, determining its meaning at steps two and three of the *Yogman* analysis is generally a question of fact not appropriate for resolution at summary judgment. *Dial Temp. Help Serv., Inc. v. DLF Int'l Seeds, Inc.*, 255 Or. App. 609, 611 (2013).

There are three franchise agreements relevant to this dispute, one for each of the Black Rock-branded coffee bars that the BR Entities ultimately opened: (1) the Blue Diamond Franchise Agreement, signed August 23, 2019; (2) the Rainbow Franchise Agreement, signed the same day; and (3) the Silverado Ranch Franchise Agreement, signed in October 2019. The franchise agreements state the specific terms governing the operations of each of the franchises that BR Coffee created, but many terms are identical among the three agreements (such as the arbitration agreement).

The franchise agreements each contain the following clause establishing "Controlling Principals":

16.2 **Franchisee's Principals and Controlling Principals**. The
term "Franchisee's Principals" shall include, collectively and
individually, Franchisee's spouse, if Franchisee is an individual, all
officers and directors of Franchisee (including the officers and
directors of any entity that controls Franchisee) whom Franchisor
designates as Franchisee's Principals and all holders of an
ownership interest in Franchisee and of any entity directly or
indirectly controlling Franchisee, and any other person or entity
controlling, controlled by or under common control with
Franchisee. The initial Franchisee's Principals shall be listed on
Attachment A. The term "Controlling Principals" shall include,
collectively and individually, any Franchisee s Principal *who has
been designated by Franchisor as a Controlling Principal*
hereunder. For purposes of this Agreement, a publicly held
corporation is a corporation registered pursuant to Section 12 of
the Securities Exchange Act of 1934, as amended, or a corporation
subject to the requirements of Section 15(d) of such Act.

ECF 52-3 at 34 (this example was taken from the Rainbow Franchise Agreement) (emphasis

added).

The "Attachment A" included a "Statement of Ownership Interest and Franchisees [sic]

Principals," listing persons and entities owning a direct or indirect interest in the franchisee (who

are Franchisee's Principals under Section 16.2 by nature of their ownership interest). *Id.* at 43.

This list includes Plaintiffs Goergen and the Trust, among others. Attachment A then separately

designated "a list of all of Franchisee's Principals described in and designated pursuant to

Section 16.2 of the Franchise Agreement," which identified only Lattanzio as an additional

"Franchisee's Principal." *Id.* No person, however, was expressly designated as a "Controlling

Principal."

Most of Black Rock's arguments conflate the terms "Franchisee's Principals" and

"Controlling Principals" as if those two terms are the same. For example, Black Rock argues that

Plaintiffs sought to revise the definition of "Controlling Principals" to not "automatically"

include Plaintiffs, when the requested revision was to the definition of "Franchisee's Principals"

and not "Controlling Principals." Black Rock also argues that Attachment A designated Plaintiffs

as "Controlling Principals" because it designated them "pursuant to Section 16.2 of the Franchise Agreement." This is a partial, and indeed, misleading, quote from the added designation of Lattanzio as a Franchisee's Principal, which specifically states that the extra designation is for *Franchisee's Principals* under Section 16.2 and does not reference Controlling Principals.[1]

The text of Section 16.2 provides for two terms. The term "Controlling Principals" is defined as consisting of a potential subset of the "Franchisee's Principals"—persons or entities who are Franchisee's Principals *and* have been designated *by franchisor* (Black Rock) as Controlling Principal(s). Thus, there are two conditions that must be satisfied to be a Controlling Principal. First, a person (or entity) must be a Franchisee's Principal. Second, that person (or entity) also must be *designated* by Black Rock to be a Controlling Principal. Accordingly, not every Franchisee's Principal automatically is a Controlling Principal.

Black Rock drafted the relevant contracts, and as Black Rock asserts in its briefing, refused to materially modify this provision. These are Black Rock's terms, and Black Rock chose to have two separate roles or concepts—Franchisee's Principals and Controlling Principals. As explained, under the contracts drafted by Black Rock, Black Rock must first designate from among the Franchisee's Principals a person or entity (or more than one) to serve in the role of Controlling Principal *if* Black Rock wants to have a Controlling Principal and have that person or entity thereby receive the benefits and burdens of being a Controlling Principal under the franchise agreements. It is not required under the franchise agreements, however, that

---

[1] Black Rock also argues that the arbitrator correctly decided that Plaintiffs were Controlling Principals and the Court should follow the arbitrator's decision. The arbitrator, however, cited the definition of "*Franchisee's Principals*" and then concluded, without explanation, that Plaintiffs were "Controlling Principals." Because the two terms are not synonymous in the relevant agreements, the Court declines to follow the arbitrator's conclusion.

there be *any* Controlling Principal. Such a title is conferred after Black Rock makes a designation, if it chooses to do so.

Further, nothing in the record suggests that Black Rock ever exercised its right to designate any of Plaintiffs (or anyone else) as Controlling Principals of any BR Entities. Black Rock argues that the various Attachment A's of the three franchise agreements are evidence that Black Rock designated Plaintiffs as "Controlling Principals." The Attachment A's, however, serve only to designate Plaintiffs, among others, as "Franchisee's Principals," which as noted is not the same thing as a Controlling Principal. The Attachment A's of the three franchise agreements list all the owners, including Goergen and the Trust, and separately add Lattanzio, all as *Franchisee's Principals*. It is not a reasonable interpretation of Section 16.2 that all listed persons and entities were also implicitly, or automatically, designated as "Controlling Principals" simply because they were listed as "Franchisee's Principals." As explained, Section 16.2 requires that Black Rock affirmatively *designate* the Controlling Principals *from* among the Franchisee's Principals. There is no mention on any Attachment A of any "Controlling Principals." No reasonable juror could conclude that an Attachment A automatically designated a Controlling Principal, and Black Rock identifies no other documents in the record by which it designated any Controlling Principals.[2]

----

[2] In its final arbitration brief, Black Rock argues that the BR Entities identified their Franchisee's Principals and "ultimately agreed to give Black Rock the authority to designate Plaintiffs as 'Controlling Principals' under 'Section 16.2 of the Franchise Agreement.'" ECF 69 at 12. Black Rock, however, ends it recitation there, without explaining how or when Black Rock *exercised* that authority, let alone providing any *evidence* that Black Rock ever actually exercised that authority. That Black Rock was *granted* the authority is not in dispute—whether Black Rock actually *designated* Plaintiffs as Controlling Principals is disputed, and Black Rock submitted no evidence that it did.

Black Rock also contends that by filing claims against Plaintiffs in the arbitration and arguing they were Controlling Principals it implicitly designated Plaintiffs as "Controlling Principals" at that time. The Court rejects this argument. The franchise agreements terminated in April 2020, well before Black Rock asserted their claims against Plaintiffs in the arbitration in September 2021. Even if asserting claims in an arbitration to which Plaintiffs were not properly subjected could be a proper designation of Controlling Principals under Section 16.2, Black Rock does not explain how that section survives the termination of the franchise agreement. Section 16.2 is not included in Section 15.5, which identifies the clauses that survive termination. Nor does Section 16.2 itself contain any provision stating it survives termination.

In summary, there is no evidence that Black Rock timely designated any Controlling Principal, as required under Section 16.2. Under the plain text of the franchise agreements, therefore, Plaintiffs are not Controlling Principals. Thus, Plaintiffs are not Controlling Principals and are not bound by the mandatory arbitration clause. For that reason, the Court need not consider under what circumstances a person or entity that is a Controlling Principal but a nonsignatory to the relevant contracts might nevertheless be bound to the mandatory arbitration provision contained within those contracts.

### 2. Principles of Agency

Black Rock also argues that Plaintiffs are bound to the arbitration agreement under common law principles of agency. Black Rock first argues that the BR Entities had actual authority to bind Plaintiffs to the arbitration agreement in the franchise agreements because Plaintiffs are all "Franchisee's Principals" as that term is used in the franchise agreements, and thus are principals as that term is used in agency law. Black Rock contends that the BR Entities, acting as agents for Plaintiffs, bound Plaintiffs to the arbitration agreement by signing the franchise agreements on behalf of Plaintiffs.

Goergen and the Trust, among others, are listed in the relevant agreements as "Franchisee's Principals" simply based on their ownership interests. That Black Rock uses the term "Franchisee's Principals" in its contract to describe persons and entities with such an ownership interest does not mean that they are "principals" under the common law of agency. Simply owning an interest in an LLC does not make a person or entity the common-law principal and the company the common-law agent.[3] Indeed, the opposite is true.

The Uniform Limited Liability Company Code describes that agency is generally the member (owner) or manager acting as the agent and binding the LLC (principal). *See* Unif. Ltd. Liab. Co. Code § 301 cmt, § 407 cmt (Unif. L. Comm'n 2013) (hereinafter Uniform LLC Code). Further, the Uniform LLC Code establishes that simply being a member does not confer agency authority. *Id.* § 301. Thus, some members of an LLC can act as an agent of that LLC and bind their principal (the LLC). *Id.* § 301 cmt, § 407 cmt. That is not the same, however, as saying that an LLC, as agent, has any authority to bind its members personally.

The fact that Lattanzio, who was not an owner of any BR Entity, was separately designated as an additional "Franchisee's Principal" does not make any difference. That

---

[3] Black Rock's reliance on *Willamette Crest Gaming, LLC v. Play N Trade Franchise, Inc.*, 2009 WL 2243811 (D. Or. July 27, 2009), is unavailing. *Williamette Crest Gaming* is distinguishable because the franchise agreement at issue was between the franchisor, franchisee, *and* "and each person owning 20% or more of Franchisee who will be a party to this Agreement (in such context, Principal)." *Id.* at *9. Two of the individual plaintiffs signed the franchise agreement as "Principals" and thus expressly were bound. *Id.* The Magistrate Judge in *Willamette Crest Gaming* also recommended finding that the other two plaintiffs, who also owned more than 20 percent of the franchisee, were bound because the franchise agreement had a term stating that each Principal expressly agreed to be bound by all the terms of the franchise agreement. *Id.* The opinion, however, does not analyze whether those nonsignatory plaintiffs were aware of, manifested assent, or otherwise were properly held to terms of that clause or any other clause of a contract to which they did not sign. For that reason, the Court does not find this portion of *Willamette Crest Gaming* persuasive. Regardless, there is no similar provision in the franchise agreements of the BR Entities regarding binding any person or entity who owns a certain percentage of the franchisee.

designation is a term of art for purposes of Black Rock's contract, but being a Franchisee's Principal under the terms of that contract does not carry with it the meaning, powers, or obligations of a common law principal or confer on another the powers of an agent. Indeed, the designation "Franchisee's Principal" has little effect under the franchise agreements other than the potential to be designated by Black Rock as a "Controlling Principal."

Black Rock also argues that the BR Entities had apparent authority to bind Plaintiffs to the arbitration agreement. Black Rock contends that Plaintiffs created the BR Entities to become franchisees, Plaintiffs held themselves out as having authority to control the BR Entities, and Plaintiffs communicated on behalf of the BR Entities. This, however, only supports a finding that Plaintiffs were agents of the BR entities, not the other way around. This type of conduct also is the point of an LLC—persons create a corporate entity and often have a controlling interest in the corporate entity, communicate on behalf of the entity, sign documents on behalf of the entity, are part of the corporate governance of the entity, and so forth. Indeed, Nevada law, under which the BR Entities were formed, expressly establishes that LLCs can make contracts, incur liabilities, appoint agents, and exercise a broad swath of powers and duties. *See* Nev. Rev. Stat. § 86.281. The management of LLCs is vested in its members, who can appoint a manager or managers. Nev. Rev. Stat. § 86.291. Those persons necessarily must act for the LLC, as with all corporate entities, who act through people. *See* Nicholas G. Karambelas, LTD. LIAB. COS.: LAW, PRAC. & FORMS § 9:13 (2021) (hereinafter LLC LAW & PRAC.) ("Like a corporation, an LLC can engage with and be engaged with the commercial world only through the acts of a human being."). None of this, however, gives an LLC the authority to bind any of its members personally.

That a member or manager acted on behalf of an LLC does not give the entity authority to bind that person to contracts. In fact, that would partially defeat the purpose of creating an LLC, which is to shield members from personal liability. It also is the reverse of the principal/agent relationship between an LLC and its members and managers. *See* UNIFORM LLC CODE § 301 cmt, § 407 cmt. Black Rock provides no evidence or legal authority for its assertion that the LLCs here had the authority personally to bind their members and managers. The Court rejects Black Rock's argument on this point.

### 3.   Third-Party Beneficiaries

Black Rock also argues that Plaintiffs are bound to the arbitration agreement because the franchise agreements intended to benefit Plaintiffs and Plaintiffs manifested an intent to be bound by the agreements. Black Rock, however, cites provisions involving "Controlling Principals." Black Rock argues that the provisions discussing Controlling Principals apply to Plaintiffs and show that Controlling Principals are intended third-party beneficiaries. As discussed previously, however, the Court has concluded that Plaintiffs were identified as Franchisee's Principals and were never timely designated by Black Rock as Controlling Principals.

Black Rock cites only one clause arguably benefitting Plaintiffs. This provision waives Black Rock's right of first refusal and the transfer fee payable by the transferee if the franchise is sold to "an immediate family member of Franchisee or any shareholder, member, or partner of Franchisee." ECF 52-4 at 28. This provision simply provides a generic potential benefit to a broad category of unknown, unnamed persons (immediate family members of any shareholder, member, or partner of the BR Entities who may wish to purchase the business and will not have to pay the transfer fee or be subject to Black Rock's right of first refusal). This is insufficient to demonstrate that *Plaintiffs* are intended third-party beneficiaries of the contract.

Further, even if this clause did show that Plaintiffs were intended third-party beneficiaries, that would not end the analysis. The Oregon Court of Appeals rejected a claim that a third-party beneficiary to a contract was personally bound to an arbitration clause in that contract, explaining:

> "[U]nder proper circumstances, an arbitration provision may be enforced against a third-party beneficiary." *Drury*, 245 Or. App. at 222. "Consistently with general contract principles, however, '[a] third party beneficiary might in certain circumstances have the power to sue under a contract; it certainly cannot be *bound* to a contract it did not sign or otherwise assent to.'" *Id.* at 223 (quoting *Comer v. Micor, Inc.*, 436 F.3d 1098, 1102 (9th Cir. 2006) (emphasis in *Comer*)). Thus, to hold a third-party beneficiary bound to an arbitration agreement, the third-party beneficiary must have "manifested assent to be bound by the agreement—for example, by ratifying it or asserting a claim for relief under the agreement." *Id.* at 224; see also *id.* at 224 n. 5 (noting that, "[f]or example, unless the third-party beneficiary in some way assents to a contract containing an arbitration clause, the contracting parties have waived the beneficiary's right to a jury trial without her consent").

*Bates v. Andaluz Waterbirth Ctr.*, 298 Or. App. 733, 741 (2019).

Black Rock argues that Plaintiffs "manifested assent" to be bound by the franchise agreements because they negotiated the agreements on behalf of the BR Entities, had decision-making authority, and caused the BR Entities, of which Plaintiffs purportedly controlled, to enter into the agreements. None of that purported conduct demonstrates Plaintiffs' individual assent to be bound to the franchise agreements. That is conduct as officers and members (i.e., agents) of the LLCs acting with authority to bind the LLCs. The Court rejects Black Rock's argument that Plaintiffs are bound as third-party beneficiaries.

### 4. Equitable Estoppel

Black Rock also argues that the Court should enforce the arbitration clause as to Plaintiffs

under the doctrine of equitable estoppel because they received the benefit of the franchise

agreements and represented that they would be bound by the terms of the agreements.

> To establish an affirmative defense of equitable estoppel or
> estoppel by conduct, the defendant must show:
>
>> (1) a false representation, (2) made with knowledge of the
>> facts, and (3) the other party must have been ignorant of the
>> truth; (4) it must have been made with the intention that it
>> should be acted upon by the other party; and (5) the other
>> party must have been induced to act upon it. Estoppel
>> protects only those who materially change their position in
>> reliance on another's acts or representations. There must be
>> a right to rely, and the reliance must be reasonable.
>
> *Hess v. Seeger*, 55 Or. App. 746, 760-61 (1982) (citations omitted).
> Estoppel may occur by silence when a party has a "duty to speak,"
> but the party invoking the doctrine must still "show that he was
> entitled to rely upon such conduct, action or silence, that he acted
> thereupon and would be prejudiced if the doctrine of estoppel were
> not applied." *Marshall v. Wilson*, 175 Or. 506, 518 (1944); *see
> generally Dunkin' Donuts Inc. v. Panagakos*, 5 F. Supp. 2d 57, 61
> (D. Mass. 1998) ("While waiver is determined by a party's actual
> intent with respect to its contractual rights, estoppel, as an
> instrument of equity, has the power to extinguish a party's
> contractual rights . . . so long as the party's conduct was
> sufficiently misleading to cause detrimental reliance by a third
> party.").

*Ross Dress For Less, Inc. v. Makarios-Oregon, LLC*, 180 F. Supp. 3d 745, 778 (D. Or. 2016),

*aff'd*, 2022 WL 2643376 (9th Cir. July 8, 2022).

Black Rock argues that Plaintiffs represented they would be bound by the franchise

agreements and did not inform Black Rock that the BR Entities could not bind Plaintiffs. Black

Rock, however, provides no *evidence* that Plaintiffs represented that they *personally* would be

bound by the agreements. Nor does this argument logically make sense. If Plaintiffs intended

personally to be bound by the franchise agreements, why create the LLCs? And if Black Rock

wanted Plaintiffs to be personally bound, as the drafter of the franchise agreements, Black Rock could easily have had Plaintiffs sign the franchise agreements in their individual capacity and make their personal obligations explicit. Alternatively, Black Rock could have included a term like the franchisor did in *Willamette Crest Gaming*, making persons and entities owning more than a certain percentage of the franchisees bound by the franchise agreements and having those persons and entities sign the agreement in that capacity. Black Rock did neither of those, and instead offers an after-the-fact rationale for why Plaintiffs should personally be bound by the agreements between Black Rock and the BR Entities.

Black Rock also argues that an addendum to the franchise agreement demonstrates that Plaintiffs are personally bound. This argument, however, is based on Black Rock's previously-rejected arguments that Plaintiffs are Controlling Principals and that Plaintiffs represented that the BR Entities could personally bind Plaintiffs.

Black Rock additionally argues that equitable estoppel applies to the Trust because it "knowingly exploited" the arbitration agreement. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) ("[A] non-signatory to an arbitration agreement may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of the agreement and receives benefits flowing directly from the agreement."). Black Rock does not cite any Oregon state case applying this type of equitable estoppel. The Court assumes without deciding Oregon would follow the doctrine described by U.S. Magistrate Judge John V. Acosta:

> Under the principle of equitable estoppel, a nonsignatory may not claim benefits arising from a contract while simultaneously attempting to avoid the burdens the contract imposes. Rather, a nonsignatory may be compelled to arbitrate where the nonsignatory "knowingly exploits" the benefits of the agreement and receives benefits flowing directly from the agreement. As this court previously noted, the Ninth Circuit has combined the knowing exploitation test with a direct benefit requirement when

> considering wither a nonsignatory to a contract is bound by an arbitration provision. Equitable estoppel is applied narrowly such that a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party. The rationale behind the narrow application of equitable estoppel illuminates how expanding estoppel to apply just as easily against nonsignatories as to signatories would threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement.

*Eclipse Consulting, Inc. v. BDO USA, LLP*, 2018 WL 6735085, at *6 (D. Or. Nov. 13, 2018) (cleaned up).

Black Rock argues that Plaintiffs knowingly exploited the agreement because they intended to have the BR Entities sign an agreement that would have personally bound Plaintiffs to arbitration. This circular argument fails. Black Rock contends that Plaintiffs intended to have the BR Entities execute the original form of contract from the franchise disclosure document and not the form of contract ultimately sent to them (which changed a material term relating to Black Rock's buyback rights). This argument again is based on Black Rock's conflating of the terms "Franchisee's Principals" and "Controlling Principals." Plaintiffs would have been Franchisee's Principals under the draft franchise agreement they intended to sign (as they are under the version ultimately signed). That does not make them Controlling Principals, at least until and unless Black Rock so designates them during the term of the contract. Nor would being a Controlling Principal automatically make them, as nonsignatories, bound to the arbitration agreement. It may be that Plaintiffs could have been bound as Controlling Principals given their particular circumstances, but binding a nonsignatory is not as simple as designating someone a Controlling Principal. Regardless, because Black Rock never designated any Controlling Principal, that argument is moot.

Black Rock next argues that Plaintiffs knowingly exploited the arbitration agreement because the BR Entities filed a lawsuit in California, in which they alleged that Robert Lattanzio was a principal and guarantor of the BR Entities and received the franchise disclosures in California. This argument rests on the contention that identifying Robert Lattanzio as a "principal" of the BR Entities in the California court filing was an admission that Robert Lattanzio was the Controlling Principal or that the BR Entities were the agents for Robert Lattanzio as the principal, as the term principal is used in agency law. The term "principal," however, is used generally in the business vernacular to reference owners and leaders. *See, e.g.*, LLC LAW & PRAC. §§ 9:14, 9:15, 18:4, 29:4; W. Michael Garner, 1 FRANCH. & DISTR. LAW & PRAC. § 4:11 (2021); *see also Stoel Rives Boley Jones & Grey of Utah, P.C. v. Dep't of Revenue*, 2008 WL 2668302, at *10 (Or. T.C. July 8, 2008) (discussing "[p]rincipals who were stockholder-employees were engaged in operating law firms," "stockholders-employees (Principals)," and "Corporate Partners and Principals as members of the Stoel Rives Management Committee were entitled with others to set the direction and operations of the partnership"). It also is common to have LLCs identify their "principals," meaning a controlling member, in court filings. *See, e.g.*, *Tooth Acres, LLC v. Hoodstock Ranch, LLC*, 2021 WL 7185082, at *1 (E.D. Wash. Dec. 9, 2021) (identifying the "principal and sole member" of an LLC); *1940 Carmen, LLC v. City of Los Angeles*, 2021 WL 3406648, at *1 (C.D. Cal. Aug. 4, 2021) (identifying that the individual plaintiff is "a principal member" of the LLC plaintiff).

To be a principal in this sense is a term of art in the business world and does not mean "Controlling Principal" as that term is used under the franchise agreements or even as a "principal" as that term is used in the comment law of principals and agents. Indeed, as discussed above, a corporate "principal" is usually the agent of the corporate entity and not the other way

around. Further, even if the term "principal" in the California court filing could be interpreted to mean one of the terms under Section 16.2 of the franchise agreements, the only reasonable interpretation is that it meant "Franchisee's Principal," because Black Rock did not designate any person or entity as a "Controlling Principal" under Section 16.2.

Black Rock's final estoppel argument is that the Trust knowingly exploited the franchise agreements based on the Trust's credit agreement with the BR Entities and the Trust's 20 percent ownership of the BR Entities. The Court is unpersuaded by the latter argument. That the Trust owned a percentage of the three BR Entities does not equate to knowingly exploiting the franchise agreements and receiving a direct benefit from the agreements. To hold otherwise would mean that every owner of a corporate entity could be bound under equitable estoppel to the contracts of the corporate entity, which defeats the corporate structure. Merely owning all or a portion of a corporate entity does not subject the owner to the terms of the contractual agreements of the corporate entity. Nor does mere ownership mean that benefits flowed directly to the Trust. Benefits flowed to the BR Entities, of which the Trust owned a percentage.

For Black Rock's argument about the Trust's security agreement with the BR Entities, Black Rock primarily challenges the Trust's UCC Financing Statement filed on June 15, 2021. That document, however, was filed more than one year after the franchise agreements were terminated in April 2020. The UCC Financing Statement could not have been knowingly exploiting the franchise agreements, which were no longer in effect.

The Trust entered into a revolving credit security agreement with BR Coffee LLC on May 1, 2018, before the franchise agreements were executed. This also could not have been knowingly exploiting the franchise agreements, which did not yet exist. The Trust entered into an Amended and Restated Security Agreement along with an Amended and Restated Secured

Revolving Note with Plaintiffs, among others, which are undated. These agreements purport to be effective May 1, 2018, the date of the original credit agreement with BR Coffee LLC. Although undated, the documents include an exhibit that details loans that had been made under the original revolving line of credit, and those loans include amounts loaned through February 8, 2021. Thus, the documents were signed after February 8, 2021, which is after the franchise agreements were terminated.

During the time the franchise agreements were in effect, the Trust loaned money under the preexisting revolving credit agreement. The Court concludes that this is insufficient to "knowingly exploit" the franchise agreements and *directly* receive benefits from the franchise agreements. To find otherwise could bind lenders and creditors of all types to the terms of franchise agreements and other contracts. Most importantly, it was the BR Entities that received the benefits of the franchise agreements. If they chose to take those benefits and pay their debt to the Trust, that would be the decision of the BR Entities. If the BR Entities chose to take their benefits and pay something else, the Trust would receive nothing. The Trust did not *directly* receive any benefit from the franchise agreements simply because it was a secured creditor. The Court rejects Black Rock's argument that any Plaintiff knowingly exploited the franchise agreements and received a direct benefit and therefore should be equitably estopped from disclaiming the arbitration agreement.

## 5.  Guarantees

Black Rock also argues that the guarantees signed by Lattanzio and Goergen

incorporated by reference the arbitration agreement.[4] The guarantees state that Lattanzio and

Goergen:

> unconditionally guarantee to [Black Rock] . . . the full, complete,
> and timely payment and performance of each and all of the terms,
> covenants, and conditions of the Guaranteed Agreement (and any
> modification or amendment to the Guaranteed Agreement) arising
> under or relating to Section 15.7 (Right to Purchase Assets) to be
> kept and performed by the Obligated Party during the term of the
> Guaranteed Agreement, including any related representations,
> warranties or covenants in the Guaranteed Agreement.

ECF 52-6 at 1.

By their express terms, the guarantees only incorporate by reference Section 15.7 of the

franchise agreements. Lattanzio and Goergen guaranteed the rights and obligations under

Section 15.7, to be performed during the term of the franchise agreements, which had been

terminated more than a year before Black Rock filed the claims against Lattanzio and Goergen in

the arbitration. Black Rock did not assert any claim under Section 15.7.

That Goergen and Lattanzio provided limited personal guarantees under Section 15.7

does not mean that Goergen and Lattanzio agreed to arbitrate other claims Black Rock might

assert against Goergen and Lattanzio personally. The guarantees do not incorporate by reference

the entire franchise agreements or the arbitration clause, Section 16.5. *Cf. Nw. Pac. Indem. Co. v.*

*Junction City Water Control Dist.*, 295 Or. 553, 559-60 (1983), *reh'g denied and opinion*

*modified on other grounds*, 296 Or. 365 (1984) (accepting that documents must be clearly

---

[4] Although Black Rock did not use the term "incorporate by reference" in its opening
brief, Black Rock sufficiently raised this argument by stating in its opening brief that the
guarantees "include the arbitration clauses in those contracts."

referenced to properly be incorporated and allowing for only limited provisions in a document to be incorporated by reference). The Court rejects Black Rock's argument that the arbitration agreement was incorporated by reference into the guarantees.

### 6. Alter-Ego and Piercing the Corporate Veil

After the Court issued its Opinion and Order concluding that the federal court and not the arbitrator has the sole authority to determine whether there is a valid contract between Plaintiffs and Black Rock requiring arbitration, the Court allowed the parties to submit one final brief explaining their respective arguments as to whether Plaintiffs are bound to the arbitration agreement. The Court intended that brief to be a reply because the other party would not have the opportunity to respond to any arguments raised in the brief.

In Black Rock's final brief, it raised for the first time the argument that the BR Entities are "alter egos" of Plaintiffs, and Black Rock cited Oregon's standards for "piercing the corporate veil" to argue that the Court should bind Plaintiffs to the arbitration agreement under that theory. Black Rock did not make this claim in the arbitration or raise this argument in either of its previous two briefs before this Court as to why Plaintiffs are bound to the arbitration. The Court declines to consider new arguments raised for the first time in reply. *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (noting that "arguments raised for the first time in a reply brief are waived"); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Even if Black Rock had timely raised this argument, however, it would still fail. Black Rock must show that Plaintiffs had actual control over the BR Entities and used that control to engage in improper conduct that harmed Black Rock. *See, e.g.*, *Wetzel v. Sandlow*, 318 Or. App. 608, 612 (2022). Black Rock contends the "improper conduct" showing alter ego status involves the contract dispute between the parties. After Black Rock provided its draft franchise

agreement as required in its franchise disclosure documents, Black Rock sent a *different* franchise agreement for the relevant BR Entities to sign. This different agreement contained more favorable terms for Black Rock's right to purchase the assets of the franchise. The first two franchisees did not notice the difference and signed the new franchise agreement unaware of the change. Before signing the third franchise agreement, the Silverado Ranch franchisee became aware of the change. Lattanzio had an exchange with counsel about the switch done by Black Rock. The attorney advised that the franchisee not bring the change to the attention of Black Rock. Counsel suggested that although doing so might avoid litigation, counsel's impression was that the parties may well end up in litigation regardless and signing the version sent in "error" might give the BR Entities "leverage" over Black Rock, particularly given that Black Rock had taken a "hard line on everything else to this point." ECF 53-2 at 1. The attorney advised that if Black Rock attempted to enforce the "wors[t] language" of the changed buyback provision, then the BR Entities could assert that it was fraudulent and a violation of the franchise disclosure law. The Court finds that on the facts presented, this conduct would not create alter ego liability under Oregon law.

## CONCLUSION

Plaintiffs are nonsignatories to the franchise agreements that contain mandatory arbitration provisions between Black Rock and the BR Entities with which Plaintiffs are affiliated. The Court finds these contracts to be unambiguous. The Court concludes as a matter of law that Plaintiffs are not parties to those contracts and are not otherwise legally bound by the mandatory arbitration provisions contained in them. Because there is no valid agreement to arbitrate between Plaintiffs and Defendant, the Court enjoins Defendant from directly enforcing against Plaintiffs any portion of the arbitration award issued in Defendant's favor. The Court, however, did not decide in this lawsuit whether Plaintiffs might someday be held responsible for

the obligations of the BR Entities as those obligations were found by the arbitrator. Such a decision would need to occur in an appropriate judicial forum in a separate lawsuit. All that the Court does now is enjoin Black Rock from directly enforcing against any of the named Plaintiffs in these actions the arbitrator's award issued against them.

**IT IS SO ORDERED**.

DATED this 6th day of February, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge